[Not for Publication]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        :
GRACO, INC., et al.,                    :
                                        :
        Plaintiffs,                     :          Civil Action No. 08-1304 (FLW)
                                        :
        v.                              :
                                        :                  **OPINION**
PMC GLOBAL, INC., et al.,               :
                                        :
        Defendants.                     :
_____ :

**WOLFSON, United States District Judge:**

        Presently before the Court is a motion by Defendants PMC Global, Inc. (" PMC Global"),

PMC Inc. ("PMC"), PMC Europe Investments ("PMC Europe"), S.L., Denis S. Commette

("Commette"), and Gama Machinery USA, Inc. ("Gama") (collectively "PMC Defendants"), to

dismiss Plaintiffs', Graco Inc. and Graco Minnesota Inc. (collectively "Plaintiffs" or "Graco"),

Complaint pursuant to Fed. R. Civ. P. 19 and 12(b)(6).  Defendant Garraf Maquinaria S.A.

("Garraf") joins in that Motion and asserts additional reasons to dismiss Plaintiffs' Complaint.

Finally, Graco filed a motion to dismiss or, in the alternative, stay the counterclaims of

Defendants Commette and Gama.

        This case has its genesis in Graco's purchase of Gusmer Corporation and Gusmer Europe

S.L. (collectively "Gusmer"), from Defendants PMC Global and PMC Europe for $65 million.

Thereafter, former Gusmer (then Graco) employees ceased working for Graco, and started

working for Gama and Garraf, which compete in the same in-plant polyurethane processing

equipment ("IPPE") industry.  Graco claims that Gama is owned by PMC, a subsidiary of PMC

Global and Garraf is owned, at least in part, by PMC Europe, and that, these Defendants, acting individually or in concert, are, inter alia, breaching their contractual duties of the sale by promoting a new competitor company, Gama.  Graco sues Defendants to recoup what it argues is the full benefit of the contracts and damages arising from the loss of value of the Gusmer trade name, technology, customer relationships, and goodwill, resulting from Defendants having hired former Gusmer and Graco employees, using Graco trade secrets, and misleading customers as to the identities of the companies.  Defendants argue that there is no agency relationship between their companies, that they are entitled to compete in the IPPE industry because Plaintiffs did not contract for a non-compete agreement, the former employees are not using trade secrets, but rather knowledge and skill they developed throughout their careers, and neither Defendant companies nor their employees are misleading customers.  Defendants Gama and Commette have also filed counterclaims against Graco for antitrust and tort violations.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1367 and 1338.

For the reasons that follow, Defendants' Motions are granted in part and denied in part, and Plaintiffs' Motion is granted in part and denied in part.  Specifically, the Court grants Defendants' requests to dismiss Count Three of Plaintiffs' Complaint without prejudice and Graco's Motion to dismiss Counts One and Two of Commette and Gama's Counterclaims without prejudice, and grants Defendants' requests to dismiss Count Nine of the Complaint.  The Court denies Defendants' requests to dismiss Count Six and Graco is directed to re-plead its Lanham Act claims under 15 U.S.C. § 1125(a)(1) within ten (10) days.  Further, the Court denies the parties' Motions with respect to all remaining claims.

2

I.      **Background and Procedural History**

Since PMC Defendants and Garraf move to dismiss Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6), the following version of events assumes Plaintiffs' allegations to be true. Similarly, Defendants Gama and Commette's allegations will be taken as true on their counterclaims. The Court will only recount facts that are relevant for the purposes of deciding these Motions.

**The Parties**

Graco Inc., a Minnesota corporation, manufactures and distributes industrial equipment, including fluid-handling systems and components that move, measure, control, dispense, and apply fluids and viscous materials used in vehicle lubrication and commercial and industrial settings. Compl. ¶ 1. Graco Minnesota Inc. ("Graco Minnesota"), also a Minnesota corporation, is a wholly-owned subsidiary of Graco, Inc. Id. ¶ 2.

PMC Global, a Delaware corporation, has its principal place of business in California. Id. ¶ 3. PMC Global's founder and Chief Executive Officer is Philip E. Kamins ("Philip Kamins"), its President is Mr. Kamins's son Gary E. Kamins ("Gary Kamins"), and its Executive Vice President is T.C. Cheong ("Cheong"). Id. PMC Europe, a Spanish corporation, is an affiliate of PMC Global. Id. ¶ 4. Philip Kamins is the President of PMC Europe, and Gary Kamins and Cheong sit on PMC Europe's Board of Directors. Id. Philip Kamins is an executive of PMC, which is incorporated in Delaware and has its principal place of business is in California. Id. ¶ 5. PMC is allegedly a subsidiary of PMC Global. Id.

Gama, incorporated in Delaware on July 12, 2007, has its principal place of business in New Jersey. Id. ¶ 6. Gama allegedly has acted as an agent for, an instrumentality of, or in active

3

concert and participation with Defendants PMC Global, PMC Europe, PMC, and Garraf.  Id.
Gary Kamins is Gama's President.  Id.  Gama allegedly does business as Gama-Europe and
Garraf.  Id.  Gama is owned by PMC Global's subsidiary, PMC.  See Commette & Gama
Disclosure Statement.  According to PMC Defendants, Gama was created by Commette, a former
employee of Gusmer (later Graco), in October 2006 and incorporated in July 2007.  PMC Dfs.
Mot. at 2; Compl. ¶ 6.

Garraf, incorporated in Spain in August 2007, is an affiliate of Gama; PMC Europe has an
ownership or financial interest in Gama.  Compl. ¶ 7.  Garraf allegedly "acted as an agent for, an
instrumentality of, or in active concert and participation with" PMC Global, PMC Europe, PMC,
and Gama.  Id.  Garraf manufactures and sells spare parts for Gusmer products, as well as spray
and pour equipment for the applications of polyurethane foam and polyurea.  Id. ¶ 54.

Commette, a New Jersey citizen, was formerly employed by Graco's subsidiary, Gusmer,
and worked for Graco under an employment and consulting agreement.  Id. ¶ 8.  Thereafter,
Commette commenced work with Gama and Garraf.  Id.  Charles Royo ("Royo") is alleged to
have also signed an employment contract while working as a Gusmer and Graco employee.  Id.
¶ 26.  After Royo's employment with Gusmer ended, he too was retained by Gama and Garraf as
an employee or consultant.  Id. ¶ 58.[1]

### Sale of Gusmer

PMC Global, through its wholly-owned subsidiary, Gusmer Machinery Group, Inc.
("GMG"), owned Gusmer.  Id. ¶ 19.  PMC Europe owned Gusmer Europe, S.L. ("Gusmer
Europe"), an affiliate of Gusmer.  Id. ¶ 20.  Gusmer Corporation and Gusmer Europe (collectively

---

[1]According to PMC Defendants, Royo co-founded Garraf..  PMC Dfs. Mot. at 2.  Garraf
disputes this allegation.  See Garraf Reply at 6 n. 1.

"Gusmer") were two businesses involved in the manufacturing and sale of polyurethane and polyurea handling equipment.  Id. ¶ 21.

In 2004, PMC Global and its affiliate entities, GMG and PMC Europe ("affiliate entities"), offered Gusmer for sale.  Id. ¶ 24.  "Gusmer was at the time the world's leading designer and manufacturer of specialized two-component dispensing equipment systems."  Counterclaim ¶ 10. In June 2004, the investment bank Greif & Co., representing PMC Global and its affiliate entities, provided a Confidential Memorandum to Graco that highlighted Gusmer's "Key Investments Considerations," which included information about Gusmer's revenue model, superior customer service, experienced management team, and strong relationships with customers.  Compl. ¶ 24. Gusmer Corporation had employment contracts with certain key employees that prohibited the employees from disclosing its trade secrets and confidential business information, and Commette allegedly signed such a contract on September 2, 2003.  Id. ¶ 25.  Similarly, Gusmer Europe had employment contracts with certain key employees, which prohibited them from competing with Gusmer Europe or disclosing its trade secrets and confidential business information.  Id. ¶ 26. Royo allegedly signed an employment contract with Gusmer Europe on September 1, 2004.  Id.

On February 4, 2005, Graco acquired Gusmer Corporation from PMC Global, pursuant to a Stock Purchase Agreement ("Agreement 1"), for $45 million in cash; Graco also acquired Gusmer Europe from PMC Global's subsidiary, PMC Europe, pursuant to a Stock Purchase Agreement ("Agreement 2"), for $20 million in cash.  Compl. ¶¶ 28-29, Exs. A & B; Dfs. Disclosure Statement.  In Agreement 1, PMC Global "absolutely and unconditionally" guaranteed all of PMC Europe's obligations to Graco in Agreement 2, including the "timely observance and performance of covenants and agreements of such parties herein and therein"  ("PMC Guaranty").

Compl. ¶ 30, Ex. A, 10.20.  Both Agreements allegedly contained a provision in which New

Jersey law would apply.  Id. ¶¶ 31-32, Exs. A & B, 10.13.[2]  Pursuant to the Agreements, Graco

allegedly "acquired all of Gusmer's tangible assets and all of its intangible assets, including

without limitation: (a) all of the Gusmer's trade names, trademarks and copyrights identified in

Section 4.14 of the Disclosure Schedules attached to and incorporated in Agreements 1 and 2 ('the

Disclosure Schedules'); (b) all of the Gusmer patents, patent rights, and trade secrets identified in

Section 4.15 of the Disclosure Schedules; (c) the employment agreements and confidentiality

agreements identified in Section 4.15 and 4.19 of the Disclosure Statements; and (d) the goodwill

of Gusmer."  Id. ¶ 33.

    PMC Global and PMC Europe allegedly warranted that they had taken precautions to

preserve Gusmer trade secrets, that Gusmer's proprietary rights "are valid and enforceable," and

that Gusmer obtained confidentiality agreements from all persons who had access to material

proprietary rights, including any trade secrets.  Id. ¶¶ 35-36, Exs. A & B, 4.16A.  Allegedly, PMC

Global and its affiliates represented in their Disclosure Schedule 4.15 that all but two Gusmer

employees (neither of whom is at issue here) had signed agreements to comply with company

policies regarding these trade secrets.  Compl. ¶ 37.  Royo had signed a Confidentiality

Agreement, and pursuant to Article 4.19 of both Agreements, Graco allegedly acquired certain

employment contracts, Royo's included.  Id. ¶¶ 38-39.  The assets at the heart of the transaction

included Gusmer's goodwill, customer and distributor relationships, trade names and trademarks,

and intellectual property.  Id. ¶¶ 33-41.  According to Graco, the parties assigned a sum certain to

specific assets, including (1) $6,500,000 to customer relationships, (2) $2,740,000 to trademarks

---

[2]For the purposes of this Motion, Garraf does not dispute the application of federal and
New Jersey law.  See Garraf Mot. at 2 n. 1.

and trade names, and (3) $6,130,000 to proprietary technology and engineering drawings.  Id.

¶ 41.  PMC Global and PMC Europe allegedly warranted that "no customers, distributors, sales

representatives or vendors intend to cease doing business with [Gusmer] or materially alter the

amount of the business that they are presently doing with [Gusmer]," Id. ¶ 40, Exs. A & B, and

Gusmer's trade names and trademarks were "valid and in full force and effect."  Id. Exs. A &

B, 4.14.

### Post-Acquisition of Gusmer

Following Graco's acquisition of Gusmer in February 2005, many of Gusmer's former

employees began working for Graco, including Commette and Royo.  Compl. ¶ 43.  Commette

and Royo became important members of Graco's management team and thus allegedly

participated in and received confidential communications relating to Graco's confidential strategy,

planning meetings and conversations, which were designed to transform and integrate Gusmer

operations into Graco's existing business.  Id.  Commette and Royo also allegedly had access to

highly sensitive, confidential, non-public, proprietary information belonging to Graco and its

subsidiaries, including information regarding customers, prospective customers, business relations

with customers, sales reports, strategic plans, marketing plans, product information and designs,

pricing information, customer discounts and rebates, profit margins, financial reports and data,

sales programs, and product engineering and design plans ("Graco Trade Secrets and Confidential

Business Information").  Id. ¶ 44.  Graco "exerted considerable effort and expended significant

money" to develop this information − all of which gave Graco "an opportunity to obtain an

advantage over competitors who do not know or use [it]."  Id. ¶ 45.  This information was

allegedly not well known outside of or even within Graco's businesses and Graco took steps to

guard its trade secrets and confidential business information by requiring employees like Commette to confirm their confidentiality obligations by signing non-disclosure agreements.  Id. ¶¶ 46-47.  Commette allegedly signed a Non-Disclosure Agreement with Graco on May 16, 2006. Id. ¶ 47.  His employment and/or consulting relationships with Graco and Gusmer Corporation ended on October 20, 2006.  Id. ¶ 49.  Royo allegedly stopped working with Graco's subsidiary, Gusmer Europe, on February 9, 2006.  Id. ¶ 48.  Royo allegedly signed an agreement not to compete with Gusmer Europe until February 9, 2008.  Id. ¶ 72.

## Gama and Garraf Enter the Marketplace

After Commette's employment with Graco and Gusmer ended, Commette allegedly headed up Gama, the principal distributor for equipment and spare parts manufactured by Garraf. Compl. ¶¶ 53-54, 60.  PMC Global, PMC Europe, and PMC allegedly have ownership, financial and/or business relationships with Gama and Garraf.  Id. ¶¶ 55-56.  Graco alleges that PMC Global, PMC Europe, PMC, Gama, and Garraf all knew or should have known that Commette has contractual and common-law obligations to maintain the confidentiality of the Graco Trade Secrets and Confidential Business Information, but that Defendants, through their agent, Commette, are misusing the Graco Trade Secrets and Confidential Business Information to solicit and obtain customers, some of whom were Gusmer's customers.  Id. ¶¶ 64, 82.  The same claims are made against Defendants with regard to Garraf's employment of Royo.  Id. ¶¶ 65, 72-74. Graco, however, does not sue Royo directly in this action, and does not contend that the Court has jurisdiction over Royo, a foreign citizen.

Gama and Garraf allegedly manufacture spare parts for Gusmer products, which requires highly specialized knowledge relating to Gusmer's products' engineering and design.  Id. ¶ 75. Graco alleges that Gama and Garraf are using the Graco Trade Secrets and Confidential Business

8

Information to market and sell these spare parts, and are directly soliciting the trade of current Graco customers, some of whom were doing business with Gusmer at the time Graco acquired Gusmer from PMC Global and its affiliates.  Id. ¶¶ 59, 61-62, 65-71, 75, 80-83.  Graco also alleges that Defendants are attempting to recapture former Gusmer business by representing that Gama and its products are the "successors" to Gusmer and the "real Gusmer," and claiming a false affiliation with the Gusmer brand, goodwill, and legacy, which belongs to Graco.  Id. ¶¶ 84-85.

### Plaintiffs' Claims

On March 14, 2008, Plaintiffs filed their Complaint.  On July 24, 2008, Plaintiffs filed an Amended Complaint ("Complaint") alleging: (1) PMC Global and PMC Europe breached their contractual and related duties; (2) Commette breached his non-disclosure agreement; (3) Commette breached his duty of loyalty; (4) Defendants PMC Global, PMC Europe, PMC, Gama, and Garraf engaged in tortious inference with a prospective economic advantage and with a contract, namely Commette's alleged non-disclosure agreement; (5) PMC Global, PMC Europe, PMC, Gama and Garraf misappropriated trade secrets and misused confidential business information; (6) Defendants directly made or acted in concert with those making directly false or misleading statements that are likely to cause confusion as to the affiliation of Gusmer with Gama and Garraf in violation Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1); (7) Defendants directly made, or acted in concert with those making, false or misleading statements that are likely to cause confusion as to the affiliation of Gusmer with Gama and Garraf in violation the New Jersey Fair Trade Act, N.J.S.A. § 56:4-1; (8) Defendants engaged in unfair competition; and (9) Defendants have been unjustly enriched from their breach of their contractual and legal obligations to Graco.  Id. at 19-26.

Plaintiffs seek, inter alia, damages, an injunction, return of documents and records and

9

forensic examination of Defendants' computers, an accounting to determine profits and damages caused by unlawful conduct, exemplary and punitive damages, costs and disbursements for this action, attorneys fees pursuant to the Agreements and the Lanham Act, treble damages, and pre-judgment and post-judgment interest.  Id. at 26-29.

On June 30, 2008, PMC Defendants filed a motion to dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 19 and 12(b)(6).  On July 25, 2008, Defendant Garraf filed a motion to dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6), joining in with PMC Defendants' Motion and supplementing it.

