William H. Trousdale, Esq.
Brian M. English, Esq.
**TOMPKINS, MCGUIRE, WACHENFELD**
**& BARRY LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Phone: 973-622-3000
Fax: 973-623-7780

Timothy Rooney, Esq. *(pro hac vice)*
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601-9703
Phone: 312-558-5600
Fax: 312-558-5700

David S. Bloch, Esq. *(pro hac vice)*
Patrick M. Ryan, Esq. *(pro hac vice)*
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, California 94111
Phone: 415-591-1000
Fax: 415-591-1400

Attorneys for PMC Global, Inc., PMC, Inc., PMC Europe Investments, S.L., Denis S. Commette, and Gama Machinery USA, Inc.

Steven M. Kaplan
**KAPLAN & LEVENSON, P.C.**
433 Hackensack Avenue, 2nd Floor
Hackensack, NJ 07601
Phone: 201-646-9400
Fax: 201-646-9401

Attorneys for Garraf Maquinaria S.A.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GRACO INC., et al.,<br><br>        Plaintiffs,<br><br>        v.<br><br>PMC GLOBAL, INC., et al.,<br>        Defendants.<br><br>DENIS S. COMMETTE, GAMA MACHINERY USA, INC., AND GARRAF MAQUINARIA S.A.,<br>        Counterclaim Plaintiffs,<br><br>        v.<br><br>GRACO INC. and GRACO MINNESOTA INC.,<br>        Counterclaim Defendants. | Case No. 08-CV-01304 (FLW) (DEA)<br><br>**DEFENDANTS AND COUNTERCLAIMANTS DENIS S. COMMETTE, GAMA MACHINERY USA, INC., AND GARRAF MAQUINARIA S.A.'S MEMORANDUM IN SUPPORT OF THEIR <u>JOINT</u> APPLICATION FOR A PRELIMINARY INJUNCTION**<br><br># <u>REDACTED</u> |

# **TABLE OF CONTENTS**

I.  Introduction ............................................................................................. 1

II.  Graco's Anticompetitive Conduct ...................................................... 3

III.  Gama and Garraf are Entitled to a Preliminary Injunction ............................ 6

    A.  A Preliminary Injunction is Needed to Protect Gama, Garraf, and Consumers from Graco's Anticompetitive Tactics. ................................................................................ 6

    B.  Gama and Garraf have Established a Reasonable Probability of Success on Its Antitrust Counterclaims. ........................ 8

        1.  Gama and Garraf Have Established a Reasonable Probability of Success on Its Unilateral Refusal to Deal Claim. ................................................................ 8

            a.  Graco's Actions Constitute an Illegal Unilateral Refusal to Deal .......................................... 9

            b.  Graco's Threats Alone are Actionable as Antitrust Violations .................................................. 15

        2.  Gama and Garraf Have Established a Cognizable Harm to Competition. ..................................................... 16

    C.  Gama and Garraf Have Suffered Irreparable Harm Because It Cannot Calculate the Damages Resulting from Graco's Anticompetitive Conduct and Will Be Forced Out of Business if It Continues. ...................................... 18

    D.  Graco Will Suffer No Material Harm by Continuing to Sell Its Products to Its Customers ........................................ 20

    E.  The Public Has an Interest in Preventing Graco from Continuing to Illegally Exploit its Monopoly. ......................... 21

IV.  Gama and Garraf have Standing to Bring their Antitrust Counterclaims against Graco. ............................................... 22

i

A.    Graco Concedes that Its Direct Competition is Gama and Garraf. ....................................................................... 22

B.    The Third Circuit's Balancing Test Weighs in Favor of Finding Antitrust Standing for Gama and Garraf. ................ 23

V.    Gama/Garraf Also Are Entitled to a Preliminary Injunction Based on the Tortious Interference, Trade Libel, and Unfair Competition Claims. .................................................................. 26

VI.    Conclusion.................................................................................. 28

VII.    Appendix — Proposed Order....................................................... 30

ii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.I.B Express, Inc. v. FedEx Corp.,*
  358 F. Supp. 2d 239 (S.D. N.Y. 2004) ............................................................. 14

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.,*
  521 F.2d 1230 (3d Cir. 1975)............................................................ 22

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
  472 U.S. 585 (1985)........................................................... 2, 8, 13, 14

*Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters,*
  459 U.S. 519 (1983)............................................................ 23

*Bascom Food Products Corp. v. Reese Finer Foods, Inc.,*
  715 F. Supp. 616 (D. N.J. 1989) (Friendly, J.) ............................................ passim

*Broadcom Corp. v. Qualcomm Inc.,*
  501 F.3d 297 (3d Cir. 2007)................................................... 14, 15, 17

*Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.,*
  227 F.3d 62 (3d Cir. 2000)........................................................ 23, 24, 25

*Crimpers Promotions Inc. v. Home Box Office,*
  724 F.2d 290 (2d Cir. 1983), *cert. denied,* 467 U.S. 1252 (1984)...................... 25

*Earley Ford Tractor, Inc. v. Hesston Corp.,*
  556 F. Supp. 544 (W.D. Mo. 1983) ................................................. 21

*Intergraph Corp. v. Intel Corp.,*
  195 F.3d 1346 (Fed. Cir. 1999)........................................................ 6

*Interphoto Corp. v. Minolta Corp.,*
  417 F.2d 621 (2d Cir. 1969)........................................................ 7, 18

*Lago & Sons Diary, Inc., v. H.P. Hood, Inc.,*
  892 F. Supp. 325 (D. N.H. 1995)........................................................ 26

*Lorain Journal Co. v. United States,*
   342 U.S. 143 (1951) ............................................................ passim

*Novell, Inc. v. Microsoft Corp.,*
   505 F.3d 302 (4th Cir. 2007) ............................................. 12

*Otto Milk Co. v. United Dairy Farmers Co-op. Ass'n,*
   388 F.2d 789 (3d Cir. 1967) ................................... 12, 15, 16

*Pacific Bell Tele. Co v. Linkline Comm'ns, Inc.,*
   555 U.S. ___, No. 7-512, slip op. (Feb. 25, 2009) ............... 8

*Patel v. Soriano,*
   369 N.J. Super. 192 (App. Div. 2004) ............................... 27

*Poster Exchange, Inc. v. Nat. Screen Service Corp.,*
   198 F. Supp. 557 (N.D. Ga. 1961) ..................................... 20

*Printing Mart-Morristown v. Sharp Electronics Corp.,*
   116 N.J. 739 (1989) .......................................................... 28

*Semmes Motors, Inc. v. Ford Motor Co.,*
   429 F.2d 1197 (2d Cir. 1970) ............................................ 20

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.,*
   60 F.3d 27 (2d Cir. 1995) ................................................. 18

*U.S. v. Bell,*
   414 F.3d 474 (3d Cir. 2005) ............................................... 7

*U.S. v. McKesson and Robbins, Inc.,*
   351 U.S. 305 (1956) .......................................................... 22

**STATUTES**

New Jersey Fair Trade Act, N.J. Stat. Ann. § 56:4-1 ....................... 27, 28

Sherman Act, § 2 ........................................................................ 9

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure Rule 65 ................................................................ 6

ROBERT H. BORK, THE ANTITRUST PARADOX 430 (1993) ........................................ 8

## I.   Introduction

Over the course of four years, 2004-2007, Graco achieved an unchallenged monopoly in the market for so-called "Spray Foam" equipment[1] by acquiring its three rivals, Liquid Controls/Decker, Gusmer, and GlasCraft.  After each acquisition, Graco terminated key employees of the acquired companies.  In 2006, a handful of these ex-employees founded a start-up competitor, Garraf Maquinaria, in Spain.  And backed by Gusmer's former owner, another handful agreed to distribute Garraf's products in the United States.  Graco, livid that the monopoly it bought is being challenged, has embarked on a coordinated campaign to strangle Garraf in its crib.  In so doing, Graco has gone well beyond the bounds of fair competition set forth by the Sherman Act.  Garraf joins Mr. Commette and Gama USA (Garraf's U.S. master distributor) to seek an injunction preventing Graco's illegal activities until trial.[2]

The law is crystal-clear.  Under United States Supreme Court precedent, the quintessential example of an antitrust injury occurs when a monopolist tries to

---

[1] "Spray Foam" refers generically to plural component spraying equipment and related products, in which two chemicals, stored separately, are pumped from their containers, mixed together, and then dispensed, typically in the form of a polyurethane or polyurea spray foam.  Home and industrial insulation, spray-on truck bed linings, spray coatings, and ground sealing are amongst the uses for Spray Foam equipment.

