# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Graco Inc., a Minnesota Corporation; Graco Minnesota Inc., a Minnesota Corporation, | ) ) ) ) Civil Action No. 08-cv-01304 (FLW) (DEA) |
| Plaintiffs, | ) ) |
| v. | ) **DOCUMENT FILED UNDER SEAL** ) |
| PMC Global, Inc., et al. | ) ) **DOCUMENT FILED** |
| Defendants. | ) **ELECTRONICALLY** ) |
| Denis S. Commette, et al. | ) ) |
| Counterclaim Plaintiffs, | ) ) |
| v. | ) ) |
| Graco Inc., et al. | ) ) |
| Counterclaim Defendants. | ) |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS ONE, TWO, FOUR, SIX, SEVEN, EIGHT, AND NINE

**STERNS & WEINROTH, P.C.**
50 West State Street, Suite 1400
Trenton, New Jersey 08610
Telephone: (609) 392-2100
Facsimile: (609) 392-7956

Clifford M. Greene, Reg. No. 37436
David J. Wallace-Jackson, Reg. No. 0288767
Bethany D. Krueger, Reg. No. 0306368
Kathryn N. Hibbard, Reg. No. 387155
**GREENE ESPEL P.L.L.P.**
200 S. Sixth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 373-0830
Facsimile: (612) 373-0929

Richard Duncan, Reg. No. 192983
Craig S. Coleman, Reg. No. 325491
**FAEGRE & BENSON LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Plaintiff Graco Inc.
and Graco Minnesota Inc.*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................................I

INTRODUCTION...........................................................................................1

STATEMENT OF RELEVANT FACTS .........................................................2

I.    PMC'S CONSPIRACY ........................................................................2

    A.    PMC CONSPIRED WITH THEN-CURRENT GRACO EMPLOYEES TO DEPRIVE
        GRACO OF THE ASSETS IT HAD JUST PURCHASED FROM PMC. ...................2

    B.    DEFENDANT DENIS COMMETTE'S KNOWLEDGE OF AND INVOLVEMENT IN
        THE FORMATION OF THE NEW VENTURE IS DISPUTED. ...............................5

II.   PMC'S CONSPIRACY DIRECTLY INTERFERED WITH GRACO'S
      INTEGRATION OF GUSMER. ...............................................................8

III.  PMC'S EXECUTION OF THE CONSPIRACY .......................................9

    A.    THE EVIDENCE REVEALS PMC'S CONTROL OF GAMA AND GARRAF. .........9

    B.    PMC'S BUSINESS PLAN FOR GAMA/GARRAF WAS BASED ON ITS
        INTENTION TO RECLAIM THE GUSMER GOODWILL BY USING INSIDE
        INFORMATION FROM THEN-CURRENT GRACO EMPLOYEES. ......................12
        1.    Solicitation of Gusmer Customers. ....................................................13
        2.    Trading on the Gusmer Name and History.........................................14
        3.    Use of Misappropriated Confidential Business Information and Trade
            Secrets.................................................................................................16

IV.   DEFENDANTS' DUPLICITY BEGAN EVEN BEFORE THE STOCK
      PURCHASE AGREEMENTS WERE EXECUTED. ..............................17

LEGAL ARGUMENT....................................................................................18

I.    NEITHER THE LAW NOR THE FACTS PERMIT DISMISSAL OF
      GRACO'S CLAIM FOR BREACH OF CONTRACT AND RELATED
      DUTIES (COUNT I)............................................................................19

II.   A JURY COULD FIND THAT DEFENDANTS ACTED WITH
      MALICE. ...........................................................................................25

A.   GRACO HAS ELICITED EVIDENCE SUFFICIENT TO SATISFY THE MALICE-LIKE ELEMENT OF ITS BREACH OF CONTRACT AND RELATED DUTIES CLAIM.............................................................................................25

B.   DEFENDANTS MISAPPLY THE LANHAM ACT AND NEW JERSEY FAIR TRADE ACT AND FAIL TO ACKNOWLEDGE THE EVIDENCE ESTABLISHING THEIR LIABILITY UNDER THESE STATUTES.........................................................27

C.   THE EVIDENCE CREATES A FACT QUESTION AS TO WHETHER DEFENDANTS ARE LIABLE FOR THEIR INTERFERENCE WITH GRACO'S CONTRACTS AND PROSPECTIVE ECONOMIC ADVANTAGES.....................................................31
   1.   *Defendants' Intentionally Interfered with Graco's Employment Agreements and Relationships.* ............................................32
   2.   *Defendants' Intentionally Interfered with Graco's Prospective Economic Advantage.* ..........................................................35

III.   DEFENDANTS ARE NOT ENTITLED TO A DISMISSAL OF GRACO'S UNFAIR COMPETITION CLAIM. ....................................36

IV.   FACT DISPUTES NECESSITATE A DENIAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON GRACO'S CIVIL CONSPIRACY CLAIM. ............................................................................37

V.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON GRACO'S BREACH OF CONTRACT CLAIM AGAINST DEFENDANT COMMETTE. ..................................................................39

VI.   ALTERNATIVELY, GRACO REQUESTS A RULE 56(F) DENIAL OR CONTINUANCE TO CONDUCT FURTHER DISCOVERY. .......40

CONCLUSION...............................................................................................40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## FEDERAL CASES

*Am. Rice, Inc. v. Ark. Rice Growers Co-op. Ass'n*,
  701 F.2d 408 (5th Cir. 1983) .............................................................28

*Carrasca v. Pomeroy*,
  313 F.3d 828 (3d Cir. 2002) .............................................................18

*Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*,
  912 F. Supp. 747 (D.N.J. 1995) .........................................................36

*Comprehensive Care Corp. v. RehabCare Corp.*,
  98 F.3d 1063 (8th Cir. 1996) .............................................................19

*Connors v. Fawn Min. Corp.*,
  30 F.3d 483 (3d Cir. 1994) ...........................................................18, 39

*Cruttwell v. Lye*,
  17 Ves. Jr. 335 Eng. Rep. 129, 134 (1810).........................................23

*Davis v. Walt Disney Co.*,
  430 F.3d 901 (8th Cir. 2005) .............................................................29

*DiPaolo v. Gross*,
   2006 WL 1148386, *10-11 (N.J. Super. Ct. Ch. Div. Apr. 28, 2006) ..............22

*Emerson Radio Corp. v. Orion Sales, Inc.*,
  253 F.3d 159 (3d Cir. 2001) .........................................................19, 25

*Ettinger v. Johnson*,
  556 F.2d 692 (3d Cir. 1977) .............................................................18

*Ingle ex rel. Estate of Ingle v. Yelton*,
  439 F.3d 191 (4th Cir. 2006) .............................................................40

*interstate Net Bank v. NetB@nk, Inc.*,
  348 F. Supp. 2d 340 (D.N.J. 2004)....................................................30

*Levitt Corp. v. Levitt*,
   593 F.2d 463 (2d Cir. 1979) .............................................................................20

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
   290 F.3d 578 (3d Cir. 2002) ......................................................................27, 30

*People for Ethical Treatment of Animals v. Doughney*,
   263 F.3d 359 (4th Cir. 2001) ...........................................................................31

*Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*,
   842 F.2d 1466 (3d Cir. 1988) ...........................................................................28

*Pinnacle Choice, Inc. v. Silverstein*,
   No. 07-1379, 2007 WL 2212861 (D.N.J. July 31, 2007) ..................................31

*Rotermund v. United States Steel Corp.*,
   474 F.2d 1139 (8th Cir. 1973) ..........................................................................38

*Scanvec v. Chang*,
   80 Fed. Appx. 171 (3d Cir. Oct. 15, 2003).......................................................28

*Sgro v. Getty Petroleum Corp.*,
   854 F. Supp. 1164 (D.N.J. 1994).......................................................................32

*St. Surin v. Virgin Islands Daily News, Inc.*,
   21 F.3d 1309 (3d Cir. 1994) .............................................................................40

