# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Graco Inc., a Minnesota Corporation; Graco Minnesota Inc., a Minnesota Corporation, | )<br>)<br>)<br>) |
| Plaintiffs, | ) |
| v. | )<br>) |
| PMC Global, Inc., et al. | )<br>) |
| Defendants. | )<br>) |
| Denis S. Commette, et al. | )<br>) |
| Counterclaim Plaintiffs, | ) |
| v. | )<br>) |
| Graco Inc., et al. | )<br>) |
| Counterclaim Defendants. | )<br>)<br>)<br>) |

Civil Action No.
08-cv-01304 (FLW) (DEA)


**DOCUMENT FILED UNDER SEAL**

**DOCUMENT FILED
ELECTRONICALLY**


## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFFS' ALLEGED TRADE SECRETS

**STERNS & WEINROTH, P.C.**
50 West State Street, Suite 1400
Trenton, New Jersey 08610
Telephone: (609) 392-2100
Facsimile: (609) 392-7956

Clifford M. Greene, Reg. No. 37436
David J. Wallace-Jackson, Reg. No. 0288767
Bethany D. Krueger, Reg. No. 0306368
Kathryn N. Hibbard, Reg. No. 387155
**GREENE ESPEL P.L.L.P.**
200 S. Sixth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 373-0830
Facsimile: (612) 373-0929

Richard Duncan, Reg. No. 192983
Craig S. Coleman, Reg. No. 325491
**FAEGRE & BENSON LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Plaintiff Graco Inc.*
*and Graco Minnesota Inc.*

# TABLE OF CONTENTS

FACTS AND PROCEDURAL HISTORY ................................................................1

I.      The Relevant Trade Secrets and Confidential Business Information. ...........3

        A.      The Graco/Gusmer H-20/35. ................................................................3

        B.      The Graco/Gusmer D Gun and GAP Pro Gun. ....................................6

        C.      Gama's Classic Proportioner and Vortex Gun. ....................................9

        D.      The Graco/Gusmer Braided Hose. ......................................................11

II.     The Graco/Gusmer Specifications and Tolerances Cannot Easily Be Reverse
        Engineered. ....................................................................................................12

III.    Graco's Other Confidential Business Information. ......................................14

IV.     Graco and Gusmer Protect Their Trade Secrets and Confidential Business
        Information. ...................................................................................................15

V.      All Defendants Participated in the Misappropriation of the Graco/Gusmer
        Trade Secrets and Confidential Business Information. .................................18

ARGUMENT ........................................................................................................19

I.      The Graco/Gusmer Tolerances and Other Information Are Neither Common
        Knowledge Nor Easily Reverse-Engineerable. ............................................19

        A.      The Tolerances and Other Information in Question Cannot Easily Be
                Discovered Through Reverse Engineering. ........................................20

        B.      There is No Evidence that Defendants or Anyone Else Has *Actually
                Ascertained* Graco's Tolerances Through Reverse Engineering. .......22

        C.      The Tolerances in Question Are Neither Matters of "General Skill and
                Ability" Nor Common Knowledge Among Machinists. ....................25

II.     Graco and Gusmer Took Reasonable Steps to Protect the Secrecy of the
        Information in Question. ................................................................................28

III.    Confidential Business Information Is Also Protected. .................................31

IV.   All Defendants Knowingly Participated in the Theft and Use of Graco's Trade Secrets and Confidential Business Information. ...................................33

    A.   Gama G-250H and First Generation Guns. ...........................................33

    B.   Gama's Braided Hose. ..........................................................................36

    C.   Gama's New Equipment. ......................................................................37

    D.   Gama's Business Strategies. .................................................................38

CONCLUSION .........................................................................................................39

## TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Bolt Assocs. v. Alpine Geophysical Assocs.*,
　365 F.2d 742 (3d Cir. 1966) ...............................................................20

*Celotex Corp. v. Catrett*,
　477 U.S. 317 (1986)...........................................................................19

*Flotec v. S. Research, Inc.*,
　16 F. Supp. 2d 992 (S.D. Ind. 1998)........................................20, 22, 26

*Foster-Miller, Inc. v. Babcock & Wilcox Canada*,
　210 F.3d 1, 12 (1st Cir. 2000)..............................................................38

*Greenberg v. Croydon Plastics Co.*,
　378 F. Supp. 806 (E.D. Pa. 1974)........................................................33

*In re Gabapentin Patent Litig.*,
　312 F. Supp. 2d 653 (D.N.J. 2004)......................................................37

*Ingle ex rel. Estate of Ingle v. Yelton*,
　439 F.3d 191 (4th Cir. 2006) ..............................................................38

*Merckle GmbH v. Johnson & Johnson, et al.*,
　961 F Supp. 721 (D.N.J. 1997)............................................................28

*Moore v. Kulicke & Soffa Indust., Inc*.
　318 F.3d 561 (3d Cir. 2003) ................................................................20

*Rohm & Haas Co. v. Adco Chemical Co.*,
　689 F.2d 424 (3d Cir. 1982) ..................................................25, 26, 34

*SI Handling Sys., Inc. v. Heisley*,
　753 F.2d 1244 (3d Cir. 1985) .................................................22, 27, 33

*Smith v. BIC Corp.*,
　869 F.2d 194 (3rd Cir. 1989) ..............................................................22

*Syncsort, Inc. v. Innovative Routines Int'l, Inc.*,
   No. 04-3623, 2008 WL 1925304 (D.N.J. Apr. 30, 2008) ...........................29, 31

*Wachtel v. Health Net of the N.E., Inc.*,
   239 F.R.C. 81 (D.N.J. 2006)...............................................................................36

*Wyeth v. Natural Biologics, Inc.*,
   395 F.3d 897 (8th Cir. 2005) .............................................................................29

**STATE CASES**

*Lamorte Burns & Co. v. Walters*,
   167 N.J. 285 (N.J. 2001) ..............................................................................31, 32

*Morgan v. Union County Bd. of Chosen Freeholders*,
   268 N.J. Super. 337 (N.J. Super. Ct. App. Div. 1993) .......................................36

*Platinum Mgmt., Inc. v. Dahms*,
   285 N.J. Super. 274 (N.J. Law Div. 1995) ...................................................32, 35

*PMC, Inc. v. Kadisha*,
   78 Cal. App. 4th 1368 (Cal. App. 2d Dist. 2000)...............................................35

*Rycoline Prods., Inc. v. Walsh*,
   334 N.J. Super. 62 (N.J. Super. Ct. App. Div. 2000) ...........................20, 21, 23

*Subcarrier Comm'ns, Inc. v. Day*,
   299 N.J. Super. 634 (N.J. Super. Ct. App. Div. 1997) .......................................31

*Sun Dial Corp. v. Rideout*,
   16 N.J. 252 (N.J. 1954)......................................................................................31

*Theragenics Corp. v. Dep't of Natural Res.*,
   536 S.E.2d 613 (Ga. Ct. App. 2000)..................................................................30

**RULES**

Fed. R. Civ. P. 56(c)...................................................................................................19

