<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **GRACO, INC., et al.,** | : | **Civil Action No.: 08-1304 (FLW)** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **MEMORANDUM OPINION** |
| | : | **AND ORDER** |
| **PMC GLOBAL, INC., et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

<u>**ARPERT, U.S.M.J**</u>

## I.      INTRODUCTION

This matter comes before the Court on Motion by Plaintiffs Graco, Inc. and Graco Minnesota, Inc. (collectively "Plaintiffs" or "Graco") to compel the production of documents or, in the alternative, for an *in camera* review of these documents [dkt. entry no. 465], returnable October 18, 2010.  Defendants PMC Global, Inc., PMC, Inc., PMC Europe Investments, S.L., Denis S. Commette ("Commette"), and Gama Machinery USA, Inc. ("Gama USA") (collectively "Defendants" or "PMC") filed opposition on October 4, 2010.  For the reasons stated herein, Graco's Motion is granted insofar as the Court will conduct an *in camera* review.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Graco filed a Complaint [dkt. entry no. 1] on March 14, 2008 alleging "breach of contract and related duties" (*see* Pl.'s Complaint, dkt. entry no. 1 at 19-21), "tortious interference" (*Id*. at 21-23), "misappropriation of trade secrets and misuse of confidential business information" (*Id*. at 23-24), violation of the "Lanham Act" (*Id*. at 24-25), violation of the "New Jersey Fair Trade Act" (*Id*. at 25-26), "unfair competition" (*Id*. at 26), and "unjust enrichment" (*Id*.) related to its acquisition of Gusmer Corporation and Gusmer Europe (collectively, "Gusmer") from PMC by way of two (2)

Stock Purchase Agreements ("SPA") (*Id.* at 7, ¶¶ 28-29).  More specifically, Graco alleges that Gama USA, a Delaware corporation and PMC, Inc., subsidiary that "also does business as Gama-Europe and Garraf Maquinaria, S.A." (*see* Pl.'s Second Amended Complaint, dkt. entry no. 91 at 3, ¶ ), and Garraf Maquinaria S.A. ("Garraf"), a Spanish corporation with PMC affiliations that "also does business as Gama and Gama-Europe" (*see* Pl.'s Second Amended Complaint, dkt. entry no. 91 at 3, ¶ 7), "are manufacturing, marketing, and selling spare parts for Gusmer products without Graco's permission...and are using Graco Trade Secrets and Confidential Business Information to manufacture these spare parts" and "are directly soliciting the trade of current customers of Graco...using Graco Trade Secrets and Confidential Business Information".  *See* Pl.'s Complaint at 17-18, ¶ 75, 81; *see also id.* at 17-18, ¶¶ 76-79, 82-86.  Graco filed an Amended Complaint on July 24, 2008 [dkt. entry no. 36] and a Second Amended Complaint on May 22, 2009 [dkt. entry 91].  The Second Amended Complaint sets forth a list of infringing Gama USA and Garraf products then known to Graco.  *See* Pl.'s Second Amended Complaint at 21, ¶ 93.  Graco asserts that this is a "non-exclusive" list. [dkt. entry no. 499 at 3]

Graco has alleged that Commette and Carles Royo ("Royo"), Gusmer employees who worked for Graco after execution of the SPA, "participated in and received confidential communications relating to Graco's confidential strategy...which [was] designed to transform and integrate Gusmer operations into Graco's existing business" and "had access to highly sensitive confidential, non-public, proprietary information belonging to Graco and its subsidiaries" including "The Graco Trade Secrets and Confidential Business Information".   *See* Pl.'s Complaint at 11, ¶¶ 43, 44.  Thereafter, upon the end of Commette and Royo's employment relationship with Graco and the formation of Gama USA and Garraf, Graco alleges that Gama USA and Garraf developed "consulting relationships with...Commette and Royo" in order "to solicit and obtain the trade of customers" and

that Commette and Royo "inevitably will have to disclose the Graco Trade Secrets and Confidential Business Information". *Id* at 14-17, ¶¶ 58-59, 63-65, 72-74.  Importantly, Graco has asserted that PMC had more than an "arm's-length distributor relationship" with Garraf based upon its allegations that "PMC exercised control over Garraf's operations, helped Garraf to secure a 712,500€ loan from a PMC affiliated company, and agreed to purchase equipment from Garraf in order to provide it with operating revenue".  *See* Pl.'s Br. at 3.

In its defense, PMC has maintained that "the foundation of Graco's misappropriation conspiracy hinges upon the premise that Royo and PMC violated respective non-compete agreements with Graco" but that "Royo does not have any non-compete obligations" based upon rulings made by Spanish courts and that "PMC does not have any non-compete obligations to Graco" based upon rulings made by this Court.  *See* Def.'s Opp'n Br. at 1; *see also* Decl. of K. Joon Oh ("Oh"), Exhs. A-B; dkt. entry no. 81 at 28.  PMC contends that Graco has failed to cite "any supporting facts...or allegedly false testimony" in order to bolster its claims that "PMC executives testified falsely about the timing of key communications", that "PMC executives denied the existence of a draft written investment agreement between PMC and Garraf", or that "PMC's witnesses also falsely testified they had no knowledge of the designs of the Garraf equipment".  *Id*. at 1-2.  PMC asserts that "Graco's conspiracy theory and its [claims] against PMC's executives do not relate to the privilege log issue raised by Graco's Motion".  *Id*. at 2.

At issue here are "documents reflecting agreements, communications, and negotiations between PMC and Garraf".  *See* Pl.'s Br. at 3.  Graco claims that PMC originally "failed and refused to produce such documents" because "there was simply a lack of written documentation surrounding this relationship".  *Id*. at 3-4.  On July 20, 2010, however, Graco states that "PMC produced a new privilege log that disclosed more than 250 documents reflecting communications between Garraf and

PMC...regarding the formation of their business relationship" and simultaneously "attempted to claw back some of the few documents regarding this relationship that...had [been] produced" based upon "a single communication ("Entry No. 7")...that...gave PMC a basis to withhold these documents by claiming that they are protected by the common-interest privilege". *Id*. at 4-5. On July 30, 2010, Graco states that "PMC produced an updated version of their...privilege logs...[that] revealed for the first time that as many as 122 documents that PMC had...withheld on grounds of attorney-client or work-product privilege were now being withheld by PMC solely under the guise of the common-interest privilege". *Id*. at 5. Graco maintains that "many of PMC's privilege assertions...are completely unsupportable". *Id*. at 5-6. Graco notes that it "has made every reasonable effort to assess the validity of PMC's privilege designations", including repeatedly requesting that PMC "provide information" about "70 previously unidentified individuals who sent or received documents that PMC [has] designated as privileged" and requesting that "PMC identify what entities the lawyers listed on Entry No. 7 represented and whether that representation is continuing". *Id*. at 6-7. Graco states that PMC's response to these requests "was insufficient to permit a proper privilege analysis". *Id*. at 7.

In its defense, PMC claims that it has "withheld communications among PMC, its legal counsel, and Royo or Manuel Moreno ("Moreno") reflecting PMC's legal advice about potential business arrangements with Royo, Moreno, and Garraf". *See* Def.'s Opp'n Br. at 2. PMC notes that some of these communications took place "before Graco's lawsuit" while others took place "after the case was filed". *Id*. PMC maintains that "these communications are based on underlying attorney-client communications or attorney work product" and that, although "Garraf has now been defaulted", the privilege "is not waived by virtue of any disclosure to Royo or Moreno because at the time all parties...had a common legal interest in structuring proposed business arrangements in

4

a way that would comply with the law and avoid litigation". *Id*. at 2-3.  PMC states that "the common interest is not hypothetical or speculative" as Entry No. 7 is "a legal memorandum on this very subject". *Id*. at 3.  PMC notes that it has identified "all other pre-litigation communications withheld on the basis of the parties' common interest in exploring a potential working relationship that would avoid or mitigate this litigation risk based specifically on Entry No. 7". *Id*.  PMC also points out that "Garraf and PMC entered into a joint defense agreement in this lawsuit that...protects their post-litigation legal communications". *Id*.

On September 24, 2010, Graco filed the instant Motion seeking a Court Order compelling the production of certain documents or, in the alternative, for an *in camera* review.  *See* Pl.'s Proposed Form of Order, dkt. entry no. 465-1.

## A.  Graco's Arguments in Support of the Motion to Compel

Initially, Graco asserts that "many of PMC's descriptions of the documents on their privilege logs are so thin as to render meaningful analysis nearly impossible...[and therefore] do not comply with Rule 26(b)(5)(A)" so as to prevent PMC from meeting its "burden to establish the validity of ...privilege designations".  *See* Pl.'s Br. at 7-8.

### 1.  Defendants are concealing non-legal business communications behind attorney-client and work-product privilege claims.

