**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

GRACO INC., et al.,

    Plaintiffs,

     v.

PMC GLOBAL, INC., et al.,

    Defendants.

Civil Action No.: 08-1304

MEMORANDUM AND ORDER

**SHERIDAN, U.S.D.J.**

 This matter comes before the Court on plaintiff-counterclaim defendants Graco Inc. and Graco Minnesota, Inc.'s (collectively "Graco") motion for summary judgment on all counterclaims asserted by defendant-counterclaimants, Denis S. Commette ("Mr. Commette") and Gama Machinery USA, Inc. ("Gama").

 On or about March 14, 2008, Graco commenced this action. After Mr. Commette and Gama (the "Counterclaimants") asserted counterclaims along with their answer, Graco moved to dismiss the counterclaims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On March 31, 2009, Graco's motion to dismiss the counterclaims was granted in part, but without prejudice. On or about December 2, 2009, the Counterclaimants filed an amended countercomplaint (the "Countercomplaint") setting forth six claims: (1) monopolization in violation of Section 2[1] of The Sherman Antitrust Act, 15 U.S.C. § 2 (the "Sherman Act"); (2) attempted monopolization in violation of Section 2 of Sherman Act; (3) tortious interference with business advantage; (4) unfair

---

[1]  *See infra note 6.*

competition in violation of the New Jersey Fair Trade Act, N.J. Stat. Ann. § 56:4-1; (5) common law unfair competition; and (6) trade libel.  On or about June 10, 2011, Graco filed a motion for summary judgment seeking dismissal of all counterclaims.

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.  For the reasons set forth below, this Court grants in part and denies in part Graco's motion for summary judgment.

**I**

In 2005, Graco paid PMC Global, Inc. $65 million for the purchase of the Gusmer business. Gusmer manufactured and distributed polyurethane foam dispensing equipment.  After the Graco purchase, executives of Gusmer terminated their relationship with Gusmer and started new companies to compete with Graco. One of the companies was Garraf which manufactured competing polyurethane foam dispensing equipment.  In addition to Garraf, another company, Gama, also headed by former Gusmer managers, began distributing the Garraf products in North America.  Graco manufactures a variety of equipment for applying adhesives, coatings, sealants, and foam – including polyurethane foam insulation.

Gama was established in September 2007 to distribute specialized equipment that is used to install polyurethane foam insulation and polyurea coatings.  Initially, Gama was the exclusive North American distributor of equipment built by Garraf Maquinaria ("Garraf")[2].  Since October 2009, Gama has manufactured its own equipment for sale.

Mr. Commette is a former employee of both Graco and Gama and is currently an outside consultant to Gama.

---

[2]      At the start of the litigation, Garraf, a corporation of Spain, was a defendant, but it has failed to cooperatively prosecute the case.  Both parties agree that it is in default.

The counterclaim discusses various kinds of spray foam equipment (SFE) each of which has separate features.  The counterclaim seeks relief for monopolization on all of the various kinds of SFE.  Despite same, at oral argument Gama, limited its claim to high pressure SFE.   In addition, Gama's expert limited his review and analysis to sales in North America of high pressure SFE which contractors use to apply fast set spray polyurethane foam. Hence, the counterclaim will be limited to high pressure SFE in the North American market.

In its complaint, Graco alleged that the business plan formulated by former Gusmer executives who associated with Garraf and Gama was to rekindle Gusmer's business relationships, and to re-acquire business through those relationships which was sold to Graco.  Based on same, Graco filed this suit due to the "conspir[acy] to steal the business back." That included the conspiracy to steal trade secrets that PMC had sold to Graco.

In response, Gama argues that Graco breached Section 2 of the Sherman Act through monopolization of the market to exclude Gama from competing.  Gama's evidence includes a statement from Patrick McHale who was concerned about the new start up companies such as Garraf.  In April, 2007 he likened the situation to "mouse droppings in your home, you do not wait until they are running all around before you bring out the poison."  Graco sent a letter to some distributors that it may take action against them if the distributor were to form a business relationship with Graco's competitors. Graco allegedly attempted to "block the channel," i.e. to cut-off business with distributors who sell Gama or Garaff products because Graco did not want Gama "piggybacking onto our distribution channel."  That is, it would either cease doing business with such distributors or would lower the discount structure to the distributor's economic peril.  One such distributor indicated that he was warned that if he engaged in business with Gama he would loose his advanced distributor status and discounts.

3

It is also alleged that Graco advised their high pressure SFE customers that Gama would soon be exiting that market.   For example, in 2008 Graco told the owner of distributor SPF Supplies, Inc., "You should think twice about becoming a Gama distributor because Gama won't be around for long due to Graco's lawsuit against it."    Another potential customer reported that, "I heard [t]hat Graco was going to close you (Gama) all down by the end of the year."   A Graco representative said "don't buy anything Gama because you would be stuck with it."  In addition, two Gama distributors declared that they heard from potential customers that Graco said Gama would soon be out of business, and accordingly chose  to purchase products from Graco over Gama.

In response to the new competition from Gama, Graco focused on its relationships with high pressure SFE distributors.  On October 24, 2007, Graco sent a letter (the "Best Efforts Letter") to its North American high pressure SFE distributors stating: "Should a distributor add a competitive product line, it will result in an immediate review of our business relationship and may impact access to specific products, changes in addendum status or possible elimination of our distributor agreement." The Best Efforts Letter further provided that "[i]t is [Graco's] opinion that taking on an additional competitive product line may significantly reduce the 'best efforts' of a Graco distributor to sell our . . . product lines."   The contracts between Graco and its distributors were renewable contracts with one year terms.   One witness, Mr. Hrynkiewicz[3], asserts that certain distributors chose not to carry Gama high pressure SFE because of the threat within the Best Efforts Letter.