### Counterclaims

On June 30, 2008, Defendants Commette and Gama ("Counterclaimants") filed an Answer and Counterclaims against Plaintiffs.  The Counterclaimants allege that Graco, founded in 1926, is the "world leader" in fluid handling systems and components for use in vehicle lubrication and commercial and industrial settings.  Counterclaim ¶ 8; Ex. 1.  In December 2004, Graco allegedly acquired Liquid Control Corporation and its subsidiary Decker Industries, a leader in lubricants and lubricant dispensing equipment.  Counterclaim ¶ 9.  At the time Graco acquired Gusmer Corporation, in February 2005, Gusmer was allegedly the world's leading designer and manufacturer of specialized two-component dispensing equipment systems.  Id. ¶ 10.  In December 2007, Graco allegedly acquired Glas-Craft, an internationally-recognized manufacturer of mixing, metering, and proportioning equipment for dispensing coating, foam, and composite materials.  Id. ¶ 11.  Counterclaimants allege that Plaintiff, through its acquisition of these companies, has built a monopoly position in the IPPE market.  Id. ¶ 12.  Counterclaimants allege that although there is a distinct market for IPPE materials and equipment, with substantial technical barriers to entry, Graco has a nearly 100% market share, with annual revenues of

10

approximately $100 million per year, and no significant competitors in the IPPE space.  Id. ¶¶ 12-14.  Counterclaimants allege that Graco's conduct has had a substantial effect upon interstate trade and commerce.  Id. ¶ 14.

Garraf, the only other company operating within the IPPE area, asked Gama, in 2007, to assist with the distribution of Garraf's products in the United States.  Id. ¶¶ 15-16, 18.  Thereafter, Gama hired Commette, who had not received a severance package from Graco nor had he agreed that he would stay out of the IPPE market.  Id. ¶ 17.  In October 2007, Graco allegedly sent a letter ("Letter") to all IPPE distributors carrying Graco products, which Counterclaimants claim are all IPPE product distributors nationwide, announcing a pre-emptive unilateral refusal by Graco to deal with any distributor that considers carrying Garraf products as well as its own.  Id. ¶ 20.  Graco allegedly intended this Letter to deter distributors from carrying Garraf products or from doing business with Gama or Garraf.  Id. ¶ 21.  Counterclaimants allege that since the Letter was sent, even though Garraf allegedly has a high quality product line, it has been nearly impossible for Garraf to identify distributors for its products, and existing Gama customers have stopped buying from it.  Id. ¶ 22.  Counterclaimants aver that distributors said that they would have carried or continued to carry Garraf products but for Graco's refusal to deal with any distributor carrying competing products.  Id. ¶ 23.  Counterclaimants allege that this Letter has directly affected Garraf's ability to distribute its products in the United States because "no IPPE distributor could risk losing the ability to sell Graco products unless the distributor intended to exit the market altogether."  Id. ¶ 24.

Counterclaimants further allege that Graco has engaged in other false and predatory communications intended to block Garraf products from being distributed in the United States and to destroy Gama's business, including statements questioning the viability of Gama's continued

existence and the quality of Gama's product line, specifically that "Gama's products are based on 'old' or outmodeled Gusmer technology." Id. ¶¶ 26-27.  In June 2008, Graco allegedly told current Gama customers and individuals within the trade that it was going to close Gama down by the end of 2008, and, as a result, if customers buy anything from Gama, they would be "stuck with it." Id. ¶¶ 29-31.  A Graco manager allegedly contacted at least one distributor that sold both Graco and Gama products demanding that the distributor elect between the two lines, claiming that Graco does not permit its current distributors to also sell Gama's line of products; as a result, at least one distributor has dropped Gama's products.  Id. ¶¶ 32-33.  Thus, Counterclaimants allege that Graco has abused its monopoly position in the IPPE market by, inter alia, sending this Letter, which allegedly constitutes an illegal unilateral refusal to deal because it was sent to Graco's prospective and current customers, "including customers who were, at the time, carrying both Graco and Garraf products." Id. ¶ 36.  Commette and Gama allege that Graco is preventing them from competing in the IPPE market, and that consumers will be forced to pay monopoly prices because Graco is preventing competitors from entering the IPPE marketplace.  Id. ¶¶ 39-40.

Commette and Gama claim that Plaintiffs (1) violated § 2 of the Sherman Act, 15 U.S.C. § 2; (2) attempted and conspired to monopolize the market place; (3) engaged in tortious interference with Commette's livelihood and Gama's business; and (4) violated the New Jersey Fair Trade Act, N.J.S.A. § 56:4-1; (5) engaged in unfair competition; and (6) committed trade libel and disparagement.  Id. at 53-56.  Commette and Gama seek, inter alia, an injunction from the anticompetitive behavior and antitrust law violations, and damages, including treble actual damages under § 4 of the Clayton Act, 15 U.S.C. § 15.  Id. at 57.

On August 19, 2008, Plaintiffs filed a Motion to Dismiss the Counterclaims on the grounds that Commette and Gama do not have standing and have not adequately plead their

antitrust counterclaims under § 2 of the Sherman Act, 15 U.S.C. § 2.  In addition, Plaintiffs move to dismiss all of the remaining state law claims pursuant to Rule 12(b)(6).  In the alternative, Plaintiffs move to bifurcate and stay the Counterclaim.

## II.    Standard of Review

When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citation and quotations omitted).  Recently, in Bell Atlantic Corporation v. Twombly, 127 S.Ct. 1955 (2007), the Supreme Court clarified the 12(b)(6) standard.  Specifically, the Court "retired" the language contained in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Id. at 1968 (quoting Conley, 355 U.S. at 45-46).  Instead, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level."  Id. at 1965.  As the Third Circuit has stated, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element.  This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  Phillips, 515 F.3d at 234 (quoting Twombly, 127 S.Ct. at 1965).

13

### III.    Discussion

#### A.    Defendants' Motion to Dismiss Plaintiffs' Claims

##### 1.    Rule 19 Analysis

As a preliminary matter, PMC Defendants argue that Plaintiffs' Complaint must be dismissed in its entirety, pursuant to <u>Fed. R. Civ. P.</u> 19, for failure to join Royo as a party.  PMC Defendants claim Royo is necessary and indispensable, because "[e]ach cause of action focuses on Mr. Royo's alleged misappropriation and sharing of trade secrets in active concert with other defendants" and "Royo is named directly in 20 separate paragraphs and referenced indirectly throughout the Complaint."  PMC. Dfs. Br. at 3.  Royo, a Spanish citizen, is not subject to personal jurisdiction in New Jersey.

<u>Fed. R. Civ. P.</u> 19 involves a two-step process to determine when joinder of a particular party is compulsory.  <u>See</u> <u>Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.</u>, 11 F.3d 399, 404 (3d Cir. 1993).  First, a court must "determine whether a party should be joined if 'feasible' under Rule 19(a)." <u>Id.</u>  If the party should be joined, but joinder is not feasible because it would destroy diversity, or the court lacks personal jurisdiction over the absentee, then the court must "determine whether the absent party is 'indispensable' under Rule 19(b)." <u>Id.</u>  If the party is "indispensable," the action cannot proceed.  <u>Id.</u>; <u>see also</u> <u>Wilson v. Canada Life Assurance Co.</u>, No. 08-1258, 2009 U.S. Dist. LEXIS 167714, at *7 (E.D. Pa. Mar. 3, 2009).

The Court must first determine whether Royo, a former Gusmer and Graco employee and current Garraf employee is a "necessary" party who must be joined under Rule 19(a), if joinder is feasible.[3]  Rule 19(a) provides that:

---

[3]Rule 19 no longer uses the word "necessary," but rather refers to parties who should be joined if feasible.  <u>See</u> <u>Provident Tradesmens Bank & Trust Co. v. Patterson</u>, 390 U.S. 102, 116 n. 12 (1968) ("Where the new version (of the Rule) emphasizes the pragmatic consideration of

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  Under Rule 19(a), the Court determines whether its can provide complete relief to the parties to the action in the absence of the party not joined.  Fed. R. Civ. P. 19(a)(1).  "Under Rule 19(a)(1), the Court must consider whether--in the absence of an un-joined party--complete relief can be granted to the persons already parties to the lawsuit.  The effect that a decision may have on an absent party is immaterial."  Huber v. Taylor, 532 F.3d 237, 248 (3d Cir. 2008).

PMC Defendants argue that complete relief cannot be afforded because Royo, who is not a party to this action, could continue to use Graco's trade secrets by "simply seek[ing] another distributor or import his products into the Unites States directly."  PMC Dfs. Mot. at 5.  In addition, PMC Defendants argue that the requested injunction will not stop the continued use of alleged trade secrets by Royo.  Id. at 3-6 (relying largely on Synygy, Inc. v. ZS Associates, Inc., No. 07-3536, 2008 WL 1820936, at *2 (E.D. Pa. Apr. 23, 2008), appeal docketed, No. 08-2355 (3d Cir. May 22, 2008), and Torrington C. v. Yost, 139 F.R.D. 91 (D.S.C. 1991)).  Plaintiffs, however, argue that their current claim is not that Royo is personally manufacturing or distributing any products, but that Garraf and Gama are engaging in such activity.  Pl. Opp. at 48.

---

the effects of the alternatives of proceeding or dismissing, the older version tended to emphasize classification of parties as 'necessary' or 'indispensable.'"); Janney, 11 F.3d at 404 n. 4 ("The term necessary in referring to a Rule 19(a) analysis harks back to an earlier version of Rule 19.  It survives in case law at the price of some confusion.").  The parties, however, discuss Royo's joinder in this action in terms of whether he is "necessary" and "indispensable."

Thus, whether Graco can get relief against Royo if he ever personally engages in future conduct that would give rise to a new and independent claim is not at issue here.  Cf. Huber, 532 F.3d at 251 (holding that concern about possible issue preclusion in a potential future lawsuit against joint tortfeasor was "too speculative").  Moreover, because Royo is not a party, the "complete relief" inquiry must focus exclusively on those who are parties to the action.  Id. at 248.

Plaintiffs argue that they can obtain complete relief against the current parties because only one of their nine claims is for misappropriation of trade secrets and most claims focus on Defendants' alleged violations of their obligations to Plaintiffs, such as breach of contract and misrepresentation, and do not depend on Royo's actions. Pl. Opp. at 49.  Graco further claims that Royo's future conduct is irrelevant to whether complete relief may be afforded based on Defendants' use of its trade secrets because, if Graco wins, then it can be granted an injunction and damages against Royo's employer, Garraf, and other Defendants, thereby enjoining these Defendants' employees, including Royo, from further divulging and exploiting Graco's trade secrets.  See Pl. Opp. at 49; Huber, 532 F.3d at 248.  Because Plaintiffs can get complete relief for their claims against the named Defendants in this action, Royo is not a necessary party under Rule 19(a)(1)(A).  Cf. Rosenzweig v. Brunswick Corp., No. 08-807, 2008 WL 3895485, at *6 (Aug. 20, 2008) (finding that the absent party – a party to the disputed contract – was necessary, and ultimately, indispensable because the court could not provide complete relief in the signatory's absence).

The Court must then consider the effect, if any, that resolution of the dispute among the named parties may have on an absent party, in this case Royo, under Rule 19(a)(1)(B).  Huber, 532 F.3d at 248.  Plaintiffs assert, and Defendants do not dispute, that Defendants are liable individually and as principals under respondeat superior for their agents' misconduct within the

16

course and scope of the agents' employment.  Courts have determined that under a theory of respondeat superior, "there is no requirement that the plaintiff join as a defendant the individual upon whose act or failure to act vicarious liability is predicated.  Indeed, the plaintiff has the option to sue the party vicariously liable for the conduct of an agent in one lawsuit and thereafter, pursue the agent in a separate suit.  In such cases, the concept of mandatory joinder does not apply."  Marion v. Borough of Manasquan, 231 N.J. Super. 320, 327-28 (App. Div. 1989).  Moreover, in their reply, Defendants do not dispute that Royo is not necessary where there is respondeat superior liability.  Therefore, Plaintiffs argue, Royo need not be joined with regard to Plaintiffs' claims grounded in vicarious liability.

The inquiry for the Court focuses on Rule 19(a)(1)(B)(i), whether a decision in this case will, as a practical matter, impair or impede Royo's ability to protect his interest.  Plaintiffs argue that Royo lacks sufficient interest in this litigation that would require him to be joined if feasible under Rule 19(a)(1)(B)(i).  Plaintiffs state that any frustration of Royo's personal business expectations based on an agreement to which his company (Garraf) is a party, is not enough to satisfy this prong of Rule 19.  See Pl. Opp. at 50 (citing to Mastercard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc., 471 F.3d 377, 387 (2d Cir. 2006) ("It is not enough under [Rule 19(a)(1)(B)(i)] for a third party to have an interest, even a very strong interest, in the litigation."); Janney Montgomery Scott, Inc., 11 F.3d at 407).  PMC Defendants argue that Royo is necessary because he maintains an interest that would not be represented in this action, and his ability to protect his interest would be impaired or impeded if he is not joined here.  PMC Dfs. Mot. at 5.  Specifically, PMC Defendants argue that for a finding of liability against them, the Court first will need to assess the validity and enforceability of Royo's employment agreements and then determine whether Royo is guilty of trade secret theft.  PMC Dfs. Mot. at 5 (citing to Synygy, 2008 WL 1820936, at *2).

Similar to this case, where Plaintiff, in addition to this action, has separately sued Royo in Spain, in the Synygy case, Synygy sued a former employee's U.S.-based employer, claiming misappropriation of Synygy trade secrets, and also sued the employee in India. There, the court dismissed the action for failure to add an indispensable party citing the possibility of inconsistent or double obligations. PMC Defendants argue that Graco's claims implicate Royo and that absent Royo's participation in this case, there is a significant possibility that his acts will be construed differently in U.S. and Spanish courts and "a judgment against his U.S. distributor would brand him an 'infringer' without ever affording him his day in court." PMC Dfs. Mot. at 5-6. In addition, Defendants claim that a resolution of the Spanish case in favor of Royo could be dispositive here, eviscerating Graco's theft allegations and granting Garraf freedom to operate. Defendants also rely on Torrington, where the court dismissed the action in which the plaintiff sued the ex-employee and not his new company on a trade secret dispute because both were necessary parties to the resolution. Torrington, 139 F.R.D. at 92-93. Defendants argue that the distribution agreement between Royo's company and Gama is similar to the agreement in dispute in Torrington; however, in this case, Royo's company, Garraf, is a named defendant and will have the opportunity to defend the case.

In sum, PMC Defendants assert that Royo would be unable to protect his "employment with defendants in its current form and [his] interest in the resolution of the charges that [he] allegedly removed and converted trade secrets." Home Am. Credit, Inc. v. Vermillion, No. 97-2139, 1997 WL 793047, at *4 (E.D. Pa. Dec. 10, 1997) (dismissing the complaint on the grounds that employees alleged to have misappropriated trade secrets are necessary parties so they may protect their interests). Similarly, in this case, Royo's conduct will be at issue because Graco's trade secret claims against Defendants are based, at least in part, on Royo's actions.

18

However, the Third Circuit, in <u>Huber</u>, has already determined that it is inappropriate for a court to look at privity, for issue preclusion purposes, and the collateral estoppel effect on, or of, a potential future action when making a determination of the necessity of a party that is based on the absent party's interest, under Rule 19(a)(1)(B)(i).   <u>Huber</u>, 532 F.3d at 250-51 ("[T]he <u>Janney</u> court noted that, given the highly factual nature of a privity analysis, courts engaging in Rule 19 analysis should not 'theorize' as to whether an absent party is in privity with a party to an action because such an analysis would be premature.").   Moreover, in <u>Huber</u>, the Third Circuit emphasized that as it had already held in <u>Janney</u>, where the preclusive effect of an action on any related litigation is speculative – as it is in the instant case – joinder of an absent party is not compulsory under this provision of Rule 19.   <u>Id.</u>   Thus, this Court cannot speculate on the preclusive effect this litigation might have on an action in Spain.   In addition, Royo's employment itself would not necessarily be jeopardized based on an outcome of this action.[4]   Therefore, Royo does not have an interest that will be impaired or impeded requiring him to be joined, if feasible, in this case.