[2] Gama was in the process of filing this motion at the end of March 2009 when the Court issued its opinion granting in part and denying in part the parties' then pending motions to dismiss.  Dkt. 82.  That order required the parties to replead certain claims, including portion of Graco's complaint and Counterclaimants' antitrust counterclaims.  Although the harm discussed below has been immediate, ongoing, and irreparable, the issue was not ripe to bring before the Court until the parties had finished repleading their respective complaint, answer, and antitrust counterclaims.  Now having done so, the Counterclaimants bring this preliminary injunction motion before the Court at the first available opportunity.

preserve its position by refusing to deal with its customers if they agree to do business with a new market entrant. *Lorain Journal Co. v. United States*, 342 U.S. 143, 148-50 (1951). Such a situation cries out for injunctive relief. According to the Supreme Court, the defendant's conduct in *Lorrain Journal* was "**bold, relentless, and predatory**," warranting an injunction requiring the defendant to continue to do business with its customers who also sought or did business with a new small competitor in the advertising market. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602, 610 (1985). Graco is engaged in the same bold, relentless, and predatory conduct here.

The facts of *Lorain Journal* are on all fours with Graco's conduct in this case. The defendant newspaper in *Lorain Journal* had a near 100% monopoly on advertising revenue. Graco enjoys a near 100% monopoly in the U.S. market for Spray Foam equipment. Like the upstart radio station attempting to compete with the monopolist newspaper in *Lorain Journal*, Gama USA and its consultant, Denis Commette,[3] are selling and attempting to sell Garraf equipment to distributors in the Spray Foam market that Graco controls. And just like the newspaper in *Lorain Journal*, Graco has engaged in a "bold, relentless, and predatory" campaign to shut competition down by unilaterally refusing to deal with business partners (distributors) if they agree to distribute Gama's products. Gama and Garraf thus seek a preliminary injunction to enjoin Graco from canceling agreements with distributors and suppliers who agree to do business with Gama and Graco's other competitors (if any) in the Spray Foam equipment market. The language of the

---

[3] We refer collectively to Gama and Mr. Commette as "Gama." Mr. Commette was formerly the head of Gusmer worldwide. He was terminated by Graco in October 2006. Commette Deposition Transcript ("Commette Depo.") at 123, 132-135 (attached to Declaration of David S. Bloch ("Bloch Dec.") ¶ 2, Ex. A).

proposed preliminary injunction, filed herewith, is patterned after the language approved by the Supreme Court in *Lorain Journal*. *Lorain Journal*, 342 U.S. at 157-59.

## II.    Graco's Anticompetitive Conduct

Gama is Garraf's sole manufacturer's representative and exclusive master distributor in the United States; Gama is the only link in commerce between Garraf and the American market. Garraf, in turn, is essentially Graco's only manufacturing competition in the Spray Foam equipment industry. Despite the fact that Garraf is tiny in comparison to Graco, Graco is very concerned that its monopoly power has become vulnerable. This is because Graco has managed to squander the goodwill it bought with its recent acquisitions. In particular, Graco discontinued ("obsoleted") Gusmer's most popular product line, including the industry-leading H20/35 hydraulic proportioner. Commette Depo at 203; Declaration of Frank Sica ("Sica Dec.") ¶ 13. Graco's confidential internal emails from June and July 2007 ███████████████████████████████████████ ████████████████████████████████████████████████████████ Bloch Dec. ¶¶ 3, 4, Exs. B, C.

Accordingly, Graco initiated a plan designed to shut Gama and Garraf down. In the words of a senior Graco official, ███████████████████ Bloch Dec. ¶ 5, Ex. D. It began its campaign to prevent any competition from Gama by sending a letter to all Spray Foam product distributors around the world, threatening to refuse to deal with them if they dared carry any competing products, including Gama's line of Garraf products. Though the letter was sent before Graco bought GlasCraft, the industry understood that it was directed solely to Gama and indeed refers to it colloquially as "the Gama letter": "it only refers to Gama." Hrynkiewicz Deposition Transcript ("Hrynkiewicz Depo.") at 296-297 (attached to

3

Bloch Dec ¶ 6, Ex. E). Graco timed its letter to arrive right before a major industry conference where Garraf rolled out its products for the first time:

> It is our opinion that *taking on an additional product line may significantly reduce the "best efforts" of a Graco distributor to sell our Graco and Gusmer product lines*.
>
> ***
>
> Should a distributor add a *competitive product line*, it will result in an immediate review of our business relationship and *may impact access to specific products*, changes in addendum status or *possible elimination of our distributor agreement*. If you are considering adding a Graco or Gusmer competitive equipment offering to your business, we ask that you give careful thought prior to making your final decision.

Bloch Dec. ¶¶ 7-8, Exs. F (Graco's October 24, 2007, "Gama Letter") (emphasis added) and G (list of its distributors to whom Graco sent the Letter).

Shortly after sending the letter, Graco officials candidly revealed in a confidential internal email that ███████████████████████████████

*Id.* ¶ 5, Ex. D (Graco e-mail, February 2008).

███████████████████████████████████████████████

███████████████████████████████████████████████

                                                        *Id.* (emphasis added).

Gama and Garraf have now learned that Graco did in fact ████████████ — and continues to do so. Indeed, Graco carried out a direct campaign to intimidate the Spray Foam distribution channel into not distributing *any* competing products. Graco went beyond the letter, telling its distributors that Graco's "*stated policy with its direct distributors is that Graco's distributors cannot offer competing product lines, including those distributed by Gama*, and that if Graco permitted [anyone] to offer both products it would undermine Graco's firm policy with all of

4

its direct distributors." Declaration of Richard Spiess ("Spiess Dec.") ¶ 22 (internal quotation marks omitted) (emphasis added). Examples of this misconduct abound:

- ***Termination of distributor Richard Spiess.***  Richard Spiess's company, SPF, was a Graco sub-distributor. During the summer of 2008, Graco told him that SPF could not continue selling Graco's products because SPF had decided to carry Gama's line of products, as well. *Id.* at ¶¶ 18-23. According to Graco, "[i]t is inappropriate and in conflict with Graco's policy for SPF to be displaying both Graco and Gama product on SPF's website." *Id.* at ¶ 20.

- ***Successful in-person threats to a major Graco distributor.***  Recently, despite the existence of this lawsuit, Graco escalated its "hard ball" tactics even further by traveling to a distributor—which previously had announced that it would start carrying Gama's products—to threaten it directly with the loss of the right to sell Graco's products. Declaration of Bill Hrynkiewicz ("Hrynkiewicz Dec.") ¶¶ 28-34. Shortly after Graco's visit, that company told Gama that it would not become a Gama distributor after all because of Graco's threats. Its principal is so afraid of Graco taking away his distributorship (and thus his livelihood) that he will not voluntarily or publicly speak of Graco's threats.[4] *Id.* at ¶¶ 34-36.

- ***Threats to other distributors.***  Graco representatives similarly have contacted and threatened other top-tier Spray Foam distributors. Declaration of David Lewis ("Lewis Dec.") ¶¶ 18-23. Graco's threats have proved successful, causing most distributors to refuse to carry the Garraf product line. Moreover, these distributors "are afraid to speak publicly about Graco's demands that the distributors not carry Gama or other non-Graco products, because they are petrified of Graco." *Id.* ¶ 30. Many of these distributors are identified below; still others have asked not to be identified for fear of retribution.

---

[4] Gama will share the name of this distributor, and contemporaneous emails reflecting his concerns, *in camera* or following an order from the Court directing Graco not to retaliate against it.

Since top-tier distributors are the only realistic conduit for Gama to sell a sufficient amount of Garraf products into the United States to stay afloat, Graco's denial of access to the market threatens irreparable injury to Gama, Garraf, and their respective employees. Moreover, the destruction of market competition is a threat to consumers that, in and of itself, warrants injunctive relief. "A 'refusal to deal' may raise antitrust concerns when the refusal is directed against competition and the purpose is to create, maintain, or enlarge a monopoly." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1358 (Fed. Cir. 1999).

Graco has made clear to people in the industry that its goal is to put Gama out of business. Spiess Dec. ¶¶ 13, 19-24; Declaration of Patrick Gililland ("Gililland Dec.") ¶ 17. Its very lawsuit—with its trumped-up claims of trade secret theft—appears to be part of that plan. And if this Court does not swiftly enjoin Graco from preventing Gama and Garraf's entry into the market, Graco will get its wish: Gama, Garraf, the jobs they provide, and the competition and lower prices they can bring to the table for the ultimate consumers, will be eliminated. As Gama's Vice President of Sales and Marketing attests, Graco's threats and tactics have "severely hurt [Gama's] efforts." Hrynkiewicz Depo. at 280-81.

This is a paradigmatic case for preliminary injunctive relief. The Court should issue an order that restores the status quo and protects an important market from the loss of competition and ends Graco's illegal suppression of competition.