*Steele v. Bulova Watch Co.*,
   344 U.S. 280 (1952)..........................................................................................28

*Wellness Pub. v. Barefoot*,
   No. 02-3773, 2008 WL 108889 (D.N.J. Jan. 9, 2008) ................................30, 37

*Woods Corp. Assocs. v. Signet Star Holdings, Inc.*,
   910 F. Supp. 1019 (D.N.J. 1995).......................................................................32

*World Finer Foods, Inc. v. Archway Cookies, LLC*,
   No.03-1277, 2007 WL 3349450 (D.N.J. Nov. 7, 2007)....................................25

## STATE CASES

*Ass'n Gp. Life, Inc. v. Catholic War Veterans*,
   61 N.J. 150 (N.J. 1972) ......................................................................19

*Auto Hearse Mfg. v. Bateman*,
   109 A. 735 (N.J. Ch. 1920) ...............................................................20

*Baldasarre v. Butler*,
   254 N.J. Super. 502 (N.J. Super. Ct. App. Div. 1992), *aff'd in relevant
   part, rev'd in part*, 132 N.J. 278 (1993) (quotation omitted) ............32

*Brunswick Hills Raquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*,
   182 N.J. 210 (N.J. 2005) ...................................................................26

*Dugan v. Dugan*,
   92 N.J. 423 (N.J. 1983) ................................................................22, 23

*In re Hall's Estate*,
   99 N.J.L. 1 (N.J. Sup. 1923), *aff'd*, 99 N.J.L. 1 (N.J. 1923) .......22, 23

*Morgan v. Union County Bd. of Chosen Freeholders*,
   268 N.J. Super. 337(N.J. Super. Ct. App. Div. 1993) .......................38

*Onderdonk v. Presbyterian Homes of New Jersey*,
   85 N.J. 171 (1981) .............................................................................23

*Reardon Laundry Co. v. Reardon*,
   97 N.J. Eq. 356 (N.J. 1925) ..............................................................20

## STATUTES

15 U.S.C. § 1125(a) ................................................................................29

15 U.S.C. § 1117(a) ................................................................................31

N.J. Stat. § 56:4-1 .............................................................................27, 30

## RULES

Fed. R. Civ. P. 56(c)...............................................................................18

Fed. R. Civ. P. 56(f)...............................................................................40

**OTHER AUTHORITIES**

1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR
    COMPETITION § 2:17 (4th ed. 2010).....................................................................23

6 Richard A. Lord, Williston on Contracts § 13:8......................................................20

23 Richard A. Lord, Williston on Contracts § 63:22...................................................26

Restatement (Second) of Contracts § 205.................................................................25

## **INTRODUCTION**

Just months after selling Gusmer to Graco, Defendants conspired with *then-current* Graco employees to form what they called ███████████ Despite the evidence proving this, the PMC Defendants base this summary judgment motion on a false assertion that there are no facts supporting an inference of bad faith or malice. This argument ignores critical evidence. The incomplete discovery to date reveals that Defendants engaged in intentional, deceptive misconduct epitomizing bad faith and malice. Indeed, they formed their ███████████ to:

- Retain Gusmer/Graco employees who would avoid ███████████ ███████ with the company so that they could use their intimate knowledge of Gusmer/Graco confidential business plans and strategies;

- ███████ Gusmer/Graco products by using misappropriated trade secrets, many of which Defendants had only recently sold to Graco;

- Unlawfully solicit Gusmer customers; and

- Trade on the Gusmer name and reputation.

Rather than confronting this evidence, Defendants ask the Court to hold that the law precludes Graco's claims. Their request relies on mischaracterizations of Graco's claims and the legal standards underlying them, and ignores this Court's prior ruling regarding the legal viability of those claims. But summary judgment cannot be based upon Defendants' feigned ignorance of material facts and misapplication of the law. Accordingly, Defendants' motion should be denied.

## STATEMENT OF RELEVANT FACTS

I. **PMC'S CONSPIRACY**

A. **PMC Conspired with Then-Current Graco Employees to Deprive Graco of the Assets It Had Just Purchased from PMC.**

In February 2005, Defendants PMC Global, Inc., and PMC Europe Investments, S.L. (collectively "PMC") sold Gusmer Corporation and Gusmer Europe (collectively "Gusmer") to Plaintiff Graco Inc. ("Graco") for $65 million. Graco's Statement of Material Facts ("SMF") No. 1. Included within this sale was Gusmer's goodwill, trademarks, trade names, customer relationships, proprietary technology (including trade secrets), and engineering drawings. SMF No. 3.

Within just months of this transaction, PMC conspired to form a business that would compete with the merged Graco/Gusmer business by soliciting its customers, using its proprietary trade secrets and confidential business information, and trading on the Gusmer name. SMF Nos. 11, 24, 25, 28. PMC's coconspirators included *then-current* Graco executives who joined Graco with the Gusmer acquisition. SMF Nos. 11-13.

Throughout fall 2005, PMC plotted with former Gusmer executives— including Carles Royo, Manuel Moreno, Mike Kolibas, and Doug Commette (Defendant Commette's son)—regarding this venture, and even went so far as to arrange and attend an October 2005 strategy meeting with Royo and Moreno in Spain. *Id*. Recognizing the inappropriateness of PMC's involvement, Royo

2

██████████████████████████████████████████████

███████████████████████████████ (Dep. Ex. 434 (emphasis added)).

When the meeting in Spain occurred, Royo, Kolibas, and Moreno were *currently* employed by Graco. SMF No. 13. In fact, Royo and Moreno were bound by two-year written noncompetition agreements with Graco, and all three were bound by nondisclosure agreements. *Id.* PMC was fully aware of these agreements, as they were executed *while PMC owned Gusmer*, and PMC expressly disclosed them to Graco in the SPAs. *Id.*

During the course of their correspondence and meetings to plan this new venture, Royo provided Graco trade secret and confidential business information to PMC executives. SMF No. 14. This included information about Graco's business plans, which informed PMC's strategy for this new venture. SMF Nos. 14-15; *see* Ex. L (Dep. Ex. 432 (10/3/05 email from Royo to Cheong stating, ██████

████████████████████████████████████████████

███████████████); ECF Doc. No. 243 at Ex. P (Dep. Ex. 373 (10/25/05 email from Royo to PMC ████████████████████████████████████

█████████

On December 14, 2005, after receiving the confidential Graco/Gusmer business information Royo had provided, PMC announced that it was ██████████

---

[1] All references to "Ex. __" are to the Declaration of Clifford M. Greene. All references to "Dep. Ex. __" refer to Graco deposition exhibits.

█████████████ with the formation of the planned company.[2] SMF No. 15. The PMC executives nicknamed the new company ████████ SMF No. 21; *see also* Ex. X (Dep. Ex. 438 █████████ Defendants premised the business plan for



SMF Nos. 22, 24, 25, 27.

Regarding the Graco/Gusmer employees, the conspirators recognized the obstacle posed by Royo's and Moreno's noncompetition agreements, and agreed that Royo and Moreno would not ███████████████████ ███████████████████████ ████

The conspirators also planned that the business would ██████ Graco/Gusmer products. SMF No. 24. Indeed, Royo confirmed this intention in an email to PMC summarizing his recent meeting with PMC president Gary Kamins: ████████

---

[2] Within days of this announcement, Graco executive Fred Sutter contacted Phil Kamins to inquire about rumors that PMC was conspiring with Kolibas to form a competing business. Kamins falsely denied this rumor. SMF Nos. 14-18.

[3] Phil Kamins insists that PMC's motivation in forming these entities was a benevolent desire to provide jobs. Ex. P (P. Kamins Dep. 84). His claim cannot be taken seriously, as these employees were gainfully employed—*by Graco*.

███████████████████████████████████████████████

██████████████████ Exs. CC-DD (Dep. Exs. 458-59 (emphasis added)).

PMC further intended that the business would solicit Gusmer customers—
the very customers that PMC represented intended to continue doing business with
Graco following the sale. SMF Nos. 25-26. PMC concluded that ████████████

███████████████████████████████████████████████

████████████ SMF No. 27.