**OTHER AUTHORITIES**

1 Melvin F. Jager, Trade Secret Law § 7:20.......................................................35, 38

Restatement (Third) of Unfair Competition § 39. ................................................37

iv

Restatement (Third) of Unfair Competition § 41. ...................................................30

Defendants' motion turns on a partisan recitation of facts and misstatements of law. Contrary to Defendants' recitation, a jury could find that *all* Defendants participated in and profited from a scheme to misappropriate Graco's trade secrets. At the outset of that scheme, Defendants agreed that their joint enterprise would ███████ some of the very Graco products in question ███████████████████ ████████████████████ Defendants hired a group of Graco engineers and executives to do just that. Shortly thereafter, Graco's unique tolerance specifications almost immediately found their way into Defendants' specifications for substantially similar products. Under such circumstances, *Defendants* have the burden to prove that they could have "quickly" reverse engineered Graco's products. They make no such showing. Instead, they just say – repeatedly – that it is "undisputed" that Graco did not protect the information in question, that the information was "reverse-engineerable," and that all of the data is otherwise publicly available. But these propositions *are* disputed – no matter how many times Defendants say otherwise. As a result, the motion must be denied.

## FACTS AND PROCEDURAL HISTORY

Plaintiff Graco Inc. purchased Gusmer Corporation and Gusmer Europe (collectively "Gusmer") from Defendants PMC Global, Inc., and PMC Europe Investments, S.L. (collectively "PMC") in February 2005 for $65 million. ECF Nos. 1-2 (Exs. A & B to Compl.). Gusmer designed and manufactured specialized

equipment used to combine and dispense chemicals. SMF1 No. 1.[1] This equipment is commonly used to apply insulation, protective coatings, and sealants. *Id.* Shortly thereafter, Defendants began scheming with then-current Graco employees to launch a new enterprise called Gama, ███████████████████████ ██ SMF1 Nos. 11-15, 21. The Gama enterprise involves a conspiracy of at least three entities – Gama USA, Gama China, and Garraf Maquinaria (or "Gama Spain") – orchestrated by the PMC Defendants. SMF1 Nos. 44, 49-51, 54-56.

Like Gusmer, Gama is in the business of manufacturing and selling equipment used to combine and apply chemicals. Exs. EEE, NN (Dep. Exs. 319, 381). Gama developed its products and strategies by misappropriating key trade secret and confidential business information from Graco and Gusmer. Defendants have sold their products by marketing an ongoing affiliation with Gusmer and by soliciting former-Gusmer distributors. SMF1 Nos. 64, 65, 68.

In March 2008, Graco sued Defendants, asserting claims for breach of contractual and other duties, unfair competition, and trade secret misappropriation. ECF No. 91 (2d Amend. Compl.). Defendants jointly defended and asserted

---

[1] References to "Ex. __" are to the Declaration of Clifford M. Greene in Opposition to Defendants' Motions for Partial Summary Judgment. References to "Dep. Ex. __" refer to Graco's deposition exhibits. Because Defendants filed two separate motions, Graco has submitted two Statements of Material Facts, referred to herein as SMF1 and SMF2. To prevent confusion, Graco has numbered its individual Statements of Material Facts sequentially.

counterclaims. ECF No. 92 (Ans. & Countercl.). In the midst of this litigation and with discovery motions pending against it, Defendant Garraf ceased responding to discovery and defaulted. Ex. BBB (Dep. Ex. 478); ECF No. 219. Despite this, Graco has obtained sufficient evidence to prove its claims against *all* Defendants.

## I.    The Relevant Trade Secrets and Confidential Business Information.

### A.    The Graco/Gusmer H-20/35.

Gusmer manufactured and sold, among other things, the H-20/35 hydraulic proportioner. SMF2 No. 74. A hydraulic proportioner is used to apply fast setting, two-component chemicals. ECF No. 103 (Weinberger Aff. ¶ 6). It consists of a driving mechanism, chemical pumps, heaters, hoses and an applicator gun. *Id.* The driving mechanism creates a reciprocating force, moving the chemical pump rods back and forth and pressurizing the chemicals inside. *Id.* The chemicals move through separate heaters and hoses until they combine at the spray gun before application. *Id.* Pressures within the system range from 2,000 to 3,500psi, the chemicals themselves can be abrasive, and there are numerous parts within that must fit together perfectly to prevent leaking. May 1, 2010 Decl. of Nick Pagano ("Pagano Decl. II") ¶ 23. As a result, the entire system must be manufactured to extremely tight tolerances and made of materials that are hardened against abrasion. *See generally* ECF No. 103 (Weinberger Aff.); Decl. of Dr. James Rice ("Rice Decl.") ¶¶ 25 – 26.

To express necessary dimensions and manufacturing tolerances, Gusmer's engineering drawings (like Graco's) used a symbolic language called "geometric dimensioning and tolerancing," or "GDT." Rice Decl. ¶ 22. GDT expresses both the required dimensions and the permissible variations or tolerances of those dimensions. *Id.* The development of GDT is

> typically a collaborative effort between Engineering and Manufacturing, usually resulting in a consensus based on design requirements, manufacturing and inspection capabilities and procedures. Due to these variables and the multiple tolerancing options, *GDT is unique from company to company and even from designer to designer*. For that reason, the representations made in an engineering drawing are <u>*like finger prints – unique to the owner*</u>.

ECF No. 103 (Weinberger Aff. ¶ 8) (emphasis added); *see* Rice Decl. ¶¶ 26 – 35.

It took Gusmer "several years and a half dozen prototypes before [it] finalized the H-20/35 design." ECF No. 109 at Ex. WW (Dep. Ex. 147); Ex. FF (Commette I Tr. 393-94). Gusmer employees Mestres, Ferran Moreno, and Raset drafted and approved Gusmer's H-20/35 drawings. SMF2 No. 77. When Graco acquired Gusmer, it acquired those drawings. SMF2 No. 76.

After they left Graco, Mestres, Moreno, and Raset went to work for Gama. *See* ECF No. 105 (Farrow Aff. ¶ 14). ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ *See* ECF No. 111 at Exs. B-C (drawings dated 9/13/06 and 10/3/06)).

The core components of Gama's G-250H are substantially similar to those of the H-20/35. SMF2 No. 82. The two machines share nearly identical piston assemblies, rod bushings, hydraulic cylinder clevises, piston rods and piston heads on their chemical pumps, and chemical pump clevises. *Id.* █████████

████████████████████████████████████████████████

███████ SMF2 Nos. 82, 85.

Most critically, ████████████████████████████████

███████████████████████████████████████████ SMF2 No. 85. For example, Gama's GDT specification for its hydraulic cylinder clevis appears below. ████████████████████████████████

████████████████████████████████



5

*Id.* ¶ 10; ECF No. 111 at Ex. B.