#### (a)  The attorney-client privilege cannot protect Defendants' business communications from discovery.

Citing *La. Mun. Police Employees Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 306 (D.N.J. 2008) and *Leonen v. Johns-Mansville*, 135 F.R.D. 94, 99 (D.N.J. 1990), Graco maintains that "communications with attorneys are privileged only if the predominant purpose and content of the communication is to aid in the provision of legal advice" as opposed "to business advice".  *Id*. at 8. Graco contends that PMC "must show that the communications would not have been made but for

the client's need for legal advice or services". *Id*.  Graco argues that PMC "cannot meet that standard" because "on more than one occasion PMC invoked Paragraph 8 of the Protective Order to claw back purely business-related communications with PMC in-house attorneys and paralegals on grounds of attorney-client privilege". *Id*.  Referencing a "draft investment agreement that PMC negotiated with Garraf" which PMC clawed back, Graco argues that "those documents were purely business-related and had no legal content at all" and, therefore, Graco "suspects that many of the hundreds of other attorney-client-privilege entries on PMC's privilege logs are similarly devoid of legal advice". *Id*. at 8-9.

Graco contends that "Defendants have asserted the attorney-client privilege over communications that were published to third parties outside the scope of any conceivable attorney-client relationship with their in-house counsel". *Id*. at 9.  Referencing a letter dated August 12, 2010, Graco maintains that "Defendants are asserting privilege over communications with third parties who Defendants identify as consultants...[including] eleven communications involving Arnauld de Briey, ...a former employee and consultant to PMC in Europe[,]...Dr. Martin Wasserman, a former employee and consultant[,]...and Li Lil, Mark Kramer, and Troy Rudd, who they...describe as tax consultants to PMC". *Id*.  Citing *Sealed Air*, 253 F.R.D. at 311 and 1 Edna Selan Epstein, *The Attorney-Client Privilege and the Work Product Doctrine* at 219 (5th ed. 2007), Graco argues that "such publication to non-attorney third parties generally constitutes waiver of attorney-client privilege...particularly...where...the party asserting the privilege has presented no evidence to satisfy its burden to show that the third parties were agents of the attorneys and that their involvement was necessary for the representation – meaning that the agent evaluated the information and in a sense translated it into understandable terms for the non-expert attorney". *Id*. at 10.  Graco maintains that "the mere fact that these communications may have later become beneficial to counsel's

6

representation of the client does not render them privileged". *Id.* Graco argues that "PMC should

be compelled to produce all documents withheld on the basis of attorney-client privilege that have

a predominant purpose other than the provision of legal advice regardless of whether they were sent

to or received by an attorney" or, at a minimum, "the Court should conduct [an] *in camera* review"

of these documents "to determine which...are actually privileged". *Id.*

> **(b)    Many of the documents over which Defendants assert the work-product privilege do not appear to be related to actual or anticipated litigation.**

Citing FED. R. CIV. P. 26(b)(3), *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 662 (3d Cir.

2003), and 8 Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2024, at 359 (2d ed. 1994),

Graco maintains that "the work-product doctrine applies only to documents and tangible things

prepared in anticipation of litigation or for trial by or for another party or by or for that other party's

representative". *Id.* at 11. Graco argues that "Defendants' logs suggest that they are...using the

work-product doctrine in order to shield documents from discovery" that "have no apparent

connection to anticipated or ongoing litigation". *Id.* Referencing a June 14, 2007 email and

attachment between "former Gama president Commette and PMC executive T.C. Cheong" which

PMC described as "communication re: employment agreement and employment contract letter

agreement", Graco argues that these documents "appear to relate to a garden-variety employment

agreement", "predate Graco's initiation of this litigation by many months", and do not merit "work-

product" privilege protection. *Id.* Graco argues that "PMC should be compelled to produce all

documents withheld on grounds of work-product privilege that were not prepared by or at the

direction of an attorney in anticipation of litigation or for use at trial" or, in the alternative, the Court

should conduct an *in camera* review of "PMC's purported work product". *Id.* at 12.

> **2.    Defendants have improperly withheld documents based upon the common-interest doctrine.**

7

Citing *Sealed Air*, 253 F.R.D. at 309, *In re Teleglobe Comm. Corp.*, 493 F.3d 345, 364 (3d Cir. 2007), and *Cooper Health Sys. v. Virtua Health, Inc.*, 259 F.R.D. 208, 213 (D.N.J. 2009), Graco maintains that "the common-interest doctrine is not a separate, freestanding privilege" but is "instead an exception to the general rule that voluntary disclosure of an attorney-client communication to a third party waives the attorney-client privilege". *Id.* at 12.  Graco contends that "the common-interest doctrine allows attorneys representing clients with substantially similar legal interests to share otherwise privileged information without waiving the underlying privilege". *Id.* Citing *Teleglobe*, 493 F.3d at 363-66, Graco argues that is is PMC's burden to show that the common-interest doctrine applies based upon circumstances where "(1) the underlying communications are otherwise privileged, (2) both parties are represented by different attorneys and the communications are between those attorneys, and (3) the parties share a substantially similar legal interest". *Id.* at 12-13.

> **(a)** **The documents over which Defendants assert the common interest doctrine are not subject to any underlying privilege.**

Citing *Cooper Health*, 259 F.R.D. at 213, Graco maintains that "the common-interest doctrine only applies when an underlying privilege is established". *Id.* at 13.  Graco notes that "the communications over which PMC [has] asserted the common-interest doctrine appear to be primarily business related rather than for purposes of securing legal advice or in anticipation of litigation" and claims that PMC has "clawed back non-privileged, business-related documents under the guise of the common-interest doctrine". *Id.*  Referencing "Entry Nos. 72 and 73 on the revised June 3, 2010 log which [are described] as 'Communication to counsel re: distributor agreement'", Graco argues that PMC withheld these documents based upon "attorney-client, work-product, and common-interest privileges" without a description indicating that "a client was seeking or receiving legal advice". *Id.*  Graco represents that PMC "provided similar descriptions for many other log

entries...withheld pursuant to the common-interest doctrine". *Id*. Graco states that "the vast majority of documents PMC [has] withheld under the common-interest doctrine are described as 'Document in connection with Entry No. 7' or 'Communication based on or in connection with Entry No. 7'" and argues that "those descriptions provide no indication that a client was seeking or receiving legal advice nor do they provide any details from which to evaluate the privilege". *Id*. at 14. Citing *Cooper Health*, 259 F.R.D. at 214, Graco argues that the "common-interest doctrine cannot apply" because the documents PMC clawed back "appear to have been business-related communications that were not privileged in the first instance". *Id*.

> **(b)** **The communications were not between PMC and Garraf attorneys.**

Citing *Teleglobe*, 493 F.3d at 364-65, Graco notes that "in addition to requiring the underlying documents to be privileged, the common-interest doctrine requires that both parties be represented by different attorneys in the subject communication" in order to "allow attorneys to coordinate their clients' criminal defense strategies". *Id*. at 14. Graco maintains that PMC's logs "show that no attorney represented Garraf in the communications withheld based on the common-interest doctrine" but rather, in most instances, "Garraf negotiated through Carles Royo or...Manuel Moreno", neither of whom "served as legal counsel in these communications". *Id*. at 15. Graco points out that "Garraf repeatedly claimed that Carles Royo was neither an employee nor an agent of any party, including Garraf itself – a position that if credited would eviscerate any argument that communications on which he was copied were privileged". *Id*. Graco argues that because "the subject communications were not between legal counsel for PMC (on the one hand) and legal counsel for Garraf (on the other), the common-interest doctrine does not apply". *Id*. Even if PMC "shared an attorney with Garraf and thus those communications were protected under the joint privilege", Graco argues that the "joint privilege does not apply" because "Garraf and PMC were on

9

opposite sides of the business negotiations that are the subject of these documents and therefore their interests were not identical" pursuant to *Teleglobe*, 493 F.3d at 366. *Id.*

Citing *Cooper Health*, 259 F.R.D. at 214 and *Teleglobe*, 493 F.3d at 364, Graco maintains that "even if Garraf had been represented by counsel the common-interest doctrine would not apply if that attorney was not a party to the communications in question" as the "common-interest doctrine does not extend to communications between non-attorneys who simply have a joint interest". *Id.* at 15-16. Graco contends that in order to be protected, "the communications must be amongst attorneys" meaning that "they must be shared with the attorney of the member of the community of interest". *Id.* at 16. Citing *Teleglobe*, 493 F.3d at 365, Graco claims that "the requirement that the communication be amongst attorneys exists to prevent the disclosing party from using the common-interest doctrine as a *post hoc* justification for its impermissible disclosures to third parties" and, therefore, the "common-interest doctrine...supplants the waiver rule only when attorneys, not clients, decide to share information in order to coordinate legal strategies". *Id.* Although PMC may argue that "New Jersey law does not require the communications to be between counsel" pursuant to *LaPorta v. Gloucester County Bd. of Chosen Freeholders*, 340 N.J. Super. 254, 262 (App. Div. 2001), Graco notes that "the Third Circuit's and the District of New Jersey's decisions in *Teleglobe* and *Cooper Health*...were decided after the *LaPorta* case and both rejected *LaPorta's* determination that the communication may be between counsel for a party and an individual representative of the other party". *Id.* Citing *U.S. v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989), Graco argues that "*LaPorta* does not change the rule that both parties must be represented by counsel" and, therefore, "because Garraf was not represented by counsel the common-interest privilege cannot apply". *Id.*