Foampak Inc. ("Foampak") was a Graco distributor that received the Best Efforts Letter.

---

[3]      Mr. Hrynkiewicz is a former Gusmer employee.  He became a Graco employee after Graco brought Gusmer, until 2006. In 2007 he began working for Glascraft until Graco bought the company.  Presently, Mr. Hrynkiewicz is a Gama employee.

Foampak's president Chris Donaghy ("Mr. Donaghy") asserts that he stopped pursuing his plan to distribute Gama products after receiving the Best Efforts Letter.  However, in January 2009, Mr. Donaghy advised Graco that he intended to sell Gama high pressure SFE.   According to Mr. Donaghy, a Graco executive met with him and told him that if Foampak distributed Gama's product then Graco would terminate its distribution agreement with Foampak.  After the meeting, Foampak abandoned plans to carry Gama high pressure SFE. Mr. Donaghy believed that risking his Graco distributorship agreement would be "business suicide."

Graco has asserted two justifications for aggressively seeking to keep Gama from utilizing its distributors.  First, fear that Gama's sale of replacement parts for Graco products could confuse customers and tarnish the Graco brand; and second, concern that Gama would "free-ride" off the services and training provided by Graco to distributors.  Graco does not present any corroborating evidence that these justifications were the reason behind the Best Efforts Letter.

<u>Background on Spray Foam, Spray Foam Equipment, and Other Polyurethane Equipment</u>

"Spray Foam" refers to polyurethane foam that is commonly used as building insulation. A central characteristic of Spray Foam is its ability to expand and then "set" (harden) quickly. "Spray Foam Equipment"[4] ("SFE") refers to "plural component spraying and dispensing 'Spray Foam' equipment."  SFE creates spray foam by mixing two separate chemicals  (produced by other

---

[4]      There is other equipment known as In-Plant Polyurethane Processing Equipment ("IPPE") It molds polyurethane foam into goods such as car dashboards.  Mr. Commette testified that IPPE is larger and more expensive than high pressure SFE; and its immobility precludes it from being used by insulation contractors to insulate a building.  Protective Coating Equipment ("PCE") is used to apply polyurea as a weatherproof coating on products such as pickup truck bed liners.  As this protective coatings does not set quickly, PCE is a slow set equipment and "cannot be used for the creation and application of spray foam insulation, as the fast setting spray polyurethane foam would solidify before reaching the gun rending the equipment inoperable."

companies) and the interaction of these chemicals creates the foam which then hardens.

Classes of Spray Foam Equipment

There are various classes of SFE, high pressure SFE, low pressure SFE, and single-use SFEs (known as "Froth Paks"). All three classes of SFE can install spray foam as building insulation. Although Gama's claims focus on high pressure SFE, all three are briefly discussed.

Generally speaking, high pressure SFE is the most sophisticated and expensive class of spray foam equipment, Froth Paks are the least, and low pressure SFE is somewhere in between. These distinctions have a measurable impact on their use in the building insulation business. Additionally, there are differences between SFE and fiberglass insulation, which is also used in the building insulation business.

High pressure SFE is defined as the equipment used by "high-pressure, two-component equipment contractors to apply fast-set polyurethane foam, polyurea coatings, and certain epoxies." In addition to installing spray foam, high pressure SFE can apply polyurea protective coatings. High pressure SFE can apply customized spray foam formulations with characteristics specially suited for a particular job. High pressure SFE is also characterized by low marginal costs per usage.

High pressure SFE is primarily sold by 20 specialized distributors of Graco and purchased by insulation contractors. Gama complains that it has been unable to acquire any sales through the 20 specialized distributors of high pressure SFE.

Low pressure SFE requires re-usable spray foam equipment assemblies utilizing pumps and low pressure applicator guns. A Gama and Graco employee stated that low pressure SFE is unsuitable for large insulation jobs, and the foam is of inferior quality.

Froth Paks require single-use spray foam equipment assemblies and have higher costs per usage. Accordingly, contractors only use Froth Paks for "touch-up work and minor repairs." Froth

Paks are not sold by distributors but are marketed through large retailers like Home Depot.

Fiberglass insulation is different from spray foam but it is also used to insulate buildings. Generally, witnesses have stated that fiberglass insulation is less expensive and lower in quality than spray foam insulation created by high pressure SFE.

Historically, Gusmer Corp. ("Gusmer") was the leading manufacturer of high pressure SFE. However, in 2005, Graco acquired Gusmer.  In 2008, Graco also acquired GlasCraft, which was Graco's largest high pressure SFE competitor at the time.  In part, Graco's motivation to acquire Gusmer was a desire to access Gusmer's distribution network.

The evidence of monopolization by Graco is limited to internal Graco reports obtained during discovery[5].  In 2005, after Graco acquired Gusmer, a Graco report indicated that Graco's market share in the high pressure SFE was 65%.  In 2008, Graco's market share in the global market was 72% while Glascraft (soon to be part of Graco) had an 11% share.   A 2009 internal report on the "spray foam market and spray polyurea market" found that Graco had a North American market share of 95% and a worldwide share of roughly 83.6%.  According to Graco, although certain high pressure SFE manufacturers have been eliminated by acquisition, other manufacturers have entered the market.  The high pressure SFE manufacturer 21st JMT was launched in 2006.  Wiwa, a German company and JHPK, a Chinese company, recently began manufacturing high pressure SFE.  Based on Graco's internal market research, these manufacturers are relatively small in terms of volume of business.

---

[5]     No original surveys or analysis of market concentrations were conducted in connection with this case by Gama.