Further, Plaintiffs argue that Defendants cannot demonstrate that any of the current parties will be subject to inconsistent obligations if Royo is not joined.   <u>Fed. R. Civ. P.</u> 19(a)(1)(B)(ii). Defendants do not argue that resolution of this action could subject them to double, inconsistent, or multiple legal obligations.   Defendants, relying on <u>Torrington</u> and <u>Synygy</u>, assert that Royo could be subject to a substantial risk of inconsistent obligations given Graco's suit against Royo in Spain.   PMC Dfs. Mot. at 5.   However, this misconstrues Rule 19(a)(1)(B)(ii), which considers

---

[4]Royo's non-compete agreement with Graco ended on February 9, 2008.   Compl. ¶ 72. Thus, there is no current bar to his employment in the IPPE group of products.   Hence, Garraf may continue to employ Royo so long as he works in a lawful manner, and does not disclose Graco trade secrets, if any.

the risk to the "existing part[ies]" of "incurring double, multiple, or otherwise inconsistent obligations because of the [absent person's] interest", not the risk to the absent party.  See also Am. Home Mortgage Corp. v. First Am. Title Ins. Co., No. 07-1259, 2007 WL 3349320, at *7 (D.N.J. Nov. 9, 2007) (explaining that "Rule 19(a)(2)(ii) [now Rule 19(a)(1)(B)(ii)] calls for the Court to examine whether proceeding without joining the absent parties will leave the parties 'subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations.'").  There is no contention that any Defendants would be subject to inconsistent obligations in this case.  Indeed Defendants would not.  Therefore, the Court finds that Royo is not a necessary party under Rule 19(a), and the Court need not conduct a Rule 19(b) inquiry to determine if Royo is indispensable.[5]  Accordingly, the Court denies PMC Defendants' request to

---

[5]However, even if Royo is necessary under Rule 19(a), he is not indispensable under Rule 19(b).  In this case, the parties agree that there is no personal jurisdiction over Spanish employee Royo, see Pl. Opp. at 52-54; therefore, joinder is not feasible and the Court "determine[s] whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed" pursuant to Rule 19(b).  Fed. R. Civ. P. 19(b).  The Rule lists four non-exhaustive factors that the Court should weigh, including: "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping the relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."  Fed. R. Civ. P. 19(b); see Gardiner v. Virgin Islands Water & Power Authority, 145 F.3d 635, 640 (3d Cir. 1998).

With respect to the first factor, PMC Defendants claim that Royo would be prejudiced by exposure to inconsistent obligations if judgment were rendered in his absence.  Plaintiffs, however, contend that resolution of "this action would not subject Royo to inconsistent obligations due to the action pending in Spain against him[ because: (1)] the Spanish action deals only with Royo's obligations under his severance agreement with Graco/Gusmer and not whether his company used Graco's trade secrets or violated the rights at issue in this lawsuit[; and (2)] Rule 19 is simply not supported by 'the real possibility that one court could find [Defendants] liable while another court was finding [the absent party] not liable in separate proceedings to which the rules of claim or issue preclusion do not apply.'"  Pl. Opp. at 52-53 (quoting General Refractors Co. v. First State Ins. Co., 500 F.3d 306, 318 (3d Cir. 2007) (internal quotations and citations omitted)).  Plaintiffs, however, do not provide the Court with a copy of the Complaint or Certification with regard to the subject matter of the Spanish action.  The Court cannot rely on

dismiss Plaintiffs' Complaint pursuant to Rule 19.

### 2.      Agency Relationship:  PMC as a Party & Non-Contract Claims Against Defendants PMC Global and PMC Europe

PMC Defendants move to dismiss PMC as a party in this suit because:  PMC is not a party

---

Plaintiffs' limited allegations in its Opposition.  Therefore, the Court is unaware of what the implications are of the Spanish action.

In addition, PMC Defendants contend that Royo's and Garraf's interests may or may not align, so "there is no certainty that the interests of [Royo] will be adequately represented" if this litigation proceeds.  See Home Am. Credit, 1997 WL 793047, at *4.  However, if a potential defendant does not wish to intervene and be a party to the suit, this fact "strongly suggest[s] that its interests will not be impeded if the suit goes forward without [him]."  Gardiner, 145 F.3d at 641.  Royo has not sought to intervene here.  Accordingly, "there is little danger of prejudice to [Royo]."  Id.  Thus, the first factor weighs against indispensability.

With respect to the second and third factors, Graco asserts that it is interested in obtaining relief against the named parties, including "Royo's company" in the form of an injunction and monetary relief.  Graco contends this remedy will be adequate.  PMC Defendants, however, argue that an injunction against Garraf would similarly enjoin Royo, without providing him the opportunity to defend himself with regard to any disclosed trade secrets.  Defendants rely on Home Am. Credit for support.  If, however, Royo finds that he needs to "defend himself" in this action with respect to disclosing any alleged trade secrets, he may intervene.  Gardiner, 145 F.3d at 641.  Otherwise, the Court can shape the relief here, because Royo's agreement not to compete ended on February 9, 2008.  Compl. ¶ 72.  Therefore, proceeding here will not affect Royo's employment on these grounds.  Therefore, the second and third factors weigh against indispensability.

With respect to the fourth factor, the Plaintiff argues that when there is a lack of a practical "assurance that the plaintiff, if dismissed, could sue effectively in another forum where better joinder would be possible," this consideration "counsels strongly against dismissal."  Gen. Refractories Co. v. First State Ins. Co., 500 F.3d at 306, 321 (3d Cir. 2007) (citing Gardiner, 145 F.3d at 642).  In this case, there are multiple parties domestic and foreign, who have contracted to apply New Jersey law, and thus, it appears that there is not another more effective, appropriate, or practical forum where better joinder would be possible.  This factor weighs strongly against dismissal and against indispensability.  See Id.

Moreover, PMC Defendants fail to put forth any persuasive arguments for a finding that Royo is indispensable.  In light of Third Circuit precedent, the Court agrees that the indispensability factors pursuant to Rule 19(b) weigh against dismissal for failure to join an indispensable party.  Accordingly, because the action can proceed in equity and good conscience, Royo is not necessary or indispensable under Rule 19(a) or 19(b), respectively, the Court denies PMC Defendants' motion to dismiss Plaintiffs' Complaint pursuant to Rule 19.

to any of the allegedly breached contracts, it is not in privity with Commette or Royo, and Plaintiffs do not allege any acts or omissions by PMC.  See PMC Dfs. Mot. at 9; Compl. ¶¶ 28-29.  PMC Defendants argue that although Graco attempts to implicate PMC by claiming Royo, Commette, Gama, or Garraf acted as PMC's agents, Graco fails to allege any facts that suggest PMC "control[led] the day-to-day time, manner, and method of executing the work" of any other Defendant.  Seltzer v. I.C. Optics, Ltd., 339 F. Supp. 2d 601, 610 (D.N.J. 2004).  PMC Defendants contend that unless an agency relationship is established, PMC cannot be held liable for the tortious acts of any parent corporation, subsidiary, sister corporation, or person.  Id. at 609-610.

Similarly, PMC Defendants argue that Graco has not alleged any acts or omissions directly committed by PMC Global or PMC Europe that are unrelated to the breach of contract claim, (Counts Four-Nine), nor has Graco alleged any facts suggesting an agency relationship between Royo, Commette, Gama and/or Garraf and PMC Global.  See PMC Dfs. Mot. at 10.  In its Reply, Garraf also complains that Graco has failed to allege any facts to support its conclusory allegations that Garraf is working in "active concert and participation" with the other defendants. Garraf Reply at 15.[6]

An agency relationship exists when one party consents to have another act on its behalf, with the principal or master controlling and directing the acts of the agent.  Seltzer, 339 F. Supp. 2d at 609; Sears Mortgage Corp. v. Rose, 134 N.J. 326 (1993).  The Third Circuit has recognized that a "servant" and an "independent contractor" are distinct under the agency doctrine.  AT & T

---

[6]Garraf asserts that allegations that Garraf is an "affiliate" of Gama, that PMC Europe has an ownership or other financial interest in Garraf, or that PMC Europe is a partial owner of the real estate where Garraf's headquarters is located, insufficient to establish an agency relationship. Compl. ¶¶ 7, 57.

v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1435 (3d Cir. 1994).  "A master-servant relationship is created if the employer assumes the right to control the time, manner, and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract.  On the other hand, an independent contractor is not subject to that degree of physical control, but is only subject to the general control and direction by the principal . . . ."  Id. (internal citations and quotations omitted).  A principal is vicariously liable for the tortious acts of the servant, but is not similarly liable for those of the independent contractor. See Id.

       "To hold a principal liable for the acts of its subsidiaries under general agency law, total domination over the subsidiary need not be proven."  Expediters Int'l of Washington, Inc. v. Direct Line Cargo Mgmt. Servs., Inc., 995 F. Supp. 468, 481-82 (D.N.J. 1998) (citing Phoenix Canada Oil Co. v. Texaco, Inc., 842 F.2d 1466, 1477 (3d Cir. 1988)).  However, there must be "a relationship between the corporations and the cause of action.  Not only must an arrangement exist between the two corporations so that one acts on behalf of the other and within usual agency principles, but the arrangement must be relevant to the plaintiff's claim of wrongdoing."  Phoenix Canada Oil Co., 842 F.2d at 1477.  Whether there are sufficient relationships with and control over affiliates for the purposes of proving agency is a question of fact.  Expediters Int'l, 995 F. Supp. at 481-82 (denying summary judgment on misappropriation of trade secret claims where the defendant argued it should not be held liable for actions of its related company, because the court could not decide, as a matter of law, that the defendant did not act as a principal to influence or control the business practices of its affiliates, where the "self-characterized 'family of companies,' jointly participated in freight dealings and shared both stock ownership and employees").

       In this case, Plaintiffs allege that Gama, Garraf, and Commette are acting as agents for,

23

instrumentalities of, or in active concert and participation with PMC Global, PMC Europe, and PMC. Compl. ¶¶ 6,7, see also Id. ¶¶ 58, 59-65, 74, 82, 85, 102. Plaintiffs allege that PMC Global, PMC Europe, and PMC are directly related or affiliated with Gama, Garraf, and Commette. Id. ¶¶ 3-7, 55-57. Graco has alleged facts to show that PMC Global, PMC Europe, and PMC dominate the activities of their subsidiaries or affiliate companies, Garraf and Gama. See, e.g., Id. ¶¶ 3-7 (detailing overlapping officers and financial interests and alleging that Gama and Garraf are instrumentalities of PMC Global, PMC Europe, and PMC); Id. ¶¶ 55-57 (explaining that PMC Europe is the owner of the real estate where Garraf is located and that PMC Global or PMC own the real estate where Gama is located). Plaintiffs argue that "reasonable inferences lead to the conclusion that PMC Global's use of its subsidiaries and affiliates is integral to its scheme to inappropriately take back what it has sold." Pl. Opp. at 43. On a motion pursuant to Rule 12(b)(6), the Court must accept the allegations in Plaintiffs' Complaint as true. Throughout their Complaint, Plaintiffs describe a scheme in which these related corporate defendants allegedly worked closely with one another to accomplish a common goal of promoting a new business called "Gama." Plaintiffs argue that Gama represents a contraction of the first two letter of Garraf Maquinaria, which manufactures Gama products in Spain. Id. at 41. Because the determination of whether there is a sufficient relationship with or control over affiliates for the purposes of proving agency is a question of fact, the Court must deny Defendants' request to dismiss PMC as a Defendant and the non-contractual claims, Counts Four-Nine, against PMC Global and PMC Europe. See Expediters Int'l, 995 F. Supp. at 481-82. Moreover, it would be inappropriate for the Court to make a finding regarding the agency relationship, or lack there of, with respect to any of the defendants on this motion based on Plaintiffs' allegations.

In their Opposition, Plaintiffs further claim that they have sufficiently alleged a scheme in

which PMC Global, PMC Europe, and PMC may also be liable under the doctrine of alter ego and civil conspiracy, in addition to agency principles. See Pl. Opp. at 42. Plaintiffs, however, did not plead theories of alter ego or conspiracy in their Complaint. Thus, they are not bases for liability in this case and the Court need not address them further.

### 3.      Count One:  Breach of Contract and Related Duties Against PMC Global and PMC Europe

Defendants move to dismiss Plaintiffs' claims that Defendants PMC Global and PMC Europe breached their contractual obligations and related duties on the grounds that Defendants' alleged acts did not violate the PMC Guaranty or covenants of the Stock Purchase Agreements ("SPAs"). PMC Defendants argue that Graco's claims are based on SPAs that are fully integrated and their "terms relate to the transfers of assets; real property leases; intercompany accounts; employee benefit plans; access to records; domain name; transition services in China; and management agreements." PMC Dfs. Mot. at 11. Defendants assert that the SPAs do not mention anything about the right of PMC Global or PMC Europe to re-enter the IPPE business. Therefore, Defendants posit that even if Graco's allegations that PMC Global or PMC Europe solicited customers, retained former Gusmer employees, and used trade secrets and other proprietary information, Compl. ¶ 88, were true, nothing in the SPAs prevent such behavior. Instead, Defendants argue that Graco is unable to identify how the PMC Guaranty or covenants of the SPAs were allegedly breached.

Plaintiffs complain that Defendants launched Gama, with the explicit objective of recapturing Gusmer's brand identity and trade, which Graco had purchased from PMC Global and PMC Europe for $65 million. In so doing, Plaintiffs contend that PMC Global and PMC Europe

failed to perform material obligations required under the contracts, and thus, they breached the SPAs.  Specifically, Plaintiffs also argue that Defendants breached New Jersey's implicit contractual obligation of good faith and fair dealing.

To state a claim for breach of contract, the plaintiff must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations.  Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007).  Furthermore, "every contract imposes on each party the duty of good faith and fair dealing in its performance and its enforcement."  Pickett v. Lloyd's & Peerless Ins. Agency, Inc., 131 N.J. 457, 467 (1993).  This implicit duty requires that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420 (1997) (internal citations and quotations omitted).  A defendant who acts with improper purpose or ill motive may be found liable for breaching the implied covenant if the breach upsets the plaintiff's reasonable expectations under the agreement.  See Intarome Fragrance & Flavor Corp. v. Zarkades, No. 07-873, 2008 WL 5109501, at *6 (D.N.J. Dec. 2, 2008) (citing DiCarlo v. St. Mary Hosp., 530 F.3d 255, 267 (3d Cir. 2008)).  The defendant need not violate an express term of a contract to be held liable for a breach of the covenant of good faith and fair dealing.  See DiCarlo, 530 F.3d at 267.

In this claim, Plaintiffs allege that Defendants PMC Global and PMC Europe continued to use Gusmer's assets that should have been transferred to Graco, such as Gusmer's customer relationships, goodwill, trade names, trade secrets, and key employment agreements, which Defendants allegedly now use to promote Gama.  Compl. ¶¶ 8, 33-41, 47, 64-65, 75, 77, 79, 80-85, 88.  Defendants do not contest the validity of the underlying contract.  Rather, PMC

26

Defendants argue that the Sale Agreements are silent as to the right of PMC Global and PMC Europe's to re-enter the IPPE business.  Graco responds that Defendants create a straw man that the Court should reject because, simply put, Defendants cannot use assets for Gama that they previously sold to Graco.  Plaintiffs contend that Defendants' conduct violates their implied contractual duties as sellers by soliciting former Gusmer distributors and customers, and deceiving customers by asserting an affiliation with Gusmer.  Plaintiffs rely on Reardon Laundry Co. v. Reardon, 97 N.J. Eq. 356, 357-58 (E. & A. 1925) and Hilton v. Hilton, 89 N.J. Eq. 182, 186-87 (E. & A. 1918) for the proposition that New Jersey has long prohibited the seller of a business from soliciting the trade of previous customers.

Defendants counter that these cases actually reject overly broad and unreasonably implied restrictions on competition; Hilton and Reardon only addressed a seller's duty not to solicit former customers when the goodwill of a business is sold.  PMC Defendants argue that a seller has no non-compete obligation unless the buyer bargained for one and that Graco did not bargain for one here.  PMC Dfs. Reply 1-2.[7]  Defendants claim that PMC Global and PMC Europe, the "sellers" in the Graco-Gusmer acquisition, are not soliciting former Gusmer customers, but rather the seller about which Graco complains is Gama.  Defendants contend that Gama is a distinct legal entity that had nothing to do with the Graco-Gusmer acquisition.  Nonetheless, Plaintiffs assert that Gama is an agent for or works in active concert and participation with PMC Global, PMC Europe, and PMC.  See Part III.A.2., supra.  Whether Gama was or is working as an agent for PMC Global

---

[7]Defendants also argue that any attempt to restrain Commette should be summarily rejected because a "former employee cannot be enjoined from using his or her experience in the industry as a basis for earning a living."  Subcarrier Communications, Inc. v. Day, 299 N.J. Super. 634, 643 (App. Div. 1997).  This argument, however, is irrelevant to Count One of Plaintiff's Complaint.

and PMC Europe or independently from them is a question of fact, which the Court will not address on a motion to dismiss.  See Id.