**III. Gama and Garraf are Entitled to a Preliminary Injunction**

**A. A Preliminary Injunction is Needed to Protect Gama, Garraf, and Consumers from Graco's Anticompetitive Tactics.**

Pursuant to Federal Rule of Civil Procedure 65, Gama and Garraf move the Court for a preliminary injunction to protect Counterclaimants and the Spray Foam industry from Graco's anticompetitive conduct. Counterclaimants cannot

6

effectively compete for customers if Graco is allowed to continue its unilateral refusal to deal. The Court can restore lawful competitive balance to the industry by issuing a preliminary injunction that prevents Graco from following through on its threats. Courts consistently have used injunctions to prevent similar illegal conduct. *See, e.g., Lorain Journal Co. v. United States,* 342 U.S. 143 (1951); *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621, 622 (2d Cir. 1969) (*per curiam*) (affirming injunction requiring defendant to continue supplying distributor despite unilateral refusal to deal); *Bascom Food Products Corp. v. Reese Finer Foods, Inc.*, 715 F. Supp. 616, 624 (D. N.J. 1989) (Friendly, J.) (same).

Each of the four factors that the courts of the Third Circuit evaluate when issuing a preliminary injunction, *see U.S. v. Bell*, 414 F.3d 474, 478 n.4 (3d Cir. 2005), weighs in Gama and Garraf's favor:

(a)     Gama and Garraf have established a reasonable probability of success on the merits. Graco's unilateral refusal to deal with its established customers, including distributors who have been buying Graco's Gusmer products since the 1970s, is nearly identical to the illegal refusal-to-deal scenario that the Supreme Court enjoined in *Lorain Journal*, 342 U.S. 143 (1951).

(b)     Gama and Garraf's harm is irreparable. Gama and Garraf will never be able to calculate all of its lost sales, customers, and business goodwill caused by Graco's threats and actions. If Graco is allowed to continue its anticompetitive conduct, Graco may well succeed in forcing Gama out of business, keeping Garraf products out of the U.S. market, and depriving Mr. Commette from continuing his lifelong vocation.

(c)     The harm to Gama and Garraf clearly outweighs any harm to Graco. Gama and Garraf's existence, their employees' jobs, and any competition in the Spray Foam market are at risk; Gama and Garraf are only seeking an opportunity to compete fairly against Graco without the restraints of Graco's threats against

customers.  Graco's only "harm" is that it would be enjoined from terminating existing Graco distributors for the sole reason that they have agreed to do business with Gama and carry the Garraf product line.  In the unlikely event that Graco prevails at trial, Gama and Garraf's revenues (and thus Graco's alleged damages) will be easy to ascertain.

(d)    The public has a vested interest in promoting competition and removing illegal restraints of trade.  The public benefits from legitimate competition in the Spray Foam marketplace through more choice and lower costs. The evidence shows that Gama and Garraf's products, when both price and quality are considered, are a better value.  Lewis Dec. ¶¶ 24-28; Spiess Dec. ¶¶ 8-10. Abuse of a monopoly position to exclude competition is the *sine qua non* of anticompetitive conduct prohibited by the antitrust laws for the benefit of consumers. *See, e.g.*, ROBERT H. BORK, THE ANTITRUST PARADOX 430 (1993).

**B.    Gama and Garraf have Established a Reasonable Probability of Success on Its Antitrust Counterclaims.**

**1.    Gama and Garraf Have Established a Reasonable Probability of Success on Its Unilateral Refusal to Deal Claim.**

Gama and Garraf need only to make a *prima facie* case showing a reasonable probability of success warranting a preliminary injunction. *Bascom Food,* 715 F. Supp. at 624.  Gama and Garraf can make that showing and more. Graco's conduct is manifestly illegal and eerily mimics the definitive example of an illegal refusal to deal that the Supreme Court enjoined in *Lorain Journal. Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601–602, n.27 (1985); *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951); *Pacific Bell Tele. Co v. Linkline Comm'ns, Inc.*, 555 U.S. ___, No. 7-512, slip op. at 8 (Feb. 25, 2009) (holding that "a firm's unilateral refusal to deal with its rivals can give rise to

antitrust liability") (citing *Aspen Skiing*, 472 U.S. at 608-611).

> a.  **Graco's Actions Constitute an Illegal Unilateral Refusal to Deal.**

It is undisputed that Graco refused to deal with its own customers, even distributors of long standing, in order to foreclose Gama and Garraf from making even the tiniest inroads into Graco's supply and distribution monopoly.  Like *Lorain Journal*, this is a paradigmatic example of an unlawful refusal to deal warranting Section 2 liability.  It is undisputed that Graco sent the "Gama Letter" ████████████. Bloch Dec. at ¶ 8, Ex. G. ███████████████████████
███████████████████████████████████████████████
███████████████████████████ *Id*. And it is undisputed that some of them have, in fact, refused to do business with Gama because of Graco's threats to their livelihood.  As in *Lorain Journal*, these potential customers "either ceased or abandoned their plans" to do business with Gama and carry Garraf products. *Lorain Journal Co. v. United States*, 342 U.S. 143, 149 (1951).  This is more than sufficient to state a *prima facie* case of antitrust injury.

The timing of Graco's "Gama Letter" was not coincidence.  The 2007 Polyurea Development Association Europe Conference in Brussels was scheduled for November 14-16, 2007, only a few weeks after Graco sent out its Letter.  Graco and Garraf both had booths at the conference, and their attendance was known well in advance.  Bloch Dec. ¶ 9, Ex. H.

The Letter had its intended effect.  Only days following the conference, Mike Ruby, then a GlasCraft Vice President and now (following Graco's acquisition of GlasCraft) Graco's Director, Sales & Marketing - In-Plant Polyurethane Equipment, ██████████████████████████
████████████████████████████████████████████

9

████  Bloch Dec. ¶ 10, Ex. I (emphasis added).  After a subsequent tradeshow, Graco Vice President and General Manager Mark Sheahan ████████████

████████████████████████████████████████████████

Bloch Dec. ¶ 11, Ex. J.

Several prospective distributors have informed Gama that they cannot carry Gama's line of Garraf products because they fear termination by Graco.  They include:

- **Urethane Service, Inc.**  USI, a current Graco distributor, has been distributing Gusmer products since the early 1970s.  It received a copy of the "Gama Letter" and understood it to mean that Graco would cancel its distributor agreement with USI if USI began to carry or distribute Gama's product line.  Hrynkiewicz Dec. ¶¶ 24-25 ████████████  Because of the "Gama Letter,"  USI would not even consider carrying Gama's products.  Hrynkiewicz Dec. ¶ 25.

- **UCSC.**  UCSC is a top-tier distributor that has been distributing Gusmer products since the early 1970s.  ████████████████  UCSC had already purchased a Garraf machine from Gama in preparation for becoming a distributor.  Sica Dec. ¶ 17.  But a few months after receiving the Gama Letter, UCSC returned the equipment that it had purchased and apologized that it could not be a Gama distributor.  *Id.* at ¶ 26.

- **Specialty Products, Inc.**  SPI also purchased Garraf equipment from Gama in preparation for becoming a Gama distributor, but cancelled its plans after receiving a copy of the "Gama Letter."  *Id.* at ¶ 27.

- **CPI.**  Graco threatened CPI, a top-tier distributor of Graco's equipment, that Graco would cancel its distributor agreement if CPI started carrying Gama's products or other non-Graco Spray Foam products.  Lewis Dec. ¶ 18-21.

- **SPF.**  Graco even instructed SPF, a sub-distributor of Graco's Spray Foam equipment, that it could not continuing selling Graco's products nor display the Graco name on its website because it had started selling Gama's equipment too.  Spiess Dec. ¶¶ 5-6, 18-23.  In Graco's own words, "If Graco allowed SPF to display Graco's products along with a competitor's, such as

10

Gama's, it would cause issues with Graco's direct distributors, because, to the outside world, it appeared as though SPF was one of Graco's direct distributors." *Id.* at ¶ 21.

Other distributors also have been affected. Indeed, despite the pending antitrust lawsuit against it, Graco has continued its efforts to enforce an industry-wide boycott of Gama and its Garraf products. Graco representatives are now traveling to distributors to directly intimidate them into not carrying Gama's products. Those distributors "are afraid to speak publicly about Graco's demands that the distributors not carry Gama or other non-Graco products, because they are petrified of Graco." Lewis Dec. ¶ 30. Graco representatives even actively promote its lawsuit against Gama as a "talking point" at industry trade shows to further deter distributors. Gililland Dec. ¶ 17; Hrynkiewicz Depo. at 298. According to Graco, "You should think twice about becoming a Gama distributor because Gama won't be around for long due to Graco's lawsuit against it." Spiess Dec. ¶ 13; Gililland Dec. ¶ 17.