Finally, the conspirators intended that the business would ███████████████

████████████████████████████████████████ SMF No.28.

### B.    Defendant Denis Commette's Knowledge of and Involvement in the Formation of the New Venture Is Disputed.

A jury could find that Defendant Commette—a Gusmer executive who
joined Graco following the acquisition—was aware of and involved in PMC's
conspiracy prior to leaving Graco in October 2006. While he denies any such
awareness or involvement (Ex. FF (Commette Dep. I 170)), documentary evidence
reveals that he met and communicated with PMC about becoming involved with
PMC's new venture less than two weeks after he ended his employment
relationship with Graco. SMF No. 29. Specifically, in a November 2006 email
following his meeting with Phil Kamins, Defendant Commette suggested that:



ECF Doc. No. 109 at Ex. JJ (Dep. Ex. 109 (emphasis added)).

Defendant Commette had extensive inside knowledge on which to base his conclusion that PMC could compete favorably against Graco—information that included how Gusmer's revenues were derived; what products Graco was planning to discontinue; Graco's product pricing, positioning, and discounts; Graco's standardization of Gusmer manufacturing practices; and Graco's post-merger operations. SMF No. 30. And if any ⬛ existed, Defendant Commette knew of it only through his employment with Graco. *See id.*

Defendant Commette's disclosure of this information violated his nondisclosure agreement with Graco, and Commette knew it. *See* SMF No. 31. He advised Phil Kamins that, to avoid



SMF No. 32.

SMF No. 33 (P. Kamins Dep. 147

██████████████████████████████████████████████

Many other facts support a jury finding that Defendant Commette's involvement with the new venture began even earlier, *during* his employment with Graco. First, Defendant Commette's son—Doug—and his protégé—Royo—were actively involved in planning ███████████ with PMC while Defendant Commette worked at Graco. SMF No. 34. An email exchange between Doug and Royo confirms that Defendant Commette was aware that Doug and Royo were communicating and that he facilitated those communications on at least one instance. SMF No. 36.

Second, in his planning notes for this new company, Doug Commette suggests that ████████████████████████████████████ ████████████████████████████████████████ ████████████████ SMF No. 35.

Third, according to Gary Kamins, Defendant Commette ███████████ ████████████████████████████████████████ ████████████████████████ SMF No. 37. ████████ ████████████████████████████████████████ ████████████████████████ when he was still working for

Graco. SMF No. 38. Gary Kamins understood that Commette was aware of Royo's

initiative at the time Defendant Commette submitted his proposal.  SMF No. 37.

Finally,  PMC  Executive  T.C.  Cheong  testified  that  it  would  be  his



Ex. O

(Cheong  Dep.  218-19).  Phil  Kamins  confirmed  this  when  he  testified  that

Defendant Commette's involvement in the new venture was critical to its success:

> My original project was Denis Commette. And nothing was relevant
> without Denis. We don't have anybody—PMC doesn't have anybody
> that could even begin to put us back in the—in that business, nor
> would I have any desire, really, to get back into that business.

SMF No. 39 (Ex. P (P. Kamins Dep. 149)).

In  light  of  this  evidence,  a  jury  could  reasonably  reject  Defendant

Commette's profession of ignorance about PMC's conspiracy.

## II.   PMC'S CONSPIRACY DIRECTLY INTERFERED WITH GRACO'S INTEGRATION OF GUSMER.

While  Royo  was  planning  this  new  business  with  PMC,  his  job

responsibilities also required him to assist with the Graco-Gusmer integration.

SMF No. 40. For example, just four days after Royo's October 30 meeting with

PMC executives in Spain, Royo played a prominent role in the first distributors'

meeting following the acquisition, which introduced the post-acquisition business to Gusmer distributors, among others. *Id.*

PMC's conspiracy with Royo and other then-current Graco employees undermined Graco's efforts to integrate Gusmer and Graco. Emboldened by PMC's interest, Royo disengaged from and ignored his responsibilities with Graco/Gusmer. SMF No. 41. He also sold products to Gusmer distributors at unauthorized prices, and failed to sell Graco products despite his obligation to promote both Gusmer *and* Graco products. SMF No. 42.

## III.   PMC'S EXECUTION OF THE CONSPIRACY

### A.   The Evidence Reveals PMC's Control of Gama and Garraf.

PMC and its coconspirators planned that their new business, which ultimately became known as "Gama," would consist of three entities:



SMF Nos. 43-44, 68.

As part of this planning process, PMC considered the form its interest in the Spanish entity would take. SMF No. 45. In a retrospective June 2008 email to Phil

Kamins, Manuel Moreno described PMC's involvement in Garraf's formation,

stating that, just weeks before the formation,  ECF Doc. No. 109 at Ex. MM (Dep. Ex. 126); Ex. P (P.

Kamins Dep. 103) (confirming accuracy of Moreno's account). The existence of

and negotiations regarding this ███████████ were confirmed in

documents Defendants just recently produced. *See, e.g.*, Ex. JJ (GAMA00036375

(produced 4/16/10)).  Gary Kamins also acknowledged ███████████

██████████████[4] SMF No. 51 (Ex. II (Dep. Ex. 342)).

Defendants' shared understanding about the role that PMC would play in

Garraf dictated how they moved forward with Garraf's formation. SMF No. 46.

For example, in reliance on PMC's involvement, Garraf expanded its operations to

a much larger scale than it had originally envisioned—taking it from a small

Spanish workshop to a higher-volume manufacturer and international exporter.

---

[4] Shortly after Gary Kamins sent this email, Garraf decided to terminate its attorney, and defaulted in this litigation. Ex. BBB (GAMA00029951); ECF No. 219 (Order directing entry of default); Clerk's ECF Default Entry (12/7/09).

ECF Doc. No. 109 at Ex. MM (Dep. Ex. 126). To accomplish this, PMC agreed to finance Garraf in two ways. First, documents Defendants only recently produced reveal that, in April 2007, ███████████████████████████████ SMF No. 47. Second, PMC ████████████████████████████████████████████ ████████████████████████ SMF No. 48. ████████████████████ ███████████████████████████ *Id.*

As a consequence of this relationship, PMC retained ultimate authority over Garraf's budget and costs, and fixed the prices and quality control standards for its products. SMF No. 52-53. Nevertheless, PMC, an international conglomerate with an in-house legal staff, claims to have made no effort to document its "special" relationship with or its obligations to Garraf. Ex. P (P. Kamins Dep. 29, 46-47, 103); ECF Doc. No. 109 at Ex. Z (Dep. Ex. 57). Instead, it chose to proceed in a manner that allowed it to unilaterally modify those obligations as it saw fit. SMF No. 52. For example, in 2009, PMC made the unilateral decision to cease purchasing from Garraf and to instead manufacture products through Gama USA. SMF No. 53.

In addition to Garraf, there is no dispute that PMC controls its U.S. and Chinese subsidiaries. SMF No. 54. Gama USA was formed in or about July 2007 to serve as Garraf's "master distributor." SMF No. 55. And Gama China was formed to sell Garraf-manufactured equipment in Asia. SMF No. 56. PMC controls

every aspect of Gama USA and Gama China, right down to hiring employees and setting salaries. SMF No. 57. As Phil Kamins testified, "everything that's done within the [Gama] organization . . . passes through this office. So it gets approved or not approved." *Id.*; Ex. O (Cheong Dep. 393 (PMC exercises same control over Gama USA as over PMC China)). "[I]f we're going to acquire something or start something, they don't do it without my approval." Ex. P (P. Kamins Dep. 37).

PMC's executives also serve as officers or are otherwise responsible for Gama USA and Gama China. SMF No. 58. ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ PMC also owns the real estate where Gama USA's headquarters are located. SMF No. 62.

### B. PMC's Business Plan for Gama/Garraf Was Based on Its Intention to Reclaim the Gusmer Goodwill by Using Inside Information from Then-Current Graco Employees.