ECF No. 105 (Farrow Aff. ¶ 11); *see also* ECF No. 111 at Ex. C

### B.    The Graco/Gusmer D Gun and GAP Pro Gun.

Gusmer also designed and manufactured the D Gun and GAP Pro gun. SMF2 No. 75. The D gun is a plural-component spray gun that provides a variety of spray patterns. ECF No. 104 (Mulder ¶ 6). It is used for small to medium output foam applications, such as interior insulation. *Id.* The GAP Pro gun is designed for use in construction, truck-bed linings, roofing, and other spraying. *Id.* ¶ 35.

The heart of the guns is their mixing chamber, which controls the volume

and mix-ratio of foam that sprays from the gun. *Id.* ¶ 7, 36. The components of the mixing chamber must be manufactured to very tight tolerances and of appropriate materials to avoid leaking and other malfunctions. *Id.* ¶¶ 6–59.

When Graco acquired Gusmer, it acquired its D Gun and GAP Pro Gun specifications. SMF2 No. 76. ███████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████         SMF2 No. 78. Very shortly thereafter—and just two months after Graco/Gusmer executive, Defendant Denis Commette, left Graco and joined Gama—Defendants began selling spare parts for the Graco/Gusmer guns. ECF No. 98-3, -4 (Lopez Decl. ¶¶ 2-4 & Ex. A); SMF1 No. 30.

Many of the parts for the Graco/Gusmer guns are substantially similar to those of the Gama guns including their respective mixing chambers, felt wipers, gun blocks, and other components. SMF2 No. 83. ████████████████████████
██████████████████████████████████████████████ SMF2 No. 86. Below are Gama's specifications for its Gun Block Collet, ████████████
███████████████████████████████████████████████████████

7



Farrow Supp. Aff. ¶ 15 & Ex. F.



*Id.* at Ex. G. ███████████████████████████████████████

████████████████████████████



*Id.* at Ex. H. ███████████████████████████████████

████████████████████████████████████

██████████████████ *See* Farrow Supp. Aff. Exs. I, J.

████████████████████████████████████

████████████████████████ Rice Decl. ¶¶ 23 – 24,

### C.    Gama's Classic Proportioner and Vortex Gun.

During the pendency of this litigation, Defendants introduced the Gama

"Classic" proportioner – ███████████████████████████████████

███ – and the Gama Vortex gun. Ex. VVV (Dep. Ex. 388); SMF2 No. 88.

9



Defendants claim that this new equipment was designed without access to the Graco/Gusmer specifications. ██████████████████████

██████████████████████████████████████

██████████████████ *See, e.g.,* SMF2 No. 91. The limited information Defendants have produced suggests this is no mere coincidence. Defendants selected MDI Manufacturing, Inc. ("MDI"), to manufacture these components. MDI had previously manufactured precisely these types of parts for Gusmer. Ex. FFF (Daugherty Tr. 33-34). ██████████████████████████

█████████████████████████████████████████

████████████████████████████ *Id.* at 31-39, 122-24, 160-62, 238-39, 242-43, 248).

Graco has sought discovery into the development of Gama's designs for its new equipment. *See* Greene R. 56(f) Aff. ¶ 8. Claiming that the new equipment is

irrelevant, Defendants have refused to respond, and Graco has asked the Court to compel Defendants to produce this information. *Id.*

**D.    The Graco/Gusmer Braided Hose.**

In early 2000, Gusmer began a two-year research and development project to design and test a copper braided hose product that would heat up faster and more uniformly than existing products. SMF2 No. 93. ████████████████████████████████████████████████████████████████████████████████████████████████████

ECF No. 107 (Pagano Aff. ¶ 6). When Graco acquired Gusmer, it acquired the results of this development and testing. *Id. ¶* 3; ECF No. 109 at Ex. DD.

Former Graco/Gusmer employees Defendant Commette, Frank Sica, and Bill Hrynkiewicz were privy to confidential information about the project. ECF No. 107 (Pagano Aff. ¶ 10). All three now work or consult for Gama. ECF No. 259 (Defs. 1st Supp. Resp. to Interrogs. 1-2). After they went to work for Gama, Gama began selling a braided hose that uses a design substantially similar to the Gusmer design. ECF No. 107 (Pagano Aff. ¶ 4). ████████████████████████ ████████████████████████████████████████████████████ ████████████  *Id. ¶ 7.* ████████████████████████████ ████████████████████████████  SMF2 Nos. 95-96.

It is unlikely that Gama would have created a braided hose that incorporates

11

the results of the Gusmer research absent inside information about that project. This is because neither Graco nor Gusmer has ever sold the braided hose, so exemplars are not publicly available. *Id.* ¶¶ 13-14. And Defendants' agents have all but acknowledged that they took advantage of Gusmer's work on the hose project. At a January 2009 trade show, Nick Pagano – who led the hose-design project for Gusmer – spoke to Sica and Hrynkiewicz. *Id.* Upon seeing a sample of Gama's hose, Pagano commented to Hrynkiewicz, "This looks pretty familiar." *Id.* ¶ 11. Hrynkiewicz laughed and said "thank you for all the work you did on it." *Id.*

## II. The Graco/Gusmer Specifications and Tolerances Cannot Easily Be Reverse Engineered.

Discussing the Graco/Gusmer H-20/35, Graco engineer Mark Weinberger attests:

> It is difficult to reverse engineer the machining instructions and processing knowledge that you need to manufacture these parts—such as the tolerances, the [GDT], or the amount of heat treating or grinding required to get the right finish. That information comes from a product development cycle of design, test, evaluation, production, and redesign—and it takes place over time. It is critical information that ultimately finds expression in the engineering drawings that I reference below.

ECF No. 103 (Weinberger Aff. ¶ 8). Expert Dr. Rice supports this conclusion. *See generally* Rice Decl. In particular, it would be difficult to reverse engineer the H-20/35 pumpline and its hydraulic cylinder and subcomponents (the piston assembly, rod bushings, and hydraulic cylinder clevis), and the chemical pump and

12

its subcomponents (piston rod, piston head, and pump clevis). ECF No. 103 (Weinberger Aff. ¶¶ 7, 10-15); Ex. E (Weinberger Tr. 43-44, 123-24, 133-35, 138). It would also be difficult to reverse engineer the machining instructions and processing knowledge needed to manufacture those parts, such as the tolerances, GDT, and the amount of heat treating or grinding necessary to achieve the required finishes. ECF No. 103 (Weinberger Aff. ¶¶ 8, 11); Rice Decl. ¶¶ 20 – 42.

Likewise, Graco engineer Josh Mulder attests that it would be difficult to reverse engineer the machining instructions and tolerances needed to manufacture key components of the Graco/Gusmer D gun and GAP Pro gun. ECF No. 104 (Mulder ¶¶ 5, 8-14, 16-19, 21-25, 36-40, 42-49); *see* Ex. GGG (Mulder Tr. 183-86, 189-92, 193-94). Expert Dr. Rice supports this conclusion. *See* Rice Decl. ¶¶ 20 – 42. This is especially true because several its constituent parts are subject to a trade secret process that alters key dimensions in the course of fabrication. Ex. GGG (Mulder Tr. 96-99, 107-11); *see also* Rice Decl. ¶¶ 21 – 26.