Graco contends that "PMC [has] withheld numerous documents based upon the common-interest doctrine that were never sent or received by an attorney for Garraf" and PMC has "presented

no evidence even suggesting that Garraf was represented by counsel while these communications were occurring". *Id.* at 17.  As such, Graco argues that the "common-interest doctrine is inapplicable and any underlying privilege was waived by publishing these documents to Garraf". *Id*.  Citing *Cooper Health*, 259 F.R.D. at 215, Graco maintains that "this is true even if these non-attorneys were communicating about legal matters" because the doctrine is inapplicable when individuals exchange "non-privileged information at a time when they were not acting as an agent or consultant for different attorneys". *Id*.  Graco argues that PMC has "offered nothing to show that they were exchanging privileged information with Garraf" and have not "shown that Garraf was represented by counsel or that the Garraf representatives who sent or received these communications were acting at the direction of or as agents for any such attorneys".  *Id*.

### (c)    Defendants cannot establish a common interest.

Graco claims that "PMC cannot establish...the existence of substantially similar legal interests shared by the parties to communications".  *Id*. at 18.  Graco maintains that PMC's "core defense in this litigation is that Gama USA and Commette were involved in an arm's length distributorship arrangement with Garraf and that they had no knowledge of or control over Garraf's inner workings".  *Id*.  Citing *Sealed Air*, 253 F.R.D. at 310 and *Cavallaro v. United States*, 153 F. Supp. 2d 52, 61 (D. Mass. 2001), *aff'd on other grounds*, 284 F.3d 236 (1st Cir. 2002), Graco notes that "this distinguishes the present case from *Sealed Air*, in which the court observed that...privileged information exchanged during a merger between two unaffiliated businesses would fall within the common-interest doctrine", as PMC has "insisted from the outset that their dealings with Garraf were strictly at arm's length and that the companies were and remain entirely separate".  *Id*.  Assuming this to be the case, Graco states that "Garraf and PMC were adverse to one another in negotiations at the time of the communications in question" and their primary interest would have been "in

11

securing the most favorable possible terms for themselves". *Id*. Citing *Teleglobe*, 493 F.3d at 365, Graco argues that while PMC and Garraf "might arguably have shared some mutual interest in the success of the enterprise, their interests would not have been so substantially similar as to permit application of the common-interest doctrine even if it were otherwise applicable". *Id*.

Graco states that "PMC's sole argument...appears to be that at the time they were working with Carles Royo to found the Gama enterprise, they...shared a common interest in avoiding future litigation against Graco which was sufficient to shield their communications from discovery". *Id*. at 18-19. Graco argues that the "broad-reaching scope of the common-interest privilege that PMC advocate[s] would render most communications among conspirators, especially those regarding the potential illegality of their plans, non-discoverable". *Id*. at 19. Citing *United States v. Kapnison*, 743 F.2d 1450, 1456 (10th Cir. 1984), *cert. denied*, 471 U.S. 1015 (1985), *United States v. Nixon*, 418 U.S. 683 (1974), and *In re Qwest Communications Intern. Inc*., 450 F.3d 1179, 1185, (10th Cir. 2006), *cert. denied*, 549 U.S. 1031 (2006), Graco maintains that "the common-interest privilege is...not intended to be used in this way" because, otherwise, "it would swallow the general rule that discovery is liberal and privileges must therefore be narrowly construed". *Id*. Further, Graco contends that PMC's argument "is further complicated by the fact that the vast majority of...communications in question were with Carles Royo", an individual that "Garraf persistently claimed throughout this litigation...was neither an employee nor a managing agent". *Id*. at 20. Graco argues that it "strains credulity for PMC to assert that they shared a common interest with an individual who allegedly was not an agent of the company against which [it was] negotiating". *Id*.

Citing *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 579 (N.D. Cal. 2007), *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003), and *Cooper Health*, 259 F.R.D. at 215, Graco maintains that PMC "cannot prove...that the principal purpose of their communications was

to further a legal interest in preventing litigation" as PMC has "made no showing that communications between PMC and Garraf or Royo were made in the course of formulating a joint legal strategy". *Id* at 20-21. Instead, Graco claims that these communications "appear to have been for the primary purpose of developing a working or business relationship" and, therefore, PMC's "privilege claims...fail because they simply did not share a common interest of the sort that would support the assertion of privilege". *Id*. at 21. Citing *Cooper Health*, 259 F.R.D. at 212, 214-15, and *Teleglobe*, 493, F.3d at 356-57, Graco argues that PMC "should be compelled to produce all of the approximately 400 documents that [it has] withheld on the basis of the common-interest doctrine or that cross-reference Entry No. 7" or, in the alternative, "the Court should conduct [an] *in camera* review of those documents to determine which of them are in fact privileged". *Id*.

### 3.   The potential applicability of the crime-fraud exception warrant *in camera* review.

Graco maintains that "even if PMC could show that these communications were otherwise privileged, [an] *in camera* review is necessary to determine whether they are...discoverable under the crime-fraud exception". *Id*. at 22. Citing *In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000) and *Ocean Spray Cranberries, Inc. v. Holt Cargo Systems, Inc*., 345 N.J. Super. 515, 522 (Law Div. 2000), Graco states that "the crime-fraud exception applies when an attorney's advice is used to aid the commission of a fraud" and is established by showing that "(1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud". *Id*. Graco notes that "fraud" does not necessarily mean "tortious or criminal fraud" and "may encompass virtually all kinds of deception and deceit even though they might not otherwise warrant criminal or civil sanctions" including "deception made in the course of litigation". *Id*. Graco claims that "PMC has countered many of [its] factual allegations with sworn testimony and representations to the Court that later proved false", including

testimony about the timing of key communications with Carles Royo and PMC's ownership of a Garraf facility", "the existence of a draft written investment agreement between PMC and Garraf", and production of documents after asserting that they did not exist or that PMC had no knowledge regarding same. *Id*. at 22-23.  Graco argues that "conduct of this sort suggests a concerted effort to misrepresent the facts and to conceal evidence that would enable Graco to discover the truth". *Id*. at 23.

Graco contends that it recently became "apparent that PMC [is] using privilege designations as part of their effort to hide the truth". *Id*.  Referencing a "draft investment agreement between PMC and Garraf" and "documents regarding business negotiations over the formation of the Gama enterprise", Graco points out that in both instances PMC or its representatives initially represented that these documents did not exist only to acknowledge same and claim privilege thereafter. *Id*. at 23-24.   As such, Graco believes that PMC's "history of misrepresentations and obfuscation...suggests that [PMC] may be withholding documents as privileged that would reveal additional misrepresentations in depositions or to the Court that would undermine their defenses". *Id*. at 24.  Under these circumstances, Graco argues that "the crime-fraud exception warrants the Court's *in camera* review of the documents in question". *Id*.  Citing *Haines v. Liggett Group Inc*., 975 F.2d 81, 96 (3d Cir. 1992) and *Ocean Spray*, 345 N.J. Super. at 518-21, 523-27, Graco maintains that an "*in camera* review is hardly unprecedented under the present circumstances" and that "its burden to establish the need for *in camera* review is much lower than its burden of establishing fraud". *Id*. at 24-25.  Citing *Haines*, 975 F.2d at 95 and *Clark v. United States*, 289 U.S. 1, 14 (1933), Graco argues that "PMC's logs confirm that [it] anticipated that [its] formation of the Gama enterprise and its future activities might subject them to civil liability" and, therefore, "if [an] *in camera* review reveals that PMC [was] using counsel to aid...in carrying out fraudulent or deceitful

14

business activities, that would...vitiate any privilege under the crime-fraud exception". *Id*. at 25-26.

Graco contends that "the only way to determine...whether PMC's documents are privileged...is for

the Court to conduct an *in camera* review". *Id*. at 26.