High Pressure SFE Distribution

High pressure SFE is almost exclusively purchased from a network of specialized distributors.  The parties disagree about whether this network of distributors is "small" and "well-established;" but it is undisputed that Graco's top twenty (20) distributors in 2008 and 2009 accounted for 60% of Graco's high pressure SFE sales.  Certain internal Graco documents state that its market position is protected by high barriers to entry, including distribution barriers.  As is further explained in the next section, Gama has been unable to form a business relationship with the established high pressure SFE distributors of Graco despite the fact that Gama's executives knew these distributors for years when they were with Gusmer.  Instead, Gama has created an independent network of 19 North America distributors.  Gama calls their distributors "second-tier" because they lack the customer relationships of Graco's top 20 distributors.  Generally, a new high pressure SFE distributor can be formed with minimal capital (as little as $100,000) so long as the distributor has some experience in the industry; but Mr. Hrynkiewicz[6] explains that new distributors cannot effectively compete with established distributors because the newcomers lack the relationships with insulation contractors that are integral to success.

At some point, Gama previously sold high pressure SFE direct to contractors over the internet; but Mr. Hrynkiewicz asserts that Gama's effort was unsuccessful.  Graco asserts there are other potential distribution channels of high pressure SFE including spray foam chemical distributors, construction equipment distributors, retailers, and insulation manufacturers. Gama counters that none of these options permit Gama to compete with Graco on a significant basis.

---

[6]        *See supra* note 3.

<u>The Expert Reports</u>

Gama submitted expert reports by Brian Regan, C.P.A., M.B.A. and Dr. Morton Kamien, Ph.D.

Mr. Regan's report (the "Regan Report") identified high Pressure SFE as a distinct market in which Graco had market power.  Mr. Regan's conclusion that high pressure SFE was a distinct market relied in part on Graco internal reports that tracked high pressure SFE sales and distributors separately.  Mr. Regan opined that fiberglass insulation was not interchangeable with high pressure SFE because Owens Corning's fiberglass insulation sales were not affected by higher Graco prices on high pressure SFE.  Mr. Regan opined that there was a distinct geographic market in North America for high pressure SFE based on Graco's internal reports and the absence of agreements between international manufacturers and the local distributors which make most North American sales.  Mr. Regan reviewed Graco's internal market concentration numbers discussed above and he concluded, as did the Graco reports, that Graco possessed market power in the North American high pressure SFE market.

Dr. Kamien's report (the "Kamien Report") identified high pressure SFE as a distinct market in which Graco had market power.  This opinion was based on the Regan Report, Graco's recognition of high pressure SFE as a distinct market, and distributor testimony that high pressure SFE pricing was increasing because the rise in price did not cause a drop in demand.  By relying on Dr. Regan's findings, Dr. Kamien concluded that by keeping competitors out of the market, a company can raise its price and improve its gross margins without losing market share.  Dr. Kamien concluded there was a distinct North American market and Graco monopolized it for the same reasons as Mr. Regan.

**II**

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury

could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 F. App'x. 222, 227 (3d Cir. 2007).

<u>Antitrust Standing</u>

Graco asserts that the Gama and Commette lack standing to pursue antitrust claims arising before Gama began manufacturing high pressure SFE in October 2009.  To determine whether antitrust standing exists, this Court must consider: "(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent of the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 320 (3d Cir. 2007) (citation omitted).  Whether antitrust standing exists is a question of law.  *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 83 (3d Cir. 2011) (citations omitted).

Graco argues that the final three elements weigh against the Counterclaimants for the period when Gama did not manufacture high pressure SFE and instead resold equipment manufactured by Garraf. Graco asserts that during this time (1) the Counterclaimants did not suffer any direct antitrust injury; (2) Garraf was a more direct victim of any alleged anticompetitive acts, and (3)  an award to the Counterclaimants raises the specter of duplicate damages because Garraf could sue separately. This Court finds that all five factors indicate that Gama possesses, and Mr. Commette lacks, antitrust standing for the entire period of the claim.

Direct victims of antitrust injury fall into two categories.  First, consumers and competitors of the defendant suffer direct antitrust injuries.  *See Barton & Pittinos Inc. v. Smithkline Beecham*

*Corp.*, 118 F.3d 178, 181-82 (3d Cir. 1997).  Second, parties competing in the same market as the defendant that suffer injuries that are "inextricably linked" to the defendant's anticompetitive conduct suffer direct antitrust injuries.  *See also Broadcom*, 501 F.3d at 320-21 (noting that inextricable injury cases are limited to those where "both plaintiffs and defendants are in the business of selling goods or services in the same relevant market").  Gama falls into the latter category.

For the entire period of this claim, specifically 2005-2009, both Graco and Gama sold high pressure SFE to insulation contractors.  They competed in the same market.  Graco has allegedly prevented Gama from selling through Graco's distributor network, the primary channel for high pressure SFE sales.  As discussed below, Gama may have lost the opportunity to compete for sales to Graco's top 20 distributors.  This is inextricably linked to Graco's alleged anticompetitive conduct.  Based on the record at this time, this Court finds that Gama suffered a direct antitrust injury.

Additionally, there is evidence that Gama  has been a more direct antitrust victim of Graco's anticompetitive conduct than Garraf.  Gama suffered an antitrust injury – inability to compete fairly in the market – whereas the manufacturer only experienced a decrease in royalties.  *EISAI Inc., v. Sanofi-aventis U.S., LLC*, 2010 WL 3172187, at *8.  Gama had the exclusive right to import Garraf product to North America.  Gama was therefore a more direct victim of Graco's alleged anticompetitive conduct then Garraf.

In addition to being the most direct victim of the antitrust injuries caused by Graco, the other factors favor recognition of Gama's standing to pursue this case.  Causation between defendant' conduct and plaintiff's injury is clear.  Finally, there is no evidence indicating that Garraf is likely to sue Graco or would receive duplicative damages if it did sue.  Gama has antitrust standing to

pursue all Sherman Act 2 claims asserted in this case, including claims arising before Gama began selling its own high pressure SFE in October 2009.