First, Plaintiff alleges a breach of contract because Defendants, individually or through their agents, are re-entering the IPPE business.  Defendants correctly argue that even if they were engaged in such behavior, Plaintiffs did not contract for a non-compete agreement and the SPAs are fully integrated.  See Ex. A, 10.7 & Ex. B, 10.7 ("10.7 Entire Agreement.  This Agreement, including the Disclosure Schedule and Exhibits hereto, contains the sole, only, and entire agreement of the parties hereto relating to the subject matter hereof and correctly sets forth the rights, duties, and obligations of each to the other of this date.  Any prior agreements, promises, negotiations, practices, or representations not expressly set forth in this Agreement are of no force or effect.").[8]  Therefore, Plaintiffs cannot allege a breach of contract claim based solely on Defendants' alleged re-entering of the IPPE market.

Second, Plaintiffs allege that Defendants breached their Guaranty by soliciting customers, retaining former Gusmer employees, and using trade secrets and other proprietary information. Defendants argue that even if these contentions were true, this does not violate their SPAs.  The Court agrees.  The representations in the SPAs in that regard were made by Defendants PMC Global and PMC Europe at the time the contract was signed.  See, e.g., Ex. A 4.14-4.16A, 4.18-4.20.  Plaintiffs do not allege or even argue that at the time Defendants PMC Global and PMC Europe entered into the Agreements with Plaintiffs, that Defendants knew of any customers that intended to cease doing business with Gusmer, that any employees intended to leave Gusmer, that

---

[8]When a plaintiff's claims are based upon documents that are expressly relied upon or integral to the complaint, the court may consider such documents on a motion to dismiss.  See Adamson v. Ortho-NcNeil Pharm., Inc., 463 F. Supp. 2d 496, 500 (D.N.J. 2006) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)).

the Gusmer name would have in any way been devalued, or that Defendants intended to compete with Graco.  Therefore, Plaintiffs cannot allege a breach of contract claim based on the PMC Guaranty.

Third, Plaintiffs' breach of contract claim is based on whether Plaintiffs contracted with Defendants for the sale of Gusmer's "goodwill."  Specifically, Plaintiffs argue Defendants failed to transfer Gusmer's goodwill because Defendants are riding on the coattails of the Gusmer name. However, the SPAs are silent as to goodwill.  The Supreme Court has defined goodwill as "the expectancy of continued patronage."  Newark v. Morning Ledger Co. v. United States, 507 U.S. 546, 555 (1993) (citations omitted).  In addition, the Supreme Court of New Jersey has stated that goodwill consists of:

> . . . the right to continue the business at the same place in which it has been established and where its reputation has been made, carrying with it the probability that old customers will continue to resort to the old place for the purpose of making their purchases, notwithstanding the change in the name under which the business has been carried on, so long as the service remains satisfactory and the standard of the goods sold is maintained . . .

Dugan v. Dugan, 92 N.J. 423, 430 (1983).  Recently, in Gettinger v. Magnetic Services, Inc., No. 07-3015, 2008 WL 4559758, at *2-3 (D.N.J. Oct. 8, 2008), another court in this District found that summary judgment was inappropriate because there was a genuine issue of material fact as to whether goodwill existed or had value where the agreement was silent on the issue.  In Gettinger, the court held that whether or not goodwill existed was fact specific, and based on the pleadings, a reasonable jury could find that the purchaser, who provided the same services as the seller, at the same location, to the same customer, had an expectation of continued patronage from that customer.  See Id. (relying on the stated elements of the Dugan court).  Thus, the court determined that goodwill could exist even where a contract is silent on the issue.

29

Similarly, in the instant case, Graco has pled that it purchased the goodwill of Gusmer in its Agreements with PMC Global and PMC Europe.  Compl. ¶ 33.  PMC Defendants, however, argue that goodwill was not part of the fully integrated contract and thus Plaintiffs are unable to make out a breach of contract claim here.  However, the Agreements include provisions that no customers, distributors, sales representatives or venders intend to cease doing business with Gusmer, that all of the Gusmer's trade names, trademarks and copyrights are in full force and effect with no pending or threatened lawsuits, that all of the Gusmer patents, patent rights, and trade secrets are protected and that employees have signed agreements and confidentiality agreements and that none intend to leave.  Complaint ¶ 33; Exs. A & B, Disclosure Schedules 4.14-4.15, 4.18-4.20.  Taking Plaintiffs' allegations as true, Plaintiffs allege the expectancy of continued patronage with Gusmer customers and thus, state a claim for breach of contract based on goodwill here.[9]

The only remaining issue with respect to this count is whether the manner in which Defendants competed can constitute a violation by PMC Global and PMC Europe of their implied duties of good faith and fair dealing.  Plaintiffs argue that "it is reasonable to infer that one who buys a business for $65 million (including its protected trade secrets, a product line, a distribution network, a customer base, and the right to control a well-known brand) would reasonably expect the seller not to devalue the acquisition (by utilizing trade secrets in order to launch a competitive business that features a knock-off product line with a claimed affiliation to the sold company's brand and by targeting the sold company's customer base)."  Pl. Opp. at 17-18.  Plaintiffs plead that "the Sale Agreements expressly transferred to Graco the following assets of that company,

---

[9]PMC Defendants' arguments that goodwill was not part of the contract is a defense that will not be entertained by the Court on a motion to dismiss.

among others: (1) Gusmer's customer relationships; (2) Gusmer's employment agreements; and (3) Gusmer's intellectual property and proprietary information." Compl. ¶¶ 33-41. Graco alleges that Defendants are now soliciting Gusmer's customers, see Id. ¶¶ 80-83; employing persons bound by non-disclosure agreements, see Id. ¶¶ 8, 47, 64; and using Gusmer's intellectual property and proprietary information to produce and distribute competing products. See Id. ¶¶ 75, 77, 79, 82.

Plaintiffs argue that they have adequately pled a claim for violating the implied contractual obligation of good faith and fair dealing because PMC Global and PMC Europe deny Graco the value of its purchase, by "keep[ing] for [themselves] the essential thing [they] sold, and also keep the price [they] got for it . . ." Levitt Corp. v. Levitt, 593 F.2d 463, 468 (2d Cir. 1979). While the duty of good faith and fair dealing cannot alter the clear terms of an agreement, see DiCarlo, 530 F.3d at 267, defendants who act with improper purpose or ill motive may be found liable for breaching the implied covenant if the breach upsets the plaintiff's reasonable expectations under the agreement. See Intarome, 2008 WL 5109501, at *6. Mere competition alone, however, cannot constitute improper purpose or ill motive.

In this case, Plaintiffs plead that Defendants Gama and Garraf are "marketing their products to customers in a manner that is intended to lead customers to believe that Defendants Gama and Garraf are the successors to Gusmer or that they are the real Gusmer." Compl. ¶ 84. In addition, Plaintiffs allege that Commette, as an agent for and in concert with other Defendants, is erroneously "informing customers that Plaintiff Graco did not purchase Gusmer Europe." Id. ¶ 85. Thus, Plaintiffs' allegations of Defendants' breach of good faith and fair dealing stems from Defendants' alleged trading off on the Gusmer name and product affiliation, which sufficiently

31

constitutes improper purpose or ill motive for purposes of this motion. Therefore, Plaintiffs have

stated a claim for breach of implied duty of good faith and fair dealing on this basis. Accordingly,

the Court denies PMC Defendants' request to dismiss this claim.

### 4.    Count Two:  Breach of Non-Disclosure Agreement

PMC Defendants argue that because Plaintiffs failed to allege facts sufficient to establish

an enforceable employment contract, Plaintiffs' allegations that Defendant Commette breached

his non-disclosure agreement should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).  PMC

Defendants argue that Graco cannot allege that Graco had a non-disclosure agreement with

Commette based on a provision in an employee handbook in this case.  Graco, however, contends

that its claim is not based on a provision in an employee handbook.  Rather, Plaintiffs allege that

Commette breached a written "Non-Disclosure Agreement" that he entered into with Graco, dated

May 16, 2006.  Compl. ¶¶ 47, 95.

To state a claim for breach of contract, the plaintiff must allege (1) a contract between the

parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating

the claim performed its own contractual obligations.  Frederico v. Home Depot, 507 F.3d 188, 203

(3d Cir. 2007).  Graco, here, alleges: (1) it had a valid, existing contract with Commette, see

Compl. ¶ 47; (2) Commette breached his obligations under that contract by disclosing Graco's and

Gusmer's confidential information to Gama, see Id. ¶ 82; and (3) that Graco had been damaged as

a result of Commette's defective performance.  See Id. ¶ 96.  Commette allegedly signed an

agreement on May 16, 2006 that prohibits him from using or disclosing "Confidential Information

of Graco Inc., Gusmer Corp., their subsidiaries or others to whom members of Graco/Gusmer owe

an obligation of confidentiality, to any person not authorized to receive such Confidential Information" either "during [his] employment with Graco/Gusmer or after such employment is terminated." Id. ¶ 47.

PMC Defendants do not argue that Plaintiffs fail to state a claim based on this Non-Disclosure Agreement.  Rather, they complain that they did not receive fair notice of this claim because Graco did not attach a copy of the agreement to its Complaint or Opposition.  Citing Adamson v. Ortho-NcNeil Pharm., Inc., 463 F. Supp. 2d 496, 500 (D.N.J. 2006), PMC Defendants argue that the Court need not credit Plaintiffs' conclusory allegations and bald assertions about this alleged contract, which Plaintiffs failed to attach.[10]  PMC Defendants inappropriately cite to Adamson.  In that case, this Court found that if documents relied on in the complaint are attached, the Court may review them.  Indeed, this Court did not require the plaintiff to attach proofs for all its allegations, which Defendants contend is necessary here. Graco correctly argues that it was not required to attach the Non-Disclosure Agreement to its Complaint.  Pl. Opp. at 19 n. 5 (citing In re Prudential Ins. Co. of Am. Sales Practices Litig., 975 F. Supp. 584, 596 (D.N.J. 1996) ("failure to attach specific documents to which the complaint refers, or to quote from them verbatim, [was not] fatal to their claims")).  Plaintiffs have alleged sufficient facts to raise a reasonable expectation that discovery will reveal evidence of the non-disclosure agreement.  See Phillips, 515 F.3d at 234 (citing Twombly, 127 S.Ct. at 1965).

---

[10]Defendants also claim that the Court is not "constrained to accept the allegations of the complaint in respect of the construction of the Agreement." Int. Audiotext Network, Inc. v. AT&T Co., 62 F.3d 69, 72 (2d Cir. 1995).  Plaintiffs correctly argue, however, that Int. Audiotext Network holds only that a court has the ability to review a document mentioned in – but not attached to – the complaint, without converting the motion to dismiss into a summary judgment action.  Id.

Accordingly, the Court denies Defendants' request to dismiss this claim.[11]

### 5.        Count Three:  Duty of Loyalty Claim

Defendants move to dismiss Plaintiffs' duty of loyalty claim against Commette pursuant to

Rule 12(b)(6) on the ground that Graco failed to allege any misconduct by Commette during his

employment.  PMC Defendants point out that according to Graco's own allegations, Commette, a

former Graco employee, began doing business with Gama "after [his] employment and consulting

relationships with [Plaintiffs] ended."  Compl. ¶¶ 50, 53.  Defendants claim that all of Commette

and Royo's alleged misconduct and breach of duty of loyalty occurred after they were fired by

Graco and such post-employment conduct cannot support Graco's claim.

The duty of loyalty owed by "an employee to an employer consists of certain very basic

and common sense obligations.  An employee must not <u>while employed</u> act contrary to the

---

[11]Because the Court does not dismiss this claim, PMC Defendants request a more definite
statement pursuant to Rule 12(e).  PMC Defendants claim that the documents Plaintiffs expressly
rely on are integral to their claims, and without these documents, Plaintiffs' allegations are too
vague and ambiguous for Commette and other PMC Defendants to respond.  Defendants request
that Plaintiffs clearly state which contracts are valid or in effect, which contracts have been
superseded or void, and which contracts it is seeking to enforce because in their Complaint,
Plaintiffs allege that there were contracts with Commette and Royo from 2003 and 2004, and a
subsequent contract with Commette in 2006.  PMC Dfs. Mot. at 9; Compl. ¶¶ 26, 47.  In their
Opposition, Plaintiffs make clear that their claim against Commette for breach of his non-
disclosure agreement is based on the May 16, 2006 Non-Disclosure Agreement.  <u>See</u> Pl. Opp. at
18.

The Court denies PMC Defendants' request at this time because these records can be
provided in discovery.  "It is not the function of 12(e) to provide greater particularization of
information alleged in the complaint or which presents a proper subject for discovery.  The basis
for granting such a motion is unintelligibility, not lack of detail."  <u>MK Strategies, LLC v. Ann
Taylor Stores Corp.</u>, 567 F. Supp. 2d 729, 737 (D.N.J. 2008) (internal citations and quotations
omitted).  In this case, Graco sufficiently alleges a claim of breach of a non-disclosure agreement
and its allegations are not so vague, ambiguous or unintelligible that PMC Defendants cannot
respond in good faith.  Accordingly, Defendants' request pursuant to Rule 12(e) is denied.

employer's interest." <u>Lamorte Burns & Co., Inc. v. Walters</u>, 167 N.J. 285, 302 (2001) (citations omitted) (emphasis added).  Specifically, during the period of employment, an employee has a duty not to compete with his employer.  <u>Id.</u> (citations omitted).  "[A]n employer may prove a <u>prima facie</u> case of an employee's breach of the duty of loyalty not only by showing that the employee directly competed with the employer while employed, but also by showing that the employee while employed assisted the employer's competitor."  <u>Id.</u> (citations omitted).  In addition, an employee who takes legally protected information from his employer to seek a competitive advantage upon resignation also breaches his duty of loyalty.  <u>Id.</u> at 304.  However, "later competition with a current employer may eventually prove harmful to the former employer. That sort of harm is not actionable; it is called free enterprise."  <u>Subcarrier Communications, Inc. v. Day</u>, 299 N.J. Super. 634, 645 (App. Div. 1997) (internal quotations and citations omitted).

Graco contends that it sufficiently alleges that Commette breached his duty of loyalty based on its allegations that Commette had an undisclosed arrangement with PMC Global regarding the disposition of unsold inventory "that was contrary to Graco's interests during the time he was employed by, and providing consulting services to Plaintiff Graco . . .".  Compl. ¶ 99.  Plaintiffs, however, do not allege in their Complaint that Commette had this undisclosed arrangement with PMC Global <u>while he was employed</u> with Graco.[12]  In addition, Plaintiffs do

---

[12]Graco asserts that after Commette's employment with it ended in March 2007, Commette visited Gusmer's Lakewood, New Jersey facility and asked a Graco employee about the status of the inventory of Gusmer's "Mighty Mite" products, which Graco had acquired from PMC Global.  <u>Id.</u> ¶ 50.  PMC Global and Graco allegedly had an agreement in which PMC Global was to reimburse Graco for any inventory not sold in three years.  <u>Id.</u> ¶ 51.  Commette allegedly told a Graco employee that he was interested in the status of this inventory because PMC Global owed him compensation for it.  <u>Id.</u> ¶ 52.  Graco asserts that any agreement by Commette to sell the Mighty-Mite inventory was 'contrary to the interests of Graco.'"  Pl. Opp. at 20-21 (quoting Compl. ¶ 99).  Plaintiffs do not allege that Commette actually had an agreement with anyone during his employment with Graco nor that he intended to purchase this inventory while he was employed.  Rather its allegations that Commette was acting as a

not dispute Defendants' assertions that Graco fired Commette nor does Graco accuse Commette of taking legally protected information from Graco while an employee of Graco for the purpose of seeking a competitive advantage upon resignation or even in anticipation of his termination by Graco.  See Lamorte Burns, 167 N.J. at 304.

Graco also argues that Commette gained access to trade secret information while employed at Graco that he "inevitably has or will have to disclose."  Compl. ¶¶ 44, 63-64. This allegation alone, however, is not actionable and insufficient to establish a prima facie claim of an employer's breach of duty of loyalty, since Plaintiffs have not alleged that Commette took such protected information for the purposes of seeking a competitive edge upon his leaving Graco's employ.  See Lamorte Burns, 167 N.J. at 303; Subcarrier, 299 N.J. Super. at 645.  Because Plaintiffs have failed to allege sufficient facts that Commette breached his duty of loyalty because either he directly competed with his employer or he assisted the employer's competitor while employed by Graco or that he took trade secrets from Graco in order to seek a competitive advantage upon his separation from Graco, the Court grants Defendants' Motion to dismiss with respect to this claim without prejudice.