Graco intensified its boycott-enforcement activities after the recent annual industry conference, Spray Foam 2009. When Graco caught wind of a distributor's decision to carry Gama's line of Garraf products, its preliminary response was "severe." Hrynkiewicz Dec. ¶ 30. Graco representatives first called the distributor, and then several Graco top executives visited the owner in person to threaten the distributor with the loss of his distributor agreement and his livelihood if he began distributing Gama products.[5] *Id.* at ¶ 32. Shortly after Graco's ultimatum, that distributor told Gama that it would not become a Gama

---

[5] Asked how Graco ████████████████████████████████

████████████████████████████████████████████████

Bloch Dec. ¶ 13, Ex. L (emphasis added).

11

distributor after all.  Hrynkiewicz Dec. ¶ 33.  It will not voluntarily come forward because the owner is too frightened of possible Graco retaliation, which could have the effect of destroying his and his employees' livelihood.  Hrynkiewicz Dec. ¶ 31.  By enforcing its boycott, Graco has turned its distributors into "coerced coconspirators" under the Sherman Act.  *Otto Milk Co. v. United Dairy Farmers Co-op. Ass'n*, 388 F.2d 789, 797 (3d Cir. 1967).

Patrick Gililland of SPF Depot (a business specializing in parts and accessories for spray and polyurea applicators) has spoken with at least one other distributor whom Graco threatened with losing its Graco distributorship — and millions of dollars in sales — if the distributor started carrying Gama products.  Gililland Dec. ¶ 16.  The distributor remains unnamed to protect it from Graco's retaliation; as it confided to Mr. Gililland, "I don't want to rock *that* boat"; "we would prefer to stay out of it and not get involved in an argument against Graco."  *Id.* (emphasis added).  Still other distributors have told similar stories about Graco's hard-ball tactics to David Lewis, who owns a business selling aftermarket parts for equipment used in the polyurethane spray-foam industry.  Lewis Dec. ¶ 1, 30.  The affected distributors include LaPolla Industries, Penntech, CPI, Foampak, SPI, NCFI, InTech, Demilec, and CUSE.  Hrynkiewicz Depo. at 281-283, 291-296; Commette Depo. at 336-344; Lewis Dec. at ¶ 22, 23; Gililland Dec. ¶ 15.

It is no surprise that those distributors have not come forward of their own volition: businesses dependent on a monopolist's products are not in a position to challenge the monopolist.  *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 319 (4th Cir. 2007) ("some parties 'affected by an antitrust violation may well not sue because of their stake in an ongoing commercial relationship with the violator'").

In *Aspen Skiing*, the Supreme Court made it quite clear that refusing to deal with established customers constitutes egregious and actionable exclusionary conduct: "Although Ski Co.'s pattern of conduct may not have been as 'bold,

relentless, and predatory' as the publisher's actions in *Lorain Journal,* the record in this case comfortably supports an inference that the monopolist made a ***deliberate effort to discourage its customers from doing business with its smaller rival*.*" *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. at 610 (footnote omitted) (emphasis added).  Graco's newly-discovered "***stated policy*** with its ***direct distributors*** is that Graco's distributors ***cannot offer competing product lines, including those distributed by Gama***."  Spiess Dec. ¶ 22 (internal quotation marks omitted) (emphasis is added).  Yet the policy is in fact applied *only* against Gama and its Garraf products (and not, for example, GlasCraft).  Hrynkiewicz Depo. at 296-297.

This bears all the hallmarks of the "bold, relentless, and predatory" conduct the Supreme Court enjoined in *Lorain Journal*:

> Under § 1 of the Sherman Act, a business "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." [Citations omitted].

> \* \* \*

> In *Lorain Journal Co. v. United States*, 342 U.S. 143 . . . (1951), we squarely held that this right was not unqualified.  Between 1933 and 1948 the publisher of the Lorain Journal, a newspaper, was the only local business disseminating news and advertising in that Ohio town. In 1948, a small radio station was established in a nearby community. ***In an effort to destroy its small competitor***, and thereby regain its "pre-1948 substantial monopoly over the mass dissemination of all news and advertising," ***the Journal refused to sell advertising to persons that patronized the radio station***. *Id.*, at 153 . . ..

> In holding that this conduct violated § 2 of the Sherman Act, the Court dispatched the same argument raised by the monopolist here:

>> "The publisher claims a right as a private business concern to select its customers and to refuse to

13

accept advertisements from whomever it pleases.
We do not dispute that general right. 'But the
word "right" is one of the most deceptive of
pitfalls; it is so easy to slip from a qualified
meaning in the premise to an unqualified one in
the conclusion. Most rights are qualified.'
*American Bank & Trust Co. v. Federal Bank,*[256
U.S. 350].... The operator of the radio station,
equally with the publisher of the newspaper, is
entitled to the protection of that Act...."

> The Court approved the entry of an injunction ordering the Journal to
print the advertisements of the customers of its small competitor.

*Aspen Skiing*, 472 U.S. at 601–602, n.27 (emphasis added), quoting *Lorain
Journal*, 342 U.S. 143.

Graco has argued elsewhere that the lack of a prior course of dealing with
rivals precludes Gama's claim. Dkt. No 48 at 7-14. This is nonsense. In a half-
century of precedent, the Supreme Court has never required that the illicit refusal
to deal or prior course of dealing must be with the named party or competitor. And
the Third Circuit has expressly rejected the contention that lack of a prior course of
dealing with rivals precludes an antitrust claim. *Broadcom Corp. v. Qualcomm
Inc.*, 501 F.3d 297, 316–17 (3d Cir. 2007) (allegations supported a refusal-to-deal
claim because Qualcomm had established a course of dealing in the industry by
participating in an industry standards organizations); *see A.I.B Express, Inc. v.
FedEx Corp.*, 358 F. Supp. 2d 239, 250–51 (S.D. N.Y. 2004) (refusal-to-deal claim
was properly pled where prior dealing was identified).

In order to foreclose a challenger to its monopolistic stranglehold, Graco
threatened to refuse to deal with mutual and potential customers for Spray Foam
equipment — including customers who have been doing business with
Gusmer/Graco for nearly 40 years — if those customers carried rival Gama's
products. "When Graco bought Gusmer, they ended up with [Gusmer's]

14

distribution system, and then they put out the threat to the distribution system that if you buy anything from Gama, [Graco is] going to cut you off." Kamins Deposition Transcript ("Kamins Depo.") at 119 (attached to Bloch Dec. ¶ 14, Exh. M).[6] This is no different from the newspaper-defendant in *Lorain Journal* that threatened mutual and potential customers in order to foreclose the victim — a newly established radio station — from challenging the newspaper's advertising monopoly.

### b.    Graco's Threats Alone are Actionable as Antitrust Violations.

The same facts also support Gama and Garraf's attempted monopolization claim. "A claim of attempted monopolization under § 2 of the Sherman Act must allege (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Broadcom Corp.*, 501 F.3d at 317 (internal quotation marks and citation omitted).

The Third Circuit has held that intimidation of a plaintiff's customers in furtherance of a monopoly is actionable, even where a consummated actual refusal to deal was not achieved. In *Otto Milk Co. v. United Dairy Farmers Co-op. Ass'n*, 388 F.2d 789 (3d Cir. 1967), the plaintiff, a milk processor, purchased raw milk from certain producers, processed it into drinking milk, cheese, and other items, and then sold the products to retail stores. *Id.* at 790–91. The defendant dairy association wanted the plaintiff to stop dealing with a competing dairy association and instead work with it. *Id.* In order to intimidate the plaintiff, the defendant boycotted and picketed stores that purchased plaintiff's products and

---

[6] Phil Kamins is the founder and Chairman of the Board of the PMC entities, which sold Gusmer to Graco.

told stores that "[picketers] would leave if the [store] stopped selling [plaintiff's] milk and ... they tried to have the stores substitute [defendant-affiliated] products for [plaintiff's]." *Id.* at 796.

The Third Circuit affirmed the trial court's finding of an antitrust violation where the "purpose of defendants' activities was to induce the retail store operators to agree to stop handling Otto's products." *Id.* at 798. It held that defendant's activities constituted an antitrust violation: "It was a raw endeavor on the part of defendants to monopolize that market by forcing [plaintiff] out of its retail connections because it would not bow to the defendants' demands, leave its [dairy association] and function under the defendants' groups." *Id.* at 797.

The facts of *Otto* illustrate why Graco's conduct plainly give rises to an antitrust violation. *First*, to secure a monopoly, the defendant intimidated plaintiff's customers and potential customers in an effort to prevent them from dealing with the victim—there, Otto, and here, Gama and Garraf. *Second*, the plaintiff and defendant did not have a prior business relationship. *Third*, the plaintiff and defendant were not even direct competitors in that the defendant was a dairy association and the plaintiff was a milk processor. Under *Otto*, Gama and Garraf have established their case.