Defendants testified that their subsidiary businesses typically have written business plans or projections, but that they never required or created such a plan or projections for Gama/Garraf. SMF No. 63. A jury could find that this is because Defendants' plan for ████████████████ was simple and understood by all—solicit the real Gusmer's customers, trade on the real Gusmer's name and reputation, and

███ the real Gusmer's products by using its trade secret and confidential business information.

### 1.        Solicitation of Gusmer Customers.

From the beginning, PMC has executed its plan to solicit Gusmer customers to become distributors for Gama/Garraf. SMF No. 64. Under this strategy, there was no need to invest in the development of a distribution network. Rather, PMC simply recruited Defendant Commette and former Gusmer and *then-current* Graco sales manager, Frank Sica, based on their close relationships with Gusmer distributors. SMF No. 65. In fact, nearly all of Gama USA's and Garraf's employees are former Gusmer and Graco employees, as is Gama China's general manager, Jerry Wu.  SMF No. 66.

While Defendant Commette testified that it was the Gusmer customers who approached Defendants, Defendants' own admissions and pleadings confirm otherwise. SMF No. 65; *see, e.g.*, Ex. K (Sica Dep. 124 (admitting he sought to attract Gusmer distributors to Gama)); ECF No. 216 (Defs. Ans. to 2d Amend. Compl. ¶¶ 74, 97 (admitting they retained Defendant Commette to solicit trade of customers, some of which were Gusmer customers at time of acquisition)).

## 2.      Trading on the Gusmer Name and History.

Defendants have also traded on the Gusmer name, history, and reputation, marketed an affiliation with Gusmer and its products that does not exist, and made other generally false or misleading statements to the market (*see* SMF No. 68):

| Misstatements Made to the Market | The Truth |
|---|---|
| "GAMA has over 40 years of experiences [sic]." | Gama is a new company that was not formed until after Graco's February 2005 acquisition of Gusmer.  It is Graco's *Gusmer* subsidiary that has over 40 years of experience in the industry. |
| "[M]odels such as H-20/35 and FF-1600 have been great achievements of GAMA and have become industrial standards." | The H-20/35 and the FF-1600 are *Gusmer* products, the rights to which Graco acquired from PMC. |
| "GAMA is a subsidiary of PMC Global Inc. of the United States. We have over 40 years of history but being named as GAMA not long before. . . . GAMA has three subsidiary companies of GAMA-USA, GAMA-Europe and GAMA-China, serve customers over 40 countries."[5] | Gama is a new company that was not formed until after Graco's February 2005 acquisition of Gusmer. |
| "Some invention from GAMA which is still widely used even now has become the standard of this industry."[5] | It is Gusmer's products that are industry standards, as represented by Defendants when selling Gusmer. |

---

[5] Defendant Commette denies giving the interview in which these statements appear, but admits that he sent the photograph that appeared with it to PMC China. Ex. FF (Commette Dep. I 376-77, 383-84). Graco is seeking—and Defendants are opposing—discovery that Graco expects will confirm that PMC, through subsidiary PMC China, provided this false information to the publication in and website on which it appeared (ChinaPU).  *See* Greene Rule 56(f) Aff.

| **Misstatements Made to the Market** | **The Truth** |
|---|---|
| "GAMA builds a new industry and brings new chances for its own development as well."[5] | The industry was already in place when Gama was formed. |
| "Two series of proportioning units for the application of two components that we invented are so popular that we have 20,000 units in use throughout the world."[5] | Defendant Commette confirmed that Gama does not have 20,000 units in the market, though Gusmer likely does. |
| "GAMA products came to China from the 1980s . . . A [GAMA] unit purchased by a Chinese customer in 1984 is still in use now although the machine looks not too good."[5] | Gama was not even in existence in 1984. Gusmer was. |
| "A lot of new technology is taken into use in the new generation of GAMA products. Not only did we better the driving unit and structure of proportioning pump, but we developed the control panel to make the operation easer [sic] and the whole unit look more delicate."[5] | Gama's products are a first generation, and thus it is impossible for them to upgrade, improve, or refine anything. Rather, this implies that Defendants have improved Gusmer's products. |
| A Graco/Gusmer customer stated: "At our meeting in August 2008, Mr. Hrynkiewicz stated to me that the GAMA products were 'the same equipment as Graco.' I understood Mr. Hrynkiewicz's statement to mean that GAMA had taken the Gusmer equipment concepts and put them together into GAMA-branded machines." | If Gama's products are "the same equipment as Graco," it is only because Defendants have misappropriated Graco's trade secrets. |
| Clarence Tolbert of Graco/Gusmer distributor NCFI testified that he had spoken to Frank Sica about Gama and its employees, facilities, and manufacturing quality, and that the "net effect" of what Sica had told him was that "there was an element there in Gusmer Europe that wasn't taken as part of the acquisition." | Graco did acquire Gusmer Europe as part of the Gusmer acquisition. |
| Gama's STAR gun is internally "identical to the popular Gusmer D gun." | If this is accurate, it is only because Defendants have misused Graco trade secrets to replicate a |

| Misstatements Made to the Market | The Truth |
|---|---|
| | Gusmer D gun. |
| Gama's units are "constructed from 'the best' (rebirth [E]uropean Gusmer team)." | Gama cannot constitute a "rebirth" of the Gusmer team because Graco acquired Gusmer. |
| "We have asked you, our valued distributors, and many veteran contractors, 'What do you change and what do you keep the same when it's time to update an ICON? The resounding response was go 'Back to Basics.'" | This statement suggests that Defendants were updating *their* past products, despite the fact that they had no past products. The H-20/35, to which Graco purchased the rights from PMC, is the icon. |

Defendants admit that customers have expressed confusion regarding the affiliation between Gama and Gusmer. SMF No. 70. For example, Defendant Commette testified that he has been asked whether a Gama unit is a Gusmer unit. Ex. FF (Commette Dep. I 392). Hrynkiewicz similarly testified that some customers were of the opinion that the Gama unit is related to the Gusmer H-20/35. Ex. WW (Hrynkiewicz Dep. I 141). And before he became employed by Gama USA, Hrynkiewicz prepared a memorandum that considered how his then-employer, GlasCraft, should address Gama's entry into the market, and concluded that GlasCraft should ███████████████████████████████████ ████████████████████████ ECF Doc. No. 109 at Ex. R (Dep. Ex. 15).

### 3.   Use of Misappropriated Confidential Business Information and Trade Secrets.

Defendants have executed their plan to ██████ Gusmer products. SMF No. 71. They have also utilized confidential business information supplied by former

Graco/Gusmer employees, including information regarding customer buying habits, mark-up structures, merchandising plans, projections, and product strategies. SMF Nos. 71, 73. These activities are explained more fully in Graco's opposition to Defendants' Second Motion for Partial Summary Judgment.

## IV. DEFENDANTS' DUPLICITY BEGAN EVEN BEFORE THE STOCK PURCHASE AGREEMENTS WERE EXECUTED.

When offering Gusmer for sale, PMC highlighted Gusmer's ███████████

███████████████████████████████████

███████████████ SMF No. 4. Without disclosing it to Graco in the SPAs or during Graco's due diligence investigation, however, █████████████

████████████████████████████████████

████████████████████████████████████

████ SMF Nos. 5-6.

The SPAs specifically called for the disclosure of agreements of this magnitude. SMF No. 7. And, prior to that, during the due diligence process, Graco also specifically requested a ███████████████████████

███████████████ SMF No. 8. ██████████████████

███████████████████████████████████

████████ *Id.* Even PMC's own business broker, Lloyd Greif, who represented PMC in the offering and sale of Gusmer to Graco, was ██████████████

███████████████████████████████████████

███████████   SMF No. 9.