Graco's engineers estimate that it would have taken many people, many months, and millions of dollars to reverse engineer the H-20/35, the D Gun, and the GAP Pro gun. ECF No. 103 (Weinberger Aff. ¶¶ 25-27).  Dr. Rice supports this conclusion. *See generally* Rice Decl. ████████████████████████████ ████████████████████████████████████████ ████████████████████ ECF No. 105 (Farrow Aff. ¶ 16).

13

Defendants have produced no drafts reflecting the development of these products, and nothing to demonstrate how they brought their products to market so quickly and so cheaply.

### III.    Graco's Other Confidential Business Information.

Defendant Commette and Carles Royo were Gusmer executives who held key managerial positions at Graco after it acquired Gusmer. Sutter Aff. ¶ 7, 8. They were privy to confidential communications relating to Graco's strategies for integrating Gusmer into Graco's existing business. *Id.* ¶¶ 7, 11, 12-14. They had access to Graco's most confidential strategic planning information, technical information and drawings, and sales and financial information. *Id.* ¶ 8, 12-13; Ex. FF (Commette I Tr. 139-47, 152-53, 159-65); Ex. HHH, III (Dep. Exs. 99, 100).

Defendant Commette and Royo used this inside information to aid Defendants  For example, *while he was a Graco executive* and privy to its confidential information, Royo provided ECF No. 243-14 (Dep. Ex. 373). A jury could conclude that these were based on inside knowledge of Graco's projections. A jury could also conclude that these SMF1 No. 15.

14

Defendants have also been caught with internal Graco documents reflecting its business strategies. For example, Defendants produced a copy of Graco ██████ ████████████████████████████████████ presentation, including information on Graco's financial objectives, projections, and marketing strategy. *See* ECF No. 109 at Ex. II (Dep. Ex. 91). They produced a copy of Graco ██████ ███████████ which includes its plans and pricing/positioning strategies. *See* Ex. JJJ (Dep. Ex. 97). Defendant Commette admitted Defendants should not have these documents. Ex. FF (Commette I Tr. 157-59, 164).

## IV.   Graco and Gusmer Protect Their Trade Secrets and Confidential Business Information.

When it sold Gusmer to Graco in 2005 for $65 million, PMC represented that Gusmer had protected the confidentiality of its trade secret technologies:

> The Company owns or possesses adequate licenses or other rights to use…all…unpatented inventions and other proprietary and intellectual property rights necessary to conduct all phases of its business as now conducted (collectively, the 'Proprietary Rights')….To the Knowledge of PMC and Shareholder, the Company has not disclosed to any person not obligated to maintain the confidentiality thereof any material Proprietary Rights (*including any trade secrets*) the value of which is contingent upon confidentiality without securing an appropriate confidentiality agreement, and to the Knowledge of PMC and Shareholder there have been no material violations of any such confidentiality obligations or any such agreements.

ECF Nos. 1-2 at § 4.16 (emphasis added). Despite this, Defendants now argue that Gusmer did *not* protect its trade secrets. The evidence shows otherwise.

Gusmer treated its engineering drawings as confidential. Decl. of Jesus

Lopez ¶¶ 4, 13, 17-20. As former Gusmer Europe employee, Jesus Lopez,
explains, "the decision to protect the confidentiality of the Gusmer drawings was
made by the Gusmer managers and was well understood by Gusmer employees.
This was consistent with the way in which Gusmer drawings were generated and
treated." *Id.* ¶ 18 Gusmer Europe's managers had to approve any decision to
provide drawings to persons outside the company. *Id.* ¶¶ 6, 13. Gusmer Europe
segregated its engineering drawings on its password-protected computer system,
and it strictly limited access to its drawings. *Id.* ¶¶ 14-16.

> This 'virtual segregation' of information stored on the Gusmer
> computer system made it clear to me that Gusmer's information was
> to be treated with care and was to be kept confidential. And I know
> from conversations with other Gusmer employees that they felt the
> same way.

*Id.* ¶ 14. "In short, Gusmer's employees knew that no confidential information,
including engineering drawings, was to leave the Gusmer facility without manager
approval, and the managers would not approve disclosure to even good distributors
or customers." *Id.* ¶ 13.

Gusmer Europe protected the physical security of its documents and facility.
Its facility in Villanova, Spain employed fewer than 50 people, almost all of whom
lived in Villanova – a town of approximately 70,000. *Id.* ¶ 5. Visitors to the facility
were escorted at all times, and employees would have noticed anyone who did not
belong. *Id.* ¶¶ 5, 7. The doors were locked during non-business hours, and it was

16

protected by a keypad-activated alarm system monitored by local police. *Id.* ¶¶ 8-9. Only managers had access to alarm codes. *Id.* ¶ 9.

Gusmer Europe also required key managers to execute strict confidentiality agreements. *Id.* ¶¶ 6, 11-12. For example, on September 1, 2004, Carles Royo executed an agreement with Gusmer Europe (signed by Defendant Commette) to maintain the confidentiality of information, knowledge, and documents to which he had access by reason of his employment. ECF Doc. No. 109 at BB; *id.* at CC.

In the United States, Gusmer took similar steps to protect its confidential information, including engineering drawings. SMF2 No. 97; *see generally* Pagano Decl. II; Second Declaration of Michael Sebion ¶ 15 ("Sebion II Decl."). Among other things, it prohibited employees from disclosing █████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Ex. DDD (Dep. Ex. 62). Defendants do not argue that Graco failed to guard the secrecy of the information in question after acquiring Gusmer, and the evidence shows that Graco *has* protected these materials. SMF2 No. 97.

Richard Mainey is an expert on corporate and data security. *See generally* Decl. of Richard Mainey ("Mainey Aff."). He has been the worldwide head of

security for IBM, Marsh McLennan, and Morgan Stanley. *Id.* ¶¶ 3 – 12. He attests that the steps Gusmer and Graco took to protect the drawings and other data at issue in this case were reasonable and appropriate under the circumstances. *See id.* ¶¶ 16 – 19.

## V.  All Defendants Participated in the Misappropriation of the Graco/Gusmer Trade Secrets and Confidential Business Information.

All Defendants were aware of and actively involved in a joint effort to misappropriate Graco's trade secrets and confidential business information. *See* Graco's Resp. to First Mot. for Partial S.J.; SMF1 Nos. 14, 29-30, 33, 73. ███

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

Ex. CC (Dep. Ex. 458) (emphasis added); Ex. I (G. Kamins Dep. 158-61). As discussed above and in Graco's opposition to Defendants' other summary judgment motion, ██████ is precisely what Defendants did.

Further, all remaining Defendants actively participated in efforts to sell the products manufactured by defaulted-Defendant Garraf in the U.S. and abroad. *See* SMF1 Nos. 44, 48, 54, 56; ECF No. 259 (Defs. 1st Supp. Resp. to Interrog. 19). Defendant Gama USA served as the U.S. "master distributor" for those products. SMF1 Nos. 48, 55. And thanks to ████████ Defendant Garraf continues to sell those products in Europe, while another PMC subsidiary (Gama

China) sells them in Asia. SMF1 No. 56; Ex. KKK (Garraf website (last visited 5/2/10)). To this day, ███████████████████████████████████ despite extensive evidence that those products are based on misappropriated trade secrets. SMF2 No. 80.