> **4.**   **Defendants should be required to produce documents that they have clawed back.**

> **(a)**   **The March 1, 2010 clawback.**

Graco states that PMC identified three (3) documents in its March 1, 2010 clawback letter,

all of which "related to the loan agreement". *Id*. at 26.  "The first is a March 4, 2009 email message

from Richard Ulrich to Carles Royo requesting that Mr. Royo sign, date, and return several copies

of an amendment to a loan agreement". *Id*. at 26-27.  Graco notes that "Mr. Ulrich's signature line

indicates that he works in a...business consultancy" and that "the message is copied to

representatives of several other companies". *Id*. at 27.  Graco states that "the other two documents

reflect nothing more than Mr. Royo's non-substantive response to Mr. Ulrich's message". *Id*.  Graco

maintains that PMC's privilege log "designates these documents as within the attorney-client

privilege and the common-interest doctrine, ...[describing] them as follows: Post-litigation discussion

re relationship in light of attendant litigation risks". *Id*.  Graco argues that these documents are not

privileged bases upon the fact that "neither the sender nor any of the recipients is an attorney" and

that "even if they were, nothing about these communications suggests that they were made for the

purpose of obtaining legal advice or prepared in connection with litigation". *Id*.  Graco contends that

"the common-interest doctrine cannot apply" because "these communications are not privileged",

and, therefore, "there was no basis for PMC to claw back these documents". *Id*.

> **(b)**   **The June 30, 2010 clawback.**

Graco states that PMC's June 30, 2010 clawback letter relates to "the investment agreement

between PMC and Garraf and the loan to Garraf that PMC facilitated" and claims that "these

documents do not fall within Paragraph 8 of the Protective Order for at least three reasons". *Id.* at 28. First, Graco argues that these documents "are not privileged" because they "are purely business related" and, even if they were privileged, "that privilege was waived because these documents include Garraf representatives who PMC [insists is a] third party". *Id.* Graco maintains that "the common-interest doctrine does not provide an exception to this waiver because these communications do not include counsel for Garraf". *Id.* Second, Graco argues that PMC "cannot show that these documents were inadvertently produced as required by Paragraph 8 of the Protective Order", as PMC "produced these documents...in response to Graco's repeated demands" and after PMC's counsel advised that "PMC would produce an Investment Agreement draft". *Id.* Graco maintains that "since the production was pre-planned and intentional, it cannot be considered inadvertent". *Id.* Third, Graco argues that PMC "did not comply with Paragraph 8's requirement that [it] promptly notify Graco of the allegedly inadvertent production" but rather, waited until "almost two months after Graco had relied on two of these documents in opposition to PMC's motions for summary judgment and more than one month after Graco introduced another of these documents during the May 20 deposition of Tina Toy". *Id.* at 28-29. Graco notes that PMC "reproduced the two documents cited in Graco's summary judgment opposition briefs and the document introduced at Ms. Toy's deposition" under Fed. R. Civ. P. 502(b), but has "refused to reproduce the remaining two documents [it] clawed back on June 30". *Id.* at 29. Graco argues that "Rule 502(b) is inapplicable" because "these documents are not privileged", their "production was not inadvertent", and PMC "did not take reasonably prompt measures to rectify their allegedly inadvertent production". *Id.*

    **B.**    <u>PMC's Arguments in Opposition to the Motion to Compel</u>

        **1.**    **Communications seeking or providing legal advice in connection with business transactions are privileged.**

16

Citing *La. Mun. Police Employees Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 306-08, 311 (D.N.J. 2008), PMC maintains that "attorney-client communications must be for the purpose of seeking legal advice" and those "communications seeking or providing legal advice in the context of ordinary business transactions also merit protection". *See* Def's Opp'n Br. at 5. PMC argues that "the draft investment agreement between Garraf and PMC...is precisely such a communication" and that same was "clawed back...because it was inadvertently produced and...falls within the protection of the common interest privilege". *Id*. at 5-6. PMC contends that it has not "waived any applicable privilege through disclosure to third parties" as it is "entitled to disclose communications to those of its former employees whom they have retained as consultants...so long as the communication is in furtherance of the legal representation". *Id*. at 6. Further, PMC claims that communications between "PMC's in-house counsel and outside tax attorneys and consultants seeking and providing legal advice" are "equally protected". *Id*.

PMC maintains that "Graco claims that PMC [has] withheld numerous documents that have no connection to anticipated or ongoing litigation...but...cities only one example: Entry No. 356 and its attachment on the July 20, 2010 privilege log". *Id*. Citing *Muller v. Walt Disney Productions*, 871 F. Supp. 678, 682 (S.D.N.Y. 1994) and *Sealed Air*, 253 F.R.D. at 308, PMC argues that "Entry No. 356 is a draft employment contract...[that is] unequivocally protected by the attorney-client privilege". *Id*. Further, PMC contends that "the entries cited by Graco are protected by attorney-client privilege...whether or not the document was work product created in anticipation of litigation" even if "the advice involved ancillary business communications". *Id*. at 6-7.

PMC notes that the "Defendants claiming pre-litigation work-product protection are California-based entities who were seeking legal advice under the protection of California privilege law years before the instant litigation was filed". *Id*. at 7. Citing *Hynix Semiconductor Inc. v.*

17

*Rambus*, 591 F. Supp. 2d 1038, 1064-65 (N.D. Ca. 2006) and *Sealed Air*, 253 F.R.D. at 311, PMC maintains that "Graco's legal argument that the work-product doctrine only applies in anticipation or for trial is fatally flawed because that is not the standard under California privilege law" which "protects a lawyer's work product prepared in a non-litigation capacity" and "is not limited to writings created by a lawyer in anticipation of a lawsuit". *Id.* Citing *Sealed Air*, 253 F.R.D. at 311, PMC also argues that "Graco fails to meet its burden of proving that PMC waived work-product protection by disclosing information to an adversary...[because it] has not even attempted to identify such a disclosure or such an adversary". *Id.* at 7-8.

2.    **In their communications with Royo and Moreno, PMC had a common interest in ensuring that any potential business arrangements would avoid litigation.**

Initially, PMC admits withholding "pre-lawsuit communications by and among PMC, its counsel, and its agents and employees, and some communications with Garraf's alleged principals, Royo and Moreno". *Id.* at 8. However, PMC maintains that it has "only withheld communications and documents arising out of [its] common interest in avoiding litigation in the exploration and cultivation of a working relationship based on legal advice provided to PMC". *Id.* PMC claims that the "withheld communications arise out of and relate directly to legal advice provided to PMC by its outside counsel on November 21, 2006 in the Garraf Memo ("Garraf Memo") and are specifically identified on PMC's privilege log". *Id.* PMC notes that the Garraf Memo "contained directions, advice, and analysis concerning possible working relationships between PMC and Garraf", that the parties "engaged in discussions based on that advice" but ultimately "entered into a pure buy-sell supplier-distributor relationship", and that "Graco offers...no evidence to the contrary". *Id.*

PMC points out that rather than "engaging the pre-litigation common-interest claims on the merits, Graco instead points to post-lawsuit communications between PMC and fellow Defendants

18

as if these documents evidence a business rather than a legal purpose". *Id.* Citing *Teleglobe Comm'n Corp. v. BCE Inc.*, 493 F.3d 345, 363 (3d Cir. 2007), PMC argues that its "post-lawsuit communications with fellow Defendants seeking to avoid any liability in future dealings are clearly protected, if not by the common interest doctrine, then by the joint-defense agreement between Garraf and PMC". *Id.* at 8-9. Citing *Teleglobe*, 493 F.3d at 363, *Ramada Inns, Inc. v. Dow Jones & Co.*, 523 A.2d 968, 972 (Del. Super. Ct. 1986), *LaPorta v. Gloucester County Bd. of Chosen Freeholders*, 340 N.J. Super. 254, 262 (2001), and *U.S. v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989), PMC argues that Graco's contention – based upon an interpretation of the common interest privilege under Delaware privilege law – that "the common interest doctrine does not apply to communications between an attorney for one party and a representative of another" is misplaced because New Jersey law "holds that...communications between counsel for a party and an individual representative of a party with a common interest are...protected". *Id.* at 9. As such, PMC claims that communications between PMC's counsel and "Messrs. Royo or Moreno" are protected, "Delaware law notwithstanding". *Id.*

PMC argues that Graco's citation of *Cooper Health Systems v. Virtua Health*, 259 F.R.D. 208, 214 (D.N.J. 2009) is misplaced as that case "involved two non-lawyers trying to coordinate their own idea of a legal strategy without any input or direction from counsel" while here, "PMC has identified the specific legal instructions (the Garraf Memo) that guided the withheld communications". *Id.* at 9-10. Further, citing *Andritz Sprout-Bauer v. Beazer East*, 174 F.R.D. 609, 633 (M.D. Pa. 1997), *Cellco Partnership v. Certain Underwriters at Lloyd's London*, 2006 U.S. Dist. LEXIS 28877 (D.N.J. 2006), and *Sealed Air*, 253 F.R.D. at 311, PMC maintains that "as a general principle, confidential communications among parties retain their privilege even if an attorney is not included on the communication" and that as such, Graco is unable to meet its "burden

of proving that Royo and Moreno can be considered adversaries in the context of the communication such that the disclosure would waive the work product protection". *Id*. at 10.  PMC argues that it "had a valid common interest with Messrs. Royo and Moreno in structuring any potential business dealings in a way that would avoid litigation" and the fact that "they were on opposite sides of the negotiating table does not somehow invalidate their shared interest vis-a-vis a third party like Graco". *Id*.  Citing *Sealed Air*, 253 F.R.D. at 310-11, PMC states that "where two parties exploring a potential business deal wish to avoid potential litigation, the common interest privilege applies". *Id*. at 10-11.