<u>Mr. Commette Lacks Antitrust Standing</u>

Turning to Mr. Commette, this Court finds that he lacks standing to pursue any antitrust claims against Graco. Mr. Commette was an employee and consultant of Graco and is now an independent consultant to Gama and Garraf. Executives cannot pursue antitrust claims premised on the theory that their employer was harmed by anticompetitive conduct. *See Korkala v. Allpro Imaging, Inc.*, No. 08-2712, 2009 WL 2496506, at *4 (D.N.J. Aug. 12, 2009). Brokers and consultants cannot pursue claims for antitrust injuries suffered by their clients. *See Martorano v. PP & L Energy Plus*, 334 F. Supp. 2d 796, 800-01 (E.D. Pa. 2004), *aff'd*, 137 F. App'x. 491 (3d Cir. 2005). The Counterclaimants have not identified any antitrust injury personal to Mr. Commette, only injuries to Gama. Accordingly, Mr. Commette's Sherman Act claims are dismissed for lack of standing.

<u>Actual Monopolization Claim</u>[7]

Section 2 of the Sherman Act prohibits "monopoliz[ing] . . . any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2 (2010). There are two elements of a Section 2 monopolization claim: "(1) the possession of market power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Broadcom*, 501 F.3d at 306-07 (internal quotation and citation omitted). Graco argues

---

[7]     The counterclaim pleads both Section 1 and 2 of the Sherman Act in the first few paragraphs of the counterclaims, but only the substance sets forth a Section 2 monopoly claim, and a Section 2 attempted monopoly claim. The Counterclaimants make no reference to Section 1 in their opposition brief. Due to lack of clarity, the Section 1 claim, if any was alleged, is dismissed (Rule 8).

that there are four flaws in Gama's[8] Sherman Act Section 2 claim: (1) no proof of a product market; (2) no proof of a geographic market; (3) no direct proof that Graco has market power; and (4) no proof of anticompetitive conduct. The first three concerns raised by Graco implicate prong one of a monopolization claim: whether Graco has market power in the relevant market. Market power can be proven either indirectly or directly. Below, indirect proof is considered.

One indirectly proves market power by (1) defining the relevant market, (2) establishing that the defendant has a large share of that market, and (3) showing that there are barriers to entry which protect the defendant's large market share. *Broadcom*, 501 F.3d at 307 (citations omitted). To define the relevant market, a plaintiff must prove the existence of a product market and geographic market. *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991).

Whether the plaintiff has properly defined the relevant market is an issue for the fact finder. *Broadcom*, 501 F.3d at 307. However, "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient." *U.S. Horticultural Supply v. Scotts Co.*, 367 F. App'x. 305, 309 (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)). If the market definition is insufficient, the plaintiff's effort to indirectly prove market power inherently fails. *Queen City Pizza*, 124 F.3d at 436-37.

---

[8]    As discussed above, Gama is the only valid plaintiff for the Sherman Act claims in this case. Accordingly, the remainder of the antitrust section of this opinion will refer to the antitrust claims as Gama's claims.

<u>There Is a Genuine Issue of Fact Regarding the Existence of a</u>
<u>High Pressure SFE Product Market</u>

The countercomplaint alleged that Graco monopolized the market for "the plural component spraying and dispensing high pressure SFE.

The relevant product market's "outer boundaries are determined by the reasonable interchangeability of use between a product and its substitute[s], or by their cross-elasticity of demand." *Broadcom*, 501 F.3d at 307 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). A "reasonable interchangeability" analysis looks at whether one product is roughly equivalent to another for the use to which it is put. . . ." *Queen City Pizza*, 124 F.3d at 437-38. Whether product's are interchangeable is analyzed from the customers' perspective. *Id.* at 438 n.6. "Factors to be considered include price, use and qualities." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991) (citing *United States v. E.I. Du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956)). The relevant product market is also defined by cross-elasticity of demand, where "the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market." *Queens City Pizza*, 124 F.3d at 437-38 (quoting *Tunis Brothers*, 925 F.2d at 722).

Graco alleges that Gama's proposed market definition is legally insufficient because there is no interchangeability or cross-elasticity evidence supporting exclusion of low pressure SFE, Froth Paks, and fiberglass insulation from the proposed product market.

Gama's experts did not present a market survey describing whether there are products that are interchangeable with high pressure SFE as analyzed from the customer's perspective. Here, a market survey is not required to determine the relevant product market since Reagan's Report concluded that high pressure SFE is a unique product and there is no substitute. When a product is

unique, a single brand of product may constitute a separate market. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992). As previously discussed, high pressure SFE can be distinguished from low pressure SFE, Froth Paks, and fiberglass insulation in terms of quality and function. Thus, the relevant product market can be analyzed using cross-elasticity evidence. Dr. Kamien's report conducted a cross-elasticity analysis where he compared Graco's increase in market share once Graco acquired Gusmer and thereafter Glascraft and the significant increase in prices that followed these acquisitions without a decrease in demand. Specifically, Dr. Kamien looked to Dr. Reagan's report and noted that Graco's market share changed from 15% to 65% in 2005 after Graco acquired Gusmer in 2005 and the price for high pressure SFE increased by 8.3%. Thereafter in 2008 when Graco acquired GlasCraft, Graco's market share changed from 65% to 80% and the prices increased by 26.8% with no decrease in demand. Thus, there is a genuine issue of fact regarding the relevant product market for high pressure SFE as to cross-elasticity.