### 6.     Count Four:  Tortious Interference

Defendants argue that Graco has failed to state a claim based on tortious interference with a prospective economic advantage[13] because Graco does not allege that Defendants

---

speculator for this inventory in March 2007 was well after he stopped working for Graco on October 20, 2006.

[13]Graco argues that PMC Defendants do not dispute its tortious interference with contract claim, specifically, Commette's alleged non-disclosure agreement, and therefore it should be deemed admitted.  Pl. Opp. at 21 n. 6.  Thereafter, however, in their Reply, PMC Defendants clearly dispute the sufficiency of the allegations for this claim.  They do not request dismissal of

interfered with any of Graco's customers, solicited any of its current customers, or that Graco suffered a loss.  PMC Dfs. Mot. at 13-14.

New Jersey recognizes tortious interference with a prospective economic advantage as separate and distinct from tortious interference with an existing contract.  Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 751-52 (1989).  To prevail on a claim for tortious interference with a prospective economic advantage, a plaintiff must demonstrate (1) that it had a reasonable expectation of an economic advantage; (2) that was lost as a direct result of Defendants' malicious interference; and (3) that it suffered losses thereby.  See Pinnacle Choice, Inc. v. Silverstein, No. 07-1379, 2007 WL 2212861, at *3 (D.N.J. July 31, 2007) (citing Lamorte Burns, 167 N.J. at 305-06).  "When a business targets its competitor's customers, it exercises a valid business judgment and that alone does not constitute tortious interference with prospective economic advantage."  Foxtons, Inc. v. Cirri Germain Realty, 2008 WL 465653, at *7 (App. Div. 2008) (internal quotations and citations omitted).  A plaintiff must set forth facts surrounding Defendants' intentional conduct that goes beyond healthy competition.  Id.  Interference must be done intentionally and with malice, such that the harm was inflicted intentionally and without justification or excuse.  Id.

Plaintiffs allege that Graco had a "reasonable expectation of economic advantage derived from the tangible and intangible assets of the Gusmer businesses that [they] purchased

---

this claim on its own.  Rather they dispute that Graco sufficiently pled the existence of the underlying agreement with which they allegedly interfered.  PMC Dfs. Reply at 8 n. 3.

On the other hand, Garraf outrightly disputes that Plaintiffs have sufficiently pled a claim for tortious interference with a contract.  Garraf Mot. at 7-8.  However, Garraf contends that Plaintiffs do not address why this claim should be dismissed with respect to Garraf.  See Garraf Reply at 8 n. 3.  The Court will address the sufficiency of Plaintiffs' tortious interference claims, with respect to both a contractual relationship and prospective economic advantage, as to all Defendants.

from Defendant PMC and its Affiliated Entities", Compl. ¶ 108, including their customer relationships, intellectual property, proprietary technology, trademarks, and trade names.  Id. ¶ 41.  Graco alleges that "Defendants' conduct, practices, and activities have intentionally and unjustifiably interfered with the reasonable expectation of advantage [Graco] derived from the[se] tangible and intangible assets . . . ."  Id. ¶ 109.  Graco further alleges that it would have received the benefit of these assets if Defendants had not engaged in the conduct described throughout the Complaint, Id. ¶ 110, and that it suffered injuries as a result.  Id. ¶ 111.

Defendants do not dispute that Plaintiffs had a reasonable expectation of economic advantage.  Garraf, however, unpersuasively argues that the allegations of interference with a prospective economic advantage are only against Commette and Royo, and not Garraf, see Garraf Mot. at 7, and thus, this claim against them should be dismissed.  Taking the allegations as a whole, Plaintiffs do allege that Garraf, either individually or acting in concert with PMC Defendants, intentionally interfered with its reasonable expectation of advantage.  See, e.g., Compl. ¶ 109.  PMC Defendants, citing to Foxtons, dispute that Plaintiffs sufficiently allege that Defendants intentionally interfered with or solicited any of Graco's current customers.  Rather, PMC Defendants argue that Graco's allegation that they solicited business from customers in the trade is insufficient to plead the intentional or malice element of the claim.  Foxtons, 2008 WL 465653, at *7.  However, because Plaintiffs' claim that Defendants solicited Graco customers by casting doubt on the origin of Graco-Gusmer products, Compl. ¶¶ 84-85, Plaintiffs allege sufficient facts surrounding Defendants' conduct that demonstrate intentional interference with an economic advantage.  See Foxtons, 2008 WL 465653, at *7.

In addition, Plaintiffs assert that they "need not allege specific lost business

opportunities in support of [their] tortious interference claim." <u>D&D Assoc. Inc. v. Bd. of Ed. Of N. Plainfield</u>, No. 03-1026, 2007 WL 4554208, at *22 n. 15 (D.N.J. Dec. 21, 2007) (citing <u>Floorgraphics, Inc. v. News Am. Marketing In-Store Servs., Inc.</u>, No. 04-3500, 2006 WL 2836268, at *6 (D.N.J. Sept. 29, 2006)). Rather, Plaintiffs claim that they "adequately alleged that [the unlawful conduct] caused consumers, distributors and other customers to stop purchasing its products." <u>Proctor & Gamble Co. v. Haugen</u>, 222 F.3d 1262, 1279 (10th Cir. 2000) (citing <u>Cook v. Winfrey</u>, 141 F.3d 322, 327-28 (7th Cir. 1998)). Plaintiffs claim that their general factual allegations regarding causation, which state the injury resulting from Defendant's conduct, are sufficient pursuant to Rule 8, and Defendants seek to impose a heightened pleading standard that is not required here. Pl. Opp. at 23.[14] Moreover, they argue that they have adequately alleged Defendants' efforts to divert business from Graco to "Gama" by interfering with Graco's then-existing customers or distributors. Compl. ¶¶ 67, 69.

Plaintiffs argue that they have sufficiently pled that Defendants' misconduct has interfered with specific prospective economic opportunities, <u>see</u> <u>Id.</u> ¶¶ 108-110, including the opportunity to sell replacement parts or new equipment to former Gusmer (now Graco) customers whose trade had been solicited and obtained by Defendants. <u>Id.</u> ¶¶ 65, 80-82. Plaintiffs state that they would have realized their reasonable expectation of economic benefit absent Defendant's conduct, and argue that they are not further required to identify and allege lost sales or damages more specifically. Pl. Opp. at 24. Defendants maintain that Plaintiff has not alleged any actual losses, as required for a tortious interference claim. <u>See</u> <u>Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.</u>, 870 F. Supp. 1237, 1249 (D.N.J. 1994). Defendants

---

[14]The Court notes that the Third Circuit has rejected a heightened evidentiary requirement for tortious interference claims, and it follows that there would be no heightened pleading standard for such claims. <u>See</u> <u>Fineman</u>, 980 F.2d at 186-87.

assert that Graco has not alleged that any of its current customers stopped doing business with it or that there were any lost sales as a consequence of Gama's alleged misconduct.  However, even in <u>Matrix</u>, the case cited by Defendants, the court noted that Plaintiffs must allege that the injury caused damages to plead a claim for tortious interference; Plaintiffs need not specify what the actual damages were at this stage of litigation.  <u>Id.</u>  While Plaintiffs will have to prove damages to succeed on this claim, they have sufficiently alleged that Defendants' actions injured them, causing damages here.  Therefore, Graco has sufficiently plead the elements of a claim of tortious interference with a prospective economic advantage, including that it had reasonable expectation of economic benefit that was lost as a direct result of Defendants' malicious interference and damages.

Plaintiffs also allege that Defendants engaged in tortious interference with a contract, specifically, Commette's Non-Disclosure Agreement.  Compl. ¶¶ 102-104.  To sufficiently pled a claim of tortious interference with a contract, Plaintiffs must allege the same elements as a claim for tortious interference with a prospective business advantage plus the additional element of a contract.  <u>Med Alert Ambulance, Inc. v. Atlantic Health System, Inc.</u>, 2007 WL 2297335, at *14 (D.N.J. 2007).  A tortious interference with contract claim cannot be directed at a person or entity that is a party to the contract.  <u>See</u> <u>Emerson Radio Corp. v. Orion Sales, Inc.</u>, 253 F.3d 159, 173 (3d Cir. 2001).

PMC Defendants argue, taking as true all factual allegations in Plaintiffs' Complaint, Graco has failed to allege tortious interference with a contract.  Rather, they argue that "Graco asserts only that Gama and Commette solicited business from customers 'in the trade' who previously had done business with Gusmer three years earlier, 'at the time Plaintiff Graco acquired Gusmer.'"  PMC Reply at 8; Pl. Opp. at 23.  Plaintiffs, however, do allege that

Defendants PMC Global, PMC Europe, PMC, Gama, and  Garraf are intentionally and unjustifiably interfering with Commette's non-disclosure agreement.  Compl. ¶ 102.  The Court has already determined that Plaintiffs have sufficiently pled a non-disclosure agreement existed.  See Part III.A.4., supra.  Because the Court has determined herein that Plaintiffs adequately pled a claim for tortious interference with a prospective economic advantage and the additional element of Commette's non-disclosure agreement, Plaintiffs have sufficiently pled a tortious interference with a contract claim.  Accordingly, Defendants' request to dismiss Plaintiffs' tortious interference claims are denied.

### 7.      Count Five:  Misappropriation of Trade Secrets & Misuse of Confidential Business Information

Pursuant to Rule 12(b)(6), Defendants move to dismiss Plaintiffs' trade secret claims because Graco has not alleged the existence of actual trade secrets or that Defendants used such secrets to Graco's detriment.  PMC Dfs. Mot. at 12-13; Garraf Mot. at 2-3.

"A trade secret claim in the federal courts is governed not by federal common law but by state law." Rohm & Haas Co. v. Adco Chem. Co., 689 F.2d 424, 429 (3d Cir. 1982).  "To prevail in New Jersey upon a claim for misappropriation of a trade secret, a trade secret owner must establish that: (1) a trade secret exists; (2) the information comprising the trade secret was communicated in confidence by plaintiff to the employee; (3) the secret information was disclosed by that employee and in breach of that confidence; (4) the secret information was acquired by a competitor with knowledge of the employee's breach of confidence; (5) the secret information was used by the competitor to the detriment of plaintiff; and (6) the plaintiff took precautions to maintain the secrecy of the trade secret." Rycoline Prods., Inc. v.

Walsh, 334 N.J. Super. 62, 71 (App. Div. 2000) (citing Rohm, 689 F.2d at 429-30; Stone v.

Goss, 65 N.J. Eq. 756, 759-60 (E. & A. 1903)).

Significantly, information need not rise to the level of a trade secret to be protected.

See Lamorte Burns, 167 N.J. at 299.  Rather, the Supreme Court of New Jersey has held that,

to be legally protected, the information may even be otherwise publicly available because it is

the relationship of the parties at the time of disclosure and the intended use of the information

that controls whether there has been a misuse of confidential business information.  See Id. at

299-301 ("specific information provided to defendants by their employer, in the course of

employment, and for the sole purpose of servicing plaintiff's customers, is legally protectable

as confidential and proprietary information").

Plaintiffs allege that when selling Gusmer, Defendants PMC Global and PMC Europe

expressly transferred Gusmer trade secrets and confidential business information to Graco and

represented to Graco that they had taken steps to protect these trade secrets, Compl. ¶¶ 34-36,

including requiring employees to sign confidentiality agreements.  Id. ¶¶ 37-39.  The parties

allegedly allocated over $4 million to the transfer of Gusmer "proprietary technology."  Id.

¶ 41.  After the sale, former Gusmer employees, including Commette, joined Graco and had

access to Graco's own trade secrets, and confidential business and technical information.  Id.

¶¶ 43-44.  Plaintiffs allege that Gama and Garraf have improperly accessed and are now using

the Graco and/or Gusmer trade secrets and confidential business information to to

manufacture, market and sell spare parts for Gusmer equipment and new equipment to solicit

former Gusmer customers and others.  Id. ¶¶ 58-62, 65-71, 75-79.  Thus, Plaintiffs argue, they

have sufficiently stated cognizable claims for misappropriation of trade secrets and misuse of

confidential business information.

Garraf argues that "Graco fails to allege any facts supporting their claim that any trade secrets were ever taken, used or disclosed by Garraf."  Garraf Reply at 6.[15]  Rather Garraf states that Graco's allegations are conclusory and nonsensical.  Moreover, Garraf complains that Graco fails to allege that "any defendant actually took any corporate material or data," and that Plaintiffs' allegation that Defendants had access to and then used Graco Trade Secrets and Confidential Business Information to manufacture spare parts for Gusmer's products is insufficient.  The Court disagrees.[16]

Garraf contends that Plaintiffs rely on the "inevitable disclosure" theory because Garraf was "founded by a group of former Gusmer employees (none of whom are Royo), most of whom have over 20 years of experience in the industry and were dismissed by Graco shortly after the acquisition," and that Graco does not allege any facts to show why these people could not make and sell products using their own and public information.  Garraf Mot.

---

[15]Garraf disputes Graco's assertion that Royo, former Gusmer employee, co-founded Gama.  Further Garraf asserts the PMC Defendants' statement to that effect in their brief, PMC Dfs. Mot. at 2, is inaccurate and is not binding on it.  See Garraf Reply at 2 n. 1.
     Garraf also contends that Graco's claim that Royo and Commette's attendance at trade shows was improper does not support Graco's claims against them.  Garraf Reply at 6 n. 2; Compl. ¶¶ 61-62, 66-71.

[16]Citing Sun Dial Corp. v. Rideout, 25 N.J. Super. 591, 598 (N.J. Super. Ch. 1953), rev'd, 29 N.J. Super. 361, 365 (App. Div. 1954), aff'd, 16 N.J. 252 (1954), Garraf argues that the "knowledge and skill which is obtained through experience is not a trade secret, that sound public policy favors employees bettering themselves, and that employees may carry away and use the skill acquired during the course of an employment either in business for themselves or in the service of other employers."  Plaintiffs, however, contend that its "desire to protect its trade secrets and confidential information is not an attempt to hold its former employees 'hostage' because they are 'cursed' with the skill and knowledge of being competent at their chosen profession."  Pl. Opp. at 28 (quoting Garraf Mot. at 6).  Rather, Graco's claims against Commette (and other employees working for Defendants) are based on more than disclosure of "mere skill and knowledge of the trade generally, but technical and business trade secrets imparted to them in confidence," which Defendants are obliged to honor.  Pl. Opp. at 28-29 (citing Sun Dial Corp., 16 N.J. at 260-61).  Because these arguments go beyond sufficiency of the pleadings and are not appropriately addressed on a motion to dismiss, the Court will not consider them here.

at 6.  But "[u]nder the inevitable disclosure doctrine, a former employer is entitled to enjoin even <u>anticipated</u> employment or other business activity that would result in inevitable disclosure in order to protect the former employer's confidential and proprietary information from disclosure."  <u>Orthovita, Inc. v. Erbe</u>, No. 07-2395, 2008 WL 423446, at *10 (E.D. Pa. Feb. 14, 2008) (emphasis in original).  Graco argues that it has gone further and is not bringing this action to prevent a "mere plan," but to enjoin Defendants' previous actions and actual disclosures evidenced by "Defendants' ongoing solicitation of its customers and the marketing, production and sale of spare parts for its products," including the use of Graco's pricing information.  Pl. Opp. at 29-30.[17]

First, PMC Defendants argue that any alleged use of Graco's trade secrets by incorporating features claimed in one of Graco's patent applications are matters of public record, and thus, defeat Graco's claim to trade secrets.  <u>See</u> <u>On-Line Tech v. Botenseewerk Perkin-Elmer GMBH</u>, 386 F.3d 1133, 1141 (Fed. Cir. 2004) ("information that is disclosed in a patent or contained in published materials reasonably accessible to competitors does not qualify for protection (as a trade secret)") (internal quotation marks and citations omitted); Compl. ¶¶ 75-79.  Second, PMC Defendants argue that the two-year-old customer and distributor information that had been publicly disclosed by Graco cannot be considered secret. PMC Dfs. Mot. at 13.  Third, PMC Defendants argue that Commette's use of his own

---

[17]Plaintiffs contend that despite Garraf's suggestion that a preliminary injunction may not be available to Plaintiffs because they did not move for such relief at the outset of the case, <u>see</u> Garraf Mot. at 3, this should not be addressed at this time because it is not currently moving for that relief.  <u>See</u> Pl. Opp. at 29-30.  The Court agrees and will not address this issue at this time.
    Further, Garraf discusses the relief available when relying on the inevitable disclosure doctrine.  <u>See</u> Garraf Reply at 7.  In this case, Graco does not assert or plead reliance on a theory of inevitable discovery to satisfy its pleading requirement, <u>see</u> Pl. Opp. at 29, and thus, such a discussion is unnecessary.

knowledge with his new employer, Gama, is not a misappropriation of trade secrets because "[t]o catalogue the employee's own knowledge of his employer's [costs and profit margins] . . . as a 'trade secret' or 'confidential information' and thus perpetually enjoin the employee from thereafter honestly soliciting business . . . [is] an unreasonable restraint on trade unsupported by any dominant social or economic justification." <u>Abalene Exterminating Co. v. Egles</u>, 36 Backes 1, 3 (N.J. Ch. 1945).  Therefore, PMC Defendants assert that "Graco has not alleged any other misuse of any other trade secret."  PMC Dfs. Reply at 7.