### 2. Gama and Garraf Have Established a Cognizable Harm to Competition.

There is a distinct market for Spray Foam materials and equipment. Graco even has an entire, distinct division—its High Performance Coatings and Foam ("HPCF") equipment division—devoted to that market and "All Your Spray Foam and Polyurea Applications." Bloch Dec. ¶ 15, Exh. N (Graco marketing material).

████████████████████████████ Bloch Dec. ¶ 16, Exh. O (Graco board

presentation). ████████████████

16



Bloch Dec. ¶¶ 16-17, Exh. O, P.

Tellingly, after acquiring Gusmer in 2005, Graco ▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉ Bloch Dec. ¶ 18, Ex. Q (Graco memorandum,

February 8, 2005). And in December 2007, Graco announced that it was acquiring

this last remaining competitor. *Id.* ¶ 19, Ex. R. Graco now has a nearly 100%

market share and no significant competitors in the Spray Foam space. Spiess Dec.

¶ 3-4; Lewis Dec. ¶ 5, 6, 10; Gililland Dec. ¶ 11, 18. Garraf/Gama is Graco's only

meaningful competitor. Gililland Dec. ¶ 11, 18; Hrynkiewicz Dec. ¶ 12; Spiess

Dec. ¶ 9-10, 17; Lewis Dec. ¶ 24-28; Sica Dec. ¶ 20. "Graco in their great

wisdom, decided to have a monopoly. And they achieved that monopoly by taking

Gusmer out and getting [Gusmer's] 80 percent of the market, adding it to [Graco's]

five percent, and then they took GlasCraft out and then ended up with 100 percent.

***So if [Graco] wanted to keep [Gama] from the market, [Graco] can do that and***

***they are doing that.***" Kamins Depo. at 120 (emphasis added).

By seeking to eliminate its only real competition, Graco is attempting to

systematically remove from the market any alternatives to its products.

Hrynkiewicz Depo. at 280-285; 291-294. It has effectively scared distributors who

would have carried or continued to carry Garraf products. Lewis Dec. at ¶ 17-23,

30; Gililland Dec. ¶ 14-17; Spiess Dec. ¶ 25; Hrynkiewicz Dec. ¶ 23-34.

Competition is harmed when alternatives are eliminated. *Broadcom Corp. v.*

*Qualcomm Inc.*, 501 F.3d 297, 316-17 (3d Cir. 2007).

**C.   Gama and Garraf Have Suffered Irreparable Harm Because It Cannot Calculate the Damages Resulting from Graco's Anticompetitive Conduct and Will Be Forced Out of Business if It Continues.**

Gama and Garraf have suffered — and continue to suffer — irreparable harm.  Counterclaimants are "unable to calculate its damages since it [] suffer[ed] not merely loss of profits . . ., but also loss of good will . . .." *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621, 622 (2d Cir. 1969) (*per curiam*).  They will never know the extent of the damage inflicted by Graco to its business, reputation, and good name.  Hrynkiewicz Dec. ¶ 21.  They will never know how many customers they would now have but for the coerced industry-wide boycott that Graco has led.  They cannot determine the total number of orders they lost because top-tier distributors and suppliers were too afraid to disobey Graco's edict against Gama and its line of Garraf products.  And it will never know how much damage Graco inflicted upon Gama and Garraf's reputation and good will — to say nothing of the personal reputation of Mr. Commette, an industry veteran of 35 years.  The "case law affords injunctive relief to plaintiffs whose loss of consumer good will result in incalculable damage." *Bascom Food Products Corp. v. Reese Finer Foods, Inc.*, 715 F. Supp. 616, 639 (D. N.J. 1989) (damage to good will and reputation from "[w]ord-of-mouth grumbling" is incalculable); *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) ("affirming finding of irreparable harm because plaintiff 'presented ample evidence to show a threatened loss of good will and customers, both present and potential, neither of which could be rectified by monetary damages'").

At a minimum, however, there is every reason to believe that Gama and Garraf would have acquired a significant share of the market absent Graco's misconduct.  As Mr. Spiess, who distributed Graco products and has extensive

experience in the industry, attests:

> Gama's product, on the other hand, are superior in both price and
> quality, and based on my knowledge of the industry and
> conversations with consumers of such products, Gama would enjoy
> broad market success if people in the industry were able to readily
> purchase them.
>
> ***
>
> It is my opinion, based on that  [sic] my experience in the [Spray
> Foam] industry and conversations with other in the industry, that, if
> Graco would not threaten to cancel its distributorship agreements
> with distributors who want to sell Gama's products, that Gama would
> acquire a substantial percentage of the overall market for the type of
> equipment sold by Gama and Graco."

Spiess Dec. ¶¶ 10, 25.

Mr. Lewis, who has worked in the industry for 13 years, confirms that "if
Graco would not threaten to cancel its distributor agreements with its top-tier
distributors, . . . Gama would acquire a substantial percentage of the overall market
in the Equipment market."  Lewis Dec. ¶ 15.

The inadequacy of damages is further highlighted because Gama and Garraf
are "brand new competitor[s] which [are being] precluded from [the Spray Foam]
market." *Bascom Food*, 715 F. Supp. at 638.  The "full measure of damages
[Gama and Garraf] generally seek [ ] [is] the profits that would have been
forthcoming over the projected life of the business."  *Id.* at 639.  Gama and Garraf,
however, do not have a long-established "record of sales or profit from the active
distribution of [Spray Foam] products to the [top-tier, direct distributor] class of
trade from which an approximation of future lost sales or products could be
calculated or extrapolated."  *Id.* (finding irreparable harm for a new competitor,
"distinguishable from [a case] where there existed a fifteen year history of sales
activities").

And the harm that Mr. Commette suffers personally and professionally

19

cannot be quantified.  Mr. Commette has worked exclusively in this industry since
1974.  Commette Depo. at. 19.  He "had spent most of his working life in the
[Spray Foam] industry . . ..  Even if he could be *financially* compensated for the
losses he would suffer from being expelled from his livelihood, he could not be
relieved from the harm resulting from the potential destruction of his life's work."
*Bascom Food*, 715 F. Supp. at 640 (emphasis in original).  As Judge Friendly
astutely held, "the right to continue a business in which Mr. [Commette] had
engaged for [35] years . . . is not measurable entirely in monetary terms; *[he]
want[s] to sell [Spray Foam equipment], not to live on the income from a damages
award.*"  *Id.*, quoting *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197,
1205 (2d Cir. 1970) (emphasis as cited) (internal quotation marks omitted).

### D. Graco Will Suffer No Material Harm by Continuing to Sell Its Products to Its Customers

The balance of harms clearly favors Gama and Garraf.  Graco will not
"suffer any appreciable loss or damage if it continues to deal with [its current
distributors] as it has done for some . . . years.  [Graco] has not shown that its prior
dealings with [its distributors] were unprofitable."  *Poster Exchange, Inc. v. Nat.
Screen Service Corp.*, 198 F. Supp. 557, 561 (N.D. Ga. 1961).  And again, if Graco
somehow prevails, it will be able to recover damages for any inroads Gama and
Garraf make.  "The relief sought by [Gama and Garraf] is not extraordinary but
merely an opportunity to stay in business until the trial of this case."  *Id.*  Thus, the
Court should issue an order restoring the status quo and preventing Graco from
carrying out its termination threats.  "Little, if any, injury will be done to [Graco]
by maintaining the status quo pending adjudication of the issues involved, whereas
[Gama and Garraf] will be destroyed by a continued refusal to deal by [Graco]."
*Id.* at 561-62.

**E.    The Public Has an Interest in Preventing Graco from Continuing to Illegally Exploit its Monopoly.**

Furthermore, the public, including top-tier distributors who have been threatened by Graco for even considering doing business with Gama or Garraf, has a substantial interest in eliminating "restraints of trade . . . generally condemned under the declaration of Justice Frankfurter that they 'serve hardly any purpose beyond the suppression of competition.'" *Earley Ford Tractor, Inc. v. Hesston Corp.*, 556 F. Supp. 544, 549 (W.D. Mo. 1983) (citation omitted).  Consumers benefit from real competition, a wider selection and variety of products, and reduced prices spurred by a free and healthy market.  As Mr. Gililland attests, "The arrival of Gama/Garraf in 2008 was thus a welcome development to the industry and to me personally."  Declaration of Gililland Dec. ¶ 11. "Five years ago, there were three competitors: Graco, Gusmer, and GlasCraft.  But in the last several years, Graco has acquired first Gusmer and then GlasCraft, leading to a virtual monopoly in the pump and spray industry." *Id.*  Graco's tactics "will have the effect of discouraging distributors from carrying Gama products in addition to or as an alternative to the Graco product line.  Such conduct, in turn, will *negatively affect my business*, by *reducing the number of products in the marketplace.*" *Id.* at ¶ 18 (emphasis added).