## **LEGAL ARGUMENT**

Summary judgment is proper only if there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Carrasca v. Pomeroy*, 313 F.3d 828, 33 (3d Cir. 2002) (quoting Fed. R. Civ. P. 56(c)). The moving party bears the burdens of "informing the court of the basis for a motion of summary judgment and pointing out those parts of the record which he or she believes demonstrate the absence of a genuine issue of material fact." *Connors v. Fawn Min. Corp.*, 30 F.3d 483, 489 (3d Cir. 1994). In determining whether the movant has carried its burden, courts draw every favorable inference in favor of the nonmoving party. *Id.* The nonmoving party may defeat a motion by showing there are genuine issues of material fact for trial. *Id.* (holding issue is "genuine" if evidence allows reasonable jury to return verdict for nonmoving party and fact is "material" when it might affect outcome of suit under governing law).

Credibility issues created by contradictory evidence or impeachment of the movant's evidence also necessitate a denial of summary judgment. *Ettinger v. Johnson*, 556 F.2d 692, 697 (3d Cir. 1977).

The PMC Defendants have not carried their burdens to show the absence of disputed issues of material fact. This lawsuit is replete with fact issues and requires

credibility determinations at trial. Nor have Defendants shown that the law requires a dismissal of Graco's claims. Accordingly, their motion should be denied.

I.   **NEITHER THE LAW NOR THE FACTS PERMIT DISMISSAL OF GRACO'S CLAIM FOR BREACH OF CONTRACT AND RELATED DUTIES (COUNT I).**

Defendants' arguments regarding Graco's claim for Breach of Contract and Related Duties rely on inaccurate interpretations of the law, an incomplete recitation of the facts, and a misreading of the Order denying their motion to dismiss. The Court's Order recognized that Graco's claim is based on the implied duties that arise out of the sale of the Gusmer businesses and their goodwill, not any express term in the SPAs. Order [Doc. 81] at 26-32. One such implied duty is the duty of good faith and fair dealing. That duty requires a contracting party to refrain from doing anything that will deprive or injure the other party's expected benefits under the contract. *Comprehensive Care Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996); *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 169-70 (3d Cir. 2001) (holding inquiry looks to parties' reasonable expectations). A party breaches this duty by engaging in conduct that was "not contemplated by the spirit of the contract and fell short of fair dealing." *Ass'n Gp. Life, Inc. v. Catholic War Veterans*, 61 N.J. 150, 254 (N.J. 1972).

Contracts for the sale of a business and its goodwill impose upon the seller a duty to refrain from: (1) specifically soliciting the business's customers, or (2)

claiming an ongoing affiliation with or "claim[ing] to be the successor of the business sold." 6 Richard A. Lord, Williston on Contracts § 13:8 (4th ed. 2009); *see also Levitt Corp. v. Levitt*, 593 F.2d 463, 468-69 (2d Cir. 1979) (seller may not publicize prior participation in and association with business, as it would create confusion and dilute goodwill); *Reardon Laundry Co. v. Reardon*, 97 N.J. Eq. 356 (N.J. 1925) (seller may not "specifically solicit the trade of the customers of the business he sold"); *Auto Hearse Mfg. v. Bateman*, 109 A. 735, 736-37 (N.J. Ch. 1920) (seller may not solicit former customers or market ongoing affiliation with business or its products).

A jury could find that PMC has breached these duties. The evidence shows that PMC has engaged in conduct that is intended to deprive Graco of the Gusmer assets PMC sold to Graco, including employee and customer relationships, trade names, and trade secrets. PMC knowingly interfered with Graco's employment relationships with high-level executives and employees, including Commette, Royo, Kolibas, and Moreno—all of whom joined Graco following the sale of Gusmer. *See* SMF Nos. 4-9, 12-20. PMC expected and knew that those executives and employees would be involved in the Graco/Gusmer integration. Nevertheless, PMC intentionally interfered with Graco's integration efforts by conspiring with the very employees Graco had charged with integrating the companies in order to form a business that would compete directly with Graco/Gusmer.

PMC also admittedly formed Gama USA with the intention of ███████████ ████████████████████████████████████ and they have executed that plan.[6] *See* SMF Nos. 25-27, 64-65. They have traded on the Gusmer name and reputation by marketing Gusmer's products and history as if they were Defendants' own. *See* SMF Nos. 28, 67; *see also* Order at 31-32 ("Plaintiffs' allegation of Defendants' breach of good faith and fair dealing stems from Defendants' alleged trading off on the Gusmer name and product affiliation, which sufficiently constitutes improper purpose or ill motive for purposes of this motion."). And Defendants have incorporated into their products valuable Graco and Gusmer trade secrets that they misappropriated—some of which they represented had been protected against misappropriation. *See* SMF Nos. 71-73; ECF Doc. Nos. 1-2 (Ex. A & B to Compl. ¶ 4.16A); Graco's Resp. to 2d Mot. for Partial S.J. Given these facts, a jury could reasonably conclude that PMC and the other Defendants acted directly and intentionally to deprive Graco of the reasonable expected benefit of the SPAs.

Rather than addressing the evidence that they breached their implied duties, PMC relies on a flawed interpretation of the law to argue that Graco's claim fails because Graco made changes to the Gusmer business. But the law does not require a buyer to continue the business in precisely the same form—same location,

---

[6] Defendants do not even address the rule prohibiting a seller from soliciting its former customers. Instead, they reach a conclusion that is directly contrary to these rules—that their conduct of "going after the same customers and distributors as Graco/Gusmer" is "*perfectly legal*." Br. at 24 (emphasis in original).

customers, services, and products. It merely gives the buyer the *right* to do so. *Dugan v. Dugan*, 92 N.J. 423, 429-30 (N.J. 1983).

New Jersey law recognizes that the value of a business's goodwill may arise out of a *variety* of "special advantages"—"a good name, capable staff and personnel, high credit standing, reputation for superior products and services, and favorable location." *Id.* (goodwill derives from factors such as "succession in place or name *or otherwise*" (emphasis added, quotation omitted)); *see also In re Hall's Estate*, 99 N.J.L. 1, 4-5 (N.J. Sup. 1923) (there are "numerous" elements that enter into goodwill's composition beyond just name), *aff'd*, 99 N.J.L. 1 (N.J. 1923); *DiPaolo v. Gross*, 2006 WL 1148386, *10-11 (N.J. Super. Ct. Ch. Div. Apr. 28, 2006). These cases do not stand for the proposition that a business's goodwill is dependent on the ongoing existence of each and every one of these advantages. *Cf.* Br. at 1-2 ("If any of these elements [location, products, and product quality] change, however, the buyer's goodwill is dissipated and the plaintiff cannot state a claim."). Indeed, businesses *must* change and evolve to address changing market conditions and customer needs. Requiring a business to continue in its *exact* form would often be fatal to that business.

Defendants apply their flawed reading of the law to argue that Graco dissipated the Gusmer goodwill it purchased for millions of dollars when it closed Gusmer's New Jersey location. *See id.* This reading would lead to an absurd result.

Graco/Gusmer is not a brick-and-mortar retailer, whose location may be critical to its success. *See Onderdonk v. Presbyterian Homes of New Jersey*, 85 N.J. 171, 183-84 (1981) (holding parties' situation is relevant to determination of what terms are implied in contract). Rather, Graco sells through distributors located throughout the world, and it was the network of Gusmer distributors—not any physical location—that the parties understood was an important factor in Graco's decision to purchase Gusmer. While at the time the cases the *Dugan* court cited were decided "a business might remain in the same physical location for hundreds of years," "that is no longer true. Today, the location may vary, but the business symbol—the trademark—remains the same." 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 2:17 (4th ed. 2010) (citing *Cruttwell v. Lye*, 17 Ves. Jr. 335, 346, 34 Eng. Rep. 129, 134 (1810)); *see also Dugan*, 92 N.J. at 429 (citing *Hall's Estate* and *Cruttwell*). Thus, a change in location does not necessitate a finding that the entirety of Gusmer's goodwill was dissipated.[7]

Defendants alternatively argue that Graco dissipated the Gusmer goodwill when it discontinued certain Gusmer products. This argument misstates both the facts and the law. Graco *integrated* components of its own products and Gusmer products to create more advanced, efficient products, and it continued to supply

---

[7] Defendants' argument regarding the Gusmer location also fails to account for the lease agreement the parties entered into (with Defendants as lessor) at the time of the sale, which anticipated that Graco/Gusmer would no longer occupy that location after the lease expired. *See* ECF Doc. No. 1-2 (Ex. A to Compl. ¶ 1.2).

component parts for legacy Gusmer products. Ex. E (Weinberger Dep. 56-61). Regardless, the law does *not* require that a business continue to sell the *exact same products in the exact same form* in perpetuity. Indeed, any such requirement would be the death knell of any manufacturer of high-technology equipment. *See, e.g.*, Ex. E (Weinberger Dep. 57 (testifying customers generally do not complain about unavailability of obsoleted products, but express "excitement over the product line . . . because – well, they feel good about the new product and they also know that the components are available from anywhere from five to 12 years after the obsolescence of a product as a repair part")).