## ARGUMENT

In order to succeed on this motion, Defendants must prove that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Defendants come nowhere close to meeting this burden.[2]

## I.   The Graco/Gusmer Tolerances and Other Information Are Neither Common Knowledge Nor Easily Reverse-Engineerable.

Defendants began manufacturing apparently-perfect spare parts for and replicas of the Graco/Gusmer equipment within just months after hiring a number of Graco executives and engineers who had access to Graco's confidential specifications for that equipment. ███████████████████████

███████████████████████████████████████████████████████████

---

[2]   Defendants assert that Graco has already litigated and lost its trade secret claims in Spain. *See* Br. 18. This is false. Graco has never sued any of the parties to this case in Spain, and it has never asserted any trade secret claims in Spain. It did sue Carles Royo in Spain for breach of his written non-competition and non-disclosure agreement. *See* Oh Decl. Ex. D. That case is currently on appeal.

Under such circumstances, "a heavy burden of persuasion" now falls upon Defendants to show that their products were the result of "independent development and not from the use of information confidentially reposed." *Bolt Assocs. v. Alpine Geophysical Assocs.*, 365 F.2d 742, 749-50 (3d Cir. 1966) (citing Restatement (First) of Torts § 757); *see Moore v. Kulicke & Soffa Indust., Inc*. 318 F.3d 561, 569 (3d Cir. 2003); *Rycoline Prods., Inc. v. Walsh*, 334 N.J. Super. 62, 74-75 (N.J. Super. Ct. App. Div. 2000) (burden shifts to defendants "to show that [they] could have arrived at [their] product by reverse engineering"). Defendants argue that that the Graco/Gusmer tolerances are not entitled to trade secret protection because: (A) tolerances can easily be discovered through reverse engineering, (B) Defendants and others have developed these same products through reverse engineering, and (C) the tolerances in question are matters of general or common knowledge. Each of these contentions is sharply disputed.

## A.    The Tolerances and Other Information in Question Cannot Easily Be Discovered Through Reverse Engineering.

Defendants offer no evidence that they developed their G-250H or first generation guns independently or through reverse engineering. The absence of such evidence distinguishes this case from *Flotec v. S. Research, Inc*., 16 F. Supp. 2d 992 (S.D. Ind. 1998), on which Defendants rely, where the product in question was developed through an extensive reverse engineering process that began with "detailed (and legitimately obtained) information." *Id.* at 996.

Instead, Defendants attempt to satisfy their heavy burden by asserting repeatedly that the products and tolerances in question are "susceptible to reverse engineering." Br. 12, 15, 19, 21-22. But to succeed on this motion, Defendants must show that it is *undisputed* that the products and tolerances in question are "*quickly* reverse engineerable. The more difficult, time consuming and costly it would be to develop the product[s], the less likely [they] can be considered to be 'reverse engineerable.'" *Rycoline Prods.,* 334 N.J. Super. at 74-75 (emphasis added). Defendants come nowhere close to meeting their burden.

While it may be possible to disassemble and measure the dimensions of a given sample of a finished product, such inspection will not reveal what the manufacturer considers to be an acceptable variation in such dimensions. SMF2 No. 87; Rice Decl. ¶¶ 21 – 29. Indeed, in some instances it may not be possible to ascertain even the *nominal dimensions* of a component through inspection of the finished product. *Id.*; Ex. GGG (Mulder Tr. 96-99, 107-11); Rice Decl. ¶ 29. And even if some aspects of Graco's products could be reproduced through reverse engineering, Graco's engineers and independent mechanical engineering expert, Dr. Rice, states that it *certainly* would have been impossible to "quickly" reproduce these products in the short time and on the small budget that Defendants

had to design, test, and manufacture these products.[3] *See* Rice Decl. ¶¶ 21 – 29.

The Court need not take Graco's word for it. The Third Circuit, in a case on which Defendants rely, called such tolerances "trade secrets par excellence, because they cannot be obtained even by the most precise measurements." *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1256 (3d Cir. 1985). The court in *Flotec*, on which Defendants also rely, likewise noted that "tolerances are *not* readily available by merely measuring the marketed product." 16 F. Supp. 2d at 1001-02 (citing, among others, *Smith v. BIC Corp.*, 869 F.2d 194 (3rd Cir. 1989)). On the facts before the Court, a jury could reasonably reject the contention that the tolerances in question can easily be discovered through reverse engineering.

### B. There is No Evidence that Defendants or Anyone Else Has *Actually Ascertained* Graco's Tolerances Through Reverse Engineering.

Defendants claim that their third-party consultant, Brent Lucas, reverse engineered components of the Graco/Gusmer products in the course of this litigation and prepared "manufacture-ready" drawings of those components. This is

---

[3] Defendants' own consultant, Brent Lucas, attests that he would need to purchase, disassemble, and carefully examine five to ten examples of a Graco product in order to "reverse a tolerance." Ex. LLL (Lucas Tr. 67-71). *See also Flotec*, 16 F. Supp. 2d at 1002 ("Determining tolerances on Flotec's regulators through such an extensive review of a large sample of finished regulators would require a substantial investment of time and expense."). There is no evidence that Defendants or Lucas undertook any such effort. Ex. LLL (Lucas Tr. 71 (confirming that, because he only had one sample, he was "not able to determine the tolerance associated with any of these parts")).

22

disputed. Reverse engineering refers to determining the process required to manufacture a product through examination of the finished product. *See Rycoline,* 334 N.J. Super. at 73 (citing *SI Handling,* 753 F.2d at 1256). Graco's engineers and technical expert attest that it would *not* be possible to manufacture the Graco/Gusmer products in question without knowing the manufacturing tolerances associated with the each of the nominal dimensions. SMF2 No. 87. Nor would it be possible to manufacture these products without specific information regarding manufacturing instructions and materials and finishes necessary for each component to function. ECF No. 103 (Weinberger ¶ 7); ECF No. 104 (Mulder ¶ 4).

Graco's witnesses are not alone. Lucas himself testified that precise tolerance data is necessary so that a manufacturer would know the acceptable limits of variation on these nominal dimensions. Ex. LLL (Lucas Tr. 78-79, 102-103). *But Lucas does not claim to have ascertained these necessary tolerances through his inspections of Graco/Gusmer units at all. Id.* at 70-71, 154, 306). Indeed, even a cursory examination of his drawings reveals that they contain no information about tolerances whatsoever. ECF Nos. 300-10 to 300-13 (Oh Decl. Exs. LL, MM, NN). Nor do they contain any information about the specific materials used to manufacture the Graco/Gusmer components. *Id.*; Ex. LLL (Lucas Tr. 42). Graco's technical expert, Dr. Rice, has concluded that Lucas did *less than five percent* of what would be required for a complete reverse engineering effort,

and there is no way that the relevant equipment could be manufactured based solely on the preliminary drawings that Lucas prepared. Rice Decl. ¶¶ 72 – 74.