### 3.    The crime-fraud exception does not apply and Graco has failed to meet its burden of proving otherwise.

In opposition to Graco's assertions, PMC states that "there was and is no conspiracy" but, rather, "just a group of former employees and industry players who had the temerity to compete with Graco". *Id*. at 11.  Citing *U.S. v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005), *Haines v. Liggett Group Inc.*, 975 F.2d 81, 95-96 (3d Cir. 1992), and *In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000), PMC maintains that "the party seeking to invoke the crime-fraud exception bears the burden of presenting evidence which, if believed by the fact-finder, would be sufficient to support a finding that the elements of the crime-fraud exception were met" where the elements are "(1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud". *Id*.  PMC argues that the crime-fraud exception "does not apply where a client seeks legal advice in order to conform its conduct with the law and to avoid litigation altogether". *Id*.  Citing *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) and *In re Grand Jury Subpoenas*, 798 F.2d 32, 34 (2d Cir. 1986), PMC argues that "the evidentiary burden on a party seeking to establish the crime-fraud exception is high and requires a detailed showing based on specific documents or other evidence that the client intends to commit a crime or

20

fraud". *Id*. at 11-12.

>            **(a)**        **Graco has failed to offer evidence that Gama or PMC committed or intended to commit a fraud or crime.**

Citing *In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000), PMC maintains that Graco "has failed to meet its burden" that any of the Defendants "intended to commit a crime or fraud". *Id*. at 12.  Based upon the fact that "the Court already has held that PMC was free to go into business against Graco", PMC contends that the Court has already "affirmatively negated the alleged crime" that Graco asserts by way of this Motion.  *Id*.  PMC argues that the "allegedly false testimony" cited by Graco at worst "reflects the inability of...PMC executives to remember particular documents or details during depositions years after the fact".  *Id*.  Citing *Johnson Electric N. Am., Inc. v. Mabuchi N. Am. Corp*., 1996 WL 191590, at *6 (S.D.N.Y. 1996) and *Jinks-Umstead v. England*, 233 F.R.D. 49, 51 (D.D.C. 2006), PMC argues that the fact that it produced "documents allegedly inconsistent with prior testimony...shows PMC's good faith in discovery" but "does not remotely establish the existence of a crime or fraud sufficient to justify piercing the attorney-client privilege" absent "*prima facie* evidence of a cover-up".  *Id*. at 12-13.  PMC notes that Graco "fails to tie any...alleged false statements to any specific attorney-client communication that it seeks to obtain" and, therefore, "has...failed to offer any evidence that PMC made [any alleged false statements] with the requisite intent".  *Id*. at 13.  Further, PMC maintains that Graco's argument that "the exception should apply because...PMC has unjustifiably withheld some documents as privileged" should fail because "a discovery dispute is not a crime nor a fraud" and Graco fails to cite "any precedent for its novel interpretation of the crime-fraud exception".  *Id*.  Finally, PMC points out that "the only privilege log entry that Graco mentions specifically is Entry No. 7" – the "Garraf Memo from the Spanish office of the international law firm DLA Piper to PMC in California...[which] reflects a client (PMC) seeking legal advice to avoid litigation, not to perpetrate

a crime or fraud". *Id*. 13-14.  Citing *U.S. v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005), PMC argues that the Garraf Memo is an example "of what the attorney-client privilege should protect and what the crime-fraud exception should not touch" based, in part, on the fact that "courts on both continents already...concluded" that "PMC and Garraf could legitimately go into business together". *Id*. at 14.

> **(b)     Graco has failed to offer evidence that the communications were in furtherance of a purported fraud or crime.**

PMC maintains that Graco "has not satisfied" the second element of the crime-fraud exception as Graco "does not even attempt to tie any alleged fraud or crime to a communication that it seeks to have excepted from the attorney-client privilege" and "has failed to identify specific communications at all". *Id*. at 14.  Citing Charles A. Wright, et al., *Federal Practice & Procedure*, § 5501 & n. 200, PMC argues that Graco's citation of *Ocean Spray Cranberries, Inc. v. Holt Cargo Systems, Inc*., 345 N.J. Super. 515, 522 (2000) is misplaced as that "case suggests a crime-fraud exception that is broader than other courts and the New Jersey statute allow". *Id*.  Further, PMC argues that Ocean Spray is "readily distinguishable" because in that case, "plaintiffs' suspicion was confirmed by counsel's concession and revelation that the 'Dice' memo contain[ed] evidence of fabrication of discovery and cover up of facts". *Id*. at 14-15.  PMC contends that Graco "has not", and "cannot", provide similar evidence in this case.  *Id*. at 15.

## III.   DISCUSSION

### A.   Legal Standards

#### 1.   Applicable Law

Pursuant to FED. R. EVID. 501,

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be

22

> interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.

Thus, "under this rule, in federal question cases the federal common law of privileges applies...[and] where state law provides the rule of decision, ...state privilege law will govern". *Wm. T. Thompson Co. v. General Nutrition Corp.*, 671 F.2d 100, 103 (3d Cir. 1982). However, it is obvious that "applying two separate disclosure rules with respect to different claims tried to the same jury would be unworkable" and "one rule or the other must govern". *Id.* at 104. "When there are federal law claims in a case also presenting state law claims, the federal rule favoring admissibility, rather than any state law privilege, is the controlling rule". *Id.*

### 2.    Discovery

Pursuant to Fed. R. Civ. P. 26(b)(1), "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" and "the court may order discovery of any matter relevant to the subject matter involved in the action", although "relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence". Courts refuse to order discovery if the information being sought is (1) irrelevant to the claim or (2) protected by a recognized privilege. *See also Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000). The precise boundaries of the Rule 26 relevance standard depend upon the context of each particular action, and the determination of relevance is within the discretion of the District Court. *See Barnes Found. v. Twp. of Lower Merion*, 1996 WL 653114, at *1 (E.D. Pa. 1996).

### 3.    Attorney-Client Privilege

Fed. R. Evid. 501 provides that evidentiary privileges are "governed by the principles of the

common law as they may be interpreted by the courts of the United States in light of reason and experience". Thus, Third Circuit precedent controls with respect to procedural questions such as the assertion of the attorney-client privilege.   The attorney client privilege applies as follows:

> (1) the asserted holder . . . is or sought to become a client;
>
> (2) the person to whom the communication was made (a) is a member of a bar of a court . . . and (b) in connection with this communication is acting as a lawyer;
>
> (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, . . .; and
>
> (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Grand Jury Investigation*, 599 F.2d 1224, 1233 (3d Cir. 1979) (*quoting United States v. United Shoe Machinery Corp.*, 80 F. Supp. 357, 358-59 (D. Mass. 1950)); *see also La. Mun. Police Emples. Ret. Sys. v. Sealed Air Corp*., 253 F.R.D. 300, 305 (D.N.J. 2008).

Communications between an attorney and client are protected by the attorney-client privilege with the purpose of this privilege being to promote frank discussions between attorneys and their clients.  *Upjohn v. United States*, 449 U.S. 383, 389 (1981); *see also Fisher v. United States*, 425 U.S. 391, 403 (1976).  "Courts should be cautious in their application of the privilege, mindful that 'it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege'".  *Sealed Air Corp*., 253 F.R.D. at 305 (*quoting Fisher*, 425 U.S. at 403).  The facts underlying any given communication remain discoverable, no matter the circumstance.  *Id*. at 305; *see also Upjohn*, 449 U.S. at 395-96.  The attorney-client privilege can be waived if privileged information is communicated to outside parties. *U.S. v. Rockwell International*, 897 F.2d 1255, 1265 (3d Cir. 1990).  Further, because the privilege may be employed to obstruct the

search for truth, the it is not absolute and care must be taken to insure that it is not abused.  *United Jersey Bank v. Wolosoff*, 196 N.J. Super 553, 561-62 (App. Div. 1984).