> There is a Genuine Issue of Fact Regarding the Existence of a
> North American Geographic Market for High Pressure SFE

In addition to proving the relevant product market, Gama bears the burden of proving the relevant geographic market. A geographic market is defined from the customer's perspective, i.e. where do potential customers rationally look for the product? *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005).

Gama describes the relevant geographic market as North America. Graco asserts that Gama has erred by excluding foreign manufacturers from the geographic market. Gama asserts that foreign manufacturers cannot be considered competitors of Graco because they lack any "meaningful distribution presence" in North America. Gama finds further support for a North American market in Graco's internal reports which separately track North America sales.

In this case, North American insulation contractors are the customers in question and the market should be defined from their perspective. Gama offered no contractor depositions or affidavits in support of their market definition, but rather relied on Graco's internal reports. The Graco internal reports use North America solely as a distinct market. Graco argues that its internal record is not directly relevant because it does not speak to the customers' (insulation contractors') perspective of the marketplace. However, Gama's expert Mr. Regan opined that insulation contractors would not rationally purchase from a foreign manufacturer. This conclusion was based on two facts. First, Gama executives and distributors assert that insulation contractors almost exclusively purchase from local distributors because of the intensive customer support needs that are intrinsic to high pressure SFE. Second, no foreign high pressure SFE manufacturers have significant access to those local North American distributors. Viewing this evidence in the light most favorable to Gama, a reasonable jury could find that North American insulation contractors look to their local distributor networks for high pressure SFE and, at those distributors, the contractors exclusively find equipment manufactured by North American producers.

<u>There is a Genuine Issue of Fact Regarding Graco's Possession of a Dominant Market Share in the North American High pressure SFE Market</u>

Market power "may ordinarily be inferred from a predominant share of the relevant market." *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). An 80% market share is sufficiently dominant to create a triable issue of fact on the matter of market power. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992). Graco asserts that Gama has submitted no evidence on market shares in the North American high pressure SFE market. Gama completed no independent market concentration research, but contends that Graco's own internal market surveys demonstrate Graco's market dominance.

17

A 2005 survey by Graco placed the company's market share in high pressure SFE at 65%. In 2008, Graco found that its market share in the global market for high pressure SFE was 72% and Glascraft (soon to be acquired by Graco) held 11% of the market.  A 2009 internal report on high pressure SFE found that Graco had a North American market share of 95% and a worldwide share of roughly 83.6%.  Dr. Kamien found these market percentages sufficient to dominate market share. A reasonable jury could determine that the product market measured in these Graco surveys is the high pressure SFE market.  Therefore, summary judgment dismissal is inappropriate.

<u>There is a Genuine Issue of Fact Regarding the Existence of</u>
<u>Entry Barriers in the North American High Pressure SFE Market</u>

A dominant market share may not equate to market power if there are new market entrants waiting in the wings to compete for that market share.  Accordingly, proof of barriers to entry are required to indirectly prove market power.  "Barriers to entry are factors, such as regulatory requirements, high capital costs, or technological obstacles, that prevent new competition from entering a market in response to a monopolist's supracompetitive prices."  *Broadcom*, 501 F.3d at 307 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 591 n.15 (1986)).

The existence of a dominant and difficult to duplicate distribution network may be a barrier to entry and indicate market power.  *See U.S. v. Dentsply Int'l*, 399 F.3d at 188-90, 194-96 (3d Cir. 2005); *see also Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 202- 203 (3d Cir. 1993) (dismissing claim on other grounds, but noting that there was "evidence of significant barriers to entry" where jury found that "quick penetration of the market [was] impossible without purchasing an existing distribution network").  Here, where sales have been through 20 distributors, and where direct sales, such as internet marketing, is infeasible, there may be a barrier to entry.  *See Dentsply Int'l*, 399 F.3d at 189.

18

Graco asserts that there are no barriers limiting entrance into either the business of distributing or manufacturing high pressure SFE or the business of manufacturing high pressure SFE. Graco notes that a handful of high pressure SFE manufacturers (including Gama, 21st, and JMT) have launched in the last decade, and there are a number of PCE and IPPE manufacturers who could quickly modify their products and enter the high pressure SFE market[9]. Additionally, Graco argues that high pressure SFE distributors can be launched with just $100,000 and some industry experience. Gama argues that Graco's control of the largest high pressure SFE distributors constitutes a barrier to entry.

The record indicates that high pressure SFE is almost exclusively purchased from a network of specialized distributors, as opposed to national chain stores. For instance, Graco's top ten distributors in 2008 and 2009 accounted for 40% of Graco's high pressure SFE sales during that time Graco acquired Gusmer in part to obtain relationships with these distributors. While Gama has been able to develop its own network of 19 independent North America distributors, these distributors allegedly lack the extensive relationships with insulation contractors that Graco distributors possess. Gama employee William Hrynkiewicz stated that new distributors face a long road to success because they must slowly build relationships with contractors. Mr. Hrzynkiewicz also asserted that Gama found direct internet sales of high pressure SFE were not viable. There is a fact whether a reasonable jury could find that there is a limited group of distributors that dominate high pressure SFE sales may pose a barrier to new entrants like Gama.

Gama submitted sufficient evidence on market definition, market share and entry barriers to indirectly prove that Graco has market power in the North American high pressure SFE market. Accordingly, this Court need not address Gama's assertion that there is direct proof of market power.

---

[9]      See Note 4.

<u>There is a Genuine Issue of Fact Regarding the Existence of Anti-Competitive Conduct</u>

In addition to demonstrating market power, the plaintiff in a Sherman Act Section 2 case must show that defendant engaged in the "willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Race Tires Am. Inc.  v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 75 (3d Cir. 2010) (quoting *Eastman Kodak*, 504 U.S. at 481).  "The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  Therefore, the plaintiff must show that the defendant engaged in anti-competitive conduct by "compet[ing] on some basis other than the merits."  *Race Tires*, 614 F.3d at 75 (citation omitted).  If the plaintiff proves that defendant's conduct had an anticompetitive effect, the defendant may still avoid liability by showing that their conduct was justified by procompetitive efficiencies. *Dentsply Int'l*, 399 F.3d at 196-97.