Graco, however, asserts that its trade secret claims are based on the "confidential, non-public, propriety information regarding customers, sales reports, strategic marketing plans, product information and designs, pricing information, customer discounts and rebates, profit margins, financial reports and data, sales programs, and product engineering and design plans."  Pl. Opp. at 17; Compl. ¶ 44.[18]  Garraf argues that Plaintiffs' "litany is wholly insufficient under <u>Twombly</u> and <u>Phillips</u> to provide fair notice to Garraf of what the purported trade secrets it is accused of misappropriating are."  Garraf Reply at 4.  However, other courts in this circuit have previously found that a "plaintiff alleging misappropriation of trade secrets need not plead the details of its trade secrets in a publicly filed complaint, inasmuch as such disclosure would destroy the essential 'secrecy' of the claimed trade secret."  <u>Orthovita</u>, 2008 WL 423446, at *9.  Because Plaintiffs have met the "minimal standard" required for pleading misappropriation of trade secrets and misuse of confidential business information here, the Court denies Defendants' request to dismiss these claims.  <u>See</u> <u>Oswell v. Morgan Stanley</u>

---

[18]Graco states that despite Defendants' allegations, it does not claim that the price of steel, <u>see</u> Garraf Mot. at 5, the pending patent on the Hybrid Heater, <u>see</u> <u>Id.</u> at 3-4; PMC Dfs. Mot. at 12, or customer information posted on the Internet, <u>see</u> PMC Dfs. Mot. at 13, are trade secrets or the bases of Plaintiffs' trade secret claim.  Pl. Opp. at 27.

<u>Dean Witter & Co., Inc.</u>, No. 06-5814, 2007 WL 1756-027, at *7 (D.N.J. June 18, 2007)

(stating that the defendant will have the opportunity to argue that "no genuine issue of material

fact exists regarding whether the information was publicly known or readily available and

therefore not protectible as a trade secret" at the summary judgment phase, <u>Id.</u> n. 7).[19]

### 8.   Counts Six-Eight:  Violations of the Lanham Act, the New Jersey Fair Trade Act, and New Jersey's Prohibition Against Unfair Competition

In its Opposition, Graco appears to argue that in Count Six of its Complaint it

sufficiently alleges two claims against Defendants under the Lanham Act, specifically false

advertising under 15 U.S.C. § 1125(a)(1)(B) and false designations of origin under 15 U.S.C.

§ 1125(a)(1)(A).[20]  Plaintiffs assert that Defendants' conduct violates the Lanham Act's

prohibition of unfair competition by way of false advertisements, false designation of origin,

and misleading representations or descriptions of fact in an effort to unlawfully capitalize on

Gusmer's reputation for which Plaintiffs paid millions of dollars for exclusive ownership and

control.  Further, Plaintiffs argue that they have sufficiently plead that Defendants'

---

[19]Moreover, at least one court in this District has held that "[i]n appropriate circumstances, information on pricing, discounts and other relevant customer data may enable an agent to take unfair advantage of its principal and therefore constitute protectible trade secrets." <u>See</u> <u>Apollo Techs. Corp. v. Centrosphere Indus. Corp.</u>, 805 F. Supp. 1157, 1204 (D.N.J. 1992) (internal citations omitted).  In addition, in <u>Global Transp. Logistics, Inc. v. Dov Transp.</u>, the court denied summary judgment where the facts were "hotly controverted" and the plaintiff claimed that its "pricing, customer preferences, customer contacts, profit margin, vendors and 'methods of operation' [we]re proprietary and confidential."  No. BER-C-79-05, 2005 WL 1017602, at *1-5 (N.J. Super. Ct. Apr. 5, 2005).

[20]Problematically, Plaintiffs do not clearly allege pursuant to which provisions of the Lanham Act they are suing citing generally to 15 U.S.C. § 1125(a)(1).  <u>See</u> Compl. ¶¶ 118-123. The Court looks to its Opposition for clarity, but relies on Plaintiffs' Complaint to determine the sufficiency of Graco's allegations.

misrepresentations and other unfair acts violate the New Jersey Fair Trade Act and amount to

unfair competition in Counts Seven and Eight, respectively.

Defendants move to dismiss all three of these counts on the grounds that Plaintiffs

have failed to allege sufficient facts to support any of these claims.  PMC Defendants argue

Graco's pleading with respect to these three Counts, which PMC Defendants group together as

Graco's "unfair competition claims," is insufficient because Graco fails to allege that

Defendants used Graco's marks or otherwise suggested an affiliation sufficient to create a

likelihood of consumer confusion.  PMC Dfs. Mot. at 14-15.  Garraf contends that an

intermediate standard of pleading is required for Plaintiffs' Lanham Act claims and Plaintiffs'

"unidentified statements" are inadequate to meet the requisite specificity.[21]  Garraf Reply at

11-13.

### a.      False Advertising Claims

To state a claim for false advertising under § 1125(a)(1)(B), a plaintiff must allege

that: (1) the defendant made false or misleading statements about the nature, characteristics,

qualities, geographic origins of his or another's goods, services, or commercial activities in

commercial advertising or promotion; (2) there is actual deception or a tendency to deceive a

substantial portion of the intended audience; (3) the deception is material in that it is likely to

influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and

(5) there is a likelihood of injury to the plaintiff.  15 U.S.C. § 1125(a)(1)(B); United States

Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 922-23 (3d Cir. 1990).

---

[21]Garraf states that it does not analyze Plaintiffs' claims under the New Jersey Fair Trade
Act and common law unfair competition separately because under New Jersey law the pleading
requirements for these claims are the same as the analysis for unfair competition under the
Lanham Act.  See Garraf Mot. at 8 n. 3 (citing Primepoint, L.L.C. v. PrimePay, Inc., 545 F. Supp.
2d 426, 431-32 (D.N.J. 2008)).

Garraf argues that the Court should apply an "intermediate" standard of pleading for Plaintiffs' Lanham Act claims because they require more specificity than the traditional notice pleading under Rule 8.  See Fed. R. Civ. P. 8(a); Garraf Reply at 11-13.  Some district courts in the Third Circuit have recognized that pleading false advertising under the Lanham Act requires an intermediate pleading standard, which strikes a balance "between application and outright rejection of Rule 9(b)."  See Wellness Publ'g v. Barefoot, No. 02-3773, 2008 WL 108889, at *15 (D.N.J. Jan. 8, 2008) (quoting EVCO Tech. & Dev. Co., LLC v. Buck Knives, Inc., No. 05-6198, 2006 WL 2773421, at *15 (E.D. Pa. Sept. 22, 2006)); see also Trans USA Products, Inc. v. Howard Berger Co., No. 07-5924, 2008 WL 852324, at *5 (D.N.J. Mar. 28, 2008).  In Mac Daetwyler Corp. v. Input Graphics, Inc., 608 F. Supp. 1549 (E.D. Pa. 1985), where this intermediate approach was first applied, the court required more particularity than traditional notice pleading under Rule 8, but something less than the specificity required under Rule 9, because the claim involved the making of false statements even though it was not a "pure 'fraud' claim."  Mac Daetwyler, 608 F. Supp. at 1556.  "In litigation in which one party is charged with making false statements, it is important that the party charged be provided with sufficiently detailed allegations regarding the nature of the alleged falsehoods to allow him to make a proper defense."  Id.  The Court finds that this intermediate standard should be applied in this case, where Plaintiffs charge Defendants with making false statements about Defendants' products; Plaintiffs meet this requirement.

Plaintiffs argue that they have sufficiently plead a claim under Rule 8(a)[22] that Gama

---

[22]Plaintiffs argue that the Honorable Joel A. Pisano, U.S.D.J., in Wellness and Trans USA incorrectly required an intermediate standard for allegations of false statements under the Lanham Act and, for support, cites to district court cases outside of the Third Circuit.  Pl. Opp. 36-38.  Plaintiffs also contend that Garraf cites to "unreported decisions [that] are at odds with contemporaneous published opinions [from district courts in other circuits] that categorically

and Garraf are making false or misleading representations when marketing their products to customers because they are "marketing their products to customers in a manner that is intended to lead customers to believe that Defendants Gama and Garraf are the successors to Gusmer or that they are the real Gusmer." Compl. ¶ 84. Plaintiffs allege that Commette, as an agent for and in concert with other Defendants, is erroneously "informing customers that Plaintiff Graco did not purchase Gusmer Europe." Id. ¶ 85.[23] Plaintiffs allege that these statements are "likely [or intended] to cause confusion or mistake or to deceive" and "have influenced and [are] likely to continue to influence customers' purchasing decisions." Id. ¶¶ 84-86, 119-120. Further, Plaintiffs allege that the products have traveled in interstate commerce, Id. ¶ 121, and that there is a likelihood of injury to the Gusmer goodwill that it purchased and damages from the name's dilution. Id. ¶¶ 33, 41, 122.

Taking Plaintiffs' allegations as a whole, they do identify Defendants' allegedly false statements with enough specificity to satisfy even the intermediate pleading requirement. Compl. ¶¶ 84-85. Similarly, even though Garraf argues that Plaintiffs only allege that the statements were "intended" to deceive, not that the supposed misstatements actually caused

---

reject the suggestion that Lanham Act claims must contain more detail than would be required by Fed. R. Civ. P. 8(a)." Pl. Opp. at 36-37. This distinction, however, is irrelevant. None of these decisions, cited by Plaintiffs or Defendants, are binding on this Court. Thus, in conducting its own analysis, the Court finds the decisions in the district courts within the Third Circuit, which are post-Twombly, are persuasive, and the Court applies an intermediate pleading standard here.

[23]Plaintiffs argue that a liberal interpretation of the "commercial advertising or promotion" requirement applies under Rule 12(b)(6), and therefore, their pleadings regarding Defendants' concerted, intentional, and false marketing communications is sufficient "advertising." Pl. Opp. at 32-33 & n. 9 (citing to cases which found that even a single promotional statement suffices as an advertisement for purposes of the Lanham Act). The crux of Defendants' argument, however, is not that Plaintiffs have insufficiently plead an advertisement, but that Plaintiffs fail to sufficiently allege that any false or misleading statements were ever made by Defendants. And even if there were such statements, there are no allegations that they caused deception or had a tendency to deceive. See, e.g., Garraf Reply at 13.

any deception or there was a tendency to deceive, the Court disagrees.  See Id. ¶¶ 84-86, 119-120.  Rather, Plaintiffs identify the allegedly false and misleading statements Defendants made and plead that customers were deceived.  However, the Court will grant Graco leave to amend its Complaint to state clearly which provisions of the Lanham Act Defendants allegedly violated.  See n. 20, supra.  Accordingly, the Court denies Defendants' motion to dismiss with respect to Plaintiffs' false advertising claim.

### b.  Claims of False Designations of Origin

Plaintiffs also claim that Defendants' marketing statements amount to false and misleading designations of origin and affiliation and false descriptions of fact under the Lanham Act.  15 U.S.C. § 1125(a)(1)(A).   PMC Defendants move to dismiss these claims, pursuant to Rule 12(b)(6), for the same reasons they move to dismiss Plaintiffs' false advertising claims.  Garraf argues that these claims are based on the same unidentified statements as Plaintiffs' claims of false advertising and Plaintiffs' allegations here merely recite the language of the elements in the statute, which are "wholly insufficient to provide Garraf with sufficiently detailed allegations regarding the nature of the alleged falsehoods to allow it to make a proper defense."  Garraf Reply at 13-14.

To prevail on such a claim, a plaintiff must prove that: (1) the defendant uses a false designation of origin, false or misleading description of fact, or false or misleading representation; (2) such improper use occurs in interstate commerce in connection with goods and services; (3) such improper use is likely to cause confusion, mistake, or deception as to origin, sponsorship, or approval of defendant's goods or services by another person; and (4) that plaintiff has been or is likely to be damaged.  15 U.S.C. § 1125(a)(1)(A).

In arguing that it has adequately alleged that Defendants misrepresented the origin of

Gama's products to consumers and created the likelihood that consumers will be confused about the origin of Gama's products, Graco cites to the same statements it offers to support its false advertising claim.  See Part III.A.8.a., supra.  Plaintiffs allege that Defendants' misleading statements also constitute false or misleading statements of fact made in conjunction with efforts to sell Garraf and Gama's products in interstate commerce.  Compl. ¶ 121.  Plaintiffs argue that a false designation of origin claim is properly stated where a competitor seeks to "instill the impression that its line is the same as, or a continuation of the [Plaintiffs'] line."  777188 Ontario Ltd. v. Lencore Acoustics Corp., 105 F. Supp. 2d 56, 63 (E.D.N.Y. 2000).  Finally, Plaintiffs contend that they have suffered damages because they are losing control of "the Gusmer name" and the associated goodwill that they purchased.  Id. ¶¶ 33, 41, 122.

Thus, much like Plaintiffs' false advertising claim, Plaintiffs set forth adequate facts to show a reasonable expectation that discovery will reveal evidence that Graco uses a false designation of origin, false or misleading description of fact, or false or misleading representation.  Although Gama's allegations that Graco made false or misleading statements of fact are adequately plead, the specific provisions of the Lanham Act upon which Plaintiffs are suing are not and the Court directs Graco to amend its Complaint with respect to this allegation.  See n. 20, supra.  Accordingly, the Court denies Defendants' Motions to dismiss Plaintiffs' claims of false designations of origin.

### c.    Claims under the New Jersey Fair Trade Act and New Jersey's Prohibition on Unfair Competition

Plaintiffs allege that Defendants' violated the New Jersey Fair Trade Act and New Jersey common law of unfair competition.  See N.J.S.A. § 56:4-1; Ryan v. Carmona Bolen

Home for Funerals, 341 N.J. Super. 87, 92 (App. Div. 2001).  Graco argues that it has

adequately plead these claims because it alleges that Defendants breached their duties of good

faith and fair dealing, see Compl. ¶¶ 87-93, and engaged in false advertising and false

designation of product origin.  Id. ¶¶ 118-123.

     PMC Defendants argue that their alleged actions do not amount to unfair competition

and thus Plaintiffs do not sufficiently plead these claims.  PMC Defendants argue that Royo's

alleged use of "a product comparison sheet that focused exclusively on head-to-head

comparisons between Plaintiff Graco's and Defendants Gama and Garraf's products," Compl.

¶ 69, suggests no more than ordinary comparative advertising, which is not unfair competition.

PMC Dfs. Mot. at 15.  PMC Defendants also argue that Plaintiffs fail to allege any confusion,

actual or likely.  PMC Reply at 9.  They argue that even if Commette told "customers that

Plaintiff Graco did not purchase Gusmer Europe," Compl. ¶ 85, it would "not have the

reasonable likelihood of confusing sophisticated consumers concerning the 'affiliation,

connection, and/or association of Gusmer with Defendants Gama and Garraf' or 'the origin,

sponsorship, and/or approval of Defendants Gama and Garraf's products.' Compl. ¶¶ 119,

120, 125[-26]."  PMC Dfs. Mot. at 15.

     New Jersey's prohibition against unfair competition provides relief for a breach of the

duty of good faith and fair dealing and violations of the Lanham Act.  "A prima facie case of

unfair competition . . . requires evidence of bad faith or malicious conduct."  Wellness, 2008

WL 108889, at *20.  In Versa Prods. Co., Inc. v. Bifold Co. (Mfg.) Ltd., 50 F.3d 189, 207 (3d

Cir. 1995), the Third Circuit found that unfair competition exists where there is an effort to

"deceive consumers as to the origin of one's goods and thereby trade off the good will of a

prior producer."  The test of unfair competition under New Jersey law is identical to the test

for unfair competition under § 1125 of the Lanham Act.  See AT&T Co., 42 F.3d at 1433.