Under the circumstances, denying injunctive relief would be "highly inappropriate," because the purpose of injunctive relief is to "serve well the high purpose of enforcing the antitrust laws." *Bascom Food*, 715 F. Supp. 616, 640 (D. N.J. 1989) (internal quotation marks and citations omitted).

**IV.    Gama and Garraf have Standing to Bring their Antitrust Counterclaims against Graco.**

     **A.    Graco Concedes that Its Direct Competition is Gama and Garraf.**

Graco's own actions, from its Gama Letter to its threats against its own distributors, show that it is trying to shut down Gama and Garraf as competitors.

Graco's own words speaks even louder.  Graco already vigorous argued that a competing manufacturer has proper antitrust standing.  Dkt. No. 48 at 2-13. Garraf has proper antitrust standing since "it is Garraf that competes in the relevant product market." *Id.* at 12.

Similarly, Graco also competes directly with Gama to distribute Spray Foam products to top-tier distributors.  Indeed, Graco's unfair competition and interference claims rest entirely on the fact that Gama competes with Graco "to sell replacement parts or new equipment to former Gusmer (now Graco) customers whose trade has been solicited and obtained by [Gama]." Dkt. No. 49 at 23. Graco operates at the same level as and directly competes against Gama to supply the same "customer base and distributor network" for Spray Foam equipment.[7]  *Id.* at 24.

Furthermore, Graco feared such direct competition from Gama and Garraf. Mike Ruby, Graco's Director, Sales & Marketing - In-Plant Polyurethane Equipment, ████████████████████████████████████████████████ ████████████████████████████████████████████████

---

[7]    *Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1254 (3d Cir. 1975) (discussing that manufacturers of competing products also were "rival distributors . . . [that] operated on the same market level" for antitrust purposes). *Id.* (discussing that "a drug manufacturer . . . also operated as a distributor" for antitrust purposes) (citing *U.S. v. McKesson and Robbins, Inc.*, 351 U.S. 305 (1956)).



Bloch Dec. ¶ 20, Exh. S.  Graco was

[8] *Id.* at ¶ 4, Exh. C. (emphasis added).

Graco even took it upon itself to explain

*Id.* at ¶ 5, Exh. D (emphasis added) [internal

Graco e-mail from February 2008].

## B.   The Third Circuit's Balancing Test Weighs in Favor of Finding Antitrust Standing for Gama and Garraf.

Gama and Garraf also have independent antitrust standing under the Third

Circuit's five-factor balancing test, which is based on the Supreme Court's

decision in *Associated General*:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 77 & n. 12

(3d Cir. 2000) (citing *Associated Gen. Contractors, Inc. v. Cal. State Council of*

---

[8]

Bloch Dec. ¶ 21, Exh. T.

*Carpenters*, 459 U.S. 519, 545 (1983)).  Each of these five factors favors a finding that Counterclaimants have antitrust standing.  (Discussed in greater detail in Opposition to Graco's Motion to Dismiss, Dkt. No. 59, at 4-13).

First, Graco's tactics — from its Letter to its threats and boycott — more than establish a "causal connection between the antitrust violation and the harm to [Gama and Garraf] and the intent by [Graco] to cause harm."  *Carpet Group*, 227 F.3d at 77 & n.12.  Since Gama first sued Graco for its antitrust violations, Graco has raced to take additional steps to enforce the boycott against Gama and Garraf by implementing "stated policy with its direct distributors is that Graco's distributors cannot offer competing product lines, ***including those distributed by Gama***, and that if Graco permitted [a distributor] to offer both products it would undermine Graco's firm policy with all of its direct distributors." Spiess Dec. ¶ 22 (emphasis added);  Lewis Dec. ¶ 17-23; 30.  Graco's representatives even visited a distributor to personally threaten that distributor if it followed through on its plans to become a Gama distributor and carry Garraf's competing Spray Foam equipment.  Hrynkiewicz Dec. ¶ 30-33.

Second, "[Gama and Garraf's] alleged injury is of the type for which the antitrust laws were intended to provide redress."  *Carpet Group*, 227 F.3d at 77 & n. 12 (citation omitted).  Antitrust laws were designed to prevent conduct intended "to foreclose competitors from any substantial market." *Lorain Journal*, 342 U.S. 143, 154, n.7 (1951).  The "anti-trust laws are as much violated ***by the prevention of competition as by its destruction***." *Id.* (emphasis added) (quotation and citations omitted).  Here, Graco's efforts to prevent, decrease, and/or foreclose competition—by forcing its distributors and suppliers, including CPI, InTech, Demilec, and LaPolla, from carrying competing Garraf products and from doing business with Gama — plainly injure both Gama and Garraf.

24

Third, Gama and Garraf's injury is sufficiently direct. Here, Garraf and Gama form the complete sales chain, from manufacturer in Spain to distributors in the United States, that attempts to compete directly with Graco. Graco competes directly with Garraf as Spray Foam equipment manufacturers; Graco operates at the same level as and directly competes against Gama to supply the same top-tier, direct distributors of that same Spray Foam equipment. Gama was and is "endeavoring to forge a link in a chain of the sale of [Spray Pump], to wit, direct contact between [manufacturer Garraf] and [distributors], that would compete with [Graco]." *Crimpers Promotions Inc. v. Home Box Office*, 724 F.2d 290, 294 (2d Cir. 1983), *cert. denied*, 467 U.S. 1252 (1984); *accord Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 77–78 (3d Cir. 2000). As the Third Circuit held, the direct "injury to [Garraf and Gama] was the precisely intended consequence of [Graco's] boycott," and is "'inextricably intertwined' with the defendant's wrongdoing." *Carpet Group*, 227 F.3d at 77–78. (Citation and internal quotation marks omitted.)

Fourth, Gama and Garraf are the most direct victims of Graco's exclusionary conduct. As discussed above, and repeatedly admitted by Graco, Gama and Graco compete directly to sell to Spray Foam equipment to the same level of top-tier, direct distributors. As Garraf's exclusive representative in the United States and the only pathway and link for its products into the United States, Gama is the most efficient, proper, and motivated enforcer of antitrust laws in this situation in the United States. Furthermore, Graco's sole counter argument—that a more direct victim exists, namely a manufacturing competitor—is now moot since Garraf has joined as a counterclaimant. Dkt. No. 64 at 4.

Fifth, and finally, there is no realistic or substantial risk of duplicative recovery and no complex issues of apportionment of damages. The parties' sales can easily be compared directly; the relevant sales involve the three parties of this

antitrust suit: Graco, Gama, and Garraf.  The parties compete to sell their Spray Foam products primarily to the same top-tier distributors, and sales to those distributors can easily be distinguished.  Graco will also have access to all relevant sales information—mooting Graco's previous concern.  Dkt. No. 64 at 4-5.

Additionally, courts have found that any risk of duplicative recovery in situations such as this can be remedied by a "lost profits" measure of damages. *See Lago & Sons Diary, Inc., v. H.P. Hood, Inc.*, 892 F. Supp. 325, 346 (D. N.H. 1995) (holding that risk of duplicative recovery is minimal when antitrust injuries are limited to lost profits).  In any event, apportionment of damages between Counterclaimants and Graco would be relatively straightforward once the trier of fact determines a number for lost sales.[9]  The profit margin for Counterclaimants and Graco, respectively, could simply be multiplied by the number of sales lost due to Graco's anticompetitive conduct and damages could be awarded to Counterclaimants based solely on its portion of the lost profits.

Although any single factor may tilt standing in Counterclaimants' favor, Counterclaimants properly established all five factors for antitrust standing.

## V.   Gama/Garraf Also Are Entitled to a Preliminary Injunction Based on the Tortious Interference, Trade Libel, and Unfair Competition Claims.

In response to Gama's original antitrust claims, Graco filed a motion to dismiss.  Gama has now re-pled those claims to include Garraf and more clearly state the bases for antitrust standing.  But Garraf, Gama, and Mr. Commette are entitled to the requested injunction even if, arguendo, the Court were to strike the antitrust claims again.  Gama already has properly stated claims for tortious inference, trade libel, and unfair competition.  Dkt. 81 at 63-70 (Wolfson, J.).

---

[9] Notwithstanding that the true number of lost sales will never be known (discussed in detail above), Graco still is not at risk of a duplicative recovery.

Based on those claims, Graco's tactics and conduct warrant an injunction independent of Graco's violation of the Sherman Act.