In fact, in advance of the Gusmer sale, PMC specifically recognized that Graco *should* introduce changes to the Gusmer organization that would improve its performance, including the consolidation of Gusmer's facilities. SMF No. 10. In light of all parties' expectation and intention that Graco would integrate the Gusmer organization and product lines with its own, Defendants cannot seriously contend that New Jersey law permits them to undermine those efforts post-sale.

In any event, the evidence would permit a jury to find that Graco has not dissipated the goodwill it purchased from Defendants. Among other things, Graco continues to use the Gusmer name—the exclusive rights to which it purchased from PMC. SMF Nos. 1, 69. It continues to sell products that incorporate Gusmer technology and trade secrets. SMF No. 72. And it sells those products through the

Gusmer distributor network, the goodwill to which it acquired from Defendants. SMF No. 67. As such, Defendants can be held liable under New Jersey law for the harm they have caused to the goodwill and other assets PMC sold to Graco.

## II.   A JURY COULD FIND THAT DEFENDANTS ACTED WITH MALICE.

### A.   Graco Has Elicited Evidence Sufficient to Satisfy the Malice-Like Element of its Breach of Contract and Related Duties Claim.

Defendants alternatively contend that Graco's claim for breach of contract and related duties must fail because Graco has not satisfied the requisite "malice" element of that claim. As a preliminary matter, Graco has no obligation to prove that Defendants acted with "malice" in the sense of "ill-will" toward Graco. To the extent that the duty of good faith and fair dealing contains a "state of mind or malice-like element," *Emerson Radio Corp. v. Orion Sales, Inc.*, 80 F. Supp. 2d 307, 311 (D.N.J. 2000), *rev'd in part on other grounds*, 253 F.3d 159 (3d Cir. 2001), that element is satisfied where the defendant "act[ed] with the objective of preventing the plaintiff from receiving its reasonably expected fruits under the contract." *World Finer Foods, Inc. v. Archway Cookies, LLC*, No. 03-1277, 2007 WL 3349450, *6 (D.N.J. Nov. 7, 2007). It specifically prohibits conduct that is unfair, unreasonable, indecent, or dishonest. *Emerson Radio*, 80 F. Supp. 2d at 311 (citing Restatement (Second) of Contracts § 205, cmt. a (good faith "excludes a

variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness")).

A jury could easily find that Defendants engaged in conduct that is unfair, unreasonable, indecent, or dishonest. They have knowingly—not accidentally—interfered with Graco's employment relationships, solicited Gusmer customers, traded on the Gusmer name, and misappropriated Gusmer trade secrets and confidential business information. As such, Defendants have sought to prevent Graco from receiving the reasonably expected fruits of the SPAs.

Defendants contend that this is insufficient because Graco has to prove that Defendants intended to deprive Graco of the Gusmer assets *before* the parties entered into the SPAs. Defendants cite no legal authority to support this contention.[8] In fact, the law requires only a showing that the defendant "'engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 225 (N.J. 2005) (quoting 23 Williston on Contracts § 63:22 (Lord ed. 2002)); *see also id.* at 224 (holding that "every party to a contract . . . is bound by a

---

[8] Even if Defendants' version of the law were correct, the evidence regarding the bonuses to executives shows that PMC intended to interfere with Graco's rights under the sales agreements even before the sale. PMC failed to disclose to Graco these multimillion dollar bonuses during due diligence or in the SPA, despite the fact that they were specifically tied to post-sale adjustments that were likely to shift those executives' allegiances from their employer (Graco) to PMC. A jury could reasonably conclude that this is the sort of conduct that the duty of good faith and fair dealing prohibits as dishonest, unfair, and unreasonable.

duty of good faith and fair dealing in both the performance and enforcement of [a] contract"). The evidence discussed above shows that Defendants have intentionally deprived Graco of the benefits of the bargain.

### B.    Defendants Misapply the Lanham Act and New Jersey Fair Trade Act and Fail to Acknowledge the Evidence Establishing Their Liability Under These Statutes.

Defendants also fail to show that the law or facts permit summary judgment in their favor on Graco's Lanham Act and New Jersey Fair Trade Act ("NJFTA") claims (Counts VI and VII). Graco has elicited evidence that would permit a jury to find Defendants liable on both of these claims. Liability arises under the Lanham Act's false advertising provision if the commercial statement at issue is (1) literally false, or (2) literally true or ambiguous but has a tendency to deceive. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586-87, 590 (3d Cir. 2002). And liability arises under the NJFTA where the defendant has appropriated the plaintiff's name, brand, trademark, reputation or goodwill as its own. N.J. Stat. § 56:4-1 (2001).

Defendants have made numerous literally false statements that are actionable under the Lanham Act. *See* SMF No. 68. Many of these false statements refer to

27

Gusmer's products, history, and reputation as if they were Defendants' own, in

violation of the NJFTA. *See id.*[9]

Defendants have also made statements that, even if not literally false, have a

clear tendency to deceive customers. For example, they have stated that the "New

generation of hydraulic proportioning unit G-250H and pneumatic proportioning

unit G-125A took the place of two series of proportioning unit which used to be

very popular respectively"—a statement that suggests that these products replaced

*Gama's* earlier lines (of which there were none). Ex. UU (Dep. Ex. 19 (ChinaPU

interview appearing on English language website)). Defendants' own personnel

---

[9]  Graco expects that Defendants will attempt to disavow those misstatements
that were made by their distributors. But a jury could find that Defendants
authorized these misstatements, ███████████████████ *See, e.g.*, Ex. CCC (GAMA00000225). At
a minimum, these distributor misstatements could evidence confusion.

Graco also expects that Defendants will argue that they cannot be held liable for
the false or misleading statements of their Chinese subsidiary, Gama China, as
these statements were uttered abroad. That argument fails for two reasons.  First,
the issue is not where a statement was uttered, but whether the defendants'
commercial activities, including the statements integral to those activities, affect
U.S. commerce. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 286-87 (1952); *Am.
Rice, Inc. v. Ark. Rice Growers Co-op. Ass'n*, 701 F.2d 408, 415 n.8 (5th Cir.
1983). Here, Defendants commercial activities affect U.S. commerce, and their
misstatements, regardless of where uttered, relate to those activities. *See Scanvec v.
Chang*, 80 Fed. Appx. 171, 173 (3d Cir. Oct. 15, 2003) (unpublished).

Second, that these statements were made through Defendants' Chinese
subsidiary does not protect Defendants where, as here, the subsidiary was acting as
an agent for the parent and is nothing more than the conduit by which the parent
engages in unlawful conduct. *See Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*,
842 F.2d 1466, 1476-77 (3d Cir. 1988) (explaining applicability of agency and veil
piercing principles in parent-subsidiary context).

acknowledged the likelihood that these sorts of statements tend to deceive and confuse customers. They also testified that they have witnessed such confusion. SMF No. 70. As Hrynkiewicz recognized before he joined Gama, it was necessary to combat customers ███████████████████████████        ██████████████ Ex. FFF (Dep. Ex. 15) (emphasis added). At a minimum, this evidence creates a fact question of whether Defendants' false and misleading statements create liability under the Lanham Act and the NJFTA.