Lucas does claim that he *could* ascertain the Graco/Gusmer tolerances, if he could disassemble and measure enough examples of the Graco/Gusmer equipment. Ex. LLL (Lucas Tr. 70-72, 74, 131-132). Notably, he contends that this would require the disassembly and inspection of at least five to ten exemplars of each component at issue – something that neither Lucas nor Defendants claim to have done. *Id.* at 70-71. In any case, a jury could reject Lucas' claim, given the testimony of Graco's engineers and expert that it is *not possible* to ascertain all of Graco's tolerances simply by measuring finished products – regardless of how many samples he might examine. *See* Rice Decl. ¶¶ 72 – 74.

Defendants also point to the fact that Mark Daugherty appears to have reproduced certain tolerances associated with the Graco/Gusmer pumpline in connection with his work on the Gama Classic proportioner pumpline. But the evidence on which Defendants rely actually undermines their argument because *Daugherty had access to Graco/Gusmer tolerances* from his prior work for those companies. *See* Ex. FFF (Daugherty Tr. 33-34, 252-253).

Defendants next claim that the Graco/Gusmer products in question have been reverse engineered by other manufacturers. But Defendants offer no evidence that any other manufacturer has ascertained the *specific tolerances* that Gusmer

developed for the H-20/35, the D gun, or the Gap gun. Absent such evidence, there can be no assurance that the components of the lookalike products on which Defendants rely fall within Graco/Gusmer's tolerance ranges, no assurance that any given example of one of these knock offs would function as well as a Graco/Gusmer machine, and certainly no assurance that a knock-off part would function in a Graco/Gusmer machine. Thus, a jury could find the general existence of lookalike products irrelevant to the issues at hand.

### C. The Tolerances in Question Are Neither Matters of "General Skill and Ability" Nor Common Knowledge Among Machinists.

Defendants next assert that the Graco/Gusmer trade secrets relating to tolerances are not entitled to protection because they constitute only "[g]eneral knowledge, skill and experience gained by an employee during his employment," which they contend "cannot be claimed as a trade secret by his employer." Br. 18 (citing *Rohm & Haas Co. v. Adco Chemical Co.*, 689 F.2d 424, 433 (3d Cir. 1982)). But this is *not* a case about *general* knowledge or skill. It is about the *very specific* tolerance figures that Gusmer developed at great cost and through multiple prototypes over a period of years, that differ from and are more stringent than is typical (SMF2 No. 92), ████████████████████████████████

████████████████████████████████████████████████████████████████

In this regard, the very case Defendants cite – *Rohm & Haas* – is fatal to

their argument. There, an employee assisted the plaintiff in developing a manufacturing process, and he later helped the defendant to develop a similar process. The district court granted summary judgment on the basis of the argument Defendants make here – that the employee's skill in the process could not be protected as a trade secret. *But the Third Circuit reversed. See Rohm & Haas*, 689 F.2d 424. It held that a jury could find that the employee had not simply brought "heightened chemical prowess" to his new employer, but rather a specific "recollection of plaintiff's process." *Id.* at 433. Likewise, a jury could find that the former Graco/Gusmer employees who now work for Defendants took documents reflecting product specifications *or simply recalled those specifications from their prior work for Gusmer*. Either circumstance constitutes misappropriation.

Defendants similarly argue that the Graco/Gusmer manufacturing tolerances are "relatively standard tolerances for machining," and are matters of common knowledge among machinists. Br. 16-17. In so arguing, Defendants attempt to bring this case within the rule articulated by *Flotec,* 16 F. Supp. 2d 992, which involved "relatively standard" manufacturing tolerances. Defendants' only support for this argument is the testimony of Mark Daugherty, who claims that general information about tolerances can be found in a "Machinery Handbook or whatever it's called," which has "columns that tells you diameters, tells you tolerances to use." Ex. FFF (Daugherty Tr. 270-71). But Daugherty *also* testified that Graco and

Gusmer *did not use standard tolerances. Id.* at 83-85. Instead, they used tolerances

so strict that Daugherty considered them "ridiculous":

> Q. Did [Gusmer] have, for lack of a better term, fairly tight
> specifications that you were required to follow?
>
> A. Yeah, they were ridiculous, but yeah, they had a lot of tolerances.
>
> Q. What did you mean by they were ridiculous?
>
> A. . . . . I sat hours on hours on how to save money, sent [Gusmer]
> emails, ["]why do you have this tolerance on this drawing, this
> drawing is way too tight, this nut bolt,["] going ["]why can that part
> be out of spec because its five thousandths too large. You want to save
> money, don't beat me with a stick, have me open these holes or have
> me loosen the tolerances.["] . . . .
>
> Q. Was Graco's approach to these same products the same with
> respect to the tight tolerances?
>
> A. Yes.
>
> Q. You're chuckling. Tell me was it worse or even tougher?
>
> A. They're a very sophisticated company who knows what they want,
> okay, which they have – well you probably know Graco better than I
> do, but Graco's mandate is even a little bit heavier than Gusmer's.

*Id.* at 83-85.

Daugherty's testimony is unsurprising. If tolerances copied from a book

would suffice, Gusmer might not have required years of research and numerous

prototypes to finalize the H-20/35 design. Ex. FF (Commette I Tr. 393-94); ECF

No. 109 at Ex. WW (Depo. Ex. 147). *Cf. SI Handling*, 753 F.2d at 1256

("Appellants attempt to trivialize this procedure arguing that it is one that would be

used by any competent engineer and therefore cannot be a protectible [sic] trade

27

secret. . . . If so, we must wonder why the competent engineers of SI only began using this procedure after a number of years of experience manufacturing the product."). And as Dr. Rice notes, not only can the Graco/Gusmer tolerances *not* be found in a machinist's handbook (or even scholarly texts), but they are *not* standard and thus are not predictable. Rice Decl. ¶ 27. Even if industry standard tolerances existed, they are irrelevant if Graco and Gusmer used non-standard tolerances.

## II.    Graco and Gusmer Took Reasonable Steps to Protect the Secrecy of the Information in Question.

Defendants claim there is no evidence that Gusmer protected the trade secrets at issue. In support of this, they cite the report of a single Graco employee who stated that Gusmer had "no protected intellectual property." *See* Br. 11. Defendants have not deposed the author of this email. If they had, they would have learned that he was expressing only his (completely accurate) understanding that Gusmer had *no unexpired patents* when Graco was considering buying the company. Scherer Decl. ¶¶ 1-3. He expressed no opinion as to whether Gusmer had protectable trade secrets. *See id.* The evidence shows – contrary to Defendants' account – that Gusmer *did* appropriately protect the secrecy of its trade secrets and confidential business information. *See generally* Mainey Decl.