Importantly, the "party asserting the attorney-client privilege bears the burden to show that it applies".  *Sealed Air Corp.*, 253 F.R.D. at 305; *see also In re Grand Jury Empaneled Feb. 14, 1978*, 603 F.2d 469, 474 (3d Cir. 1979); *Glaxo, Inc. v. Novopharm, Ltd.*, 148 F.R.D. 535, 538 (E.D.N.C. 1993); *Fischer v. United States*, 425 U.S. 391 (1976).  The party resisting disclosure must state its privilege claim expressly by "describ[ing] the nature of the documents, communications, or things not produced."  FED. R. CIV. P. 26(b)(5).  Failure to identify with specificity the recipients of the information alleged to be privileged does not necessarily void the assertion of the privilege.  However, such failure requires enhanced scrutiny to ensure that the privilege was not waived by disseminating the information to those who did not require access to it.  *See Smithkline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476 (E.D. Pa. 2005).

The attorney-client privilege extends to corporations but its administration presents special problems.  *Sealed Air Corp.*, 253 F.R.D. at 305; *see also In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 124 (3d Cir. 1986); *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985); *Wolosoff*, 196 N.J. Super at 562; *Macey v. Rollins Environmental Services*, 179 N.J. Super 535, 540 (App. Div. 1981).   The "necessity for full and open disclosure between corporate employees and in-house counsel...demands that all confidential communications be exempt from discovery."  *Wolosoff*, 196 N.J. Super at 562.  However, the privilege is limited to "confidential communications made within the context of the strict relation of attorney and client."  *Id*.  "Communications which relate to business rather than legal matters do not fall within the protection of the privilege" (*Leonen v. Johns-Mansville*, 135 F.R.D. 94, 98 (D.N.J. 1990)), and, therefore, "the general rule is 'while legal advice given to a client by an attorney is protected by the

25

privilege, business advice generally is not'" (*Sealed Air Corp.*, 253 F.R.D. at 305 (*quoting In re Nat'l Smelting of New Jersey, Inc. Bondholders' Litig.*, 1989 U.S. Dist. LEXIS 16962, at *18 (D.N.J. 1989)).  *See also Coleman v. Am. Broad Co.*, 106 F.R.D. 201, 205 (D.D.C. 1985); *Claude P. Bamberger Int'l Inc. v. Rohm & Haas Co.*, 1997 WL 33786546, at *2 (D.N.J. 1997); *United States v. Davis*, 636 F.2d 1028, 1044 (5th Cir. 1978).

Given that "legal advice is often intimately intertwined with and difficult to distinguish from business advice" (*Sealed Air Corp.*, 253 F.R.D. at 306 (*citing Leonen*, 135 F.R.D. at 88-89); *see also Sedco Int'l SA v. Cory*, 683 F.2d 1201, 1205 (8th Cir. 1982)), and "because it is often too difficult, impractical and unrealistic to compartmentalize whether certain advice given to a client is legal in nature or business in nature in the context of a complicated....transaction" (*Sealed Air Corp.*, 253 F.R.D. at 306), "the policy behind the attorney-client privilege is best upheld where the attorney-client relationship is predominantly for the purpose of rendering legal services" (*Sealed Air Corp.*, 253 F.R.D. at 306 (*citing In re Nat'l Smelting*, 1989 U.S. Dist. LEXIS 16962, at *21-22)). Specifically, "the proper inquiry is focused on whether the communication is designed to meet problems which can fairly be characterized as predominantly legal" (*Sealed Air Corp.*, 253 F.R.D. at 306 (*citing Leonen*, 135 F.R.D. at 99); *see also Bamberger*, 1997 WL 33768546, at *2) and the party claiming privilege "should demonstrate that the communication would not have been made but for the client's need for legal advice or services" (*Sealed Air Corp.*, 253 F.R.D. at 306 (*citing Leonen*, 135 F.R.D. at 99)).

Generally, when a party discloses privileged information to a third party, the privilege is extinguished, and the document is discoverable. *See In re Teleglobe Commc'n Corp.*, 493 F.3d 345, 364 (3d Cir. 2007).  "Although voluntary disclosure of attorney-client communications to a third-party ordinarily waives the privilege, the privilege will not be waived if the disclosure was to an

agent whose services are necessary for effective representation of the client's interests". *Sealed Air Corp.*, 253 F.R.D. at 311; *see also Cellco P'ship v. Certain Underwriters of Lloyd's London*, 2006 U.S. Dist. LEXIS 28877 (2006). Importantly, "the party claiming a third-party as an agent bears the burden to show the privilege has not been waived". *Id.* The asserting party must demonstrate that "the third party's involvement must be necessary to the lawyer's provision of legal advice", meaning "the agent must evaluate the information and in a sense translate it into understandable terms for the non-expert attorney". *Id.* at 312. Further, "the communications between an attorney and a third-party are not protected from disclosure simply because the communications later become beneficial to the representation of the client". *Id.*

### 4.    Work-Product Privilege

A party may not ordinarily "discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)" absent a showing by the requesting party of "substantial need for the materials to prepare its case" and an inability, "without undue hardship, [to] obtain their substantial equivalent by other means". FED. R. CIV. P. 26(b)(3)(A). "If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation". FED. R. CIV. P. 26(b)(3)(B); *see also Quinn Construction, Inc. v. Skanska USA Building, Inc.*, 263 F.R.D. 190, 193 (E.D. Pa. 2009). "The work product doctrine is governed by a uniform federal standard set forth in FED. R. CIV. P. 26(b)(3) and 'shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case.'" *In re Cendant Corp. Securities Litig.*, 343 F.3d 658, 661-62 (3d Cir. 2003)(*quoting United States v. Nobles*, 422 U.S. 225, 238 (1975)). The Supreme Court articulated the essential nature of

27

the doctrine in *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947): "In performing his various duties, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. ...This work is reflected, of course, in interviews, statements, memoranda, correspondences, briefs, mental impressions, personal belief, and countless other tangible and intangible ways." Importantly, "waiver of work-product protection occurs only when a disclosure enables an adversary to gain access to the information" and the "burden of establishing waiver of the work-product doctrine falls...on the party seeking to establish waiver". *Sealed Air*, 253 F.RD. at 311; *see also Westinghouse Elec. Corp. v. Republic of Phil.*, 951 F.2d 1414, 1428 (3d Cir. 1991); *Maldonado v. New Jersey*, 225 F.R.D. 120, 131-32 (D.N.J. 2004).

The work product doctrine is not an absolute bar to discovery of materials prepared in anticipation of litigation. "Work product can be produced upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." *In re Cendant*, 343 F.3d at 663. Even if the party seeking discovery of information otherwise protected by the work product doctrine has made the requisite showing, "courts must still protect against the disclosure of mental impressions, conclusions, opinions, or legal theories of an attorney and his agents." *Id*. Thus, there are "two tiers of protection: first, work prepared in anticipation of litigation by an attorney or his agent is discoverable only upon a showing of need and hardship; second, 'core' or 'opinion' work product that encompasses the 'mental impressions, conclusions, opinion, or legal theories of an attorney or other representative of a party concerning the litigation' is 'generally afforded near absolute protection from discovery' and requires a heightened showing of extraordinary circumstances". *Id*. at 663-64; *see also In re Ford Motor Co.*, 110 F.3d 954, 962 n.7 (3d Cir. 1997); *Sporck v. Peil*, 759 F.2d 312, 316 (3d Cir. 1985).

28

Importantly, "the party asserting work product protection bears the burden to show the doctrine applies". *Sealed Air*, 253 F.R.D. at 306; *see also Conoco, Ins. v. U.S. Dep't of Justice*, 687 F.2d 724, 730 (3d Cir. 1982). The Third Circuit has adopted a "two part test for ascertaining whether the documents or things at issue should be protected under the work-product doctrine". *Id.*; *see also In re Gabapentin Patent Litig.*, 214 F.R.D. 178, 183 (D.N.J. 2003); *Muse-Freeman v. Bhatti*, 2008 WL 2165147, at *1 (D.N.J. 2008); *Paris v. R.P. Scherer Corp.*, 2006 WL 1982876, at *2 (D.N.J. 2006). The first inquiry is "the reasonable anticipation test, which requires that the court determine whether litigation could reasonably have been anticipated...[with the] relevant inquiry [being] whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation". *Id.*; *see also In re Gabapentin*, 214 F.R.D. at 183; *Maertin v. Armstrong World Indus.*, 172 F.R.D. 143, 148 (D.N.J. 1997); *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1258 (3d Cir. 1993); *Rockwell Int'l*, 897 F.2d at 1266. "Although the litigation need not be imminent, there must be an identifiable specific claim of impending litigation". *Id.*; *see also Rockwell Int'l*, 897 F.2d at 1266; *Maertin*, 172 F.R.D. at 148; *Leonen*, 135 F.R.D. at 97. The second inquiry "is whether the documents were prepared primarily for the purpose of litigation, ...as documents prepared for other purposes that prove useful in subsequent litigation are not attorney work-product". *Id.* at 307; *see also Paris*, 2006 WL 1982876, at *2; *In re Gabapentin*, 214 F.R.D. at 184. "Documents created in the ordinary course of business, even if useful in subsequent litigation, are not protected by the work-product doctrine". *Id.*; *see also Rockwell Int'l*, 897 F.2d at 1265-66. Thus, "even where the reasonable anticipation of litigation is established, whether the document comes within the purview of the work-product doctrine still depends primarily on the reason or purpose for the document's production". *Id.*; *In re Gabapentin*, 214 F.R.D. at 184.