Gama alleges that Graco's threat to cancel the contract of any distributor that sold a competitor's high pressure SFE turned the "best efforts" clause in Graco's distribution contracts into anticompetitive exclusive dealing agreements.  An exclusive dealing agreement occurs when two companies with a vertical relationship in their industry (supplier/distributor, distributor/customer, etc.) agree that neither will transact business with a third company that competes with one of the parties to the agreement (a rival supplier, distributor, etc.).  Graco asserts Gama cannot prove anti-competitive conduct because (1) its one year distribution agreements do not explicitly include an exclusive dealing clause and (2) even if Gama was foreclosed from Graco' distribution network, Gama could reach customers through direct sales or alternative distribution agreements.[10]

---
[10]

Graco also asserts that it is "free to choose the parties with  whom [it] will deal."  It is true that Graco itself is likely free to decline dealing with Gama.  But, there is a clear distinction between

20

Alternatively, Graco argues that its contracts with distributors do not harm competition in light of their pro-competitive justifications.

> There is a Genuine Issue of Fact Regarding the Existence of Anti-Competitive Effects Caused by Graco's Exclusive Dealing Agreements With Its Distributors

Exclusive dealing agreements can lead to both anti-competitive effects that harm consumers and pro-competitive efficiencies that benefit consumers. *Race Tires*, 614 F.3d at 76; *see also Dentsply Int'l*, 399 F.3d at 184. In deciding whether exclusive dealing agreements have anti-competitive effects, the following factors are relevant: (1) the importance of dealer access in the industry; (2) the potential for competitors to use alternate distribution channels to challenge defendant's monopoly position; (3) the effectiveness of the exclusive dealing agreements in foreclosing competitor access to distributors; (4) actual loss in customer options caused by the agreements; (5) the extent to which the exclusive dealing agreements form a barrier to entry; and (6) whether the exclusive dealing agreements were the product of coercion. *Dentsply Int'l*, 399 F.3d at 192-196 (discussing factors one through five); *Race Tires*, 614 F.3d at 77-78 (discussing factor six).

The jury is responsible for determining whether an exclusive dealing agreement has anti-competitive effects based on the factors discussed above. *See LePage's Inc. v. 3M*, 324 F.3d 141, 163 (3d Cir. 2003). In this case, a jury could find that the first, second, third, fifth, and sixth factor in the Third Circuit analysis indicate that Graco's conduct was anticompetitive.

---

"refusal to deal" cases, like *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 129 S. Ct. 1109, 1118 (2009), and "exclusive dealing agreement" cases, such as this case. It is well established that "anti-competitve conduct can include a conspiracy to exclude a rival." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 (3d Cir. 2010) (citation omitted).

*Factors One and Two: Dealer Access and Alternative Sales Channels in the High pressure SFE Market*

If dealer access is unimportant or direct sales are efficient then efforts to exclude a competitor from dealers would have little anticompetitive effect.  In *Dentsply International*, the Third Circuit held that access to high-volume dealers was critical because customers relied on the benefits of high-volume dealers, including financing, better pricing, "one stop shopping", and product return services. 399 F.3d at 192-193.  The court held that direct sales were not a viable alternate distribution channel where the industry was dominated by a network of "long-entrenched" distributors and no manufacturer had been able to gain significant market share with direct sales.  *Id.* at 193.  In this case, Gama's employees and experts explain that dealer access is critical in the high pressure SFE industry because customers rely on dealer-provided customer service.   Furthermore, Gama completely abandoned its direct sales approach after finding that it was not viable. A reasonable jury could find that access to Graco's high-volume dealers is a prerequisite to success in the high pressure SFE industry and that direct sales are not a viable substitute.

*Factor Three: Effectiveness of Graco's Exclusive Dealing Agreements*

An exclusive agreement would not be anticompetitive if it failed to actually exclude competitors.  Although, a number of circuits[11] consider the length of an exclusive dealing agreement to be critical in deciding whether it is anticompetitive, the Third Circuit has rejected the notion that short-term exclusive dealing contracts are inherently less dangerous.   In the Third Circuit, the emphasis is on evaluating the defendant's actual success in excluding competitors from its distributor network. *Dentsply Int'l*, 399 F.3d at 193-94.  Graco's distribution agreements only last one year. But,

---

[11]

*E.g., Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-63 (9th Cir. 1997); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) ("[e]xclusive-dealing contracts terminable in less than a year are presumptively lawful").

since Graco distributed the Best Efforts Letter in 2007, Graco appears to have succeeded in generally excluding Gama from its distribution network. A number of Graco distributors have asserted that they chose not to deal with Gama because of the Best Efforts Letter. A reasonable jury could find that Graco essentially succeeded in precluding its competitors from accessing its distribution network.

*Factor Five: Barriers to Entry in the High Pressure SFE Market*

Significant barriers to entry exist if a dominant manufacturer's share is so large that distributors cannot risk losing access to its product and those same distributors are so entrenched that upstart manufacturers cannot compensate for lack of access by using alternate sales channels or sponsoring new distributors. *Dentsply Int'l*, 399 F.3d at 194-96. The president of High pressure SFE distributor Foampak asserted that he could not afford to risk his access to Graco product and therefore abstained from selling Gama product. Other named distributors apparently decided not to carry Gama high pressure SFE because they could not risk losing access to Graco product. Industry insiders assert that new high pressure SFE dealerships provide little market penetration and direct sales are not viable. Accordingly, a reasonable jury could find that Graco's control over its dominant high pressure SFE distribution network was a significant barrier to new market entrants.