Therefore, because the Court already determined that Plaintiffs' claims, as alleged, are

adequately plead for the purpose of this motion, the Court need not conduct a separate analysis

here.  See Part III.A.8.a. & b., supra.  Accordingly, the Court denies Defendants' motion to

dismiss these claims.


### 9.      Count Nine:  Unjust Enrichment

Defendants move to dismiss Plaintiffs' claim for unjust enrichment.  PMC Defendants

contend that Plaintiffs fail to state a claim because (1) unjust enrichment is not an independent

tort and is only "quantum recovery for breach of a quasi-contact properly pled under New

Jersey law" and (2) Plaintiffs do not allege any quasi-contract nor that Defendants have been

unjustly enriched or received any illegitimate benefit.  PMC Dfs. Mot. at 15-16.  Garraf argues

that Plaintiffs' claim for unjust enrichment is inadequately plead because Graco fails to allege

"(i) any direct relationship between it and Garraf or (ii) that [Graco] conferred any benefit to,

or reasonably expected any remuneration from Garraf."  Garraf Mot. at 11.  Plaintiffs allege

that "Defendants have been unjustly enriched by reason of their foregoing breach of their

contractual and legal obligations to Plaintiff Graco."  Compl. ¶ 134.

As a preliminary matter, this Court has previously held that an unjust enrichment claim

may be sustained independently as an alternative theory of recovery.  Torres-Hernandez v.

CVT Prepaid Solutions, Inc., No. 08-1057, 2008 WL 5381227, at *9 (D.N.J. Dec. 17, 2008)

(citing In re K-Dur Antitrust Litigation, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (finding

defendant's motion to dismiss plaintiff's unjust enrichment claim as premature even where

other remedies at law were available to plaintiff); United States v. Kensington Hosp., 760 F.

Supp. 1120, 1135 (E.D. Pa. 1991) (allowing plaintiff to assert an unjust enrichment claim as

an alternative theory of recovery when plaintiff had asserted a cognizable contract claim in the

same complaint)).  An unjust enrichment claim requires plaintiff to allege "(1) at plaintiff's

expense (2) defendant received benefit (3) under circumstances that would make it unjust for

defendant to retain benefit without paying for it." In re K-Dur Antitrust Litigation, 338 F.

Supp. 2d at 544  (quoting Restatement of Restitution 1 (1937)).  Further, "[t]he unjust

enrichment doctrine requires that plaintiff show that it expected remuneration from the

defendant at the time it performed or conferred a benefit on defendant and that the failure of

remuneration enriched defendant beyond its contractual rights." VRG Corp. v. GKN Realty

Corp., 135 N.J. 539, 554 (1994).  While New Jersey law does not recognize unjust enrichment

as an independent tort cause of action, it does sound in quasi-contract.  Cafaro v. HMC, No.

07-2793, 2008 WL 4224801, at *12 (D.N.J. Sept. 8, 2008) (finding that the plaintiffs' unjust

enrichment claim should be dismissed because the allegations sounded in tort and not in

quasi-contract).  Thus, where Plaintiffs' unjust enrichment claim is based on a

quasi-contractual or implied contractual relationship with the expectation of remuneration, the

Court must determine whether the claim is adequately plead.

    The doctrine of unjust enrichment is "typically invoked . . . when [the] plaintiff seeks

to recover from [the] defendant for a benefit conferred under an unconsummated or void

contract." Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc., 171 F.3d

912, 936 (3d Cir. 1999) (internal citations omitted).  In such an instance, the law implies a

quasi-contract and requires that the defendant compensate the plaintiff in quantum meruit for

the value of the benefit conferred.  See Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d

989, 998 (3d Cir. 1987).  "To establish unjust enrichment, a plaintiff must show both that

defendant received a benefit and that retention of that benefit without payment would be unjust . . . . [and the plaintiff] expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." VRG Corp., 135 N.J. at 554 (internal citations omitted).

Garraf argues that Graco fails to allege any direct relationship between the parties or that Garraf conferred any benefit to, or reasonably expected any remuneration from Garraf. Graco does not argue that it adequately plead these two elements. Rather, it says "[i]t would be inappropriate, or premature at best, to resolve this unjust enrichment claim against Garraf before Graco has had the benefit of discovery to fully understand and prove the relationship between Garraf, which manufactures and markets 'Gama' products, and its co-defendants." Pl. Opp. at 40 n. 11. By Graco's own admission, it fails to adequately plead this claim.

More fundamentally, however, Graco does not allege recovery for a benefit conferred under an unconsummated or void contract. Instead, Graco alleges Defendants, acting in active concert with one another, have been unjustly enriched as a result of their violations of the obligations they owe to Graco, after PMC Global and PMC Europe sold Gusmer and its intangible assets to Graco for $65 million. Compl. ¶¶ 28-29, 33, 134. Graco further alleges that Defendants are now interfering with the previously sold assets by soliciting Gusmer's customers, retaining employees bound by non-disclosure and non-competition agreements with Gusmer, using Gusmer's intellectual property and proprietary information, while retaining the full $65 million purchase price, and thus, causing damage to Graco. Id. ¶¶ 7, 88, 135. The entire thrust of Graco's allegations is that Defendants, working in concert, are retaining or seeking to recapture the intangible assets that comprised a substantial portion of

Gusmer's value.  There is, therefore, no basis for applying a quasi-contractual remedy and Plaintiffs' claims for unjust enrichment cannot stand.  Accordingly, the Court grants Defendants' request to dismiss Graco's unjust enrichment claim.

B.      **Plaintiffs' Motion to Dismiss Defendants Gama and Commette's Counterclaims**

1.      **Antitrust Counterclaims**

Defendants Gama and Commette (collectively Gama or "Counterclaimants")[24] plead violations of Section 2 of the Sherman Act for monopolization (Count 1) or attempted monopolization (Count 2), based on allegations of "unlawful acquisition and maintenance of monopoly power in the [in-plant polyurethane processing equipment and materials ("IPPE")] market," through Graco's purported "unilateral[] refus[al] to deal with distributors that carry products from competing manufacturers."  Counterclaim ¶¶ 42, 44.[25]

---

[24]As both parties refer to Commette and Gama as Gama on this motion, the Court does the same.

[25]Counterclaimants also allege conspiracy to monopolize the IPPE market, however, the Supreme Court has clearly held that under the Sherman Act, 15 U.S.C. § 1, a parent company and its wholly owned subsidiary are incapable of conspiring with each other.  See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 776-77 (1984).  In Copperweld, the Court determined that "[a] parent and its wholly owned subsidiary have a complete unity of interest.  Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." Id. at 771.  As the parent and subsidiary always have a "unity of purpose or a common design," Id., the Court held that a parent corporation and its wholly owned subsidiary are incapable of conspiring with each other for purposes of § 1 of the Sherman Act.  Id. at 777.  Similarly, Counterclaimants fail to state a claim of conspiracy because Graco Inc. and its wholly-owned subsidiary Graco Minnesota cannot conspire with each other because they too have a unity of purpose or a common design.  See Id.
      Gama, however, argues that it did adequately plead a conspiracy claim under the Sherman Act because Graco's boycott conspiracy implicates both Graco and its top-tier American distributors who effectively became coerced coconspirators against Gama.  Otto, 388 F.2d at 797.  However, I find that Gama's allegations that "Graco and Graco Minnesota and/or others . . . conspired to monopolize the IPPE market" are too vague under Twombly.  Counterclaim ¶ 50.

Graco moves to dismiss Gama's antitrust claims on the grounds that Counterclaimants do not have antitrust standing because Gama is only a distributor and not a participant, i.e. a competitor or consumer, in the market.  Thus, Graco argues, since Gama does not directly compete against Graco in the relevant market, it cannot suffer injury of the type the antitrust laws were designed to prevent.[26]  Graco also argues that Gama is neither an efficient nor proper enforcer of the antitrust laws.

Gama alleges that "Graco has a nearly 100% market share and no significant competitors" in the "distinct market for plural component pump and spray and in-plant polyurethane processing equipment market ('IPPE') materials and equipment, with substantial technical barriers to entry".  Counterclaim ¶¶ 12-13.  Gama's counterclaims refer only to "IPPE;" however, according to Gama, IPPE encompasses the "plural component pump and stay and in-plant polyurethane processing equipment market in which Gama and Graco compete."  Gama Opp. at 1 n. 2.  Gama claims that it intends to amend its counterclaims to more clearly describe the pump and spray industry, but this change will be explanatory and not substantive.  See Id.  Gama, however, has not plead this definition at this time.  The Court must consider Gama's allegations as plead.  Id.  Graco argues that due to this admission, Gama concedes that its pleading of market definition is insufficient, but asserts that even if

---

Because counterclaimants fail to allege with specificity that any other conspirator was involved, the Court dismisses Gama's claims of conspiracy to violate antitrust laws.  Moreover, Gama lacks standing to bring its antitrust claims.  See Part III.B.1., infra.

[26]Graco argues that as an agent of Gama, Commette's injury and standing are necessarily derivative of Gama's.  Thus, if Gama lacks antitrust standing, then Commette also lacks standing.  See Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n, 830 F.2d 1374, 1378 (7th Cir. 1987) (denying a corporate officer of the plaintiff company challenging anticompetitive conduct standing); Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 710-711 (11th Cir. 1984).  Gama does not dispute this.

Gama amended its Counterclaims, Gama would not have standing.

Gama alleges that Garraf, located in Spain, is the only company that makes competing products and that as Garraf's sole manufacturer's representative and exclusive distributor in the United States, Gama is the only link in commerce between Garraf and the American market.  Counterclaim ¶¶ 15-16, 18; Gama Opp. at 1.  According to Gama, Graco threatened all of its IPPE product distributors with the loss of the right to sell Graco products if those distributors were also to sell competing products distributed by Gama.  Further, those distributors are the only realistic conduit for Gama to sell Garraf products in the United States, and Graco's threats have proved successful in cutting off Gama's sales, as distributors are refusing to carry Gama's Garraf product line.  Counterclaim ¶¶ 20, 24.

"Because of the infinite variety of claims that arise under the antitrust statutes, [the Supreme Court] has refused to fashion a black-letter rule for determining standing in every case."  Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 922 (3d Cir. 1999) (quoting Merican, Inc. v. Caterpillar Tractor Co., 713 F.2d 958, 964 (3d Cir. 1983)).  When assessing a Plaintiff's standing to bring antitrust claims, "[t]he [Supreme] Court has emphasized that lower courts should avoid applying bright-line rules and instead should analyze the circumstance of each case, focusing on certain key factors."  Id. at 922.  In Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 545 (1983), the Supreme Court articulated a five-factor balancing test for antitrust standing.  The Third Circuit has expressed these factors as follows:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of

> standing principles might produce speculative claims; (4) the existence of more
> direct victims of the alleged antitrust violations; and (5) the potential for
> duplicative recovery or complex apportionment of damages.

Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 320 (3d Cir. 2007).

Gama analyzes these five factors, arguing that it does meet the standing requirements.
Graco contends that only a narrow class of persons and injuries have antitrust standing and
Associated General Contractors requires more than a but-for theory of harm.  First, Graco
argues that its alleged monopolization of IPPE manufacturing does not directly harm Gama
because Gama does not manufacture such products or buy Graco's products.  Gama, however,
asserts that there is a causal connection between the antitrust violation, the harm to Gama, and
Graco's intent because Graco sought to prevent "all IPPE product distributors nationwide"
from purchasing Garraf products from Gama and that these IPPE distributors are "the only
realistic conduit for Garraf products in the United States."  Counterclaim ¶¶ 20, 24.  In
addition, Gama alleges that Graco sent a Letter to all IPPE distributors nationwide that
unilaterally threatened Graco's refusal to deal, which had its intended effect because "existing
Gama customers have stopped buying."  Id. ¶ 22.  According to Gama, distributors "would
have carried or continued to carry Garraf products but for Graco's refusal to deal with any
distributor carrying competing products."  Id. ¶ 23.  Thus, there appears to be a causal
connection between Graco's intent to harm competition by sending its Letter and Gama's
injury from the loss of sales and potential sales.

In its Motion, Graco focuses heavily on the second factor, which deals with the
concept of antitrust injury.  "If the injury is not of the requisite type, even though the would-be
plaintiff may have suffered an injury as a result of conduct that violated the antitrust laws, he
or she has no standing to bring a private action under the antitrust laws to recover for it."

Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 181 (3d Cir. 1997).

"Antitrust injury is a necessary but not insufficient condition of antitrust standing." Id. at 182

(citation omitted).  "Even a plaintiff who can show antitrust injury may lack antitrust standing,

because the remaining . . . factors may weigh against allowing him or her to sue under the

antitrust laws." Id.

   Graco argues that Gama is not a competing manufacturer in the alleged market and

therefore cannot suffer an antitrust injury. Pl. Mot. at 9-13.  In Schuylkill Energy Resources,

Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405 (3d Cir. 1997), the Third Circuit

explained that plaintiffs "must prove antitrust injury, which is to say injury of the type the

antitrust laws were intended to prevent and that flows from that which makes defendants' acts

unlawful.  The injury should reflect the anticompetitive effect either of the violation or of

anticompetitive acts made possible by the violation." 113 F.3d at 413 (quoting Brunswick

Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)).  Further, in Schuylkill, the

court stated:

> The antitrust laws are intended to preserve competition for the benefit of
> consumers in the market in which competition occurs . . . .  The requirement
> that the alleged injury be related to anti-competitive behavior requires, as a
> corollary, that the injured party be a participant in the same market as the
> alleged malefactors . . . .  A plaintiff who is neither a competitor nor a
> consumer in the relevant market does not suffer antitrust injury.

Id. at 415 (quoting Vinci v. Waste Management, Inc., 80 F.3d 1372, 1376 (9th Cir. 1996)).

An antitrust injury reflects an activity's anti-competitive effect on the competitive market.

Casper v. SMG, No. 00-3465, 2006 WL 3111132, at *4 (D.N.J. Oct. 31, 2006).  "The

requirement that the alleged injury be related to anti-competitive behavior requires . . . that the

injured party be a participant in the same market as the alleged malefactors." Schuylkill

Energy Resources, 113 F.3d at 415.

In order for a reasonable factfinder to determine if Gama competed in the market in which trade was allegedly restrained – the alleged antitrust injury – the answer depends on how that market is defined.  Barton, 118 F.3d at 182.  In Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997), the Third Circuit discussed the definition and boundaries of the relevant market in antitrust actions.  It wrote:

> Plaintiffs have the burden of defining the relevant market.  The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.  Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

Queen City Pizza, 124 F.3d at 436 (internal citations and quotations omitted).  Further, the court stated:

> Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively. . . .  When assessing reasonable interchangeability, (f)actors to be considered include price, use, and qualities. Reasonable interchangeability is also indicated by cross-elasticity of demand between the product itself and substitutes for it.  As we explained in Tunis Brothers Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991), products in a relevant market are characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market.

Id. at 437-38 (internal citations and quotations omitted).

Gama contends that the relevant product market is a "distinct market for IPPE materials and equipment."  Counterclaim ¶¶ 1, 7.  "Graco denies that 'the IPPE space,' Counterclaim ¶ 12, defines a relevant product market under antitrust law."  Pl. Mot. at 10 n. 7.

Graco asserts that Gama's claims should be dismissed because it has failed to identify any product in the alleged market and its interchangeability with other products.  Id.  It is unclear what exactly defines the IPPE market "materials and equipment" or the "pump and spray industry."  As pled, Gama does not define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand nor does it allege a proposed relevant market, as pled, that clearly encompasses all interchangeable substitute products.  See Queen City Pizza, 124 F.3d at 437-38.  Despite granting all factual inferences in Gama's favor, the relevant market is legally insufficient, and Gama cannot demonstrate that its alleged injury is of the type for which the antitrust laws were intended to provide redress.  See Barton, 118 F.3d at 182.  Thus, the Court dismisses Gama's antitrust claims.  See Id. (citing numerous cases that dismissed the plaintiff's antitrust claims for failure to sufficiently plead a relevant market).[27]

Because Gama fails to sufficiently define the relevant market and thus lacks standing, the Court need not address the individual arguments the parties raise with regard to the sufficiency of Graco's pleading regarding its monopolization and attempted monopolization claims.  Accordingly, the Court grants Graco's request to dismiss Gama's antitrust claims

---

[27]With regard to Gama's alleged antitrust injury, depending on how Gama defines the relevant market, Gama may be able to demonstrate that it, at least at times, directly competes with Graco, as Graco admits that sometimes it acts as a distributor selling to end-users.  In addition, Gama may be able to show that it forges the link between Garraf and the top-tier American distributors and competes directly with Graco, which sells its products directly to the same distributors, and thus Gama's harm is inextricably intertwined with Graco's alleged refusal to deal and its forced group boycott.  See Carpet Group Int'l v. Oriental Rug Importers Ass'n Inc., 227 F.3d 62, 77 (3d Cir. 2000).  Even if, however, Gama adequately defines the relevant market and demonstrates Gama's alleged injury is of the type for which the antitrust laws were intended to provide redress, balancing the five factors in Associated General Contractors, Gama will have to demonstrate that it has standing with regard to the factors of directness of the injury, the existence of more direct victims, and, most troubling, the potential for duplicative recovery or complex apportionment of damages.

without prejudice.