With respect to tortious interference, the case is clear. Gama and Garraf not only had a "reasonable expectation to continue [Gama's] sales of Garraf products to its existing customers and distributors, and to sell its products to other members of the trade," Dkt. 81 at 63, but both Mr. Lewis and Mr. Spiess attest that Gama would have substantial a percentage of the Spray Foam market if Graco had not started threatening the distribution channel. Spiess Dec. ¶¶ 10, 25; Lewis Dec. ¶ 15. As discussed above in detail, Gama and Garraf have suffered potentially irreparable losses as a result of Graco's malicious and intentional misconduct.

Moreover, Graco's "publication[s] of [] matter[s] derogatory of [Gama and Garraf's] property or business, of a kind designed to prevent others from dealing with him or otherwise to interfere with [their] relations with others" are actionable as trade libel. Dkt. 81 at 68 (quoting *Patel v. Soriano*, 369 N.J. Super. 192, 246-47 (App. Div. 2004)) (internal quotation marks omitted). The Court already has held, in the motion to dismiss context, that such examples as Graco's "Gama Letter," its threats to distributors, its stated policy about Gama, and its "talking points" disparaging Gama, all potentially constitute trade libel. *Id.* And considering the facts adduced in Garraf/Gama's motion, the situation cries out for injunctive relief. Gama/Garraf have lost actual sales and customers; indeed, Spray Foam distributors returned equipment and cancelled plans to become Gama distributors after receiving the Gama Letter.

That same Graco conduct constitutes unfair competition and violates the New Jersey Fair Trade Act, N.J. Stat. Ann. § 56:4-1. *Id.* at 70. Furthermore, at least in the pleading context, "Graco does not dispute that its other conduct supports the unfair competition claims." *Id.* (citation and internal quotation marks omitted). Graco is engaged in exactly the type of intentional and malicious

conduct that "strays from 'the rules of the game." *Id.* at 66, quoting *Printing Mart-Morrristown v. Sharp Electronics Corp.*, 116 N.J. 739, 757-58 (1989). Where, as here, "neither the normal nor the expected course of practice is followed," the complained-of conduct should be enjoined *Id.*

Gama and Garraf have more than established a "reasonable probability" of success on these remaining claims. They have established a very substantial likelihood of success, coupled with clear evidence of ongoing and irreparable harm. For all the reasons discussed above, Gama and Garraf are entitled to a preliminary injunction against Graco.

## VI. Conclusion.

Gama and Garraf's request here is modest. They seek only a small bit of space so that its prospective distributors can evaluate the Garraf product line *on the merits*, without fear that Graco will terminate their existing distribution relationships. Granting that small bit of space will not harm Graco — it is not losing money with these distributors — but will allow Gama and Garraf the ability to survive through trial.

Gama and Garraf have no doubt that they will be vindicated in the end. But in order to reach that point, the Court must prevent Graco from engaging in further boycott activities. Thus, Gama and Garraf ask the Court to enter the attached proposed Order (modeled after the one the Supreme Court approved in *Lorain Journal*), which would prevent Graco from terminating, threatening to terminate, or refusing to deal with existing distributors based solely on those distributors' decision to also distribute for Gama/Garraf.

////

Respectfully submitted,

Dated: June 11, 2009

Of Counsel:

Timothy Rooney (*pro hac vice*)
David S. Bloch (*pro hac vice*)
Patrick M. Ryan (*pro hac vice)*
**WINSTON & STRAWN LLP**

**TOMPKINS, MCGUIRE, WACHENFELD &
BARRY LLP**
        /s/**Brian M. English**

William H. Trousdale, Esq.
Brian M. English, Esq.


Attorneys for Defendants and Counterclaim Plaintiffs Gama Machinery USA and Denis
Commette

**KAPLAN & LEVENSON, P.C.**

Steven M. Kaplan

Attorneys for Defendant and Counterclaim Plaintiff Garraf Maquinaria S.A.

29

## VII.   Appendix — Proposed Order

William H. Trousdale, Esq.
Brian M. English, Esq.
**TOMPKINS, MCGUIRE, WACHENFELD**
**& BARRY LLP**
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Phone: 973-622-3000
Fax: 973-623-7780

Timothy Rooney, Esq. *(pro hac vice)*
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601-9703
Phone: 312-558-5600
Fax: 312-558-5700

David S. Bloch, Esq. *(pro hac vice)*
Patrick M. Ryan, Esq. *(pro hac pending)*
**WINSTON & STRAWN LLP**
101 California Street
San Francisco, California 94111
Phone: 415-591-1000
Fax: 415-591-1400

Attorneys for PMC Global, Inc., PMC, Inc., PMC Europe Investments, S.L., Denis S. Commette, and Gama Machinery USA, Inc.

Steven M. Kaplan
**KAPLAN & LEVENSON, P.C.**
433 Hackensack Avenue, 2nd Floor
Hackensack, NJ 07601
Phone: 201-646-9400
Fax: 201-646-9401

Attorneys for Garraf Maquinaria S.A.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GRACO INC., et al.,<br>　　　　　　　　Plaintiffs,<br>　　　　v.<br>PMC GLOBAL, INC., et al.,<br>　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 08-CV-01304 (FLW)<br><br>**[proposed] FINDINGS OF FACT**<br>**AND ORDER GRANDING**<br>**DEFENDANTS AND**<br>**COUNTERCLAIMANTS'** |
| DENIS S. COMMETTE and GAMA<br>MACHINERY USA, INC.,<br>　　　　　　　Counterclaim<br>　　　　　　　Plaintiffs,<br>　　　　v.<br>GRACO INC. and GRACO MINNESOTA INC.,<br>　　　　　　　Counterclaim<br>　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **APPLICATION FOR A**<br>**PRELIMINARY INJUNCTION** |

31

**THIS MATTER** having been opened to the Court by Tompkins, McGuire, Wachenfeld & Barry LLP, attorneys for of Defendants and Counterclaimants Gama Machinery USA, Inc. and Mr. Denis S. Commette's (collectively "Gama") and Kaplan & Levenson, P.C. for Defendant and Counterclaimant Garraf Maquinaria S.A. ("Garraf") by way of Counterclaimants' application seeking an Order for a preliminary injunction against Counter-Claim Defendants Graco Inc. and Graco Minnesota Inc. (collectively "Graco"), upon notice to Sterns & Weinroth, P.C., attorneys for Graco, and after consideration of Gama and Garraf's application for preliminary injunction and supporting papers, affidavits, and all papers filed in response thereto, pursuant to Federal Rules of Civil Procedure 65, the Court **HEREBY FINDS AND CONCLUDES**, based on the evidence and good cause having been shown, that:

1. As the only domestic equipment maker and primary suppliers to distributors of plural component spraying equipment (in which two chemicals, stored separately, are pumped from their containers, mixed together, and then dispensed in the form of a polyurethane or polyurea spray foam) and related products (hereinafter, "Spray Foam" equipment), Home and industrial insulation, spray-on truck bed linings, and ground sealing are amongst the uses for Spray Foam

equipment.  Graco has acquired and possesses monopoly power over the U.S. Spray Foam equipment market;

2. Graco and its smaller rivals Gama and Garraf are direct competitors in the U.S. Spray Foam equipment market;

3. This market is distinct and is characterized by substantial technical barriers to entry for competition;

4. Graco, directly and through acquired companies, has prior courses of dealing with distributors in the market;

5. Graco has refused or threatened to refuse to deal with those distributors if the distributors were to carry competing products, including products from Gama and Garraf.  Graco made those threats and refusals despite long-time relationships and prior dealings between those distributors and Graco and its acquired companies. Some of those relationships date as far back as 1970;

6. Graco implemented a stated policy that it would refuse to deal and terminate distributor agreements with its distributors if they were to carry competing products, including products from Gama and Garraf. Furthermore, Graco openly disclosed and discussed that policy;

7. Graco conspired and organized a boycott of Gama, Garraf, and their products by the same distributors with which Graco refused and

threatened to refuse to deal if they were to carry competing products, including products from Gama and Garraf;

8.  Graco's boycott, refusals to deal, and threats were an attempt to monopolize the Spray Foam equipment market;

9.  Graco knowingly, intentionally, and maliciously made false and disparaging statements concerning Gama, Garraf, and their property, product, and business to the public and members of Spray Foam industry;

10. Gama and Garraf lost business, sales, and customers due to Graco's boycott, refusals to deal, and threats;

11. Gama and Garraf had a reasonable expectation of an economic advantage;

12. Gama and Garraf's losses were a direct result of Graco's malicious interference and misconduct;

13. The damage to Gama and Garraf's business and good will resulting from Graco's boycott, refusals to deal, and threats cannot be calculated;

14. Gama and Garraf suffered direct injury from Graco's boycott, refusals to deal, and threats, are the most direct victims of Graco's conduct,

and may be forced out of the Spray Foam market if Graco is permitted to continue its anticompetitive behavior;

15. Graco has no risk of suffering a duplicative recovery if and when Gama and Garraf were to prevail at trial;

16. Graco's boycott, refusals to deal, and threats resulted in a cognizable harm to competition for the domestic Spray Foam market by stifling and limiting alternatives to its products;

17. Gama and Garraf have shown a reasonable probability of success on the merits for each and every one of their counterclaims against Graco;

18. Gama and Garraf have suffered irreparable harm and will continue to suffer irreparable injury if the Court denies relief since the injuries to their business and good will cannot be calculated or adequately remedied by damages and since Gama and Garraf may be forced out of the domestic Spray Foam market without preliminary relief;

19. Graco's conduct is harming competition and consumers;

20. The balance of harms favors Gama and Garraf.  Without preliminary relief, Gama and Garraf will continue to suffer irreparable injury and may be forced out of the domestic Spray Foam market.  Graco will not suffer greater harm by granting preliminary relief to Gama and

35

Garraf since Graco can continue sells its Spray Foam products in the marketplace, fulfill new and existing orders, and enter into or renew distribution agreements with distributors; and

21. The public interest is best served by granting preliminary relief, as it will encourage competition and choice in the Spray Foam marketplace while removing improper restraints to trade.