Rather than addressing this evidence, Defendants go to great lengths to distort the clear language of the Lanham Act and the NJFTA. First, Defendants read a fraud requirement into the Acts where none exists. Specifically, they argue that Graco's allegations regarding Defendants' false or misleading statements require a showing of fraud, which they contend requires intent to deceive. Br. at 22. Once again, Defendants cite no authority to support this assertion, because no such authority exists. While an intent to deceive may be relevant to whether a promotional statement is *likely* to confuse, see *Davis v. Walt Disney Co.*, 430 F.3d 901, 904 (8th Cir. 2005), neither the Lanham Act nor the NJFTA require intent to deceive in order to establish liability for false or misleading promotional speech.[10]

---

[10] Lanham Act liability requires a showing that defendant, in connection with goods or services, used "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact." 15 U.S.C. § 1125(a). The NJFTA requires a showing that the defendant "appropriate[d] for

At most, the Lanham Act requires a showing that the statements at issue have a *tendency* to deceive—a requirement that Defendants' own testimony and documents have satisfied. *Novartis*, 290 F.3d at 586, 590.

Next, Defendants contend that the Lanham Act and the NJFTA require a showing of malice. To support this argument, they conflate these claims and Graco's unfair competition claim. While a common law unfair competition claim may require a showing of malice, that requirement has not been and should not be read into the statutory language of the Acts, as New Jersey's common law prohibition on unfair competition is much broader than the conduct specifically proscribed by those Acts. *interstate Net Bank v. NetB@nk, Inc.*, 348 F. Supp. 2d 340, 352-53 (D.N.J. 2004). It is aimed at "fair play" and the promotion of "higher ethical standards in the business world." *Wellness Pub. v. Barefoot*, No. 02-3773, 2008 WL 108889, *20 (D.N.J. Jan. 9, 2008) (noting that, while most unfair competition cases involve passing off or unprivileged imitation—conduct that would also violate the Lanham Act and NJFTA—such conduct is not a prerequisite to unfair competition claims). Thus, the elements under the broader unfair competition law cannot be read into the unambiguous language of these statutes.

Regardless, the evidence adduced to date would permit a jury to find that Defendants knowingly and intentionally made false and misleading statements that

---

his . . . own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals." N.J. Stat. § 56:4-1.

attributed Gusmer's products, history, and reputation to Defendant Gama. This satisfies any malice element that may exist. Thus, a jury not only could find Defendants liable under these Acts, but also liable for willful misconduct that would support an award of attorneys' fees under the Lanham Act. 15 U.S.C. § 1117(a); *see also People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370 (4th Cir. 2001) ("Under 15 U.S.C. § 1117(a), a case is 'exceptional' [for purposes of an attorneys' fees award] if the defendant's conduct was malicious, fraudulent, willful or deliberate in nature. In other words, a prevailing plaintiff must show that the defendant acted in bad faith." (Quotation omitted.)).

C.    **The Evidence Creates a Fact Question as to Whether Defendants Are Liable for Their Interference with Graco's Contracts and Prospective Economic Advantages.**

Graco's claim for tortious interference with prospective economic advantage (Count IV) requires a showing that the plaintiff: (1) had a reasonable expectation of an economic advantage; (2) that was lost as a direct result of Defendants' malicious interference; and (3) that it suffered losses as a result. Order at 37 (citing *Pinnacle Choice, Inc. v. Silverstein*, No. 07-1379, 2007 WL 2212861, *3 (D.N.J. July 31, 2007)). Its tortious interference with contract claim contains an additional element requiring that the plaintiff prove the existence of a contract. *Id.* at 40.

31

Defendants contend, again, that Graco has not satisfied the malice element.[11] Br. at 22. But in the tortious interference context, "malice is not used in the literal sense requiring ill will toward the plaintiff." *Woods Corp. Assocs. v. Signet Star Holdings, Inc.*, 910 F. Supp. 1019, 1031 (D.N.J. 1995) (quotation omitted). "Instead, malice is defined as 'the intentional doing of a wrongful act without justification or excuse.'" *Id.* (quoting *Sgro v. Getty Petroleum Corp.*, 854 F. Supp. 1164, 1183 (D.N.J. 1994)). Meeting this standard requires a showing that "defendant's conduct was 'transgressive of generally accepted standards of morality; that is, a violation of standards of socially acceptable conduct.'" *Id.* (quoting *Baldasarre v. Butler*, 254 N.J. Super. 502, 526 (N.J. Super. Ct. App. Div. 1992), *aff'd in relevant part, rev'd in part*, 132 N.J. 278 (1993) (quotation omitted)). The relevant inquiry is whether the defendant's interference was "sanctioned by the rules of the game." *Id.* (quotation omitted). As discussed below, Graco's evidence easily satisfies this element.

### 1.    Defendants Intentionally Interfered with Graco's Employment Agreements and Relationships.

There is abundant evidence that Defendants knowingly and intentionally interfered with Graco's employment contracts with high-level managers, executives, and employees, and that it deprived Graco of the economic advantages

---

[11] Defendants also contend that New Jersey law requires a showing that the tortious interference was "premeditated." Br. at 22. Once again, Defendants offer no support for their assertion that premeditation is required.

it hoped to derive from those employment relationships. *See* SMF Nos. 4-9, 12-20.

Defendants began conspiring with then-current Graco employees—some of whom they knew to be subject to noncompetition agreements with Graco—to form the new ███████████ within months of the Gusmer sale. *See* SMF Nos. 11-13, 21.

Defendants' knowledge of these employees' then-current relationships with Graco cannot reasonably be disputed, despite Defendants' best efforts to do so by offering false deposition testimony:

| **Defendants' False Testimony** | **Contradictory Evidence** |
|---|---|
| Gary Kamins falsely testified that Gama USA did not offer Frank Sica employment or hire him until after Sica was terminated by Graco. Ex. I (G. Kamins Dep. 134). | Ex. K (Sica Dep. 60 (testifying that he received an offer from Gama USA on June 4, 2007 and accepted it the following day)).<br><br>Ex. J (Dep. Ex. 384 (Sica's 6/18/07 resignation letter advising Graco, advising that resignation was effective July 2, 2007)). |
| Phil Kamins falsely testified that he did not discuss the formation of a new company that would compete with Graco until after Graco terminated and had filed a noncompetition lawsuit against Royo in Spain, which was in 2008. Ex. P (P. Kamins Dep. 90-93). | Ex. L (Dep. Ex. 432 (10/3/05 email exchange between Royo and PMC executives, ███████ ████████████████████ ████████████ *see also* SMF Nos. 11-13. |
| Gary Kamins falsely testified that PMC did not receive an inquiry from Mike Kolibas about a new business until after Kolibas' employment with Graco ended. Ex. I (G. Kamins Dep. 127). | Ex. X (Dep. Ex. 438 ████████ ████████████████████████ ████████████████████████ |

[REDACTED]

Through this conspiracy, Defendants used trade secret information that informed their strategy for their new [REDACTED] *See* SMF Nos. 14, 21. For example, they [REDACTED]

[REDACTED] *Id.* In fact, PMC's determination about if and how to proceed with this venture turned, in part, on the internal information they learned from these employees regarding Graco's strategic decisions. *See, e.g.*, Ex. L (Dep. Ex. 432 (10/3/05 email from Royo to Cheong stating they [REDACTED] to which Cheong responded that [REDACTED]

Defendants even acknowledge that their interference with Graco's employment contracts and relationships, and the prospective economic advantages from those contracts and relationships, transgressed generally accepted business standards. Gary Kamins testified—albeit falsely—that he would never have made an offer to Frank Sica while Sica was employed by Graco because his "personal business philosophy is not to raid the competition's management team." Ex. I (Gary Kamins Dep. 134). He made this statement despite the fact that Defendants *did* offer Sica a position almost a month before his employment with Graco ended. Ex. J (Dep. Ex. 384); Ex. K (Sica Dep. 60).