As a preliminary matter, Graco need not prove that its drawings were maintained with "absolute secrecy." *Merckle GmbH v. Johnson & Johnson, et al.*,

961 F Supp. 721, 732 (D.N.J. 1997) (Br. 8-9, 22). A jury need only find that Gusmer and Graco treated the information in question with "that qualified secrecy which arises from mutual understanding and is required alike by good faith and good morals." *Id.* And the evidence shows that Gusmer – both in Europe and in the U.S. – *did* view its engineering drawings as confidential, and did take reasonable steps to protect their secrecy. SMF2 No. 97. Defendants do not and cannot argue that Graco failed to protect this information after it purchased Gusmer from Defendants. *See id.* And an expert in corporate and informational security, Richard Mainey, attests that the steps Gusmer and Graco took to protect their drawings were reasonable under the circumstances. *See generally* Mainey Decl. Given these facts, Defendants cannot "overwhelmingly establish that the purported trade secret was . . . widely revealed." *Syncsort, Inc. v. Innovative Routines Int'l, Inc.*, No. 04-3623, 2008 WL 1925304, *3 (D.N.J. Apr. 30, 2008).

At best, Defendants can show that *some* copies of the drawings in question did not contain confidentiality legends. But *many* copies of the specifications in question *did* contain confidentiality legends at both Graco and Gusmer. *See* Sebion II Decl. ¶¶ 5 – 14. And a failure to mark a given document "confidential" is not dispositive of whether that document or the information it contains is a trade secret. *See Wyeth v. Natural Biologics, Inc.*, 395 F.3d 897, 899 n.4 (8th Cir. 2005) (finding trade secret even though documents were "unmarked" and "not identified

as trade secrets or as confidential"); *Theragenics Corp. v. Dep't of Natural Res.*, 536 S.E.2d 613, 615-16 (Ga. Ct. App. 2000) ("trade secret status was not lost simply because [a party] . . . failed to designate [the documents] as such"). This authority is consistent with the way in which companies like Gusmer and Graco operate. As security expert Mainey notes, it is not unusual to have certain confidential documents not marked as such. Mainey Decl. ¶ 19. What matters is whether employees understood that the information was to be held in confidence and whether the company maintained a culture of confidentiality. Both Gusmer and Graco meet both of these standards. *See id.*

Defendants also argue that Gusmer and Graco may have disclosed tolerances to outside vendors, even though the Stock Purchase Agreement between PMC and Graco does not reference specific nondisclosure agreements with such vendors. Br. 19-20. This is not dispositive. The jury will be charged with determining whether—after examining all the facts surrounding these relationships, including "the past practice of the parties [and] the customs of the industry"—such disclosures constitute a failure to protect the documents in question. Restatement (Third) of Unfair Competition § 41 cmt. b. In this regard, Defendants' own witnesses undermine their argument. For example, MDI's Mark Daugherty testified that his firm did significant work for Graco and Gusmer, *and that it took significant steps to protect the confidentiality of their information*. Ex. FFF

30

(Daugherty Tr. 61-63). While Defendants assert that there was no confidentiality agreement between MDI and Gusmer, Daugherty testified that the two companies *did* have an understanding that Gusmer's information was to be kept confidential. *Id.* at 62-63. Such an understanding can alone support a duty not to disclose. *See, e.g., Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 300 (N.J. 2001).

Of course, *no* reasonable precaution could have kept the Graco/Gusmer tolerances from the hands of Graco executives and engineers to whom they were entrusted. But Graco has only to demonstrate a *substantial* measure of secrecy, in which case "'disclosure 'to employees involved in its use will not ordinarily result in loss of the employer's protection.'" *Subcarrier Comm'ns, Inc. v. Day*, 299 N.J. Super. 634, 642 (N.J. Super. Ct. App. Div. 1997) (quoting *Sun Dial Corp. v. Rideout*, 16 N.J. 252, 257 (N.J. 1954)) (emphasis added). On the facts of this case, the jury will have to consider "the *entire* record to determine whether [Graco's] alleged trade secrets were, in fact, secret." *Syncsort*, 2008 WL 1925304, *3.

## III.   Confidential Business Information Is Also Protected.

Even if the information in question did not rise to the level of a trade secret, it would still be protected under New Jersey law as confidential business information. *See, e.g., Lamorte Burns*, 167 N.J. 285. The law protects such confidential information against efforts by those in a confidential relationship to steal that information. *See id*. This is true even if the information is "otherwise []

31

publicly available." *Id.* (citing *Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super. 274, 295 (N.J. Law Div. 1995)). This guiding principle is that "an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency . . . in competition with or to the injury of the principal." *Id.*

Even if the Graco/Gusmer information did not rise to the level of trade secrets, a jury could find that Defendant Commette, Royo, and Graco's other employees "would not have been aware of that information but for their employment" and that it was disclosed under an expectation of confidentiality. *Lamorte Burns*, 167 N.J. at 300. They were therefore under a duty to refrain from using this information to compete against Graco/Gusmer. *See id.* A jury could find that those individuals did precisely that – and did so in concert with Defendants.

In addition, a jury could find that Defendant Commette and other coconspirators were privy to non-technical confidential information relating to Graco/Gusmer's customers, sales strategies and marketing plans, pricing information, market forecasts, and integration initiatives. *See Platinum Mgmt.*, 285 N.J. Super. 274, 295-96 (protecting information regarding customer identities – even though otherwise publicly available – and buying habits, mark-up structure, merchandising plans, sales projections and product strategies). And a jury could find that they used this information to inform their decision to launch the ██████

██████ venture and to develop its own competing strategies.

## IV.   All Defendants Knowingly Participated in the Theft and Use of Graco's Trade Secrets and Confidential Business Information.

Defendants claim that Graco cannot satisfy the "use" element of the trade secret analysis because there is no evidence that any Defendant actually took or employed the tolerances or other trade secret information at issue. Graco does not have to produce video footage of Defendants removing documents from its files and then using them in manufacturing in order to survive summary judgment. To the contrary, the Third Circuit has explained as follows:

> In trade secret cases "[m]isappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which *the trier of fact* may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything."

*SI Handling*, 753 F.2d 1261 (quoting *Greenberg v. Croydon Plastics Co.,* 378 F. Supp. 806, 814 (E.D. Pa. 1974)). If the evidence permits any reasonable inference that Defendants knowingly stole and used Graco's trade secrets, then summary judgment must be denied.

### A.   Gama G-250H and First Generation Guns.

A jury could find that the Graco/Gusmer tolerances, and particularly their GDT expressions, are "like finger prints – unique to the owner." ECF No. 103 (Weinberger Aff. ¶ 8); *see also* Rice Decl. ¶¶ 21 – 29. ██████████████

33

████████████████████████████████████████

████  Given the absence of evidence that Defendants did or could have reverse engineered these products and tolerances that quickly and cheaply, a jury could infer that Defendants simply took information about Graco/Gusmer's unique tolerances and used them to develop their competing products. Such an inference is especially likely since Defendants touted their products "as duplicates of plaintiff's products." *Rohm & Haas*, 689 F.2d at 431. *See* SMF1 No. 68.