### 5.        Crime-Fraud Exception to Privilege

"The attorney-client privilege must necessarily protect the confidences of wrongdoers, but the reason for that protection – the centrality of open client and attorney communication to the proper functioning of our adversary system of justice – ceases to operate at a certain point, namely, where the desired advice refers not to prior wrongdoing, but to future wrongdoing". *In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000) (*citing United States v. Zolin*, 491 U.S. 554, 562-63 (1989). "It is the purpose of the crime-fraud exception to the attorney-client privilege to assure that the seal of secrecy between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime". *Id.*; *see also Zolin*, 491 U.S. at 562-63.   The crime-fraud exception "applies only when the legal advice gives direction for the commission of future fraud or crime". *Id*. (*citing Haines v. Liggett Group, Inc*., 975 F.2d 81, 90 (3d Cir. 1992).   In order to invoke the exception, a party "must make a *prima facie* showing that (1) the client was committing or intending to commit a fraud or crime and (2) the attorney-client communications were in furtherance of that alleged crime or fraud".*Id.*; *see also In re Grand Jury Investigation*, 842 F.2d 1223, 1226 (11th Cir. 1987); *United States v. Horvath*, 731 F.2d 557, 562 (8th Cir. 1984).   Such a *prima facie* showing "requires presentation of evidence which, if believed by the factfinder, would be sufficient to support a finding that the elements of the crime-fraud exception were met".   *Id.*; *see also Haines*, 975 F.2d at 95-96; *United States v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005).   "Where...the attorney-client privilege and the work product immunity substantially overlap...[there is] no reason to apply a different standard for attorney work product".

 *United States v. Richard Roe, Inc.*, 68 F.3d 38, 40-41 n.2 (2d Cir. 1995); *see also In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir. 1979).

"The crime-fraud exception does not apply simply because privileged communications would

provide an adversary with evidence of a crime or fraud" but, rather, "only applies when the court determines that the client communications or attorney work product was itself in furtherance of the crime or fraud".  *Roe*, 68 F.3d at 40; *see also In re Grand Jury Subpoenas Duces Tecum*, 798 F.2d 32, 34 (2d Cir. 1986).  Further, "the crime-fraud exception applies only where there is probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or conceal the criminal activity".  *Roe*, 68 F.3d at 40; *see also United States v. White*, 887 F.2d 267, 271 (D.C. Cir. 1989).  A "simple finding of relevance does not demonstrate a criminal or fraudulent purpose".  *Roe*, 68 F.3d at 40-41.  Rather, "only when a client knowingly seeks legal counsel to further a continuing or future crime does the crime-fraud exception apply".  *Doe*, 429 F.3d at 454.

"The decision to engage in *in camera* review implicates a much more lenient standard of proof than the determination to apply the crime/fraud exception, as the intrusion on the asserted privilege is minimal".  *Haines*, 975 F.2d at 96.  "Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies".  *Haines*, 975 F.2d at 96; *see also Zolin*, 491 U.S. at 572.  Once such a showing is made, "the decision whether to engage in *in camera* review rests in the sounds discretion of the district court".  *Haines*, 975 F.2d at 96; *see also Zolin*, 491 U.S. at 572.

### 6.    Common-Interest Doctrine

The common-interest privilege, also known as the community-of-interest privilege, "allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others [and] it applies in civil and criminal litigation...and even in purely

transactional contexts". *Teleglobe*, 493 F.3d at 364; *see also Sealed Air*, 253 F.R.D. at 309. "The requirement that the clients' separate attorneys share information (and not the client themselves) derives from the community-of-interest privilege's roots in the old joint-defense privilege...[and] helps prevent abuse by ensuring that the common-interest privilege only supplants the disclosure rule when attorneys, not clients, decide to share information in order to coordinate their legal strategies". *Id*. at 364-65. Similarly, "the congruence-of-legal-interests requirement ensures that the privilege is not misused to permit unnecessary information sharing". *Id*. at 365. "Parties asserting this privilege...bear the burden of proving it applies". *Id*. at 365 n.2.

The common-interest doctrine "protects communications made between attorneys when all members of the community share a common legal interest in the shared communication". *Sealed Air*, 253 F.R.D. at 309; *see also Teleglobe*, 493 F.3d at 364; *Cooper Health System v. Virtua Health, Inc.*, 259 F.R.D. 208, 213 (D.N.J. 2009). "Although the most common statement of the degree of interest required is that the interest be identical, not similar, and be legal, not solely commercial, the Third Circuit has not specifically adopted such a stringent approach...[and has, instead,] noted that members of a community of interest must share at least a substantially similar legal interest". *Id*. at 309-10; *see also Teleglobe*, 493 F.3d at 365; *Duplan Corp. v. Deering Milliken, Inc.*, 397 F. Supp. 1146, 1172 (D.S.C. 1975); *Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.*, 174 F.R.D. 609, 634 (M.D. Pa. 1997). Thus, "the fact that...parties [may be] on adverse sides of a business deal...does not compel the conclusion that the parties did not share a common legal interest", such as when the parties may face "the possibility of joint litigation in which they would share a common interest". *Id*. at 310; *see also Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310-12 (N.D. Cal. 1987). Although some courts have chosen not to adopt the same reasoning, "the weight of case law suggests that...privileged information exchanged during a merger between two unaffiliated

businesses would fall within the common-interest doctrine".   *Id.*; *see also Cavallaro v. United States*, 153 F. Supp. 2d 52, 61 (D. Mass. 2001), *aff'd on other grounds*, 284 F.3d 236 (1st Cir. 2002); *Rayman v. Am. Charter Fed. Sav. & Loan Ass'n*, 148 F.R.D. 647, 655 (D. Neb. 1993).

Importantly, the common-interest doctrine is only applicable "if an underlying privilege has been established". *Id.* at 309; *see also Andritz Sprout-Bauer*,174 F.R.D. at 634; *Cooper Health*, 259 F.R.D. at 213.  Further, the common-interest doctrine "only applies when clients are represented by separate counsel" and is not identical to the "co-client" situation, which is to say that "in the community-of-interest context...courts can afford to relax the degree to which clients' interests must converge without worrying that their attorneys' ability to represent them zealously and single-mindedly will suffer" because the clients have separate attorneys. *Teleglobe*, 493 F.3d at 365-66.

The Court notes that in *LaPorta v. Gloucester County Bd. of Chosen Freeholders*, 340 N.J. Super. 254, 262 (App. Div. 2001), the New Jersey Appellate Division, citing *United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989), *cert. denied*, 502 U.S. 810 (1991), held that "communications need not only be among counsel for the clients" as "communications between counsel for a party and an individual representative of a party with a common interest are also protected" under the common interest doctrine.   Further, *LaPorta* also set forth three (3) requirements in order for the common interest doctrine to be asserted: "(1) the disclosure is made due to actual or anticipated litigation; (2) for the purposes of furthering a common interest; and (3) the disclosure is made in a manner not inconsistent with maintaining confidentiality against adverse parties".  *LaPorta*, 340 N.J. Super. at 262.

### 7.      Joint-Client Privilege

The joint-client privilege may only be invoked when "multiple clients engage one or more common attorneys to represent them on a matter of interest to all". *Id.* at 362.  "Whether individuals

have jointly consulted a lawyer or have merely entered concurrent but separate representations is determined by the understanding of the parties and the lawyer in light of the circumstances" and must be "distinguished from situations in which a lawyer represents a single client but another person with allied interests cooperates with the client and the client's lawyer". *Id.*; *see also* Restatement (Third) of the Law Governing Lawyers § 75 comment C.  A co-client representation continues "until a client discharges the lawyer, ...the lawyer withdraws, ...[or the] relationship terminates by implication" due to circumstances readily apparent to all joint clients that their "legal interests have diverged too much to justify using common attorneys".  *Id.*; *see also* Restatement (Third) of the Law Governing Lawyers § 31; *Fed. Deposit Ins. Corp. v. Ogden Corp.*, 202 F.3d 454, 463 (1st Cir. 2000); *Flynt v. Brownfield, Bowen & Bally*, 882 F.2d 1048, 1051 (6th Cir. 1989); *In re Dow*, 132 B.R. 853, 858 (Bankr. S.D. Ohio 1991); *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 167 F. Supp. 2d 128, 129 (D. Mass. 2001).  "The keys to deciding the scope of a joint representation are the parties' intent and expectations" as "finding too broad the scope of a joint representation gives the parties more control over each other's ability to waive the privilege than they intended and...subjects them to losing it in litigation with one another".  *Id.* at 363.