*Factor Six: Coercive Character of Graco's Exclusive Dealing Agreements*

If a party is coerced into an exclusive dealing agreement that may indicate the party perceived the agreement as anticompetitive and support an identical jury finding. In *Race Tires America, Inc.*, the Third Circuit noted that the exclusive supply agreement between a tire manufacturer and auto racing circuit was sought out by both parties and that this weighed against a finding of anticompetitive conduct. 614 F.3d at 77-78. On the other hand, the finding of anticompetitive conduct in *Dentsply International* was supported by the fact that the dominant manufacturer

23

"imposed" an exclusive dealing regime on its distributors. *Race Tires,* 614 F.3d at 77 (citing *Dentsply, Int'l*, 399 F.3d at 184). There is evidence that certain Graco distributors wanted to sell Gama high pressure SFE but were convinced to decline Gama business by the Best Efforts Letter. A reasonable jury could find that Graco's exclusive dealing agreements were the product of coercion.

Viewing the evidence in the light most favorable to Gama, a reasonable jury could find that Graco engaged in anticompetitive conduct by transforming the best efforts clause in its distributor agreements into coercive exclusive dealing agreements.

There is an Issue of Fact as to Whether Graco's Pro-Competitive
Justifications are Pretextual.

As an affirmative defense, a Sherman Act Section 2 defendant can prove that its exclusive dealing agreement – although causing anticompetitive effects – was justified because it "promote[d] a sufficiently pro-competitive objective." *Dentsply Int'l*, 399 F.3d at 196-97. Valid justifications include: (1) preventing distributors from free-riding on marketing and services provided by the manufacturer, *Leegin Creative Leather Products., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890-91 (2007), and (2) reducing customer confusion, *See Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 60 (2d Cir. 1997) (dicta). Whether an asserted pro-competitive justification should be rejected as pretextual is a question of fact. *Digene Corp. v. Third Wave Techs., Inc.*, 323 F. App'x. 902, 910 (Fed. Cir. 2009); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1296 (11th Cir. 2004).

Graco asserts that its exclusive dealing agreements were justified because they prevented its distributors from free-riding on the training services that Graco provides and reduced the risk of customer confusion. As discussed above, these are both valid justifications.

24

However, Graco provides no contemporaneous evidence that the Best Efforts Letter was motivated by an emphasis on reducing customer confusion or preventing free-riding. Instead, Mr. McHale's contemporaneously indicated that Graco should bring out "the poison and traps" to stop Gama. Viewing the evidence in the light most favorable to Gama, a reasonable jury could find that Graco's pro-competitive justifications are a post hoc pretext.

There is a genuine issue of fact regarding the existence of both market power and anti-competitive conduct. Accordingly, Gama's monopolization claim may proceed forward.

<u>Attempted Monopolization Claim</u>

Section 2 of the Sherman Act prohibits "attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2 (2010). There are three elements of a Section 2 attempted monopolization claim: (1) predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving market power. *Race Tires*, 614 F.3d at 75 (citing *Spectrum*, 506 U.S. at 456).

As established above, there is a genuine issue of fact regarding whether Graco's exclusive dealing agreements with its distributors constitute anticompetitive conduct.

Specific intent to monopolize may be proven by showing that the defendant engaged in anti-competitive conduct without any pro-competitive justification. *See Broadcom*, 501 F.3d at 318 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 n.39 (1985)). As established above, there is a genuine issue of fact as to whether Graco engaged in anti-competitive conduct without any pro-competitive justification.

A "dangerous probability" of monopoly may be proven by showing that the defendant possessed a market share in excess of 60% and that barriers to entry limit customer choice. *See In*

25

*re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 700-01 (E.D. Pa. 2007) (citing *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 112 (3d Cir. 1992)).  As established above, there is a genuine issue of fact as to whether Graco has a 90% share and controls entry barriers in the North American market for high pressure SFE.

Accordingly, Gama's attempted monopolization claim may proceed forward.

The Trade Libel Claim

The sixth count in the Countercomplaint is for trade libel.  The Counterclaimants allege that "Graco [] published and communicated to third persons false statements about Counterclaimants, their property, and their business. "The elements of trade libel are: 1) publication; 2) with malice; 3) of false allegations concerning [the claimant's] property, product or business, and 4) special damages, i.e. pecuniary harm."  *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004) (citations omitted) (applying New Jersey law).  Graco asserts that this claim must fail because the Counterclaimants have presented no admissible evidence of special damages.  (Graco's Moving Br., pp. 36-37; Graco's Reply Br., pp. 23-24).

"[P]roof of damages is essential in an action for trade libel."  *Patel v. Soriano*, 848 A.2d 803, 834 (N.J. Super. Ct. App. Div. 2004).  Special damages can be shown by "identify[ing] particular business interests who have refrained from dealing with [the plaintiff.]"  *Patel*, 848 A.2d at 835 (denying summary judgment dismissal where plaintiff-physician lost half of her clients after alleged defamation); *see also Mayflower Transit*, 314 F. Supp. 2d at 378-79 (denying plaintiff's motion for summary judgment because no evidence on specific lost contracts or customers was presented).  The Counterclaimants argue that the declarations of two Gama distributors prove special damages.  The distributors declared that they had heard from potential customers who chose not to purchase Gama product because they heard from Graco that Gama was going out of business.  These distributors did

26

not identify the lost customers.  In fact, no evidence has been presented identifying any specific customer or contract that Gama lost because consumers heard Gama was exiting the business.  The Counterclaimants fail to raise a genuine issue of fact as to the existence of special damages.