> 2.    **Gama' State Law Claims**
>
> a.    **Tortious Interference with Business Advantage**

The Court has already determined that to state claim for tortious interference with prospective economic advantage, a plaintiff must establish (1) that it had a reasonable expectation of an economic advantage; (2) that was lost as a direct result of Defendants' malicious interference; and (3) that it suffered losses thereby.  See Part III.A.6., supra.  Graco argues that Gama fails to allege that it had a reasonable expectation of business advantage or that Graco acted intentionally and with malice.  Graco also contends that because Gama is only a start-up with no established customers, it cannot plead generic expectations of business advantage.[28]

Gama, however, argues that it has a reasonable expectation to continue its sales of Garraf products to its existing customers and distributors, and to sell its products to other members of the trade.  Counterclaim ¶¶ 22-24.  Gama contends that Graco knew of Gama's business expectations when it took deliberate steps to wrongfully undermine those expectations by allegedly sending a Letter to "all IPPE distributors carrying Graco products – which is to say, all IPPE product distributors nationwide[,] . . . announc[ing] a pre-emptive unilateral refusal by Graco to deal with any distributor . . . that considers carrying Garraf products as well."  Counterclaim ¶¶ 20-21.  Gama alleges that Graco knowingly made false and disparaging comments about Gama's business and products to customers in the trade and

---

[28]The Court notes that this argument contradicts Graco's claim that Gama has successfully entered the market as evident from "Gama's own website [that] identifies at least 12 distributors for Garraf products, acquired in Gama's one year of business."  Pl. Mot. at 25 n. 12.

gave its customers ultimatums not to carry Gama's products.  Id. ¶¶ 25-27, 29-33.  Due to

Graco's conduct, Gama's customers stopped buying products and dropped the Gama line.  Id.

¶¶ 23, 32.  Thus, Gama argues, it sufficiently pleads that "but for [Graco's] interference, there

was a reasonable probability that [it] would have received the anticipated economic benefit."

Slim CD, Inc. v. Heartland Payment Sys., Inc., No. 06-2256, 2007 WL 2459349, at *3 (D.N.J.

Aug. 24, 2006).[29]  The Court agrees.  Accepting all of Gama's allegations as true, Gama

alleges a reasonable expectation of an economic benefit from selling products to customers in

the trade with which Graco intentionally and wrongfully interfered.  See Id., 116 N.J. at 753-

51 (finding that courts easily find a reasonable expectation of economic benefit even where

the sale is to the public at large).

        Graco also argues that Gama fails to allege any action constituting malice because

nothing about its Letter or actions was "wrongful" and Gama fails to plead any factual

allegations to support its claim that Graco "intentionally and unjustifiably interfer[ed] with

Gama's business."  Pl. Mot. at 29-32; Counterclaim ¶ 53.  Graco asserts that exercising control

over one's own distribution network cannot constitute tortious interference.  For support, Graco

relies on Frank Brunckhorst Co., L.L.C. v. Coastal Atlantic, Inc., 542 F. Supp. 2d 452 (E.D.

Va. 2008).  In that case, after the termination of its contract with Brunckhorst, Coastal alleged

it had a business expectancy to sell competitive products to its former customers, but

"Brunckhorst interfered with that expectancy by 'threatening' Coastal's former customers in

---

[29]Graco argues that Gama "implicitly conceded that it has failed to 'establish with
reasonable certainty a prospective economic relation."  Pl. Reply at 8-9.  However, Gama states
that it intends to amend its counterclaims with the actual dollar amount it allegedly lost due to
Graco's conduct.  Gama Opp. at 23 & n. 4.  Because a plaintiff must only allege that the injury
caused damages to state a tortious interference cause of action, and need not specify what the
actual damages were at this stage of litigation, Graco's argument is unavailing.  Matrix, 870 F.
Supp. at 1249.

order to prevent them from buying [a competing product line] from Coastal." Frank Brunckhorst , 542 F. Supp. 2d at 464. Under Virginia law, the court dismissed the claim because "[even though] perhaps unsavory, Brunckhorst tactics in threatening to withdraw supplies of Boar's Head products to those retailers who decided to purchase [the competing] products from Coastal were within its legal rights." Id. The court further found that apart from Coastal's conclusory allegation the counterclaim did not allege any reference to "illegal or independently tortious" means or methods that "violate an established standard of a trade or profession, or involve unethical conduct." Id. Thus, Graco argues that its Letter simply informed its distributors that it preferred that they carry only Graco products because taking on an additional competitive product line may significantly reduce the best efforts of a Graco distributor to sell Graco products. Thus, Graco contends that its conduct was a justifiable method of protecting its business interests, and not "transgressive of generally accepted standards of common morality." Lamorte Burns, 167 N.J. at 306. Graco also asserts that Gama failed to sufficiently allege malice because Gama merely recited that Graco "acted intentionally and without justification." Foxtons, 2008 WL 465653, at *7. The Court disagrees.

Gama argues that sending such a Letter or literature is not simply dismissed as "a lawful method of competition" or "at most mere puffing." Buono Sales, Inc. v. Chrysler Motor Corp., 363 F.2d 43, 49 (3d Cir. 1966). Rather, the Third Circuit has found that, under New Jersey law, a "defendant's carefully planned method of enticing" a plaintiff's customers away from plaintiff and to defendant constitutes tortious interference with plaintiff's business. Id. Similarly, Gama argues and the Court agrees that Gama has sufficiently pled a claim of tortious interference here.

Moreover, Gama contends that it sufficiently stated a claim even without the Letter because Graco does not contest that it has knowingly made false and disparaging comments about Gama's businesses and products to customers in the trade.  Counterclaim ¶¶ 26, 30-31. In addition, Graco allegedly gave its customers ultimatums not to carry Gama's products.  Id. ¶ 32.  Courts applying New Jersey law have permitted claims of such "sharp dealing", where neither the normal nor the expected course of practice is followed and a defendant strays from "the rules of the game."  Print Mart-Morristown, 116 N.J. at 757-58.[30]  Gama alleges a similar type of activity to that held actionable in Print Mart-Morristown, and thus, accepting all of Gama's allegations as true, Gama alleges the malice element.  Accordingly, Gama has stated a claim for tortious interference with business advantage and thus the Court denies Graco's request to dismiss this claim.


**b.    Trade Libel Claim**

To assert a claim of trade libel or disparagement, the plaintiff must demonstrate (1) publication, (2) with malice, such as knowingly making false statements or with reckless disregard for their falsity, (3) of false allegations concerning its property, product or business, and (4) special damages.  See Floorgraphics, Inc. v. News America Marketing in-Store

---

[30]Citing, e.g., Harris v. Perl, 41 N.J. 455, 461 (1964); Buono Sales, Inc. v. Chrysler Motors Corp., 363 F.2d 43, 49 (3d Cir. 1966) (holding that under New Jersey law an automobile manufacturer could be held liable for tortious interference with prospective economic relations, where an auto maker wrote to DeSoto purchasers and recommended that buyers have their cars serviced at dealerships that did not handle DeSoto in an effort to phase out dealerships of discontinued DeSoto model), cert. denied, 385 U.S. 971, 87 S. Ct. 510, 17 L.Ed.2d 435 (1966), appeal after remand, 449 F.2d 715 (1971); Somers Constr. Co. v. Bd. of Ed., 198 F. Supp. 732 (D.N.J. 1961) (permitting a tortious interference claim where the complaint alleged that architects had maliciously advised board of education to accept a higher bid for construction of new high school).

Services, Inc., No. 04-3500, 2008 WL 1901107, at *3 (D.N.J. Apr. 24, 2008); Mayflower

Transit, LLC v. Prince, 314 F. Supp. 2d 362, 378 (D.N.J. 2004) (citing Sys. Operations Inc. v.

Scientific Games Dev. Corp., 555 F.2d 1131, 1140 (3d Cir. 1997)).

      Graco argues that Gama fails to state a claim for trade libel and product disparagement

because it does not identify any publication that could be verified and proven false nor has it

plead special damages.  First, Graco contends that Gama fails to identify an actionable

statement and specifically, the following allegations in Gama's Counterclaim are not

actionable:  Graco's Letter to distributors informing them of Graco's intention to review their

business relationship should they add a competing product line, Counterclaim ¶ 20; Graco's

statements that Gama is selling "old" or "outmodeled" Gusmer technology, Id. ¶ 26; and Graco

personnel's false statements concerning Gama's continued viability and the quality of Gama's

product line.  Id. ¶ 27.  Graco argues that each of these statements either do not contain false

statements or cannot be proven false.  Graco further contends that Gama's allegations that

Graco representatives falsely claimed to customers that Gama would cease to be in operation

by the end of 2008 and that the customers would be "stuck with [Garraf products] when Graco

forces Gama out of business," Id. ¶¶ 29-31, are merely predictions about future market

conditions and not actionable statements of fact.  Pl. Mot. at 37.  Graco argues that these

statements are merely an expression of Graco's business opinion and intentions and truth is a

defense; thus, Gama fails to plead an actionable statement.[31]  Second, Graco argues that Gama

fails to plead special damages with particularity, as required by New Jersey law.

      Gama, however, argues that it did adequately plead trade libel, and more specifically

---

[31]The Court notes that such defenses are inappropriate at this stage of litigation – on a
motion to dismiss when all factual allegation are accepted as true.

actionable statements.  Gama asserts that Graco's false statements are sufficient allegations of trade libel because the statements are "publication[s] of [] matter[s] derogatory to the plaintiff's property or business, of a kind designed to prevent others from dealing with him or otherwise to interfere with plaintiff's relations with others."  Patel v. Soriano, 369 N.J. Super. 192, 246-47 (App. Div. 2004).  Much like the parties here dispute every claim and allegation, the parties also argue about one another's reliance on specific case law relating to trade libel and defamation claims and whether Gama's allegations constitute actionable statements under trade libel.  Specifically, Gama argues that Graco relies on cases that focus on defamation rather than trade libel.  See Gama Opp. at 26.  On the other hand, Graco argues that Gama never actually contends that it pleads actionable statements of fact, but rather only disputes the law.  Pl. Reply at 10.  Although there are some significant differences between trade libel and defamation claims, "[m]any statements effectuate both harms."  Patel, 369 N.J. Super. at 247.  "[O]ne may disparage plaintiff's business by reflecting upon its character, the manner in which it is conducted, or its popularity or danger, and not affect any property."  Id. at 248 (internal citations omitted).  Further, in a disparagement action, the plaintiff must show "proof of publication of material derogatory to the quality of a plaintiff's business, or to his business in general, of a kind calculated to prevent others from dealing with him, or otherwise to interfere adversely with his relations with others."  Id.

In the instant case, Gama alleges that Graco knowingly made false statements to the public and members of the trade about Gama's business and product lines, including statements about its business, products, product offerings, technology, operations, and business plans.  Counterclaim ¶¶ 25-27, 29-33.  Thus, Gama alleges that Graco made false statements derogatory to Gama's property or business, of a kind designed to prevent others from dealing

with Gama or otherwise to interfere with Grama's relations with others.  See Patel, 369 N.J. Super. at 246-47.  Accordingly, Gama has properly plead a claim for trade libel.

A trade libel or disparagement claim also requires that a prevailing plaintiff prove special damages by establishing pecuniary loss that has been realized or liquidated, such as lost sales, or the loss of prospective contracts with customers.  See Patel, 369 N.J. Super. at 248 (noting that traditionally a plaintiff was required to identify particular business interests who have refrained from dealing with him, or explain the impossibility of doing so, but where requiring such identification is unreasonable, proof of lost profits resulting from breach of contract may suffice, particularly where the loss is shown with reasonable certainty and where the possibility that other factors caused the loss is satisfactorily excluded.  Id. at 248-49).  At this stage of the litigation, however, Gama adequately pleads special damages.  Gama alleges that it was damaged by Graco's conduct because it lost sales to established customers, existing distributors dropped its product lines, and it was prevented from acquiring new customers that were also recipients of the Letter.  Counterclaim ¶¶ 24, 32-33.  While these allegations are sufficient here, to ultimately prevail on this claim, Gama must identify the businesses who stopped dealing with it, or explain why it cannot prove lost profits with reasonable certainty while excluding the other factors that could cause the loss.  See Patel, 369 N.J. Super. at 248-49.  Accordingly, the Court denies Graco's request to dismiss this claim pursuant to Rule 12(b)(6).

c.      New Jersey Fair Trade Act & Unfair Competition Claims

Graco contends that Gama fails to state a claim under the New Jersey Fair Trade Act, N.J. Stat. Ann. § 56:4-1, and for unfair competition, and thus, the Court should dismiss these

claims.  Courts have repeatedly held that § 56:4-1 is the state statutory equivalent of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and thus the same pleading standard is required. See, e.g., SK & F, Co. v. Premo Pharm. Labs., Inc., 625 F.2d 1055, 1066 (3d Cir. 1980).  Graco argues that Gama does not provide any facts or explanation as to how it violated the New Jersey Fair Trade Act, allege any practices that constitute false advertising or misdesignation of origin, nor plead the elements of a claim.

In addition, New Jersey and federal unfair competition claims are measured by identical standards.  See Primepoint, L.L.C. v. PrimePay, Inc., 545 F. Supp. 2d 426, 431-32 (D.N.J. 2008) (citing A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., (" A&H V"), 237 F.3d 198, 210 (3d Cir. 2000)).  Graco argues that Gama has failed to adequately allege a claim for unfair competition or provide any explanation regarding the grounds of its claim.

Gama, however, contends that it has adequately pled these claims because Graco's conduct "falls below any standards of fair play or business fairness."  Gama Opp. at 28.  Gama argues that Graco has employed improper tactics to stifle competition in the IPPE industry, has monopolized the IPPE market, and has exerted its influence to exclude Gama from competing against it.  For support that it has adequately pled these claims, Gama argues that it adequately pled trade libel and disparagement under Section 43(a) of the Lanham Act, and "Graco does not dispute that its other conduct supports the unfair competition claims."  Gama Opp. at 28-29.  Because Gama has pled actionable conduct under Section 43(a) of the Lanham Act, see Part III.B.2.b., supra., and thus, the elements of a New Jersey Fair Trade Act or unfair competition claim, Gama has sufficiently alleged these claims.  Accordingly, the Court denies Graco's request to dismiss these claims.

### 3. Graco's Request to Stay Claim

If the Court denies Graco's motion to dismiss Gama's counterclaims, Graco requests, in the alternative, that the Court bifurcate Gama's claims.  Gama argues that Graco has made such a request to keep competition out of the domestic market as long as possible and tie Gama in round after round of trials and discovery.  Courts may bifurcate trials for "convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b).  Moreover, bifurcation "remains the exception rather than the rule" even though "courts have generally been more willing to bifurcate patent trials than other types of cases." Innovative Office Prods., Inc. v. Spaceco, Inc., No. 05-4037, 2006 WL 1340865, at *1 (E.D. Pa. May 15, 2006) (citation omitted).  In this case, however, Graco's contract and tort claims are not dispositive of Gama's remaining counterclaims and all of the claims focus on the business practices and conduct of all the parties.  It is senseless to try Graco's claims first and Gama's thereafter.  The Court does not see a need to bifurcate the Counterclaim.  Accordingly, the Court denies Graco's request.

### IV. Conclusion

For the foregoing reasons, Defendants' Motions are granted in part and denied in part, and Plaintiffs' Motion is granted in part and denied in part.  Specifically, the Court grants Defendants' requests to dismiss Count Three of Plaintiffs' Complaint without prejudice and Graco's Motion to dismiss Counts One and Two of Commette and Gama's Counterclaims without prejudice, and grants Defendants' requests to dismiss Count Nine of the Complaint.  The Court denies Defendants' requests to dismiss Count Six and Graco is directed to re-plead its Lanham Act claims under 15 U.S.C. § 1125(a)(1) within ten (10) days.  Further, the Court denies the parties' Motions with respect to all remaining claims.

/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

Date: March 31, 2009