Accordingly, **IT IS HEREBY ORDERED THAT**:

A. Gama and Garraf's Application for Preliminary Injunction is **GRANTED**;

B. Graco, which includes any of its subsidiaries, officers, agents, servants, employees, representatives, and attorneys, and those persons or entities in active concert or participation with them, is **HEREBY ENJOINED AND RESTRAINED** from:

    i. Refusing to sell its products for the Spray Foam market or related equipment or discriminating as to price, quantity, quality, delivery date, or any other terms or conditions of sale of such products or related equipment where the reason for such refusal or discrimination is, in whole or in part, express or implied, that purchaser or prospective purchaser bought or distributed, buys or distributes, will buy or distribute, or has

proposed or proposes to buy or distribute competing products or related equipment sold, distributed, or manufactured (or to be sold, distributed, or manufactured) by a person or company other than Graco, including without limitation Gama and Garraf's products and related equipment;

ii. Refusing to enter into, or renew, a distribution agreement relating to Graco's products for the Spray Foam market or related equipment or discriminating as to price, quantity, quality, delivery date, or any other terms or conditions of the distribution agreement where the reason for such refusal or discrimination is, in whole or in part, express or implied, that the distributor or prospective distributor bought or distributed, buys or distributes, will buy or distribute, or has proposed or proposes to buy or distribute competing products or related equipment sold, distributed, or manufactured (or to be sold, distributed, or manufactured) by a person or company other than Graco, including without limitation Gama and Garraf's products and related equipment;

iii. Canceling, terminating, or in any manner impairing sales of its products for the Spray Foam market or related equipment for

the reason, in whole or in part, express or implied, that the purchaser or distributor bought or distributed, buys or distributes, will buy or distribute, or has proposed or proposes to buy or distribute competing products or related equipment sold, distributed, or manufactured (or to be sold, distributed, or manufactured) by a person or company other than Graco, including without limitation Gama and Garraf's products and related equipment;

iv. Canceling, terminating, or in any manner impairing any contract, agreement, or understanding, including without limitations distributor agreements, relating to its products for the Spray Foam market or related equipment for the reason, in whole or in part, express or implied, that the purchaser or distributor bought or distributed, buys or distributes, will buy or distribute, or has proposed or proposes to buy or distribute competing products or related equipment sold, distributed, or manufactured (or to be sold, distributed, or manufactured) by a person or company other than Graco, including without limitation Gama and Garraf's products and related equipment;

v. Selling, offering to sell, or negotiating to sell its products for the Spray Foam market or related equipment on or accompanied by any condition, agreement, or understanding, in whole or in part, express or implied, that the purchaser or prospective purchaser:

1. has not bought or distributed, does not buy or distribute, will not buy or distribute, or has not proposed or propose to buy or distribute competing products or related equipment sold, distributed, or manufactured (or to be sold, distributed, or manufactured) by a person or company other than Graco, including without limitation Gama and Garraf's products and related equipment;

2. only buys or distributes, will buy or distribute, proposes or will propose to buy or distribute Graco's products or related equipment;

vi. Entering into, renewing, offering to entering into or renew, or negotiating to enter into or renew distributor agreements relating to its products for the Spray Foam market or related equipment on or accompanied by any condition, agreement, or

understanding, in whole or in part, express or implied, that the distributor or prospective distributor:

1. has not bought or distributed, does not buy or distribute, will not buy or distribute, or has not proposed or propose to buy or distribute competing products or related equipment sold, distributed, or manufactured (or to be sold, distributed, or manufactured) by a person or company other than Graco, including without limitation Gama and Garraf's products and related equipment;

2. only buys or distributes, will buy or distribute, proposes or will propose to buy or distribute Graco's products or related equipment;

vii. Threatening to refuse to sell its products or discriminate as to price, quantity, quality, delivery date, or any other terms or conditions of sale of its products for the Spray Foam market or related equipment where the reason for such refusal or discrimination is, in whole or in part, express or implied, that purchaser or prospective purchaser bought or distributed, buys or distributes, will buy or distribute, or has proposed or proposes to buy or distribute competing products or related

40

equipment sold, distributed, or manufactured (or to be sold, distributed, or manufactured) by a person or company other than Graco, including without limitation Gama and Garraf's products and related equipment;

viii. Threatening to refuse to enter into, or renew, a distribution agreement relating to Graco's products for the Spray Foam market or related equipment or discriminate as to price, quantity, quality, delivery date, or any other terms or conditions of the distribution agreement where the reason for such refusal or discrimination is, in whole or in part, express or implied, that the distributor or prospective distributor bought or distributed, buys or distributes, will buy or distribute, or has proposed or proposes to buy or distribute competing products or related equipment sold, distributed, or manufactured (or to be sold, distributed, or manufactured) by a person or company other than Graco, including without limitation Gama and Garraf's products and related equipment;

ix. Threatening to cancel, terminate, or in any manner impair sales of its products for the Spray Foam market or related equipment for the reason, in whole or in part, express or implied, that the

41

purchaser or distributor bought or distributed, buys or distributes, will buy or distribute, or has proposed or proposes to buy or distribute competing products or related equipment sold, distributed, or manufactured (or to be sold, distributed, or manufactured) by a person or company other than Graco, including without limitation Gama and Garraf's products and related equipment;

x.   Threatening to cancel, terminate, or in any manner impair any contract, agreement, or understanding, including without limitations distributor agreements, relating to its products or related equipment for the Spray Foam market for the reason, in whole or in part, express or implied, that the purchaser or distributor bought or distributed, buys or distributes, will buy or distribute, or has proposed or proposes to buy or distribute competing products or related equipment sold, distributed, or manufactured (or to be sold, distributed, or manufactured) by a person or company other than Graco, including without limitation Gama and Garraf's products and related equipment;

C. Within fifteen (15) days after the entry of this order, Graco must send a copy of this Order, by mail, facsimile, and e-mail, to all distributors and customers of its products for the Spray Foam market;

    i.  Graco must provide a copy of this Order to any new distributor or purchaser, or prospective distributor or purchaser, of its products for the Spray Foam market;

    ii.  Within fifteen (15) days after the entry of this order, Graco must provide the Court and Gama a list containing the names, mailing addresses, facsimile numbers, and e-mail addresses of each person or entity to whom Graco sent a copy of this Order pursuant to Section C and its subsections. Graco must supplement and amend this list within fifteen (15) days after it sends any additional copies of this Order pursuant to Section C and its subsections;

D. Within fifteen (15) days after the entry of this Order, Graco must post a copy of this Order on each of its websites that contains information regarding its products for the Spray Foam market, providing a hyperlink titled "Antitrust Injunction" on the home pages of such websites in a manner consistent with the other information on such homepages;

43

E.  Within fifteen (15) days after the entry of this order, Graco must post a copy of this Order on each of its websites that contains information regarding its products for the Spray Foam market, in a manner consistent with press releases or news updates available on such websites;

F.  Within thirty (30) days after the entry of this order, Graco must provide the Court, Gama, and Garraf copies of all distributor agreements relating to its products for the  Spray Foam market which Graco canceled or did not renew since October 24, 2007.  After the initial thirty days, Graco must provide the Court, Gama, and Garraf copies of any additional distributor agreements that Graco cancels or does not renew, within fifteen (15) days from the date of cancellation or non-renewal.


**IT IS SO ORDERED** this _____ day of _____ 2009,


_____
Hon. Freda L. Wolfson,
U.S.D.J.

SF:258865.20