Defendants' interference with these employment contracts and relationships has resulted in damage to Graco. Among other things, Defendants' interference undermined Graco's efforts to integrate the Graco and Gusmer businesses, as certain Graco employees' primary motivation and focus became PMC's interests in forming a new competing business. *See* SMF Nos. 16-20, 40-41.

### 2.   Defendants Intentionally Interfered with Graco's Prospective Economic Advantage.

The evidence also shows that Defendants interfered with the economic advantage Graco expected to derive from relationships with Gusmer distributors it acquired from PMC. Defendants admit that they have solicited the Gusmer customer relationships that they sold to Graco. *See* SMF Nos. 25-27, 64-65. The evidence shows that they have done so by misrepresenting their affiliation with Gusmer's products, history, and reputation. *See* SMF Nos. 28, 68; *see also* Order at 38 ("[B]ecause Plaintiffs' claim that Defendants solicited Graco customers by casting doubt on the origin of Graco-Gusmer products, . . . Plaintiffs allege sufficient facts surrounding Defendants' conduct to demonstrate intentional interference with an economic advantage."). Such interference is tortious. And, while Defendants again ignore the facts, a jury could find that Defendants' interference with these distributors has caused Graco to lose lucrative distributor relationships. Ex. AAA (Graco's 2d Supp. Resp. to PMC Interrog. No. 6). The evidence of Defendants' interference with Graco's contracts and prospective

economic advantages is more than sufficient to create a question for the jury regarding Defendants' liability for such interference.

## III.  DEFENDANTS ARE NOT ENTITLED TO A DISMISSAL OF GRACO'S UNFAIR COMPETITION CLAIM.

Neither the facts nor the law permit a dismissal of Graco's unfair competition claim. New Jersey's unfair competition law "seeks to espouse some baseline level of business fairness." *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747, 786 (D.N.J. 1995). Its objective is to "reinforce fair dealing and scrupulous conduct on the commercial level." *Id.* "By incorporating other causes of action, *including tortious interference, breach of duties of good faith and fair dealing, misappropriation* and defamation, it applies a flexible and elastic standard of conduct in the commercial context." *Id.* (emphasis added); *see also* Order at 52 ("New Jersey's prohibition against unfair competition provides relief for a breach of the duty of good faith and fair dealing and violations of the Lanham Act."). Federal courts applying New Jersey law have recognized that "New Jersey law would find unfair competition where there has been tortious interference, which requires a demonstration of malice, or upon a finding of a breach of good faith and fair dealing." *Coast Cities*, 912 F. Supp. at 786 (considering unfair competition claim predicated on same allegations as tortious interference and duty of good faith and fair dealing claims).

Under this authority, Graco's proof of Defendants' tortious interference and breaches of their implied duties necessitates a finding that Defendants have competed unfairly. As described more fully above and in Graco's opposition to Defendants' second Motion for Partial Summary Judgment, the evidence shows that Defendants have engaged in a pattern of misappropriation directed toward nearly every aspect of the Gusmer business and its goodwill—including Gusmer's employment relationships; customer relationships; trade name, reputation, and history; and trade secrets and confidential business information. This evidence is more than sufficient to satisfy any state-of-mind or malice standard encompassed within Graco's unfair competition claim. *See Wellness Pub.*, 2008 WL 108889, *19-20 (holding "prima facie case of unfair competition, like tortious interference and employee piracy, requires evidence of bad faith or malicious conduct," meaning "intentional doing of a wrongful act without justification or excuse" (quotations omitted)). Accordingly, Defendants have failed to show an entitlement to a summary dismissal of Graco's unfair competition claim.

## IV.   FACT DISPUTES NECESSITATE A DENIAL OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON GRACO'S CIVIL CONSPIRACY CLAIM.

Under New Jersey law, "a civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the

parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" *Morgan v. Union County Bd. of Chosen Freeholders*, 268 N.J. Super. 337, 364 (N.J. Super. Ct. App. Div. 1993) (quoting *Rotermund v. United States Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir. 1973) (quotation omitted)). It requires a showing "that there was a single plan, the essential nature and general scope of which was known to each person who is to be held responsible for its consequences." *Id.* at 999 (quotation omitted). Once this showing is made, each conspirator is liable for every act and statement of *every other conspirator* that was done or made in furtherance of the conspiracy. *Id.*

The plaintiff need not submit direct evidence of an agreement. *Id.* "[T]he nature of a conspiracy is such that more often than not the only type of evidence available is circumstantial in nature." *Id.* (quotation omitted).

> Thus, the question whether an agreement exists *should not be taken from the jury* in a civil conspiracy case so long as there is a *possibility* that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives.

*Id.* (quotation omitted) (emphasis added).

The record is replete with evidence showing that Defendants conspired to misappropriate the Gusmer assets PMC sold to Graco. The documents show that PMC, Doug Commette, and Garraf and its principals (namely, Royo and Moreno) agreed to form a business that had as its objectives soliciting Gusmer customers,

███████████████████████████████████████

There can be no business justification for their doing so, as they had just sold those very assets to Graco for $65 million. These facts are more than sufficient to permit an inference that Defendants conspired among themselves and with others and reached an agreement to achieve those objectives. In the face of this abundant evidence, summary judgment on Graco's conspiracy claim should be denied.

## V.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON GRACO'S BREACH OF CONTRACT CLAIM AGAINST DEFENDANT COMMETTE.

The caption of Defendants' motion indicates that they are seeking summary judgment on Graco's breach of contract claim against Defendant Commette. But Defendants offer no evidence or argument to show their entitlement to a dismissal of this claim, which is based on Defendant Commette's nondisclosure agreement. Because they have not satisfied their burden of "informing the court of the basis for [their] motion of summary judgment and pointing out those parts of the record which [they] believe[] demonstrate the absence of a genuine issue of material fact," *Connors v. Fawn Mining Corp.*, 30 F.3d 483, 489 (3d Cir. 1994), Defendants' motion, as it relates to that claim, must fail.

## VI.   ALTERNATIVELY, GRACO REQUESTS A RULE 56(f) DENIAL OR CONTINUANCE TO CONDUCT FURTHER DISCOVERY.

Though fact and expert discovery do not conclude until July 30, 2010 and November 19, 2010, respectively [ECF No. 269], Graco already has evidence sufficient to show the existence of fact and credibility issues precluding summary judgment. Thus, this motion should be denied. If there were any doubt that a denial is necessary, however, then the Court should continue this motion until such time as outstanding discovery can be completed, including the discovery that is the subject of disputes pending before Magistrate Judge Arpert. *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir. 1994) (holding district courts "usually grant properly filed Rule 56(f) motions as a matter of course" (quotation omitted)); *see also Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 196 (4th Cir. 2006) (holding denial of Rule 56(f) motion is "particularly inappropriate" when information sought is object of outstanding discovery). This outstanding discovery is summarized in the Rule 56(f) Affidavit of Clifford M. Greene.

## <u>CONCLUSION</u>

For these reasons, Defendants' Motion for Partial Summary Judgment should be denied.

Dated: May 3, 2010                    RESPECTFULLY SUBMITTED,

                                            **STERNS & WEINROTH**
                                            **A Professional Corporation**


                                            By /s/ Karen A. Confoy
                                            Karen A. Confoy
                                            kconfoy@sternslaw.com


Clifford M. Greene, Reg. No. 37436
David J. Wallace-Jackson, Reg. No. 0288767
Bethany D. Krueger, Reg. No. 306368
Kathryn N. Hibbard, Reg. No. 387155
**GREENE ESPEL, P.L.L.P.**
200 S. Sixth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 373-0830
Facsimile: (612) 373-0929


Richard Duncan, Reg. No. 192983
Craig S. Coleman, Reg. No. 325491
**FAEGRE & BENSON LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
*Attorneys for Plaintiff Graco Inc. and Graco Minnesota Inc.*

41