████████████████████████████████████████

Defendants next argue that – even if a jury could find that *Garraf* stole the Graco/Gusmer designs – *its* misappropriation cannot be charged to the rest of the Defendants. To support this, Defendants claim they had no knowledge of and no involvement in Garraf's design and manufacture of the products in question. █

████████████████████████████████████████

[black redaction bars]

Ex. CC (Dep. Ex. 458) (emphasis added). They knew that virtually *all* of Garraf's employees and executives were former Graco/Gusmer employees – including the very engineers who designed the Gusmer products Defendants' intended to copy.

Under the circumstances, a jury could find Defendants' protestations of ignorance amount to nothing more than "willful blindness," which is itself a form of knowledge. *Cf. Platinum Mgmt.*, 285 N.J. Super. at 295 (N.J. Law Div. 1995). Thus, even if a jury found that the remaining Defendants were not *directly* involved in the Garraf's design and manufacturing efforts, it could nevertheless find them liable because they "knew *or had reason to know* about the trade secret theft." 1 Melvin F. Jager, *Trade Secret Law* § 7:20. Even after years of litigation and discovery has revealed evidence that Garraf misappropriated the Graco/Gusmer trade secrets, Gama *still* continues to import and sell Garraf equipment. SMF2 No. 80-81. It is black letter law that "marketing goods that embody the trade secret" constitutes use of the trade secret. *See PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1383 (Cal. App. 2d Dist. 2000).

Finally, a jury could find that Defendants conspired to misappropriate Graco/Gusmer trade secrets and confidential business information. A cause of

action for civil conspiracy exists where two or more people act in concert to commit an unlawful act, in fact commit some overt act in furtherance of the conspiracy, and thereby cause damage. *Morgan v. Union County Bd. of Chosen Freeholders*, 268 N.J. Super. 337, 364 (N.J. Super. Ct. App. Div. 1993). Once this showing is made, each conspirator is liable for every act and statement of *every other conspirator* in furtherance of the conspiracy. *Id*. Even if a jury accepted that Garraf did the dirty work of stealing the trade secrets and manufacturing the equipment, it could find that this was part of an agreement among *all* Defendants to accomplish that goal and to jointly profit from it.[4] This issue should not be taken from the jury "so long as there is a *possibility* that the jury can infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Id.* at 999.

**B.    Gama's Braided Hose.**

A jury could likewise find that it is more than mere coincidence that Defendants introduced a braided hose product that shares features with the similar hose Gusmer developed several years ago. This is particularly true, given that

---

[4] Defendants cannot escape such a possibility merely by pointing out that Garraf chose to default rather than respond to outstanding discovery. Indeed, a jury could infer from Garraf's refusal to do participate in this litigation that it had something to hide. *See, e.g., Wachtel v. Health Net of the N.E., Inc.*, 239 F.R.C. 81 (D.N.J. 2006) (deeming key allegations admitted, given defendant's "deliberate and willful" nondisclosure and resulting prejudice suffered by plaintiffs).

Gama-employee Bill Hrynkiewicz's credits former Gusmer employee Nick Pagano for his work to design that product. ECF No. 107 (Pagano Aff. ¶ 11). Defendants suggest that Graco can state no claim relating to the braided hose because it never sold that product. But research efforts and results are *themselves* subject to protection. *See, e.g., In re Gabapentin Patent Litig*., 312 F. Supp. 2d 653, 667 (D.N.J. 2004) (holding that one party's "research and development history" was part of its "clearly protectable and highly confidential trade secrets"); *see also* Restatement (Third) of Unfair Competition § 39 cmt. e (1995). And if knowledge of Gusmer's research enabled Defendants to bring its product to market more quickly, that alone will support a trade secret claim.

## C.     Gama's New Equipment.

Defendants claim they did not use the Graco/Gusmer trade secrets to develop their new Gama Classic proportioner or Vortex gun. But, as discussed above, ███████████████████████████████████████████████████████ ██████████████████████████████████████████████ SMF2 No. 89-92. And as Graco's engineers and expert make clear, this suggests that Defendants used Graco's trade secrets to develop those machines. Defendants offer an alternate explanation – that they developed the new equipment by reverse engineering their own first-generation products with the assistance of MDI. Br. 6. But a jury could reject this explanation, making this issue inappropriate for

summary judgment.

Further, a jury could conclude that Defendants used the first-generation equipment to gain a "head start" in developing their second-generation equipment, or to gain a foothold in the market that they could exploit using that equipment. This, too, would constitute "use" that would support liability for misappropriation of Graco/Gusmer's trade secrets. *See, e.g.* 1 Melvin F. Jager, *Trade Secret Law* § 7:20 (quoting *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1, 12 (1st Cir. 2000) (liability exists where misappropriation enables development of products "far more quickly than otherwise would have been possible.")).

In any event, this issue is inappropriate for summary judgment because it has not been tested in discovery. Graco has asked Defendants to supplement their discovery responses to provide information relating to the origins of the designs for Defendants new equipment. Greene R. 56(f) Aff. ¶ 8. Defendants have refused, and Graco has brought this issue to the Court's attention. *See id.* It would be inappropriate to grant summary judgment until Graco has had the opportunity to test Defendants' claim that the new equipment was "clean room designed" through reasonable discovery. *See, e.g., Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 196 (4th Cir. 2006).

### D.    Gama's Business Strategies.

Finally, a jury could find that Defendants' decision to go into business and

the specific strategies they employed were the result of knowledge of Graco's internal business plans. Such a finding would be supported by the correspondence between PMC and then-current Graco employees regarding ███████ ████ for the new business. *See* SMF1 No. 14.

## CONCLUSION

Defendants come nowhere close to demonstrating *through undisputed facts* that Graco's trade secret claims must be dismissed. To the contrary, the evidence permits reasonable inferences that *all* Defendants jointly prosecuted a scheme to misappropriate the confidential Graco/Gusmer information at issue here, that the information was appropriately protected at all times, and that Defendants have proven no alternate explanation for ██████████████████████ ████████████████ Defendants' motion for partial summary judgment must therefore be denied. This case should be set for trial after discovery is complete.

Dated: May 3, 2010                    RESPECTFULLY SUBMITTED,

                                       **STERNS & WEINROTH**
                                       **A Professional Corporation**


                                       By /s/ Karen A. Confoy
                                       Karen A. Confoy
                                       kconfoy@sternslaw.com

Clifford M. Greene, Reg. No. 37436
David J. Wallace-Jackson, Reg. No. 0288767
Bethany D. Krueger, Reg. No. 306368
Kathryn N. Hibbard, Reg. No. 387155
**GREENE ESPEL, P.L.L.P.**
200 S. Sixth Street, Suite 1200
Minneapolis, MN 55402
Telephone: (612) 373-0830
Facsimile: (612) 373-0929

Richard Duncan, Reg. No. 192983
Craig S. Coleman, Reg. No. 325491
**FAEGRE & BENSON LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Plaintiff Graco Inc. and Graco Minnesota Inc.*