"When co-clients and their common attorneys communicate with one another, those communications are in confidence for privilege purposes...[and] the privilege protects those communications from compelled disclosure to persons outside the joint representation".  *Id.* "Waiving the joint-client privilege requires the consent of all joint clients", although "a client may unilaterally waive the privilege as to its own communications with a joint attorney so long as those communications concern only the waiving client...[and] may not...unilaterally waive the privilege as to any of the other joint clients' communications or as to any of its communications that relate to other joint clients".  *Id.*  Importantly, "if two or more persons are jointly represented by the same

lawyer in a matter, a communication of either co-client that relates to matters of common interest is privileged as against third persons". *Id*. at 366-67.  This is to say that "because co-clients agree to share all information related to the matter of common interest with each other and to employ the same attorney, their legal interests must be identical...in order that an attorney can represent them with all the candor, vigor, and loyalty that our ethics require". *Id*. at 367.

### 8.    Implied Waiver of Privilege

Privilege may not be used both as a sword and a shield.  *In re Human Tissue Prods. Liab. Litigation*, 255 F.R.D. 151, 158 (D.N.J. 2008).  Indeed, "a litigant cannot at one and the same time make use of those privileged communications which support his position while hoping to maintain the privilege as those communications which undercut his legal position".  1 Edna Selan Epstein, The Attorney-Client Privilege and the Work Product Doctrine 508 (5th ed. 2007) ("Epstein"). "Courts have found an implied waiver of the attorney-client and/or attorney work product privilege where a client affirmatively places otherwise privileged information at issue in the case".  *In re Human Tissue*, 255 F.R.D. at 158.  There are several factors that courts have considered in determining whether a waiver by affirmative reliance has occurred.  These include:

> (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party;
>
> (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and
>
> (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975); *see also In re Human Tissue*, 255 F.R.D. at 159; *Rhone-Poulenc Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994).

Other courts have focused on overriding fairness considerations in assessing whether an implied waiver has occurred.  *In re Human Tissue*, 255 F.R.D. at 159.  *See*, e.g., *Goldberg v.*

*Hirschberg*, 10 Misc.3d 292, 806 N.Y.S.2d 333, 335 (N.Y. Sup. Ct. 2005) ("The sanctity of the attorney-client privilege notwithstanding, '[it] may implicitly be waived when [a party] asserts a claim that in fairness requires examination of protected communications.'")(*quoting United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)); *Wolosoff*, 196 N.J. Super at 567 ("We are persuaded that 'when confidential communications are made a material issue in a judicial proceeding, fairness demands waiver of the privilege.'"); *In re Hillsborough Holdings Corp.*, 176 B.R. 223, 238-39 (M.D. Fla. 1994) ("A party waives the attorney-client and accountant-client privileges which attach to various communications if that party 'injects into the case an issue that in fairness requires an examination of otherwise protected communications.'").  Whether fairness requires disclosure is decided "on a case-by-case basis, and depends primarily on the specific context in which the privilege is asserted".  *In re Grand Jury Proceedings*, 219 F.3d 175, 183 (2d Cir. 2000).

### 9.     Limitations on Waiver

Pursuant to FED. R. EVID. 502(b),

> Inadvertent disclosure.  When made in a Federal proceeding or to a Federal office or agency, the disclosure does not operate as a waiver in a Federal or State proceeding if:
>
> (1) the disclosure is inadvertent;
> (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and
> (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

However, pursuant to the Protective Order executed by the parties in this matter,

> 8.  Inadvertent production of documents subject to work product immunity or the attorney-client privilege or any other privilege or immunity shall not constitute a waiver of the immunity or privilege, provided that the producing party promptly notifies the receiving party in writing of such inadvertent production after the producing party learns of such inadvertent disclosure.  No party shall thereafter assert that such inadvertent production waived any privilege or

36

immunity. The receiving party shall return such inadvertently produced item(s) of information and all copies thereof within ten (10) business days after the earliest of (a) discovery by the receiving party of its inadvertent production , or (b) receiving a written request from the producing party for the return of such item(s). The receiving party having returned such inadvertently produced item(s) may thereafter, without asserting waiver because of the inadvertent production, seek production of any such item(s) in accordance with applicable law.

*See* dkt. entry no. 68.

### B.   Graco's Motion to Compel

Here, Graco seeks to compel production of the following:

(a)   all documents highlighted on Exhibits J-O submitted with Graco's Motion;

(b)   all documents PMC has designated as within the 'common interest privilege';

(c)   all documents PMC has designated as within the 'work-product privilege' that predate the initiation of this action on March 14, 2008;

(d)   all documents PMC has designated as within the 'attorney-client privilege' that include third parties who are not attorneys for PMC or agents of attorneys for PMC;

(e)   all documents PMC has designated as within the 'work-product privilege' that were not prepared in anticipation of litigation or for trial;

(f)   all documents PMC has designated as within the 'attorney-client privilege' that do not have as their predominant purpose the provision of legal advice; and

(g)   revised privilege and redaction logs that reflect the production of the above referenced documents.

*See* Pl.'s Proposed Form of Order, dkt. entry no. 465-1.

Based upon the arguments offered by the parties, and the very fact that privileged logs are at issue, it is clear that the documents requested are relevant pursuant to FED. R. CIV. P. 26, that PMC

37

has asserted attorney-client, work-product, and common-interest privileges over those documents, and that Graco has challenged PMC's designation of specific highlighted documents.  *See* Cert. of David J. Wallace-Jackson ("Wallace-Jackson"), Exhs. J-O.  At this time, the Court finds that it is unable to accurately address the concerns raised by Graco due to the abstract nature of the issue presented – namely, whether PMC has properly asserted and/or waived various privilege claims – without reviewing the documents.  Although the Court makes no finding as to the propriety of PMC's privilege claims, the Court does find that Graco has presented sufficient facts to warrant an *in camera* review.  Specifically:

> -Graco was provided documents that it contends were "purely business-related" but were nevertheless clawed back by PMC and marked as privileged, thereby leading Graco to suspect that PMC's privilege logs contain other similar instances (*see* Pl.'s Br. at 8-9, 13-14, 26-29);
>
> -PMC has asserted privilege claims over documents shared with former employees, consultants, and non-attorneys which it insists were communications in furtherance of legal representation (*see* Pl.'s Br. at 9-10; *see also* Def.'s Opp'n Br. at 6);
>
> -PMC has asserted privilege claims over at least two (2) documents which it claims constitute a "draft employment contract" protected under attorney-client privilege, while Graco maintains that same have "no connection to anticipated or ongoing litigation" and are not protected under work-product privilege (*see* Def.'s Opp'n Br. at 6-7; *see also* Pl.'s Br. at 11-12);
>
> -PMC has withheld a substantial number of documents by way of the common-interest doctrine by using the description "Document/communication in connection with Entry No. 7" without providing any additional indication that a client was seeking or receiving legal advice or a means by which the Court or Graco can evaluate the privilege claim, thereby leading Graco to question whether the elements of a common-interest privilege exist (*see* Pl.'s Br. at 12-21); and
>
> -the nature of the allegations made by the parties in this matter, coupled with a contentious discovery process, have produced examples of conduct that would support a good faith belief by a

reasonable person that an *in camera* review may reveal evidence to establish the claim that the crime-fraud exception to privilege claims applies (*see Haines*, 975 F.2d at 96; *see also Zolin*, 491 U.S. at 572.; Pl.'s Br. at 22-26).

An *in camera* review will provide the Court with the appropriate context within which to rule on whether the privilege claims challenged by Graco have been appropriately asserted by PMC. Upon concluding its review, the Court will issue an additional Order – relying upon the facts, law and reasoning set forth herein – as to which documents, if any, PMC may be compelled to produce.

## IV.   CONCLUSION AND ORDER

The Court having considered the papers submitted and opposition thereto, and for the reasons set forth above;

**IT IS** on this 14th day of February, 2011,

**ORDERED** that Plaintiff's Motion to compel the production of documents or, in the alternative, for an *in camera* review [dkt. entry no. 465] is **GRANTED** insofar as the Court will conduct an *in camera* review of the documents highlighted by Graco in the Cert. of Wallace-Jackson, Exhs. J-O and the documents PMC clawed back under cover of letters dated March 1, 2010 and June 30, 2010; and it is further

**ORDERED** that PMC shall provide the Court with the materials set forth above by **March 4, 2011**; and it is further

**ORDERED** that PMC shall provide the Court with an alphabetical list identifying all of the senders, recipients, and parties copied on the above materials, including their names, positions, employers, and whether they were/are attorneys by **March 4, 2011**.

s/ *Douglas E. Arpert*
**DOUGLAS E. ARPERT**
**UNITED STATES MAGISTRATE JUDGE**