Accordingly, the Counterclaimants' trade libel claim is dismissed.

<u>The Unfair Trade Practice Claims</u>

The fourth count of the Countercomplaint alleges that "Graco's conduct constitutes unfair trade practices as that concept is defined by the New Jersey Fair Trade Act ("Fair Trade Act"). Graco's conduct was not privileged or authorized under law."  The fifth count alleges that "Graco's conduct constitutes unfair competition."  The parties make no distinction between the common law and statutory claims in their papers.  Courts treat the two claims as identical.  *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, Inc., No. 97-1568, 2007 WL 979854, at *17 (D.N.J. Mar. 30, 2007) (citing *Duffy v. Charles Schwab & Co., Inc.*, 97 F. Supp. 2d 592, 600 & n.7 (D.N.J. 2000)). This Court will dismiss the common law claim because it duplicates the statutory claim.

The Fair Trade Act states that "[n]o merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals."  N.J.S.A. 56:4-1.  The Fair Trade Act "is equivalent to the federal unfair competition provision contained in Section 43(a) of the Lanham Act."  *CSC Holds., LLC v. Optimum Networks, Inc.*, 731 F. Supp. 2d 400, 411 (D.N.J. 2010) (citations omitted).  Plaintiff has the burden of showing: "(1) that the defendant has made false or misleading statements as to his own product or another's; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will,

etc." *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) (quotations and citations omitted).

Graco argues that this claim must fail because its alleged statements – that Gama was going out of business, that Gama products are "recycled" from old designs, and that Gama products are "knock offs" of Graco designs – were mere "puffery." (Graco's Moving Br., pp. 38-39). Puffery is not actionable. *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir 1993); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp .2d 384, 484 (D.N.J. 2009). Puffery is characterized by general claims of superiority or inferiority as opposed to claims regarding specific attributes or measurable aspects of a product. *Castrol*, 987 F.2d at 946. Whether a statement qualifies as puffery can be decided as a matter of law. *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection*, 911 F.2d 242, 245 (9th Cir. 1990); *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 21 (E.D.N.Y. 2009). Graco told potential customers that Gama would soon be exiting the high pressure SFE market. An implication of this is that Gama customers would be left without service support. Indeed, it appears that Graco promoted this conclusion. ("[T]he Graco rep [] Said [sic] . . . don't buy anything gama because you would be stuck with it."). The availability of customer service is a specific product characteristic that would be material to most customers. At this time, this Court cannot say that Graco's statements concerning Gama's viability are excusable as puffery. However, this Court notes that there is no indication that Graco has made any misleading statements regarding Mr. Commette.

Accordingly, Gama's Fair Trade Act claim may proceed forward and its common law unfair trade practices claim is dismissed as redundant. Both Mr. Commette's Fair Trade Act claim and common law unfair trade practices claim are dismissed.

Tortious Interference With Business Advantage Claim

The third count of the Countercomplaint alleges that "Graco is intentionally and unjustifiably interfering with Gama's business and Mr. Commette's livelihood." Tortious interference with business advantage requires proof of "(1) a reasonable expectation of economic advantage to plaintiff, (2) interference done intentionally and with 'malice,' (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages." *Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996) (citing *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 37 (N.J. 1989)). Graco asserts that this claim must fail because the Counterclaimants failed to submit evidence of (1) malicious conduct by Graco and (2) specific economic damages suffered by Gama or Mr. Commette

To constitute tortious interference, defendant's conduct must be both intentional and malicious. Malice is evinced by actions that are "transgressive of generally accepted standards of common morality or of law." *Lamorte Burns & Co. v. Walters*, 770 A.2d 1158, 1170, 1171 (N.J. 2001). Conduct that is fraudulent, dishonest, or illegal meets this test. *Lamorte Burns*, 770 A.2d at 1171 (citation omitted). In this case, the alleged wrongful conduct includes Graco's "repeated[] false and misleading statements to Gama customers" and "anticompetitive conduct in violation of the Sherman Act." As discussed above, Graco may have violated the Sherman Act. It cannot be said that, as a matter of law, Graco did not engage in malicious conduct.

Economic damages are a substantive element of a tortious interference claim. These damages must be identified with a certain degree of specificity. "[C]laimed loss of . . . unknown customers" is insufficient. *Eli Lilly and Co. v. Roussel Corp.*, 23 F. Supp.2d 460, 494 (D.N.J.1998) (applying New Jersey law) (quoting *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.*, 801 F. Supp. 1450, 1459 (E.D. Pa.1992) (applying Pennsylvania law)); *c.f. Patel*, 848 A.2d at 835 (lost customer is proper

29

proof of special damages in trade libel claim).  The president of Graco distributor Foampak has asserted that Foampak would have carried Gama product absent Graco's exclusive dealing requirement.  A reasonable jury could find that Foampak was a potential Gama customer lost due to Graco's tortious interference.  However, the Counterclaimants have not identified any evidence that Mr. Commette has suffered economic damages.

Accordingly, Gama's tortious interference claim may proceed forward, but Mr. Commette's claim is dismissed.

## ORDER

For the reasons set forth in the above Memorandum,

IT IS on this 15th day of February, 2012

ORDERED that Graco's Motion for Summary Judgment dated June 10, 2011 (Docket Entry 616) is granted in part and denied in part; and it is further

ORDERED that Mr. Commette's counterclaims (Counts One through Six) are dismissed; and it is further

ORDERED that Gama's counterclaims (Count Five and Count Six) are dismissed; and it is further

ORDERED that Gama's counterclaim alleging a Sherman Act violation is limited to a Section 2 violation of high pressure spray foam equipment in North America.


_s/Peter G. Sheridan_____
PETER G. SHERIDAN, U.S.D.J.